# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ISABEL LITOVICH, MICHAEL V. COTTRELL, FRANK HIRSCH, HOLDCRAFT MARITAL TRUST, and UNITED FOOD AND COMMERCIAL WORKERS UNION AND PARTICIPATING FOOD INDUSTRY EMPLOYERS TRI-STATE PENSION FUND, on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA CORPORATION; MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; BofA SECURITIES, INC.; BARCLAYS CAPITAL INC.; CITIGROUP INC.; CITIGROUP GLOBAL MARKETS INC.; CREDIT SUISSE SECURITIES (USA) LLC; DEUTSCHE BANK SECURITIES INC.; THE GOLDMAN SACHS GROUP, INC.; GOLDMAN, SACHS & CO., LLC; JPMORGAN CHASE & CO.; J.P. MORGAN SECURITIES LLC; MORGAN STANLEY; MORGAN STANLEY & CO., LLC; MORGAN STANLEY SMITH BARNEY LLC; NATWEST MARKETS SECURITIES INC.; WELLS FARGO & CO.; WELLS FARGO SECURITIES LLC; and WELLS FARGO CLEARING SERVICES, LLC,<br><br>Defendants. | Case No. 20-cv-03154<br><br>Hon. Lewis J. Liman |

## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

## **TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

JURISDICTION AND VENUE ..................................................................................... 8

PARTIES ........................................................................................................................ 9

AGENTS AND CO-CONSPIRATORS ....................................................................... 19

FACTUAL ALLEGATIONS ........................................................................................ 20

I.      CORPORATE BONDS ....................................................................................... 20

      A.     Basics of Corporate Bonds.......................................................................... 20

      B.     Corporate Bonds Are Traded Over-the-Counter ("OTC") .................................... 22

      C.     OTC Trading in the Secondary Market Is Highly Concentrated ......................... 26

      D.     Round Lot vs. Odd-Lot Trading ................................................................... 28

II.     ECONOMIC EVIDENCE DEMONSTRATES DEFENDANTS' CONSPIRACY
      TO CHARGE SUPRA COMPETITIVE PRICES FOR ODD-LOTS BONDS
      VERSUS ROUND LOT BONDS....................................................................... 29

      A.     Peer-Reviewed Econometric Research Shows that Dealers Consistently
           Charge Investors in Odd-Lots of Corporate Bonds Higher Bid-Offer
           Spreads than Round Lot Investors ......................................................... 29

      B.     Plaintiffs' Expert Analysis Confirms that Defendants Charge Higher
           Transaction Costs to Odd-Lots Investors than Round Lot Investors ................. 34

           1.     Dealers Charged Wider Spreads for Odd-Lots vs. Round Lots............... 34

           2.     Defendants Charged Average Wider Spreads for Odd-Lots vs.
                Round Lots ....................................................................................... 37

           3.     Defendants Charged Average Wider Spreads than Non-Defendants ....... 39

           4.     RPT Analysis Shows that Transaction Costs for Customer-Initiated
                Sales Are Higher than Other Odd-Lot Trades ......................................... 40

            5.     Defendants Obtained Significantly Lower Execution Prices for
                Customer-Initiated Sales of Odd-Lots vs. Round Lots............................ 42

           6.     Economic Analysis of a Sample of Plaintiff's Trades Demonstrates
                Defendants Consistently Charged Plaintiffs Higher Transaction
                Costs for Odd-Lots Trades ................................................................... 45

      C.     Foreign Odd-Lot Bond Trading Demonstrates that the Adverse Pricing of
           Bond Odd-Lots Is Not Explained by Limitations in Liquidity ........................ 47

      D.     Historical Evidence in the U.S. Demonstrates Odd-Lots of Bonds Did
           Not Trade at Adverse Prices Compared to Round Lots.................................. 51

III.    DEFENDANTS ENGAGED IN A PATTERN OF COLLUSIVE CONDUCT TO
      RESTRICT COMPETITION FROM ELECTRONIC PLATFORMS THAT
      SOUGHT TO IMPROVE PRICING FOR ODD-LOT BOND INVESTORS ............... 52

A.   Defendants' Pattern of Punishing Dealers Who Might Engage in Competitive Trading Activity.................................................................. 55

B.   Dealers Shut Down the InterVest Trading System ................................. 56

C.   Defendants' Joint Ownership of TradeWeb Allowed Them to Stifle Competition from Electronic Platforms that Threatened to Improve Odd-Lot Pricing ..................................................................................... 57

D.   Defendants' Group Boycott and Collusive Effort to Deny and/or Delay ABS/NYSE Bonds from Gaining Access to Bloomberg's Trade Order Management System ("TOMS")............................................................... 61

E.   Defendants' Refusal to Participate with Bonds.com ............................. 63

F.   Defendants Abused Their Board Positions on BondDesk to Remove Leadership that Had Pursued Offering Retail-Sized Odd-Lot Investors More Transparency and Better Pricing ................................................... 65

G.   Defendants Use TradeWeb (Which They Owned) to Acquire BondDesk and Permanently Foreclose BondDesk as a Retail-Focused Platform......................... 67

H.   Other Retail Focused Electronic Platforms for Trading Bonds Failed Due to Defendants' Resistance ............................................................. 71

I.   The Survival of Electronic Platforms that Are Only Open to Institutional Investors Is Further Proof of Defendants' Anticompetitive Conduct.................. 72

IV.   DEFENDANTS ARE ALLEGED TO HAVE ENGAGED IN SUBSTANTIALLY SIMILAR CONDUCT IN OTHER TRADING MARKETS TO RESTRAIN THE EVOLUTION FROM OTC TRADING TO ELECTRONIC TRADING, INCLUDING EXCHANGES ................................................................ 75

A.   Credit Default Swaps ........................................................................... 75

B.   Interest Rate Swaps............................................................................... 76

C.   Stock Loan Market ............................................................................... 78

V.   OTHER SECTION 1 VIOLATIONS SHOW DEFENDANTS' CALLOUS INDIFFERENCE TOWARD THE ANTITRUST LAWS .............................. 79

A.   LIBOR/Euribor/Yen LIBOR/Swiss Franc LIBOR............................... 79

B.   Foreign Currency Exchange Spot Market............................................. 80

C.   ISDAfix.................................................................................................. 81

D.   Mexican Government Bonds ................................................................. 81

E.   GSE Bonds ............................................................................................ 82

F.   Precious Metals..................................................................................... 82

VI.   PLUS FACTORS DEMONSTRATE DEFENDANTS' CONDUCT CANNOT BE EXPLAINED AWAY AS MERE PARALLEL CONDUCT................................... 83

A.  Peer-Reviewed Research Demonstrates Actions Against Unilateral Self-Interest in the Absence of an Agreement ...................................... 83

B.  Analysis of Riskless Principal Trades Demonstrates Actions Against Unilateral Self-Interest in the Absence of an Agreement ..................................... 84

C.  The Market Is Highly Concentrated .................................................... 84

D.  Common Motive to Conspire ............................................................. 85

E.  No Legitimate Economic Justifications Explain the Magnitude of Adverse Pricing for Odd-Lot Trades of Corporate Bonds vs. Round Lot Trades of the Same Bond Issue ............................................................. 85

F.  There Are High Levels of Interfirm Communication Between Defendants ......... 87

**G.**  The Higher Prices for Odd-Lot Transactions Have Persisted Even as Advances in Electronic Trading Have Driven Defendants' Trading Costs Down and Demand for Odd-Lot Bond Transactions Has Increased ................... 88

VII.  RELEVANT MARKET DEFINITION ............................................................ 88

VIII.  IMPACT OF DEFENDANTS' CONDUCT ON RELEVANT MARKETS AND INVESTORS ..................................................................................... 90

ANTITRUST INJURY ............................................................................... 91

FRAUDULENT CONCEALMENT ................................................................ 91

CLASS ACTION ALLEGATIONS ................................................................ 97

CLAIM FOR RELIEF ............................................................................... 99

REQUEST FOR RELIEF .......................................................................... 101

JURY TRIAL DEMAND ........................................................................... 102

Plaintiffs Isabel Litovich, Michael V. Cottrell, Frank Hirsch, Holdcraft Marital Trust, and United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund, individually and on behalf of all others similarly situated (the "Class"), bring this consolidated class action complaint against Defendants Bank of America Corporation; Merrill Lynch, Pierce, Fenner & Smith, Inc.; BofA Securities, Inc.; Barclays Capital Inc.; Citigroup Inc.; Citigroup Global Markets Inc.; Credit Suisse Securities (USA) LLC; Deutsche Bank Securities Inc.; The Goldman Sachs Group, Inc.; Goldman, Sachs & Co., LLC; JPMorgan Chase & Co.; J.P. Morgan Securities LLC; Morgan Stanley; Morgan Stanley & Co., LLC; Morgan Stanley Smith Barney LLC; NatWest Markets Securities Inc.; Wells Fargo & Co.; Wells Fargo Securities LLC; and Wells Fargo Clearing Services, LLC for damages and injunctive relief pursuant to Section 1 of the Sherman Act, 15 U.S.C. §1; and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

## INTRODUCTION

1.      History demonstrates that when trading markets through innovation and competitive forces evolve from traditional voice-based over-the-counter ("OTC") markets to electronic exchange trading, trading volume increases while transactional costs per trade paid by investors plummet.  While investors benefit from increased efficiencies in the market's evolution, the dealers in the OTC markets see their control over information and pricing – and therefore profits per trade – greatly diminish.  Faced with an evolution in their trading markets, dealers must adapt to the new competitive landscape by competing on price.  Unfortunately, dealers can also choose to unlawfully band together to restrain marketplace innovation and price competition.  In this case, the dealers chose the latter.

2.      This case involves a conspiracy by Defendants from at least August 1, 2006 to the present ("Class Period") to restrain electronic advances in the marketplace that would have reduced

1

transactional costs for investors in odd-lots of corporate bonds to the detriment of Defendants' trading profits.  Plaintiffs and other similarly situated investors (the "Class") have bought and sold odd-lots of corporate bonds in the secondary market directly from and to Defendants, who are horizontal competitors.  As a result of Defendants' conspiracy, Plaintiffs and the Class paid more when buying, and received less when selling, their corporate bonds, suffering antitrust injury under Section 1 of the Sherman Act, 15 U.S.C. §1.[1]

3.      The U.S. corporate bond market is among the world's largest and deepest sources of business capital.  Companies issue and sell new bonds to one or more registered securities firms ("dealers") in the primary market in individual offerings of a given total amount, known as an "issue."  Each bond in a given issue is identical to all other bonds in that issue.

4.      Upon their purchase in the primary market, dealers generally resell groups of those new bonds in private transactions, and thereafter trade the bonds with other dealers and investors in the secondary market.  Unlike equities, which investors trade anonymously with other investors on exchanges where the current best buying ("bid") and selling ("offer") prices are displayed in real time, bond investors in the United States, such as Plaintiffs, must trade bonds individually with dealers in the secondary over-the-counter ("OTC") market maintained by those and other dealers.  In that private market (also known as the "dealer market"), dealers generally disclose only their own bid or offer price; no competing bids or offers from other dealers are disclosed to Investors like Plaintiffs.  The market's pricing is opaque.

---

[1]      Throughout this complaint, the term "bond" is used.  Unless the context demonstrates otherwise, the use of the word "bond" should be read to specifically mean "corporate bonds" as opposed to other types of bonds, such as U.S. Treasuries, municipal bonds, government-sponsored enterprise (GSE) bonds, SSAs, European bond, Mexican bonds, etc.

5.     Within the OTC market, corporate bond quotes and trades are also categorized based on the lot size (the number of bonds included) of the trade.  "Round lots" consist of any trade involving increments of 1,000 bonds, or that is greater than and divisible by $1 million in par value.  "Odd-lots" generally consist of bond trades involving less than 1,000 bonds, or that is less than $1 million in par value.  Because bonds being traded from the same issue are fungible, odd-lots of that issue can be combined into a round lot, and, conversely, a round lot of a given issue can be broken into odd-lots of that issue.  Bonds of the same company from different issues, and bonds issued by different companies that receive comparable "ratings" from nationally recognized ratings organizations, such as Moody's, S&P, or Fitch, and are of comparable maturities, are also highly interchangeable.

6.     In the OTC market, Defendants are dealers for both round lots and odd-lots of corporate bonds.  As dealers, Defendants generally provide either a bid price at which they are willing to purchase lots of a specific bond or an offer price at which they are willing to sell lots of such bonds.  Plaintiffs and the Class are Defendants' customers.  They buy corporate bonds from, and sell corporate bonds to, dealers in that market, and can only determine current market prices based on the individual bids and offers privately quoted by dealers.

7.     The difference between the bid price and the offer price is known as the "bid-offer spread" or the "spread."  As dealers, Defendants prefer wider spreads.  Defendants wish to buy bonds (at the bid) from Plaintiffs and the Class at the lowest price possible and sell bonds (at the offer) to Plaintiffs and the Class at the highest price possible.  Defendants capture the bid-offer spread (the spread) as compensation for their dealing activities, and wider spreads increase Defendants' ability to make profits.

8.      In contrast, spreads are a transaction cost for Plaintiffs and the Class.  Plaintiffs and the Class prefer narrower spreads.  Plaintiffs and the Class want to buy at the lowest price available and sell at the highest price available, increasing their ability to make profits when buying or selling bonds.

9.      In the OTC market, odd-lot trades comprise the vast majority of all corporate bond trades by number of trades.  For example, in 2017, 2018, and 2019, approximately 90% of corporate bond trades were less than $1 million in size.  Corporate bond trades of less than $100,000, a subset of odd-lots which are sometime referred as "micro lots" by bond traders and academics, comprise approximately 70% of all trades in the same years, and are the trades most likely, but not always, made by individual investors (known as retail investors).

10.     Defendants display remarkable parallel pricing in terms of odd-lots versus round lots.  Despite the high number of odd-lot trades executed by dealers and the fact that such trades are qualitatively identical to round lot trades, Defendants demand odd-lot investors, such as Plaintiffs and the Class, pay spreads that are 25% to 300% higher than investors trading in round lots of the same issue.  The highest spreads are typically paid by retail investors, who buy in the smallest increments.  The difference in spreads between odd-lots of any size and round lots of the same issue, though, occurs at all increments.  This pricing disparity has been demonstrated by 11 different peer-reviewed econometric studies, and is confirmed by Plaintiffs' own empirical analyses of bonds where Defendants have acted as dealer.  That is, Plaintiffs have demonstrated, through economic analysis, parallel pricing by each of the Defendants in terms of their discriminating between spreads for odd-lots and round lots.  Because of Defendants' domination of the secondary market for corporate bonds, odd-lot investors therefore face substantially higher

trading costs per bond than round lot investors, and Defendants dealing in odd-lot transactions reap higher compensation from their higher spreads.

11.     Defendants' pricing disparities between odd-lots and round lots constitute parallel conduct.  No reasonable economic justification explains the magnitude of the pricing disparity between odd-lot and round lot trades of the same issue or each of the Defendant's parallel conduct in this regard.  In a truly competitive market, multiple factors, such as advances in technology that improve pre-trade price transparency and dealers' competitive desire to secure a greater share of the growing odd-lot market, suggest that Defendants should be narrowing their spreads on odd-lots toward parity with the already profitable round lot trades, as dealers obtain and thus seek to execute greater trading volumes than their competitors.  Narrowing their spreads for odd-lot trades toward the spreads they receive for round lot trades is in the unilateral, economic self-interest of each Defendant.  Such narrowing could enable each Defendant to individually profit by increasing its proportionate share of the market for odd-lot trading in U.S. corporate bonds.  But in this market, the economic evidence shows Defendants do not compete on price.  One would expect, if Defendants were competing, for one to break ranks.  Instead, acting in parallel, each and every Defendant has charged anticompetitively higher spreads on their odd-lot transactions than on their even-lot transactions for bonds from the same exact issue.

12.     Moreover, as with any market, this pricing disparity should provide an incentive for competition.  Improved pre-trade transparency on pricing, and, therefore, reduced transaction costs to investors, would result from electronic trading platforms.  Such platforms, such as NASDAQ, successfully took over equity markets long ago.

13.     All-to-all electronic trading should have been a natural evolution for odd-lot bonds, as well.  Institutional and retail investors have long clamored for such platforms.  But in the face

of this customer demand, Defendants ignored the logical competitive response of meeting customer demand available technological innovations, and instead, repeatedly and collectively stifled efforts to prevent this evolution in the market for odd-lot trading in corporate bonds. According to a report by Greenwich Associates LLC based on interviews with Defendants, "the top five dealers by market share saw the current e-trading evolution as more of a threat than an opportunity. . . ."  Bloomberg recently noted that in U.S. corporate bond trading "[t]here aren't any exchanges and everything is negotiated, which gives dealers the upper hand when it comes to where the market is for a given bond . . . enabling the biggest firms, like JPMorgan and Goldman Sachs, to keep a stranglehold on the market. . . .  The bond market is littered with startups that have tried – and failed – to loosen Wall Street's grip on bond trading and make it more efficient."[2]

14.    The litter of failed bond trading startups strewn across the bond marketplace is no accident of competitive forces.  Defendants conspired to consistently shut down innovations in bond trading through group boycotts of electronic platforms that would increase pre-trade pricing transparency for investors dealing in odd-lots, and odd-lot-focused electronic trading platforms that would have afforded access to investors whose trading would have lessened the spread disparity between odd-lot transactions and round lot transactions.

15.    Defendants' collusion was facilitated by their joint ownership and control of 46% of TradeWeb.  TradeWeb is an electronic platform in which all named Defendants have invested. Through their parallel investments, Defendants foreclosed retail odd-lot investors from using TradeWeb – even though in a competitive market, Defendants would be expected to ***encourage*** the use of an electronic platform in which they each had an investment.  Defendants also used

---

[2]    Nick Baker and Matthew Leising, *Ex-Goldman Exec Pushes '70s Fix for Bond Market's Big Problem*, BLOOMBERG (June 25, 2018), https://www.bloomberg.com/news/articles/2018-06-25/ex-goldman-exec-touts-70s-era-fix-to-bond-market-s-big-problem.

TradeWeb during the Class Period as a "stalking horse" to catch and kill electronic platforms that would have made bond trading more transparent and that threatened Defendants' hegemony as OTC dealers. Defendants' actions have protected their supracompetitive profits from wider odd-lot spreads.

16.     Other evidence, known as plus factors, also supports the conclusion that the wider odd-lot spreads paid by Plaintiffs and the Class are the result of an anticompetitive, horizontal agreement among Defendants to restrict competition throughout the Class Period and not merely the result of "conscious parallelism." Plaintiffs allege the following plus factors:

- Eleven different academic studies demonstrate statistically significant differences between actual and competitive prices between odd-lots and round lots.

- Plaintiffs' own expert analysis of Riskless Principal Trades implemented by Defendants demonstrate economically and statistically significant differences in transaction costs between round lot and odd-lot trades.

- Plaintiffs' own expert analysis showing the adverse direct effects, by Defendant, on odd-lot trades by Plaintiff UCFW as evidence of their ability to charge supracompetitive prices.

- Defendants control the vast majority of trading, such that the market is highly concentrated.

- Defendants have a common motive to conspire to maintain their control of the highly concentrated, lucrative, and pricing opaque secondary market of OTC trading in corporate bonds.

- Odd-lot trades offered in international bond markets with lower volumes and less liquidity than the U.S. market trade at significantly narrower odd-lot spreads than round lot spreads seen in the U.S.

- Defendants regularly communicate pricing information (via Bloomberg messaging, and/or through the electronic platforms that they prevent retail investors from directly accessing) that they withhold from investors dealing in odd-lots in order to maintain higher spreads on odd-lot bond transactions than those for round lots.

- Wider spreads for odd-lots persist even as advances in electronic trading as seen in other financial markets should have made trading cheaper and easier for Defendants and therefore lower cost for their customers.

- In a competitive market untainted by collusive conduct, any individual Defendant could easily narrow its odd-lot spreads toward greater parity with its round lot spreads while making a profit, and thereby capture a greater percentage of the total market in odd-lot trading at still profitable round lot spreads.

17.     Taken together, these allegations, as more fully set forth below, more than plausibly demonstrate that beginning at least as early as August 1, 2006,[3] Defendants agreed to restrain competition in the secondary trading market for odd-lots of corporate bonds in the United States. Further, as a direct and proximate result of Defendants' unreasonable restraint, Plaintiffs and the Class suffered harm in the form of artificially higher transaction costs for odd-lot corporate bond transactions, by way of artificially higher bid-ask spreads, than they would have paid but for Defendants' antitrust violations.  Plaintiffs therefore bring this class action alleging a violation of Section 1 of the Sherman Act to obtain relief for themselves and the Class.

## JURISDICTION AND VENUE

18.     The Court has subject matter jurisdiction over Sherman Act claims pursuant to 28 U.S.C. §§1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

19.     The Court has personal jurisdiction over Defendants subject to service under Section 12 of the Clayton Act, 15 U.S.C. §22.  Defendants' collusive acts took place, in substantial part, in New York specifically and in the United States generally.  These acts were conducted by persons and entities subject to the laws of the United States, including New York, as well as other states and territories.

---

[3]     August 1, 2006 is selected as the beginning of the Class Period because beginning in July 2006, corporate bond trade pricing data was required to be reported by the Financial Industry Regulatory Authority ("FINRA") via its public Trade Reporting and Compliance Engine ("TRACE") system.  As discussed further in this complaint, this TRACE data demonstrates that Defendants are not competing on odd-lot bid-offer pricing.  Discovery will likely show that Defendants were engaging in anticompetitive behavior long before August 1, 2006 and enable Plaintiffs to lengthen the Class Period.

20.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Antitrust Act, 15 U.S.C. §§15, 22, and 26, and 28 U.S.C. §1391(b), (c), and (d).  One or more Defendant resides, transacts business, is found, or has agents in this District, a substantial part of the events giving rise to Plaintiffs' claims arose in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

21.     Defendants' acts were within the flow of, were intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States.

## PARTIES

22.     Plaintiff Isabel Litovich is a citizen of San Juan, Puerto Rico.  Plaintiff Litovich held a client account with Defendant Morgan Stanley in which she traded odd-lots of corporate bonds (including, specifically, bonds issued by Harrahs Operating Co. Inc., CUSIP 413627BM1, purchased on March 25, 2013) during the Class Period at prices that were impacted by Defendants' misconduct and/or in transactions that occurred directly with one or more Defendant (specifically Morgan Stanley), and suffered economic injury as a result of Defendants' misconduct.

23.     Plaintiff Michael V. Cottrell is a citizen of the state of Maryland.  Plaintiff Cottrell held a client retirement account with Fidelity in which he held odd-lots of corporate bonds that he had traded during the Class Period at prices that were impacted by Defendants' misconduct and/or in transactions that occurred directly with one or more Defendant, and suffered economic injury as a result of Defendants' misconduct.  These bonds included, but were not limited to, bonds issued by:  Goldman Sachs Group, Inc., CUSIP 38150AA39, purchased on June 15, 2018; Ford Motor Credit Company, CUSIP 34540TTE2, purchased June 18, 2018; Caterpillar Financial Corp., CUSIP 14912HUN8, purchased June 18, 2018; Philip Morris International, Inc., CUSIP 718172BZ1, purchased on December 20, 2018; Medtronic Inc., CUSIP 585055AX4, purchased on December 20, 2018; GlaxoSmithKline Capital PLC, CUSIP 377373AE5, purchased on

December 20, 2018; Gilead Sciences Inc., CUSIP 375558BB8, purchased on December 20, 2018; John Deere Capital Corp., CUSIP 24422ETF6, purchased December 20, 2018; Burlington Northern Santa Fe, CUSIP 12189LAH4, purchased December 20, 2018; Altria Group Inc., CUSIP 02209SAT0, purchased December 20, 2018; JPMorgan Chase & Co., CUSIP 46625HJE1, purchased May 13, 2019; Charles Schwab Corp., CUSIP 808513AT2, purchased May 13, 2019; Apple Inc., CUSIP 037833CG3, purchased May 13, 2019; and Potomac Electric Power Co., CUSIP 737679DG2, purchased August 13, 2019.

24.     Plaintiff Frank Hirsch is a citizen of Deerfield, Illinois.  Plaintiff Hirsch held two accounts (an SEP IRA and an account for the Frank Hirsch Family Trust) with Charles Schwab in which he and/or his financial advisor acting on his behalf traded odd-lots of corporate bonds during the Class Period at prices that were impacted by Defendants' misconduct and/or in transactions that occurred directly with one or more Defendant, and suffered economic injury as a result of Defendants' misconduct.  These bonds included, but were not limited to, bonds issued by:  General Electric Capital, CUSIP 36962G3K8, purchased November 14, 2011; Toyota Motor Credit, CUSIP 89233PA48, purchased November 17, 2011; and Home Depot, CUSIP 437076BG6, purchased March 23, 2020.

25.     Plaintiff Holdcraft Marital Trust is a trust organized under the laws of Florida. Plaintiff Holdcraft Marital Trust held an account with Wells Fargo Advisors in which its trustees and/or its financial advisor acting on its behalf traded odd-lots of corporate bonds during the Class Period at prices that were impacted by Defendants' misconduct and/or in transactions that occurred directly with one or more Defendant (specifically with Wells Fargo), and suffered economic injury as a result of Defendants' misconduct.  These bonds were traded with Wells Fargo as the broker dealer and included, but were not limited to, bonds issued by:  Goldman Sachs Group, Inc., CUSIP

38141EY29, purchased October 30, 2013; General Electric Capital Corp., CUSIP 36962G4R2, purchased October 30, 2013; JPMorgan Chase & Co., CUSIP 46625HHZ6, purchased October 30, 2013; Safeway Inc., CUSIP 786514BU2, purchased October 30, 2013; Citigroup Inc., CUSIP 172967JT9, purchased November 17, 2015; Dow Chemical Co., CUSIP 26054LF81, purchased August 10, 2015; Ford Motor Credit Co. LLC, CUSIP 34540TTL4, purchased March 29, 2016; Ford Motor Credit Co. LLC, CUSIP 34540TLV2, purchased May 16, 2016; General Motors Financial Co., CUSIP 37045XBQ8, purchased May 2, 2017; AT&T Inc., CUSIP 00206RDQ2, purchased May 2, 2017; and Citigroup Inc., CUSIP 172967KU4, purchased May 2, 2017.

26.     Plaintiff United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund ("UFCW") is a multi-employer and multi-union employee based benefit plan based in Plymouth Meeting, Pennsylvania.  Through its investment advisers acting on its behalf, Plaintiff UFCW traded odd-lots of corporate bonds directly with certain Defendants during the Class Period.  While UFCW is a pension fund, it routinely trades in odd-lots of corporate bonds directly with Defendants through its investment advisors acting on its behalf, and thus suffers the same injuries as retail investors who trade in odd-lots at inferior spreads as a result of Defendants' misconduct.  As a result, the trades that Plaintiff UFCW makes in odd-lot increments result in the same economic injury suffered by retail investors who trade in the same odd-lot increments.  Odd-lot trades of corporate bonds by UFCW were made with Defendants Bank of America, Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan Chase, Morgan Stanley, and Wells Fargo.  A list of such trades have been attached as Exhibit A to this First Amended Consolidated Class Action Complaint.

27.     Defendant Bank of America Corporation ("BAC") is a Delaware corporation headquartered at 100 North Tryon Street, Charlotte, North Carolina 28255.  Through its bank and

non-bank subsidiaries, BAC, a publicly traded bank holding company, provides a range of financial services and products across the United States.  BAC operates four business segments, including Consumer Banking, Global Wealth and Investment Management ("GWIM"), Global Banking, and Global Markets.  BAC's Global Markets business segment offers sales and trading services to institutional clients across fixed-income, credit, currency, and equity businesses. Global Markets' activities are executed through BAC's global network of bank and broker-dealer entities.  Among Global Markets' "Core Business Lines" (as defined by Rule 165(d) of Dodd-Frank) is "Global Credit and Special Situations," which is a dealer in the bonds and loans of corporate issuers whose coverage includes investment-grade issuers in the U.S.  BAC's GWIM business provides comprehensive wealth management services to individuals, businesses, and institutions, including a full set of investment management, brokerage, banking, and lending solutions.  BAC finances its business using a globally-coordinated funding strategy to provide greater control, consistency, and wider name recognition with investors.

28.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") is a Delaware corporation with its headquarters at One Bryant Park, 1111 Avenue of the Americas, New York, New York 10036, and is an indirect subsidiary of Bank of America Corporation. Defendant Merrill Lynch is a "Material Entity" within BAC, as defined by Rule 165(d) of Dodd-Frank, meaning it is a subsidiary that is significant to the activities of a Core Business Line. Through year-end 2018, Merrill Lynch was the primary U.S. broker-dealer for BAC, serving corporate, institutional, retail through BAC's GWIM, and Global Markets businesses.  In May 2019, BAC separated the institutional and retail brokerage business within Merrill Lynch with the retail brokerage business remaining within Merrill Lynch.

29.     Defendant BofA Securities, Inc. is a Delaware corporation with its headquarters at One Bryant Park, 1111 Avenue of the Americas, New York, New York 10036, and is an indirect subsidiary of BAC.  BofA Securities is a U.S. licensed broker-dealer which, as of May 2019, is responsible for BAC's institutional brokerage business for the GWIM and Global Markets business segments.

30.     Defendants BAC, Merrill Lynch, and BofA Securities, Inc. are referred to collectively in this complaint as "Bank of America."  Bank of America traded odd-lots of corporate bonds in the United States with Plaintiffs and/or the Class during the Class Period, and as a result of the conduct alleged herein, Bank of America charged unlawful, artificial prices to Plaintiffs and/or the Class.  Bank of America, as used in this complaint, includes all of Bank of America's predecessors, subsidiaries, or affiliates that played a material role in the unlawful acts alleged herein.

31.     Defendant Barclays Capital Inc. ("Barclays") is a Connecticut corporation with its headquarters at 745 7th Avenue, New York, New York 10019.  Barclays is a U.S. licensed broker-dealer and is a material U.S. operating entity of Barclays PLC, a public limited company.  Barclays engages in investment banking, wealth management, and investment management services in the United States.  Through its Credit core business line, Barclays acts as a dealer for, among other things, corporate bonds.

32.     Barclays traded odd-lots of corporate bonds in the United States with Plaintiffs and/or the Class during the Class Period, and as a result of the conduct alleged herein, Barclays charged unlawful, artificial prices to Plaintiffs and/or the Class.  Barclays, as used in this complaint, includes all of Barclays' predecessors, subsidiaries, or affiliates that played a material role in the unlawful acts alleged herein.

33.     Defendant Citigroup Inc. ("Citi") is a Delaware corporation headquartered at 390-388 Greenwich Street, New York, New York 10013.  Citi is a publicly traded registered bank holding company that conducts its business through three segments:  Global Consumer Banking, Institutional Clients Group, and Corporate/Other.  Citi's three main business lines consists of Banking, Market & Securities Services, and Global Consumer Banking.

34.     Defendant Citigroup Global Markets Inc. ("CGMI") is a New York corporation with its headquarters at 390-388 Greenwich Street, New York, New York 10013.  It is an indirect subsidiary of the parent, Citi.  CGMI is Citi's primary U.S. licensed broker-dealer.  CGMI is a market-maker in equities, and a dealer in fixed income securities and commodities.  It provides a full range of products and services, including, among other things, sales and trading, institutional brokerage to a wide range of corporate, institutional, public sector and high-net-worth clients.

35.     Defendants Citigroup Inc., and CGMI are referred to collectively in this complaint as "Citigroup."  Citigroup traded odd-lots of corporate bonds in the United States with Plaintiffs and/or the Class during the Class Period, and as a result of the conduct alleged herein, Citigroup charged unlawful, artificial prices to Plaintiffs and/or the Class.  Citigroup, as used in this complaint, includes all of Citigroup's predecessors, subsidiaries, or affiliates that played a material role in the unlawful acts alleged herein.

36.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a Delaware limited liability company with its headquarters at 11 Madison Avenue, New York, New York 10010.  It is a U.S. licensed broker-dealer and the main U.S. operating company of its ultimate parent, Credit Suisse Group AG, a global financial holding company.  It operates as an investment bank in the United States.  Its businesses include securities underwriting, sales and trading,

investment banking, private equity, alternative assets, financial advisory services, investment research, and asset management.  Credit Suisse is a leading dealer in private and public debt.

37.     Credit Suisse traded odd-lots of corporate bonds in the United States with Plaintiffs and/or the Class during the Class Period, and as a result of the conduct alleged herein, Credit Suisse charged unlawful, artificial prices to Plaintiffs and/or the Class.  Credit Suisse, as used in this complaint, includes all of Credit Suisse's predecessors, subsidiaries, or affiliates that played a material role in the unlawful acts alleged herein.

38.     Defendant Deutsche Bank Securities, Inc. ("Deutsche Bank"), is a Delaware corporation with its headquarters at 60 Wall Street, New York, New York 10005.  It is a full service broker-dealer providing brokerage and investment advisory service, investment banking services and other services.  Its main activities include, among other things, fixed income sales and trading and dealer services.  It is one of two subsidiaries through which its ultimate parent, Deutsche Bank AG, primarily operates in the United States.

39.     Deutsche Bank traded odd-lots of corporate bonds in the United States with Plaintiffs and/or the Class during the Class Period, and as a result of the conduct alleged herein, Deutsche Bank charged unlawful, artificial prices to Plaintiffs and/or the Class.  Deutsche Bank, as used in this complaint, includes all of Deutsche Bank's predecessors, subsidiaries, or affiliates that played a material role in the unlawful acts alleged herein.

40.     Defendant The Goldman Sachs Group, Inc. ("Group Inc.") is a Delaware corporation headquartered at 200 West Street, New York, New York 10282.  It is a bank holding company and a financial holding company regulated by the U.S. Federal Reserve System ("Federal Reserve").  It reports its activities in four business segments, including "Investment Banking," "Institutional Client Services," and "Investment Management."  Group Inc. raises capital for the

company and sends its downstream to its subsidiaries to support their business activities.  In turn, Group Inc. depends on dividends, distributions, and other payments from its subsidiaries to fund its obligations.

41.     Defendant Goldman, Sachs & Co. LLC ("GS&Co.") is a New York limited liability company with its headquarters at 200 West Street, New York, New York 10282.  It is a direct wholly-owned subsidiary of Group, Inc., and is its principal operating subsidiary in the United States.  GS&Co. is a broker-dealer and is responsible for Group Inc.'s Investment Banking, Institutional Client Services, and Investment Management business in the United States.  Through its Institutional Client Services business, GS&Co. provides financial products to its clients and acts as dealer, including in investment grade corporate bonds.

42.     Defendants Group, Inc. and GS&Co. are referred to collectively in this complaint as "Goldman Sachs."  Goldman Sachs traded odd-lots of corporate bonds in the United States with Plaintiffs and/or the Class during the Class Period, and as a result of the conduct alleged herein, Goldman Sachs charged unlawful, artificial prices to Plaintiffs and/or the Class.  Goldman Sachs, as used in this complaint, includes all of Goldman Sachs' predecessors, subsidiaries, or affiliates that played a material role in the unlawful acts alleged herein.

43.     Defendant JPMorgan Chase & Co. ("JPMorgan Chase") is a Delaware corporation headquartered at 270 Park Avenue, New York, New York 10017.  It is a financial holding company regulated by the Federal Reserve.  It reports its activities in five business segments, including "Corporate & Investment Bank" and "Asset & Wealth Management."  JPMorgan Chase issues debt and equity securities in the capital markets and uses those proceeds to fund and support its subsidiaries and their business activities.  In turn, JPMorgan Chase depends on dividends, distributions, and other payments from its subsidiaries to fund its obligations.

44.     J.P. Morgan Securities LLC ("JPMS") is a Delaware limited liability company with its headquarters at 270 Park Avenue, New York, New York 10017.  JPMS is JPMorgan Chase's primary U.S. registered broker-dealer and investment banking entity.  Through its Corporate & Investment Bank business, JPMS provides financial products to its clients and acts as a dealer, including in investments grade corporate bonds.

45.     Defendants JPMorgan Chase and JPMS are referred to collectively in this complaint as "JPMorgan."  JPMorgan traded odd-lots of corporate bonds in the United States with Plaintiffs and/or the Class during the Class Period, and as a result of the conduct alleged herein, JPMorgan charged unlawful, artificial prices to Plaintiffs and/or the Class.  JPMorgan, as used in this complaint, includes all of JPMorgan's predecessors, subsidiaries, or affiliates that played a material role in the unlawful acts alleged herein.

46.     Defendant Morgan Stanley ("MS") is a Delaware corporation headquartered at 1585 Broadway, New York, New York 10036.  MS is a global financial services firm that, through its subsidiaries and affiliates, provides a wide variety of products and services to a large and diversified group of customers and counterparties.  MS conducts its three core business lines (Wealth Management, Investment Management, and Institutional Securities Group) through its subsidiaries.

47.     Defendant Morgan Stanley & Co., LLC ("MS&Co.") is a Delaware limited liability company with its headquarters at 1585 Broadway, New York, New York 10036.  It is an indirect, wholly owned non-bank subsidiary of MS and serves as MS's primary institutional broker-dealer in the United States.

48.     Defendant Morgan Stanley Smith Barney LLC ("MSSB") is a Delaware limited liability company with its headquarters at 1585 Broadway, New York, New York 10036.  It is an

indirect, wholly owned non-bank subsidiary of MS and serves as MS's primary retail broker-dealer in the United States.

49.     Defendants MS, MS&Co., and MSSB are referred to collectively in this complaint as "Morgan Stanley."   Morgan Stanley traded odd-lots of corporate bonds in the United States with Plaintiffs and/or the Class during the Class Period, and as a result of the conduct alleged herein, Morgan Stanley charged unlawful, artificial prices to Plaintiffs and/or the Class.   Morgan Stanley, as used in this complaint, includes all of Morgan Stanley's predecessors, subsidiaries, or affiliates that played a material role in the unlawful acts alleged herein.

50.     Defendant NatWest Markets Securities Inc. ("NatWest") is a Delaware corporation with its headquarters at 600 Washington Boulevard, Stamford, Connecticut 06901.   It is the primary U.S. broker-dealer of RBS Group plc, a foreign banking organization and financial holding company.

51.     NatWest traded odd-lots of corporate bonds in the United States with Plaintiffs and/or the Class during the Class Period, and as a result of the conduct alleged herein, NatWest charged unlawful, artificial prices to Plaintiffs and/or the Class.   NatWest, as used in this complaint, includes all of NatWest's predecessors, subsidiaries, or affiliates that played a material role in the unlawful acts alleged herein.

52.     Defendant Wells Fargo & Co. ("WF&Co.") is a Delaware corporation headquartered at 420 Montgomery Street, San Francisco, California 94104.   It is a publicly traded financial holding company.   Through its direct and indirect subsidiaries, WF&Co. conducts four core business lines, including "Wholesale Banking" and "Wealth and Investment Management," primarily focusing on the United States.

53.     Defendants Wells Fargo Securities LLC ("WFS") is a Delaware limited liability company with its headquarters at 420 Montgomery Street, San Francisco, California 94104.  It is an indirect, wholly owned non-bank subsidiary of WF&Co. and serves as WF&Co.'s primary institutional broker-dealer in the United States.

54.     Defendant Wells Fargo Clearing Services, LLC ("WFCS") is a Delaware limited liability company with its headquarters at One North Jefferson Avenue, St. Louis, Missouri 63103. It is an indirect, wholly owned non-bank subsidiary of WF&Co. and serves as WF&Co.'s primary retail broker-dealer in the United States.

55.     Defendants WF&Co., WFS, and WFCS, are referred to collectively in this complaint as "Wells Fargo."  Wells Fargo traded odd-lots of corporate bonds in the United States with Plaintiffs and/or the Class during the Class Period, and as a result of the conduct alleged herein, Wells Fargo charged unlawful, artificial prices to Plaintiffs and/or the Class.  Wells Fargo, as used in this complaint, includes all of Wells Fargo's predecessors, subsidiaries, or affiliates that played a material role in the unlawful acts alleged herein.

## AGENTS AND CO-CONSPIRATORS

56.     Defendants' agents, including their officers, employees, or other representatives, ordered, authorized, or performed the acts alleged in this complaint on Defendants' behalf in the normal course of their duties as Defendants' agents engaged to manage and operate Defendants' businesses or affairs.

57.     Each Defendant acted as the principal, agent, or partner for each other Defendant with respect to the acts, violations, and common course of collusive conduct alleged herein.

58.     Persons not named as Defendants may have committed acts in furtherance of the unlawful antitrust conspiracy alleged herein, such that they may be liable as co-conspirators.

Because the record of their conduct lies within their control or the control of the Defendants, Plaintiffs are unable at this time to identify any such co-conspirators by name.

## FACTUAL ALLEGATIONS

**I.**    **CORPORATE BONDS**

    **A.**    **Basics of Corporate Bonds**

    59.    Bonds are debt similar to a loan or an IOU.  The issuer, such as a corporation, issues bonds to raise money for any number of purposes, including augmenting cash, refinancing existing debt or funding capital investments.  The lenders, also known as bondholders, receive from the issuer scheduled payments of a specified rate of interest (the "coupon rate") during the life of the bond, as well as the promise to repay the principal (the "face value" or "par value" of the bond) when it matures after a set period of time (the "maturity date").  Bonds allow their issuers to attract a large number of lenders on equal terms in an efficient manner.  In the secondary market, the price of a bond is expressed as a percentage of the bond's par value.  Thus, a bid/offer spread of 99/101 means that the dealer is willing to buy a bond at 99% of the bond's par value, and is willing to sell the bond at 101% of the bond's par value.

    60.    Corporate bonds have a number of attractive benefits to investors.  The bond's coupon rate provides a predictable income stream of interest payments to bondholders.  Upon maturity, the bondholder receives the entire principal amount loaned to the corporation.  Bonds are generally regarded to be less volatile in their price movements than many other financial instruments.  Bonds are also considered safer than stocks, insofar as they are debt obligations with set payment schedules, and holders of a company's bonds enjoy priority over holders of the company's equity shares with respect to claims on the company's assets in the event of bankruptcy.

    61.    Like any investment, corporate bonds have risks.  These bonds have credit risk and prices could move higher or lower based on the market perception of the issuers' claim-paying

ability.  Bonds also have interest rate risk.  Bond prices will vary inversely with current interest rates because rising interest rates make the bond's coupon rate less attractive.  To sell an older bond with a lower interest rate, the investor may be required to sell it at a discount.  Bonds also have liquidity risks because investors may not be able to find a market to buy or sell the bond. Bonds have call or pre-payment risk because a bond issuer may retire a bond before its maturity date, depriving the investor of receiving the coupon rate until maturity (bonds are more likely to be retired when interest rates are declining, much like a homeowner might refinance a mortgage to benefit from a lower interest rate).

62.     The popularity of corporate bonds as an investment vehicle is evidenced by the monetary value of outstanding bonds.  According to the Securities Industry Financial Markets Association ("SIFMA"), $9.567 trillion in U.S. corporate bonds were outstanding as of the end of 2019.[4]  In 2019, average daily trading volume of publicly traded U.S. corporate bonds was $34.9 billion.[5]

63.     As further set forth in the chart below, both the volume and value of corporate bond trading has steadily increased between 2013-2019, with over 16.5 million trades for over $8.6 trillion in par value in 2019:

**Corporate Bonds Annual Trading Volume Data**

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| Number of trades | 10,773,767 | 10,328,658 | 10,797,691 | 12,837,632 | 13,857,643 | 15,490,337 | 16,595,280 |
| Par Amount ($ Millions) | $6,174,087 | $6,739,906 | $7,047,997 | $7,530,079 | $7,764,356 | $7,910,259 | $8,623,655 |

---

[4]     https://www.sifma.org/resources/research/us-bond-market-issuance-and-outstanding/.

[5]     https://www.sifma.org/resources/research/us-bond-market-trading-volume/.

64.     The size of a bond trade has no impact on and is irrelevant to the terms of the traded bond itself.  For any individual corporate bond issue, the characteristics of each bond in that issue – its par value, coupon rate, maturity date, credit rating, type of interest payments, and risks – are identical regardless of whether an investor is trading that bond in an odd-lot or round lot transaction.  Bonds of the same company from different issues, and bonds issued by different companies that receive comparable "ratings" from nationally recognized ratings organizations, such as Moody's, S&P, or Fitch, and are of comparable maturities, are also highly interchangeable.

**B.     Corporate Bonds Are Traded Over-the-Counter ("OTC")**

65.     Investors trade almost all corporate bonds in the United States in the OTC/dealer market.  In contrast, investors trade almost all stocks on exchanges.  There are significant differences between OTC and exchange trading that are relevant for purposes of this action, particularly the costs and fees paid by investors, and the transparency of information available to investors before their trades are negotiated and completed.

66.     On an exchange-based market like the NYSE, investors can effectively trade with each other, through brokers, by buying or selling a given security via the regulated exchange at a price reflecting the immediately collected and disseminated National Best Bid and Offer ("NBBO").  Generally, the brokers who manage the exchange platforms through which these investors trade do not act as principals (that buy the security for resale as a dealer) but rather, act as brokers representing the buyer or seller and receiving a commission that is disclosed in advance of each trade.

67.     For example, if retail Investor A wished to buy $10,000 in XYZ company stock traded on the New York Stock Exchange, she could log on to her brokerage account (E-Trade, Scottrade, TD Ameritrade, etc.), see the live-quoted NBBO price for XYZ's stock, and decide whether to buy $10,000 of shares at the quoted price.  If she decided to buy she would, through

her broker's facility, effectively be buying from another entity (another retail investor, a bank, an institutional investor, or the company itself) willing to sell at that NBBO price.  Investor A's brokerage fees for the transaction would be known in advance as well (some brokerages allow a certain number of "free" trades based on the regular fees you pay; others have set per-trade fees).

68.    Exchange-based markets are generally transparent.  Investors are informed of the fees/costs they will pay before they trade, pay the same fees regardless of trade size (absent rare exceptions for particularly large orders which may be assessed a *higher* – not lower, as is the case here – transaction cost due to increased risk), receive the best price then available on the exchange for the security they are trading, and are able to provide liquidity to the market without the need for intermediating dealers.  Thus, exchanges provide a centralized market for trading, and a centralized information source for the best current bid and offer prices prior to the trade, and the prices at which trades are concurrently transacted.

69.    OTC trading works differently because all negotiation – and thus, all trading – flows through individual dealers, which act as a principal in every transaction.  There is no NBBO price in OTC trading.  Instead, investors who want to buy or sell corporate bonds request a quote (a "request-for-quote" or "RFQ") from a specific dealer and must decide, based solely on the extent of the quote provided, whether to transact at the offered price.

**Simplified OTC Trading Structure**



70.     By way of illustration, assume Investor A requested a quote to purchase and Investor B requested a quote to sell an equal volume (100 bonds) of a corporate bond via dealer X with a par value of $1,000 on a given day.  Under these circumstances, dealer X's transaction costs and profit would equal the difference between the price at which it bought the corporate bond from Investor B (its bid, expressed as a percentage of the par value) and the price at which it sold the corporate bond to Investor A (its offer, again expressed as a percentage of the par value), multiplied by the par value and multiplied by the number of bonds traded.

71.     Thus, if dealer X responded to Investor A's RFQ at "99 Offer" and Investor B's RFQ at "101 Bid," it would have purchased those 100 XYZ corporate bonds from Investor B at a price of $99,000 (99% bid times $1,000 par value times 100 bonds) and sold the 100 XYZ corporate bonds to Investor A at a price of $101,000 (101% offer times $1,000 par value times 100 bonds).  Dealer X's profit and transaction costs would represent the $2,000 difference, or the bid-offer spread expressed as a percentage (2%) multiplied by the par value of the underlying XYZ corporate bond ($1,000 par value) multiplied by the number of bonds traded (100 bonds).

72.     RFQs to obtain a bid or offer price can be made in several ways.  The RFQ could be placed electronically via a dealer's proprietary bond-trading system; via Bloomberg message to dealers who had previously quoted non-binding "off-the-market" bid-offer spreads on that bond to see what prices they would be willing to trade at now; via a multi-dealer trading platform such as MarketAxess or TradeWeb (although these are open only to institutional investors, and do not provide the kind of transparency in pricing necessary for a competitive market in the sale of all odd-lots); or via phone by calling dealers directly (Bloomberg reports that 80% of U.S. corporate bond trades are still done by phone or chat).

73.     There is no requirement that a dealer respond to an RFQ, there is no one platform on which all dealers trade and respond to RFQs, and there is no centralized source of information for all available prices available to investors.  Hence, there is no guarantee that an investor is getting the best price possible because the quality of a quote is entirely dependent on which dealers receive and respond to the investor's RFQ(s).

74.     Once investors select a quote that a dealer has provided in response to their RFQ, they execute the trade with that dealer.  There are no disclosed dealer-imposed transaction costs to the investor, because all transaction costs are embedded within the dealer's spread between the (lower) price at which they buy the bond and the (higher) price at which they sell the bond.[6]

75.     Where an individual dealer, rather than an exchange, acts as the transaction intermediary, the dealer can retain whatever undisclosed mark-up it chooses on the transaction. The customer, who receives only a bid or offer quote, cannot discern what profit the dealer is receiving in its role as a transaction intermediary if that dealer does not execute an offsetting trade on the same day.[7]  The lack of price transparency to investors in OTC markets stands in stark contrast to the full transparency on exchanges.

76.     Thus, for example, if Investor A wanted to buy $10,000 of a corporate bond issued by company XYZ, Investor A would direct her wealth management advisor to obtain an RFQ to purchase $10,000 of that bond.  The wealth management advisor, pursuant to the best execution requirements of Rule 5310 of the Financial Industry Regulatory Authority ("FINRA"), would

---

[6]     On May 14, 2018, the Securities and Exchange Commission ("SEC") enacted amendments to FINRA Rule 2232 (Customer Confirmation) that requires member firms to disclose additional transaction-related information to retail customers for trades in certain fixed income securities. Specifically, amended Rule 2232 requires a member to disclose the amount of mark-up or mark-down it applies to trades with retail customers in corporate or agency debt securities if the member also executes an offsetting principal trade in the same security on the same trading day.

[7]     *Id.*

obtain a quote or quotes for that purchase from a dealer or dealers and present the best-priced quote to Investor A.  If Investor A decided to buy at that price, she would buy from the dealer, and the markup the dealer included in that price (representing the dealer's transaction costs and profit) would be unknown to Investor A, if the transaction occurred prior to May 14, 2018, and if the transaction occurred after that date, if the dealer had purchased the XYZ bond in an offsetting purchase transaction on another day.[8]  Instead, the dealer would collect its transaction costs and profit out of the spread between the offer price at which it sold the $10,000 in XYZ bonds to Investor A, and the bid price at which it bought the $10,000 XYZ bonds from the issuer, another dealer, or another investor.  In such cases the amount of the dealer's costs and profit would be entirely opaque to Investor A (and to the prior seller, for that matter).  It would be like buying a home where the buyer knows only what she paid and the seller knows only what she received, but neither knows the commission charged by the agents in between.

77.    The lack of pre-trade transparency in the OTC market for U.S. corporate bonds works fully to the advantage of dealers like Defendants.  As Bloomberg has noted "the debt market's lack of transparency . . . has been hugely profitable for the biggest dealers."[9]  As described further below, Defendants have sought to maintain this lack of transparency as part of their anticompetitive efforts to maintain significantly better prices for them, and worse prices for the investors, on retail investor odd-lot transactions.

C.    **OTC Trading in the Secondary Market Is Highly Concentrated**

78.    OTC trading in the secondary markets for U.S. corporate bonds is highly concentrated, and is becoming even more so.  This concentration makes it more likely that

---

[8]    *Id.*

[9]    Baker and Leising, *supra* note 2.

Defendants are engaging in collusion.  Defendants have dominated the U.S. corporate bond market for well over a decade.

79.     Defendants who become the leading dealers in a specific corporate bond issue frequently obtain that status due to their involvement in the underwriting syndicate that brings that bond to the market.  Thus, data on market shares for initial U.S. corporate bond underwriting is strongly indicative of the market shares (and the ability to control the market) for secondary trading in U.S. corporate bonds.  Data from 2014-2018 collected by Bloomberg shows that the Defendants have been among the top firms by market share in the U.S. corporate bond underwriting market almost every year (with the top three firms never changing).  Collectively, they have controlled 65% or more of the bond underwriting market every year since at least 2014:

| U.S. Corporate Bond Underwriting Market Share (%) | | | | | |
|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** |
| JPMorgan | 11.9 | 12.4 | 11.6 | 11.5 | 11.1 |
| Bank of America | 10.8 | 11.4 | 10.4 | 10.5 | 10.8 |
| Citigroup | 9 | 9.9 | 9.7 | 9.9 | 9.2 |
| Morgan Stanley | 7.9 | 7.3 | 6.9 | 7.8 | 7.1 |
| Goldman Sachs | 7.6 | 8.8 | 7.9 | 8.5 | 7.6 |
| Barclays | 6.7 | 6.0 | 6.0 | 5.3 | 6.5 |
| Deutsche Bank | 6.5 | 5.6 | 5.3 | 4.1 | 3.2 |
| Wells Fargo | 5.6 | 6.6 | 6.8 | 5.7 | 6.5 |
| Credit Suisse | 4.8 | 4.5 | 3.5 | 3.7 | 3.7 |
| RBS | 2.3 | 0.7 | 0 | 0 | 0 |
| **Defendants' Total:** | **73.1** | **73.2** | **68.1** | **67** | **65.7** |

80.     The Defendants' collectively large market share in the underwriting market for U.S. corporate bonds gives them power over the secondary market for trading in these bonds.  That power flows from their control over the supply of the bonds to be sold in the secondary trading market.  From these leading positions as U.S. corporate bond underwriters, Defendants have secured a correspondingly larger aggregate share as the top dealers in the Relevant Market (defined

below) for secondary trading in U.S. corporate bonds.  According to a survey by Greenwich Associates, the top 10 dealers in the U.S. corporate bond market currently represent approximately 90% of all U.S. trading volume in corporate bonds.[10]  As recently as 2006, the top 10 dealers in corporate bond trading volume represented 80% of U.S. corporate bond trades.

### D.    Round Lot vs. Odd-Lot Trading

81.    Round lot transactions, given their size, almost always involve institutional investors that trade for numerous individuals and companies – sophisticated, repeat participants in the market that maintain longstanding relationships with dealers and are willing and able to shop around for the best pricing.  As a result, they tend to be better informed than odd-lot or retail investors, who typically trade infrequently.

82.    As a result, dealers responding to an RFQ for a round lot know that they are dealing with an institutional investor that is likely to be: (a) price sensitive; (b) willing and able to obtain multiple quotes from other dealers; (c) knowledgeable regarding the market and pricing due to their repeated role in trading; and (d) in control of large portfolios of bonds that offer additional trading opportunities in the future if the dealer is competitive in its pricing.  Responding to these incentives, dealers provide quotes for round lots at their best competitive pricing, keeping their spreads narrow, in the hope of securing this (and other, future) trades from the round lot institutional investor – a process entirely consistent with economic and market microstructure theory.

83.    By contrast, round lots are almost never traded by retail investors, for the simple reason that retail investors do not tend to have positions in an individual bond issue in excess of

---

[10]    Greenwich Associates, *U.S. Corporate Bonds: Investors Need Dealers, Dealers Need Incentives*, at 3 (2015); MSRB, *2016 Fact Book*, at 31.

$1 million, or some under definitions of odd-lots, positions in excess of $100,000. As a result, odd-lot RFQs are more likely to involve less sophisticated retail investors. Indeed, as the size of an odd-lot trade decreases, it is ever more likely to be conducted by or on behalf of a retail investor.

84.     Defendants, as dealers in the OTC market, are therefore able to use the size of a given RFQ for a corporate bond transaction (round vs. odd, and even within odd-lots the relative size of the odd-lot) as one means to price discriminate between institutional and retail investors. And, because of their conspiracy to eliminate electronic trading platforms for odd-lots, they are able to do so.

85.     There is no explanation consistent with a healthy, competitive market for why the differential in spreads between odd-lots and round lots has persisted to the degree it has. History has shown no meaningful improvement, despite technological changes and the growth in the number and volume of odd-lot trades that should (in a competitive market) be driving odd-lot spreads toward parity with round lot spreads. Instead, as shown below, the spread differential has actually widened through the collusive acts of the Defendants, enabling them to charge odd-lot investors (primarily retail investors) more than what they would be charged in a competitive market free of such collusion, and considerably more than the spreads paid by institutional investors in the same bond issues.

## II.     ECONOMIC EVIDENCE DEMONSTRATES DEFENDANTS' CONSPIRACY TO CHARGE SUPRA COMPETITIVE PRICES FOR ODD-LOTS BONDS VERSUS ROUND LOT BONDS

### A.     Peer-Reviewed Econometric Research Shows that Dealers Consistently Charge Investors in Odd-Lots of Corporate Bonds Higher Bid-Offer Spreads than Round Lot Investors

86.     Research on odd-lot versus round lot trading in the corporate bond market has established that dealers charge odd-lot investors higher selling prices and pay them lower purchase prices than round lot investors for the same bond issue. This "adverse pricing" results in wider

spreads, and therefore higher costs, for odd-lot investors than round lot investors, at a statistically significant magnitude.[11]  As the Financial Economists Roundtable has stated, the corporate bond markets represent a situation where "[p]erversely, these transaction costs rise as the trade size decreases" and "a relatively small trade of $50,000 may cost, on a percentage basis, five or 10 times more than a large trade arranged by a financial institution."[12]

87.    Beginning in July 2006, FINRA's Trade Reporting and Compliance Engine ("TRACE") system began documenting most corporate bond transactions and making such data available to the public.  Dealers in corporate bonds were required by FINRA to report certain anonymous trade data to the TRACE program (including par value size, price, whether a transaction was a purchase or a sale, and information regarding whether the counterparty to the deal was a fellow dealer or a customer), with all of the collected data being made publicly available on a delayed basis.  TRACE thus provided greater information to the public, including retail investors, and researchers in corporate fixed-income instruments regarding how OTC trading in the secondary market for corporate bonds worked, pricing trends in the market, and other transactional data.

88.    TRACE also should have created increased competitive pressure amongst Defendants for both odd-lot and round lot transactions, as greater transparency and disclosure of

---

[11]    For purposes of this complaint, Plaintiffs are using the term "adverse pricing" or "adverse prices" to describe the scenario by which dealers such as Defendants offer lower bid prices to buy bonds from odd-lot investors, and higher prices to sell odd-lots of bonds to investors.  As a result of such "adverse pricing," odd-lot investors are disadvantaged in any U.S. corporate bond transaction – buy or sell – with dealers such as Defendants.

[12]    Larry Harris, Albert S. Kyle, Erik R. Sirri, *Statement of the Economists Roundtable, April 2015: The Structure of Trading in Bond Markets*, at 6, FINANCIAL ANALYSTS JOURNAL (November/December 2015).

trading prices in the market should have put more pressure on Defendants in a truly competitive market to improve their bid and offer prices.

89.    But better dealer pricing for odd-lot transactions never materialized.  Building primarily off of TRACE data, many research studies have been undertaken by fixed income experts, which have specifically examined the impact of trade size (odd vs. round lot) on the trading costs paid by investors.  The research is peer-reviewed, replicable, and based on reliable data.  Within this body of research, an astonishing consensus has emerged:  odd-lot trades cost significantly more to transact than larger round lot trades of corporate bonds in the United States. The following table details some of this research:

| Study | Time Period | Summary of Cost Findings | Increased % Cost of Odd vs. Round |
|---|---|---|---|
| Adrian, *et al.* (2017) | 2002-2015 | Bid-offer spreads for odd-lots are approximately double round lot spreads | 100% |
| Bessembinder, *et al.* (2017) | 2014-2016 | One-way (*i.e.*, one purchase or sale, or half of the bid-offer spread) transaction costs averaged 62 basis points for micro lots (under $100k); 29 basis points for odd-lots (between $100k and less than $1 million); 20 basis points for round lots ($1 million to less than $10 million); and 16 basis points for block trades ($10 million or more) | 45%-210% |
| Biswas, *et al.* (2015) | 2009-2014 | One-way transaction costs for bonds under $100k in par value was 48.5 basis points; for bonds over $2 million in par value, transaction costs were just 10 basis points | 385% |
| Ciampi & Zitzewitz (2010) | 2008-2009 | Mean bid-offer spread for all corporate bonds below $100k was 207 basis points, compared to 112 basis points for all trades between $100k-499k; 60 basis points for all trades between $500k-999k; 30-36 basis points for trades above $1 million | 67%-590% (corporate) |

| Study | Time Period | Summary of Cost Findings | Increased % Cost of Odd vs. Round |
|---|---|---|---|
| Edwards, *et al.* (2007) | 2003-2005 | One way transaction costs averaged 46-75 basis points for micro lots (under $100k); 14-34 basis points for odd-lots ($100k-less than $1 million); and between 4-9 basis points for round lot trades ($1 million and above) | 55%-1775% |
| Feldhutter (2012) | 2004-2009 | Average round trip transaction costs for odd-lots were between 21-54 basis points (depending on trade size), compared to 19 basis points for round lot trades | 10%-184% |
| Harris (2015) | 2014-2015 | Mean effective half-spread of 77.3 basis points for micro lot trades below $100k; 40.2 basis points for odd-lot trades between $100k and less than $1 million; 31.1 basis points for round lot trades between $1 million and less than $5 million; and 30.2 basis points for block trades of $5 million or more | 29%-156% |
| Hendershott & Madhavan (2015) | 2010-2011 | Average one-way transaction costs for micro lot trades below $100k were 87.9 basis points for voice trades and 22 basis points for electronic trades; 46.7 basis points for voice trades and 13.8 basis points for electronic trades for odd-lots of $100k to less than $1 million; 15 basis points for voice trades and 10.5 basis points for electronic trades for round lots of $1 million to less than $5 million; and 11.2 basis points for voice trades and 8.9 basis points for electronic trades for block trades of $5 million or more | 211%-685% (voice) 31%-147% (electronic) |
| Ritholtz (2016) | 2003-2015 | Average bid-offer spreads of 104 basis points for micro lot trades below $100k; 28 basis points for odd-lot trades between $100k and less than $1 million; and 13 basis points for round lot and block trades of $1 million or more | 115%-700% |

| Study | Time Period | Summary of Cost Findings | Increased % Cost of Odd vs. Round |
|---|---|---|---|
| White (2017) | 2005-2017 | Bid-offer spreads for retail corporate bond transactions (transactions less than $100k) are over 50 basis points higher than that of institutional transactions (transactions greater than $100k) | N/A |
| Zitzewitz (2010) | 2008-2010 | One-way transaction costs averaged 132 basis points for trades less than $100k; 44 basis points for transactions over $500k | 200% (increase for trades under $100k vs. trades over $500k) |

90.     Collectively, these studies show that odd-lot investors in corporate bonds pay average transaction costs (represented by the bid-offer spread) that are between 10% (Feldhutter) to as much as 1,775% (Edwards) greater than round lot investors. In dollar terms, using the most recent available (and relatively conservative) analysis by Bessembinder (2017) estimating the one-way (*i.e.*, just for a single purchase or sale) transaction costs for corporate bonds, a $700,000 odd-lot purchaser or seller would pay $2,030 ($700,000 * 29 basis points, or 0.0029) in transaction costs, whereas an investor purchasing or selling a $1 million round lot would pay $2,000 ($1 million * 20 basis points, or 0.0020). While the dollar amounts for the two transactions are similar, the ***percentage*** of each investor's cost is not: 0.29% for the odd-lot trade versus 0.20% for the round lot trade. In a truly competitive market where dealers competed and drove down the odd-lot pricing to the same level as round lots – 0.20% in this case – the $700,000 odd-lot investor would pay in absolute dollars only $1,400 – a substantial difference of $630 that dealers are currently able to impose on their odd-lot counterparties.

91.     The disparity in transactions costs becomes even larger and more inequitable for retail odd-lot investors trading in smaller amounts, demonstrated by comparing the total costs paid by such investors for trading in the same volume of bonds as one round lot trade. For example, a retail investor purchasing $50,000 in a given corporate bond would pay $310 ($50,000 * 62 basis

points, or 0.0062) in transaction costs according to Bessembinder's model.  This means 20 retail investors trading a total of $1 million in par value in corporate bonds in $50,000 increments would pay a total of $6,200 in transaction costs, or ***more than three times*** as much as the $2,000 a single $1 million round lot investor would pay.

92.    The impact of this adverse pricing for odd-lot transactions, when carried through to the entirety of the market, costs odd-lot investors in the aggregate an enormous sum, billions of dollars annually.

93.    For instance, the U.S. corporate bond market in 2018 had $7.91 trillion in annual trading volume by par value, and approximately 18% of this par value volume, or $1.4238 trillion, was estimated to be in odd-lots.  Using Bessembinder's estimates, the total transaction costs for this portion of the market at 29 basis points was $4.13 billion ($1.4238 trillion * 0.0029); if this portion instead traded at the 20 basis point transaction cost Bessembinder found for round lots, the total transaction costs would be just $2.85 billion ($1.4238 trillion * 0.0020).  The difference, or $1.281 billion, is a conservative measure of the supracompetitive transaction costs in 2018 alone.

94.    In sum, numerous peer-reviewed studies demonstrate that dealers, including Defendants, have engaged in a pattern of parallel conduct by charging odd-lot investors higher selling prices and paying them lower purchase prices than round lot investors for the same bond issue.

**B.    Plaintiffs' Expert Analysis Confirms that Defendants Charge Higher Transaction Costs to Odd-Lots Investors than Round Lot Investors**

**1.    Dealers Charged Wider Spreads for Odd-Lots vs. Round Lots**

95.    Plaintiffs also engaged their own expert to analyze corporate bonds trading data. Plaintiffs' expert analyzed the transactions costs for Riskless Principal Trades ("RPTs") in the U.S.

corporate bond market from January 2006 to December 2019 across four trade sizes:  (1) less than $50,000; (2) $50,001 to $100,000; (3) $100,001 to $1,000,000; and (4) greater than $1,000,000.

96.     In an RPT, the dealer simultaneously purchases and sells a bond.  That is, the dealer does not experience any inventory risk, as it is acting merely as an intermediating counterparty to the buyer and the seller – resulting in no net impact on the dealer's portfolio.  In a market with all-to-all trading (such as would exist on the electronic platforms that Defendants' anticompetitive conduct has prevented from existing), RPT trades would be rare if not unnecessary, as the buyer and seller could deal directly with each other, cutting out the dealer intermediary.

97.     In the analysis, RPTs are defined as buy and sell trades that occur almost simultaneously – *i.e.*, within one minute of each other.  The analysis focused on trades in which the trade amount is the same for both the purchase and sale transaction.  Thus, the dealer does not have any mismatch in amounts which may cause inventory risk or justify an increased transaction spread.  Since trade size is matched upon inception of the buy/sell transaction, there should be no difference in transaction costs across RPTs of different trade sizes.  ***Of special relevance to this case, there should be no difference in the transaction costs in RPTs for round lot versus odd-lot RPTs***.

98.     The analysis found the opposite.  It found statistically and economically significant differences in transaction costs for round lot and odd-lot trades over the period from 2006-2019.  The analysis shows that dealers charge considerably higher transaction costs for odd-lot RPTs when compared to round lot RPTs, even when dealing with larger odd-lot transactions.  The following chart shows that the transaction costs for smaller odd-lot RPTs (less than or equal to $100,000 in size, which are sometimes referred to as "micro lots") average around 40 basis points, with transaction costs for larger odd-lot trade sizes of between $100,000 to $1 million averaging

19 basis points.  By comparison, round lots trades exceeding $1 million cost only around eight basis points to execute.[13]



**Odd Lots**
**RPT Analysis**
**RPT Average Spreads by Trade Size, 2006 - 2019**



*Notes & Sources:*
  *FINRA's Enhanced TRACE bond trading data, 2006 - 2019.*

99.     Further, breaking out the analysis for the last four years indicates that this anticompetitive behavior persisted after the April 21, 2016 statutory period alleged by Defendants. The following chart shows that transaction costs during this period average 32 basis points for odd-lot trades less than or equal to $50,000, more than 33 basis points for odd-lot trades between $50,000 to $100,000 in size and 20 basis points for odd-lot trades between $100,000 to $1 million.

---

[13]     All analysis focuses on mark-ups of trade value, excluding commissions, so there is no fixed cost of trading.

In contrast, transaction costs for round lot trades (over $1 million) during this period average only nine basis points.  These differences are statistically and economically significant.



**Odd Lots**
**RPT Analysis**
**RPT Average Spreads by Trade Size, April 21, 2016 - 2019**

*Notes & Sources :*
*FINRA's Enhanced TRACE bond trading data, 2006 - 2019.*

### 2.   Defendants Charged Average Wider Spreads for Odd-Lots vs. Round Lots

100.   Given the highly concentrated secondary trading market, it is clear from the foregoing analysis of dealer RPT spreads that Defendants also charge wider spreads for odd-lots versus round lots.  Plaintiffs have gone a step further and analyzed a subset of actual trades by Defendants in order to confirm this point.

101.   In order to identify specific trades by Defendant dealers, Plaintiffs' expert obtained data on insurance company corporate bond transactions from the National Association of Insurance Commissioners ("NAIC") that identifies the counterparty to insurance company buys

(Schedule D – Part 3) and sells (Schedule D – Part 4).   Plaintiffs matched these trades to transactions reported on FINRA to differentiate trades implemented by Defendants from other dealers.[14]

102.    The analysis found that RPT spreads on transactions implemented by Defendants – over the entire time period – exhibited the same pattern of economically and statistically significant differences in transaction costs for round lot and odd-lot trades.   This pattern demonstrates Defendants' parallel conduct.   The following chart shows that Defendants charged an average of 86 basis points for smaller odd-lot trades (less than or equal to $50,000 in size), 94 basis points for odd-lot trades ranging from $50,000 to $100,000 in size and 22 basis points for odd-lot trades from $100,000 to $1 million.   In contrast, average spreads on round lot RPT trades over $1 million executed by Defendants averaged 13 basis points.

---

[14]     Plaintiffs followed the methodology of P. Asquith, T. Cover, and P. Pathak, *The Market for Borrowing Corporate Bonds*, JOURNAL OF FINANCIAL ECONOMICS, 107, 155-82 (2013); P. Asquith, T. Cover and P. Pathak, *The Effects of Mandatory Transparency in Financial Market Design: Evidence from the Corporate Bond Market*, NBER WORKING PAPER 19417 (2019); and A. Rapp, *Middlemen Matter: Corporate Bond Liquidity and Dealer Inventory Funding*.





*Notes & Sources* :
*FINRA's Enhanced TRACE bond trading data, 2006 - 2019. NAIC Schedule D Part 3 data for the period 2006 - 2019.*

### 3. Defendants Charged Average Wider Spreads than Non-Defendants

103.    Comparing the RPT spreads on odd-lot trades executed by Defendants to trades by non-Defendant dealers provides further evidence of the anticompetitive practices engaged in by dealer Defendants.  Transaction costs on non-Defendant dealers' odd-lot trades are statistically and economically significantly lower than the trades executed by Defendant dealers.  For example, transaction costs on odd-lot trades less than or equal to $50,000 in size executed by Defendant dealers average 62 basis points ***higher*** than non-Defendant trades of the same size.  Further, comparing the transaction costs for odd-lot trade sizes ranging from $50,000 to $100,000 demonstrates that Defendant trades average 17 basis points ***higher*** than same-sized trades by non-Defendant trades.  In sum, Defendants' parallel conduct with respect to odd-lot pricing on RPT, where there is no economic justification for pricing disparity with round lot pricing, results in

statistically significantly greater overcharges to Class members compared to similar RPTs with non-Defendant dealers.

104.    The results shown above are consistent with Defendants' anticompetitive practices in the corporate bond market that limit the free flow of information to retail customers, thereby increasing retail odd-lot transaction costs for both retail-level and institutional-level investors.

105.    It should be noted that this analysis stands as a lower bound estimate of excessive transaction costs imposed by dealer Defendants on retail customers in the corporate bond market. This is because the analysis involves insurance company clients, which are relatively sophisticated, even if they are not as well informed about prices and market conditions in the corporate bond markets as are round lot institutional traders.  Thus, it is reasonable to expect that transaction costs paid by non-institutional retail (odd-lot) customers would exceed those found here.

106.    Academic literature shows that in 2015, the markup on just RPT odd-lot transactions resulted in a transfer of $667 million from customers to dealers.  The markup on all odd-lot transactions was even higher, into the billions of dollars.  Updated for the 12 months ending in the third quarter of 2019, Harris and Mehta (2020) show that RPT markups transferred $612 million from customers to dealers.  But for Defendants' conspiracy, increased market transparency, such as all-to-all electronic trading platforms, would have alerted customers that they could have executed at better prices, saving billions of dollars.

### 4.    RPT Analysis Shows that Transaction Costs for Customer-Initiated Sales Are Higher than Other Odd-Lot Trades

107.    Analysis shows that Defendants discriminate between retail customers to charge non-competitive prices for odd-lot trades of corporate bonds.  Consistent with Defendants' thwarting competition in the Relevant Market, the economic analysis of Riskless Principal Trades found economically and statistically significantly higher transaction costs for odd-lot RPTs when

compared to round lot RPTs when broken down by RPT type.  The different types relate to timing and sequencing of the trades, which are described at the bottom of the chart, which summarizes these results.

**Odd Lots**
**RPT Analysis**
**RPT Average Spreads by Trade Size and RPT Type, 2006 - 2019**



*Notes & Sources:*
FINRA's Enhanced TRACE bond trading data, 2006 - 2019.
*Definitions of field headers:*
CC_BS: Customer to Customer crossing RPTs where the dealer first buys from the customer and then sells to another customer.
CC_SB: Customer to Customer crossing RPTs where the dealer first sells to the customer and then buys from another customer.
CD_BS: Customer to Dealer normal RPTs where the dealer first buys from the customer and then sells to another dealer.
CD_SB: Customer to Dealer normal RPTs where the dealer first sells to the customer and then buys from another dealer.
DC_BS: Dealer to Customer normal RPTs where the dealer first buys from another dealer and then sells to the customer.
DC_SB: Dealer to Customer normal RPTs where the dealer first sells to another dealer and then buys from the customer.

108.   The RPT analysis further shows that transaction costs for customer-initiated sales are higher than other odd-lot trades.  The following chart shows that odd-lot RPT sales initiated by retail customers have transaction costs that are statistically and economically higher than all other trade transaction costs.

**Odd Lots**
**RPT Analysis**
**RPT Average Spreads by Customer Initiated Trade Type (Buy vs. Sell) and Trade Size, 2006 - 2019**



**Notes & Sources:**
*FINRA's Enhanced TRACE bond trading data, 2006 - 2019.*
*Definitions of field headers:*
*Customer Initiated Sell: These are RTPs where the customer initiated the RPT with a sell order.*
*Customer Initiated Buy: These are RTPs where the customer initiated the RPT with a buy order.*

### 5.    Defendants Obtained Significantly Lower Execution Prices for Customer-Initiated Sales of Odd-Lots vs. Round Lots

109.    To examine the role of specific Defendant dealers, further analysis was undertaken that indicates that Defendants did not compete for odd-lot business by improving execution prices, but rather, failed to compete to get the best possible execution prices for their customers. Defendants took advantage of customer-initiated odd-lot sales by obtaining statistically and economically significantly lower execution prices for their clients than were concurrently available for round lot sales of the same bonds.  The analysis shows that Defendants paid investors prices for customer-initiated odd-lot sales that were statistically and economically significantly lower

than the prices they paid for round lot sales of the same bonds on the same date, thereby enriching Defendants by lowering their bond acquisition costs and increasing their spreads.

110.   Using NAIC data that identifies the dealer executing each trade, we examine the prices obtained by Defendants for odd-lot sales.   We compare each of those prices for each customer-initiated odd-lot sale to the average of all round lot sales trade prices in the same bond on the same date.   The following Table shows that for odd-lot sales handled by Defendants over the 2006-2019 period, Defendants obtained prices that were an average of almost 61 basis points below round lot average prices, with a 98.4 basis point median markdown.   These economically and statistically significant price markdowns for customer-initiated odd-lot sales directly harm retail odd-lot sellers since they receive lower prices for their bonds.   As a result, Defendants profited from the increased spread when they turned around and sold the odd-lots in later (or even concurrent or simultaneous) transactions.

| No. of Trades | Average Defendant Non-Competitive Markdown (bp) | Median Defendant Non-Competitive Markdown (bp) |
|---|---|---|
| 36,545 | 60.4 | 98.4 |

***Notes & Sources***:
FINRA's Enhanced TRACE bond trading data, NAIC Schedule D Part 4.
*The non-competitive markdown is calculated as the difference between the price obtained by Defendants on customer-initiated odd lot sales as compared to average round-lot sales prices for the same bond on the same date.*

111.   The breakdown of non-competitive markdowns by Defendant is shown in the following Table.   Over the 2006-2019 period, all Defendants obtained economically and statistically significantly lower prices for their customers selling odd-lots as compared to round lot sales of the same bond on the same date.   The price markdowns range from 27.3 (Goldman Sachs) to 154.4 (RBS/NatWest) basis points for the average customer-initiated odd-lot sale.   All of these

averages are statistically and economically significant.  It should be noted that this analysis represents a subset of all potentially non-competitive markdowns since the NAIC database is limited to odd-lot sales undertaken by insurance companies.

| Defendant | No. of Trades | Average Defendant Non-Competitive Markdown (bp) | Median Defendant Non-Competitive Markdown (bp) |
|---|---|---|---|
| Bank of America | 6,594 | 50.3 | 75.0 |
| Barclays | 4,096 | 83.7 | 137.5 |
| Citigroup | 3,760 | 51.4 | 81.2 |
| Credit Suisse | 3,152 | 39.5 | 69.3 |
| Deutsche Bank | 2,400 | 44.4 | 75.0 |
| Goldman Sachs | 4,130 | 27.3 | 46.9 |
| JP Morgan Chase | 4,895 | 55.7 | 97.0 |
| Morgan Stanley | 4,049 | 52.8 | 92.2 |
| RBS / NatWest | 192 | 154.4 | 300.0 |
| Wells Fargo | 3,277 | 146.2 | 208.1 |

*Notes & Sources*:
*FINRA's Enhanced TRACE bond trading data, NAIC Schedule D Part 4.*

112.    Comparing markdowns by all Defendants executing customer-initiated odd-lot sales over the entire period shows that their customers received an average of almost 61 basis points *lower* than odd-lot customer-initiated sales executed by non-Defendants.  This differential is economically and statistically significant.  The Table below provides examples of the differential between individual Defendants' and non-Defendants' markdowns for odd-lot sales based on the limited insurance company transactions available to Plaintiffs – Plaintiffs believe that a fuller review of all data obtained via discovery will confirm (if not increase) this differential.  It should be noted that Defendants' non-competitive behavior would impact overall pricing in the market, thereby allowing dealers currently designated as non-Defendants to increase prices through the well-known economic phenomenon known as umbrella pricing.

| | Bank of America | Barclays | Citigroup | Deutsche Bank | JP Morgan Chase | Morgan Stanley | RBS / NatWest | Wells Fargo | All Defendants |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| Average Defendant Markup | 50.3 | 83.7 | 51.4 | 44.4 | 55.7 | 52.8 | 154.4 | 146.2 | **60.4** |
| Average Non-Defendant Markup | 41.7 | 41.7 | 41.7 | 41.7 | 41.7 | 41.7 | 41.7 | 41.7 | **41.7** |
| **Defendant Average Less Non-Defendant Average** | **8.6** | **42.1** | **9.8** | **2.7** | **14.0** | **11.2** | **112.7** | **104.5** | **18.7** |

The table is titled: **Average of Markup: Average Round-Lot Sales Price for Matching Bond and Date MINUS Defendant Customer-Initiated Odd-Lot Sales Price**

*Notes & Sources:*

*FINRA's Enhanced TRACE bond trading data, NAIC Schedule D Part 4.*

*The non-competitive markdown is calculated as the difference between the price obtained by Defendants on customer-initiated odd lot sales as compared to average round-lot sales prices for the same bond on the same date.*

### 6. Economic Analysis of a Sample of Plaintiff's Trades Demonstrates Defendants Consistently Charged Plaintiffs Higher Transaction Costs for Odd-Lots Trades

113. Applying the price markdown analysis to the Plaintiffs' trades shows that Defendants do not achieve the best prices on behalf of Plaintiffs' odd-lot sales. Comparing the sales price obtained by Defendant dealers for Plaintiffs' odd-lot sales to average sales prices for round lot sales of the same security on the same day illustrates how Defendants' anticompetitive behavior harms Plaintiffs. The following Table shows 38 examples of losses incurred by Plaintiff UFCW on its odd-lot sales executed by Defendants. In these examples, UFCW received lower prices on odd-lot sales executed by Defendants as compared to the average prices that were available to round lot sellers in the same security on the same date. These price markdowns are statistically and economically significant and constitutes direct evidence of the cartel's effect on the OTC market. The Table below shows that UFCW realized sales proceeds totaling $4,257,701 on these 38 trades. However, if UFCW had received higher round lot sales prices, sales proceeds would have totaled $4,261,717. Thus, UFCW lost $4,016 on these 38 trades alone. These examples illustrate how Defendants' anticompetitive scheme harmed Plaintiffs who sell odd-lots of corporate bonds. It should be noted that these examples represent a small portion of the potential

impact on Plaintiffs given the limitations of obtaining matches between Plaintiffs' trades and the

NAIC data which contain dealer information, but only apply to insurance company transactions.

| Plaintiff | Trade Date | CUSIP | Defendant Name | Actual Sale Proceeds | Round Lot Sale Proceeds | Loss to Plaintiff ($) |
|---|---|---|---|---|---|---|
| UFCW | 1/11/2007 | 842587AB3 | Barclays | $449,496 | $449,640 | $144 |
| UFCW | 12/3/2013 | 594918AV6 | JP Morgan Chase | $54,683 | $54,713 | $30 |
| UFCW | 1/14/2014 | 89236TBB0 | Deutsche Bank | $214,817 | $214,987 | $170 |
| UFCW | 4/4/2016 | 29379VBK8 | JP Morgan Chase | $159,837 | $159,971 | $134 |
| UFCW | 4/20/2016 | 38141GVU5 | Goldman Sachs | $159,896 | $160,338 | $442 |
| UFCW | 5/5/2016 | 822582BR2 | Barclays | $149,667 | $149,675 | $8 |
| UFCW | 5/23/2016 | 512807AR9 | JP Morgan Chase | $29,975 | $30,030 | $55 |
| UFCW | 5/25/2016 | 94988J5D5 | Wells Fargo | $249,893 | $250,000 | $107 |
| UFCW | 6/2/2016 | 00817YAU2 | Citigroup | $139,986 | $140,219 | $233 |
| UFCW | 6/29/2016 | 68389XBK0 | JP Morgan Chase | $139,756 | $140,166 | $410 |
| UFCW | 7/12/2016 | 20030NBV2 | Citigroup | $139,861 | $139,958 | $96 |
| UFCW | 7/18/2016 | 949746SA0 | Wells Fargo | $124,883 | $124,974 | $91 |
| UFCW | 7/27/2016 | 92343VDG6 | Deutsche Bank | $174,237 | $174,434 | $197 |
| UFCW | 8/4/2016 | 446150AK0 | Goldman Sachs | $49,925 | $50,033 | $108 |
| UFCW | 8/5/2016 | 577081BA9 | Bank of America | $45,041 | $45,043 | $1 |
| UFCW | 8/9/2016 | 26441CAR6 | Barclays | $69,993 | $70,033 | $40 |
| UFCW | 8/10/2016 | 031162CG3 | Citigroup | $89,902 | $89,928 | $26 |
| UFCW | 8/29/2016 | 13607RAB6 | Citigroup | $84,985 | $85,010 | $26 |
| UFCW | 9/7/2016 | 822582BW1 | Goldman Sachs | $144,497 | $144,521 | $24 |
| UFCW | 12/8/2016 | 38145GAJ9 | Goldman Sachs | $59,955 | $59,969 | $14 |
| UFCW | 1/4/2017 | 89236TDP7 | Citigroup | $94,872 | $94,908 | $36 |
| UFCW | 1/17/2017 | 949746SK8 | Wells Fargo | $5,000 | $5,001 | $1 |
| UFCW | 1/23/2017 | 38141GWC4 | Goldman Sachs | $74,760 | $74,799 | $39 |
| UFCW | 1/31/2017 | 00206RDN9 | Citigroup | $149,886 | $150,029 | $143 |
| UFCW | 2/13/2017 | 38141GWC4 | Goldman Sachs | $19,942 | $19,953 | $10 |
| UFCW | 3/7/2017 | 30161MAR4 | Barclays | $114,753 | $114,851 | $98 |
| UFCW | 3/21/2017 | 456837AG8 | JP Morgan Chase | $134,739 | $134,745 | $6 |
| UFCW | 3/28/2017 | 774341AH4 | Wells Fargo | $134,910 | $134,948 | $38 |
| UFCW | 5/2/2017 | 824348AU0 | Citigroup | $119,926 | $120,077 | $151 |
| UFCW | 6/27/2017 | 29250NAQ8 | Citigroup | $104,912 | $105,049 | $137 |
| UFCW | 7/27/2017 | 00206REK4 | JP Morgan Chase | $59,990 | $60,061 | $71 |
| UFCW | 9/27/2017 | 26884LAE9 | Citigroup | $109,712 | $110,164 | $452 |
| UFCW | 10/10/2017 | 666807BQ4 | JP Morgan Chase | $49,993 | $50,018 | $25 |
| UFCW | 2/5/2018 | 55336VAQ3 | Barclays | $59,959 | $59,981 | $23 |
| UFCW | 6/10/2019 | 337738AS7 | JP Morgan Chase | $124,790 | $124,876 | $86 |
| UFCW | 8/6/2019 | 674599CW3 | Citigroup | $69,909 | $70,142 | $233 |
| UFCW | 9/19/2019 | 70450YAC7 | JP Morgan Chase | $54,966 | $55,073 | $107 |
| UFCW | 11/5/2019 | 25272KAG8 | JP Morgan Chase | $43,399 | $43,402 | $4 |
| **Total** | | | | **$4,257,701** | **$4,261,717** | **$4,016** |

*Notes & Sources:*

*FINRA's Enhanced TRACE bond trading data and plaintiff trading data.*

*The non-competitive markdown is calculated as the difference between the price obtained by Defendants on customer-initiated odd lot sales as compared to average round-lot sales prices for the same bond on the same date.*

114.   Performing a similar analysis on customer-initiated odd-lot purchases of corporate bonds shows a statistically and economically significant markup on Defendant-executed trades. That is, retail odd-lot customers pay higher prices for purchases as compared to round lot purchases in the same bond executed by Defendant dealers.

115.   Applying the non-competitive price markup analysis to Plaintiffs' purchases executed with Defendants (for those Plaintiff trades where a matching average benchmark is available in TRACE) results in total losses of $10,080 on five Plaintiff buy trades.   That is, Plaintiffs actually paid a total of $460,789 for these five bonds, but would have only paid $450,709 if they would have received round lot prices, for an aggregate loss of $10,080.   Again, this is direct evidence of the cartel's effect on the OTC market.

| Plaintiff | Trade Date | CUSIP | Defendant Name | Actual Purchase Cost | Round Lot Purchase Cost | Loss to Plaintiff ($) |
|---|---|---|---|---|---|---|
| Litovich | 3/25/2013 | 413627BM1 | Morgan Stanley | $349,350 | $341,042 | $8,308 |
| Holdcraft | 11/17/2015 | 172967JT9 | Wells Fargo | $51,307 | $50,419 | $888 |
| Holdcraft | 3/29/2016 | 34540TLL4 | Wells Fargo | $15,000 | $14,813 | $188 |
| Holdcraft | 5/16/2016 | 34540TLV2 | Wells Fargo | $25,000 | $24,688 | $313 |
| Holdcraft | 5/2/2017 | 37045XBQ8 | Wells Fargo | $20,132 | $19,749 | $383 |
| **Total** | | | | **$460,789** | **$450,709** | **$10,080** |

*Notes & Sources:*
*FINRA's Enhanced TRACE bond trading data and plaintiff trading data.*
*The non-competitive markdown is calculated as the difference between the price obtained by Defendants on customer-initiated odd lot sales as compared to average round-lot sales prices for the same bond on the same date.*

## C.   Foreign Odd-Lot Bond Trading Demonstrates that the Adverse Pricing of Bond Odd-Lots Is Not Explained by Limitations in Liquidity

116.   Odd-lots are actively traded – as discussed earlier, odd-lots in corporate bonds represent approximately 90% of daily trades by number of trades, and approximately 18% of total trading volume. And the number and volume of odd-lot trades have grown since 2006.   The size

of the annual trading market in U.S. corporate bonds – over $7 trillion – shows that lack of liquidity or trading activity is not the explanation for adverse odd-lot pricing.

117.     Indeed, "many bonds trade as actively as do small and some mid-cap stocks,"[15] and the disparity between odd-lot transaction costs and round lot transaction costs persists within the same bond issues, regardless of how actively they trade.  If a general lack of activity or liquidity in a specific corporate bond were the cause of higher transaction costs, the effect would be felt by both odd-lot investors and round lot investors in that bond.

118.     In addition, foreign corporate bond markets (with fewer market participants and far less liquidity than U.S. corporate bond markets) have successfully reduced (if not eliminated entirely) any differential in pricing between round lot and odd-lot trades, which contradicts any suggestion that liquidity or trading activity (or any other legitimate economic force) is the cause of adverse odd-lot trade pricing in the United States.  The success of these foreign markets in reducing and/or eliminating entirely any adverse pricing for odd-lot trades suggests that the adverse pricing in the U.S. corporate bond market is not the result of unilateral conduct, but rather collusive conduct by Defendants.

119.     In Israel, for example, the Tel Aviv Stock Exchange ("TASE") operates a corporate bond exchange that began operations in 1953.  Banks and brokerage firms with membership on the exchange provide their clients with online access to the exchange where they can submit orders, trade anonymously, and view the status of an online order book that is updated in real-time.

120.     The TASE bond exchange is much smaller than the U.S. corporate bond market. TASE's corporate bond market is only 1% of the American corporate market – $80 billion vs.

---

[15]     Larry Harris, *Transaction Costs, Trade Throughs and Riskless Principal Trading in the Corporate Bond Market* (Oct. 22, 2015).

$7.48 trillion – and is quite isolated, with foreign entities holding only 0.9% of all corporate bonds. However, as reported by Abudy and Wohl (2017), despite TASE's smaller size and isolation, the TASE bond exchange is "a lively market with many transactions per bond-day, very little off-exchange trading and low spreads: the average transaction half spread is 0.078% [or 7.8 basis points]. This figure is much lower than the comparable figures in the U.S., especially for 'retail size' transactions [which Abudy and Wohl define as transactions by investors with less than $559,000 in all TASE securities].'" The Israeli corporate bond market has better pricing for odd-lot sized transactions than the United States market, given that the 7.8 basis point transaction cost Abudy and Wohl calculate for the average TASE bond exchange is lower even than Bessembinder's (2017) 20 basis points transaction cost for round lots.

121.    The Italian bond market likewise functions without forcing odd-lot investors to incur adverse pricing when they buy or sell corporate bonds.

122.    The Italian bond market is the largest in Europe and the third largest in the world after the United States and Japan. The Italian market includes an outsized retail investor presence, as direct holdings of fixed-income securities (such as corporate bonds) by households are as high as 20% of total financial holdings in Italy (or even higher), compared to between 10%-15% in Germany and typically less than 5% in other countries, including the United States.[16]

123.    To serve this large retail investor presence, the Italian corporate bond market has created multiple electronic platforms for the trading of odd-lots of corporate bonds. The Borsa Italiana in Milan (Italy's only stock exchange, which is owned itself by the London Stock Exchange) owns a 70% share in EuroTLX, which specializes in retail-size trades.[17]

---

[16]    Bruno Biais, *et al*., *European Corporate Bond Markets:  Transparency, Liquidity, Efficiency*, CENTRE FOR ECONOMIC POLICY RESEARCH (May 2006).

[17]    *See* https://www.eurotlx.com/en/chi-siamo/.

124.    Borsa Italiana's EuroTLX has been operating since 2003, targeting "non-professional and professional investors trading in retail size and focus[ing] on fixed income securities and investment products.  EuroTLX offers the possibility of trading electronically a wide range of financial instruments with a high level of transparency on prices and on pre- and post-trade information."[18]  Because of EuroTLX's success in catering to retail investors (precisely the types of investors who trade in smaller odd-lots), it "has been included in the Best Execution Policy of Italian brokers."[19]

125.    Notably, studies have found that EuroTLX, with its retail focus on investors more likely to trade in odd-lots, outperforms dealers in the U.S. in terms of liquidity and bid-offer spreads in odd-lots.  A November 2008 study by EuroTLX itself found that the bid-offer spread for bonds on EuroTLX were generally between 20-25 basis points; a later 2014 report confirmed this calculation.[20]  This average bid-offer spread of 20-25 basis points represents a one-way transaction cost of 10-12.5 basis points for the primarily odd-lot transaction on EuroTLX, well below the 20 basis points Bessembinder (2017) observed for round lots, and the 29 basis point observed for odd-lots, in the United States.

126.    That smaller foreign corporate bond markets can provide odd-lot investors with lower bid-offer spreads, and therefore more competitive, pricing than in the United States strongly

---

[18]     *See* https://www.eurotlx.com/en/chi-siamo/.

[19]     *Id*.

[20]     *See Scambi sui bond alla prova della liquidita*, TLX, https://www.eurotlx.com/sites/default/files/Scambi_sui_bond_alla_prova_della_liquidita.pdf; *The Liquidity of Dual-Listed Corporate Bonds*, Commissione Nazionale Per Le Societa E La Borsa, http://www.consob.it/documents/11973/204072/qdf79.pdf/bc36834b-bd60-4810-a2e0-b4012c4d 040b.

suggests adverse pricing for odd-lots in the larger U.S. corporate bond market is the result of collusion and is not economically justified.

### D. Historical Evidence in the U.S. Demonstrates Odd-Lots of Bonds Did Not Trade at Adverse Prices Compared to Round Lots

127.    There is nothing about the odd-lot market that justifies the high spreads taken by Defendants.  Historically, trading costs for odd-lots in the U.S. corporate bond markets were much lower than today, and lower than in the Class Period 2006-2019.

128.    Prior to 1946, retail investors were prevalent in the corporate bond market, and bonds primarily traded on exchanges such as the NYSE.  During this time period, odd-lot trading dominated the market, with trading in round lots limited to only a few very active issues, and institutional investors (who preferred round lots) forced to wait for new issues of bonds to buy in round lot sizes or deal with bond-trading firms that accumulated odd-lots of bonds, combined them into round lots, and then sold them as round lots to institutional investors at a premium.  Only after the Great Depression (when private retail investors lost about 75% of their bond holdings due to default, call, or maturity) and World War II, did institutional investors dealing in round lots come to dominate the (now OTC/dealer) bond market.  By 1946, there was no significant active exchange-based corporate bond market on the NYSE.[21]

129.    In a study by Biais and Green (2007), the authors found that "[i]n the 1940s, despite fixed commissions, costs for retail investors trading corporate bonds were as low or lower than they are today in OTC markets."  Biais and Green also found that during the pre-World War II period, trade costs were more uniform across all trade sizes – "the relationship between trading

---

[21]    Bruno Biais and Richard C. Green, *The Microstructure of the Bond Market in the 20th Century*, at 3 (2007).

costs and trade size is much flatter in the historical exchange data than in the modern samples. . . .

[w]hat is most puzzling, in our view, is that costs in the modern data are as high as they are relative

to the historical costs."[22]

130.    Given advances in communication and data-processing that have – or should have

– driven down the costs to Defendants themselves in transacting in odd-lots of corporate bonds,

the fact that odd-lot bond pricing has not approached parity with round lot pricing like that seen in

the pre-Depression bond market further suggests that adverse pricing for odd-lots is not

economically justified.

## III.    DEFENDANTS ENGAGED IN A PATTERN OF COLLUSIVE CONDUCT TO RESTRICT COMPETITION FROM ELECTRONIC PLATFORMS THAT SOUGHT TO IMPROVE PRICING FOR ODD-LOT BOND INVESTORS

131.    Defendants, as the top dealers by market share, admit that they view e-platforms as

a threat to their business.[23]  E-platforms have the ability to allow Plaintiffs and the Class to trade

corporate bonds with greater transparency and significantly less cost, *i.e.*, with narrower bid-offer

spreads.   Therefore, in order to maintain wider spreads on odd-lot trades of corporate bonds,

Defendants have engaged in a pattern of parallel conduct and anticompetitive collusion to restrict

competition from those electronic platforms seeking to improve odd-lot pricing for bond investors

and seeking to compete with Defendants in this market.

132.    As *Bloomberg* recently reported:

Today, about 80 percent of U.S. bond deals are still done by phone or over chat.
There aren't any exchanges and everything is negotiated, which gives dealers the
upper hand when it comes to where the market is for a given bond.  It's a situation

---

[22]      *Id.* at 28.

[23]      Greenwich Associates, *U.S. Corporate Bonds: Investors Need Dealers, Dealers Need Incentives*, at 3 (2015); MSRB, *2016 Fact Book*, at 3.

that has enabled the biggest firms, like JPMorgan and Goldman Sachs, to keep a stranglehold on the market.

And it's not like they have much incentive (or even the legal obligation) to change. The bond market is littered with startups that have tried – and failed – to loosen Wall Street's grip on bond trading and make it more efficient.   Names like BondBook, BondConnect, BondGlobe, BondHub, BondLink and XBond . . . flopped.[24]

133.    Defendants' collusive conduct included:  punishing those participants in the bond odd-lot markets that were engaging in trading activity that had the potential to narrow the bid ask spreads; investing in and acquiring control of various electronic platforms to ensure they did not improve pricing for odd-lot investors (including one platform, TradeWeb, that was co-owned by all Defendants and used repeatedly to acquire and shut down platforms that threatened to provide pre-trade pricing transparency and increase pricing competition for retail odd-lot investors); engaging in a group boycott of other retail-focused (and therefore, odd-lot focused) electronic trading platforms; punishing others who attempted to offer support or liquidity to such retail-focused electronic trading platforms; denying liquidity to electronic platforms that might improve price competition for retail odd-lot investors despite the potential opportunity such platforms offer to increase each respective Defendant's market share of odd-lot transactions; and using their market power to deny and/or delay access to essential facilities that competing retail-focused electronic platforms required to enter the secondary market for trading odd-lots of corporate bonds.

134.    As a result of Defendants' coordinated and collusive conduct, the only electronic platforms that have survived and secured any significant share of corporate bond trading are owned

---

[24]    Nick Baker and Matthew Leising, *Goldman alum wants to revolutionize bond trading,* BLOOMBERG (June 25, 2018), https://www.theledger.com/news/20180625/goldman-alum-wants-to-revolutionize-bond-trading.

in part by Defendants, are only open to institutional investors, and/or effectively exclude retail

investor odd-lot trades.

135.   The following chart summarizes some of Defendants' efforts to restrain electronic

trading, which are further described in the sections that follow:

| Electronic Trading Platforms | Time Period | Defendants' Concerted Efforts |
|---|---|---|
| InterVest Trading System | mid-1990s - February 1998 | Bloomberg terminated the service due to pressure from Defendants. |
| TradeWeb | 1996-now | Defendants took control of TradeWeb and used their joint ownership to maintain TradeWeb as a dealer-to-dealer market structure rather than all-to-all trading. |
| ABS/NYSE | 1976-now | Defendants engaged in a group boycott to not provide or severely limit order flow to ABS/NYSE Bonds. Defendants also engaged in collusive efforts to deny and/or delay ABS/NYSE Bonds from gaining access to Bloomberg's Trade Order Management System ("TOMS"), an essential facility necessary for any new entrant providing electronic trading of corporate bonds. |
| Bonds.com | 2005-2014 | Defendants refused to participate with Bonds.com in a concerted manner. |
| BondDesk | 1999-now | Defendants abused their board positions on BondDesk to remove leadership that had pursued offering retail-sized odd-lot investors more transparency and better pricing. Defendants also used TradeWeb to acquire BondDesk and permanently foreclose BondDesk as a retail-focused platform. |
| Trading Edge | 1999-2001 | Trading Edge was acquired by MarketAxess, an electronic trading platform open only to institutional investors and founded by, among others, JPMorgan.  MarketAxess shuttered Trading Edge's anonymous trading platform. |

A.      **Defendants' Pattern of Punishing Dealers Who Might Engage in Competitive Trading Activity**

136.    From the 1980s through the present, Defendants have engaged in a pattern of parallel conduct to threaten or inflict penalties on any market participant that might have engaged in competitive trading activity with the potential to narrow the bid ask spreads in odd-lots.

137.    In particular, Defendants refused to transact business with any market participant that threatened the operation of their conspiracy.  They did so by placing them in a "penalty box" – a form of discipline that could range from several weeks to several months.  During time in the penalty box, no employees of the Defendant firm administering the discipline would transact with the penalized market participant.  For example, when odd-lot traders employed by InterVest engaged in trading that Salomon Smith Barney (later acquired by Citigroup) deemed to be "disruptive" of the market, Salomon refused to do business with those traders.  None of the other Defendants stepped in to do business with the traders, instead, as one would expect in a competitive market.

138.    Defendants efforts to punish those who threaten to narrow odd-lot spreads continue to this day.  During the period from 2015-2019, due to the growth of its ETF bond fund business, Blackrock needed to rebalance its ETF bond portfolios as well as respond to redemption requests in such bond fund portfolios requiring it to trade odd-lot bonds.  Because of the increasing volume of such odd-lot bond trades, Blackrock was motivated to execute such odd-lot trades at narrower spreads than offered by the Defendant.  Blackrock began to use competitive regional banks and brokers such as First Tennessee, Piper Jaffrey, and McDonald & Co. for its odd-lots trading needs because of the narrower spreads they provided.  When defendant Morgan Stanley learned that Blackrock was providing First Tennessee with axe sheets and allowing it to gain business because of the narrower spreads that it was providing, Morgan Stanley threatened to limit any business that

it transacted with First Tennessee and blackball them.  Defendant Morgan Stanley took such steps in order to punish First Tennessee for offering narrower spreads for such transactions.

139.    As more and more bond traders moved to electronic trading platform, Blackrock also began to use MarketAxess as a venue for executing the odd-lot bond trades that were necessary to rebalance its ETF bond funds and to process redemptions.  During the period from 2016 through 2018, Blackrock used electronic RFQ's available on MarketAxess to execute directly with regional banks such as First Tennessee, Piper Jaffrey, and McDonald & Co. in order to benefit from the narrower spread that such dealers provided.  Eventually, defendants Morgan Stanley and Citibank learned of these transactions and threatened to limit any business that they transacted with First Tennessee for offering narrower spreads for such transactions.

140.    When individual employees of disciplining Defendant dealers tried to help the traders that were being penalized (by, for example, transacting business with them), they did so at risk of losing their jobs with the Defendant dealer.  The substantial risks faced by employees ensured that the penalty box – the disciplining action – worked.

**B.    Dealers Shut Down the InterVest Trading System**

141.    In the mid-1990s, InterVest Financials Services was set to debut a new electronic trading system for corporate bonds.  The system promised anonymous, push-button trading, which promised to cut commissions by over 75%.  InterVest struck a deal with Bloomberg to provide its system on Bloomberg terminals.  The relationship quickly soured.

142.    Following the announcement of InterVest on Bloomberg, bond dealers began to complain to Bloomberg that InterVest offered a service that competed with them.  When Bloomberg tried to put a moratorium on InterVest going live, InterVest threatened legal action.  InterVest's time on Bloomberg, however, was short-lived.  Barely a year after launching in

December 1996, Bloomberg terminated the service by February 1998 due to pressure from Defendants.

### C. Defendants' Joint Ownership of TradeWeb Allowed Them to Stifle Competition from Electronic Platforms that Threatened to Improve Odd-Lot Pricing

143.    TradeWeb was founded in 1996 (with its first electronic marketplace going live in 1998) by Jim Toffey, a former Credit Suisse employee.  Initial funding came from Credit Suisse, Lehman Brothers (later acquired by Barclays), Salomon Smith Barney (later acquired by Citigroup), and Goldman Sachs.  By 2004, TradeWeb had added Citigroup, Merrill Lynch, Morgan Stanley, JPMorgan, and Deutsche Bank to its consortium of owners.

144.    TradeWeb initially focused on Treasury bonds, but it was soon apparent that its electronic trading platform could work for corporate bond trading as well.

145.    But instead of using their joint ownership in TradeWeb to advance it as a successful electronic trading platform – such as NASDAQ – that would bring in more profits through increasing trade volume, Defendants stifled its growth.  Absent their joint interest in squelching transparency in the market for odd-lot trading, Defendants would have promoted TradeWeb as a platform for all trades, including odd-lots.  Joint owners in a company like TradeWeb – in a world in which those owners were competing with one another rather than colluding – would want to see more trades to increase the platform's profits.  The more trades going through the platform, including odd-lots, the better.  But instead of advancing the interests of the company that they jointly owned, Defendants acted in parallel to ensure it would never threaten the source of their anticompetitive profits in the sale of odd-lot bonds:  complete opacity.

146.    News reports from this period suggest that Defendants invested in TradeWeb out of fear that emerging electronic markets would decrease their market power in corporate bonds.  In 2001, *Forbes* explained that "TradeWeb came to life as much out of fear as out of efficiency.

For brokers, electronic ordering systems threatened to squeeze already thin margins even further. But unlike new digital startups that sought to eliminate established intermediaries, TradeWeb was created with the aim of maintaining the status quo.  TradeWeb helps existing bond brokers and dealers do their jobs faster."[25]

147.    A 2000 *Euromoney* article laid the situation out in even starker terms, describing TradeWeb was "the textbook case on the politics of multi-bank consortia."[26]  The *Euromoney* article cited an example where TradeWeb's bank owners founded rival platforms to TradeWeb to weaken TradeWeb itself.  According to the *Euromoney* article, TradeWeb shareholders Goldman Sachs, Merrill Lynch, and Morgan Stanley founded BondBook as an attempt to preempt TradeWeb's entry into the non-treasuries bond market.  Summing up the situation, the *Euromoney* article explained that "ultimately TradeWeb is only as independent as the seven banks [that own it] want it to be.  And all of them are invested in other models:  five are in BondBook (Deutsche, Goldman, Merrill [now owned by Bank of America], Morgan Stanley, Salomon [now owned by Citigroup]) and the other two, CSFB [Credit Suisse] and Lehman [now owned by Barclays], are in MarketAxess."

148.    The same *Euromoney* article quoted one unnamed "head of investment banking e-commerce at a US investment bank" as saying, "[h]aving a stake in BondBook or MarketAxess is a way of replacing money which we made on market-making but which will be lost once it goes electronic[. . . .]  That's why we run them as for-profit businesses [rather than utilities].  But if an anonymous platform such as BondBook [or TradeWeb or MarketAxess] succeeds, it will kill

---

[25]    Neil Weinberg, *B2B Grows Up*, FORBES (Sept. 10, 2001), https://www.forbes.com/best/2001/0910/018.html.

[26]    Antony Currie, *Could TradeWeb unravel from inside?*, EUROMONEY (Dec. 1, 2000), https://www.euromoney.com/article/b1320hxsf8zy1x/could-tradeweb-unravel-from-inside.

market-making profits for everyone.  So if you're not an equity holder, you lose revenues and you get no compensation for it."[27]  Defendants' purchase of anonymous platforms that would otherwise introduce innovation and efficiencies to odd-lot trading and threaten cartelist profits is a game of "catch and kill" that enables the Defendants to maintain their ability to extract monopoly rents from Plaintiffs and the Class.

149.    In 2004, Thomson Reuters purchased TradeWeb from its dealer bank owners.  At least one source has attributed this sale to "regulatory concerns over potential conflicts of interest and competition issues in dealer-owned networks."[28]  Indeed, in 2000, the Department of Justice had issued antitrust civil investigative demands to similar electronic bond trading platforms BondBook, BondDesk, and MarketAxess, and contacted Merrill Lynch, Salomon Smith Barney/Citigroup, Morgan Stanley, and Deutsche Bank as part of a probe the DOJ described as an effort to look into "the competitive effects of certain joint ventures in the online bond trading industry."[29]

150.    As part of the sale of TradeWeb to Thomson Reuters, however, the Defendants agreed to a four-year contract whereby "the founding investment banks . . . would steer liquidity to TradeWeb."[30]

---

[27]    *Id.*

[28]    *Wall Street firms pay $180 million to buy back into TradeWeb*, FINEXTRA (Oct. 11, 2007), https://www.finextra.com/newsarticle/17582/wall-street-firms-pay-180-million-to-buy-back-into-tradeweb.

[29]    John Parry, *Online Bond Trading Tie-Ups Highlight an Antitrust Issue*, WSJ (May 10, 2001), https://www.wsj.com/articles/SB989513870694056329.

[30]    Ivy Schmerkin, *BREAKING NEWS: Thomson Plans to Spin Off TradeWeb*, WALL STREET & TECHNOLOGY (Oct. 10, 2007), https://web.archive.org/web/20170109021802/http://www.wallstreetandtech.com/trading-technology/breaking-news-thomson-plans-to-spin-off-tradeweb/d/d-id/1258992.

151.    With that deal scheduled to end in 2008, Thomson Reuters "realized the banks would take their liquidity and shop it around, which would threaten the value of TradeWeb."[31]  To prevent that from happening, Thomson Reuters proposed "Project Fusion," a joint ownership structure that went into effect in January 2008 that gave minority ownership stakes in TradeWeb to Credit Suisse, Goldman Sachs, Lehman Brothers (later acquired by Barclays), Merrill Lynch (later acquired by Bank of America), Morgan Stanley, JPMorgan, Deutsche Bank, and RBS.[32]  In April 2008, Citigroup acquired an equity stake in TradeWeb as well.[33]

152.    Defendants' ownership of TradeWeb (as well as other platforms, such as MarketAxess) gave them both the ability to shut out retail odd-lot investors from using these platforms, and the ability to use TradeWeb as a "stalking horse" to catch and kill would-be electronic platforms that threatened to offer better transparency and pricing to retail odd-lot investors (as discussed further below).  To this day, in what can only be explained by Defendants' refusal to support it as a competitive platform for odd-lots trades, TradeWeb does not allow access to retail investors to trade odd-lot corporate bonds, and continues to maintain a dealer-to-dealer market structure rather than all-to-all trading.  By denying TradeWeb access to retail investors, Defendants perpetuate their ability to widen spreads (and thus accrue supracompetitive profits) for odd-lot transactions.

---

[31]     *Id.*

[32]     *Id.*

[33]     Thomson Corp., *Citi Takes Equity Stake in TradeWeb*, MARKETSCREENER (April 8, 2008), https://www.marketscreener.com/THOMSON-CORP-14638/news/Thomson-Corp-Citi-Takes-Equity-Stake-in-Tradeweb-491596/.

**D.      Defendants' Group Boycott and Collusive Effort to Deny and/or Delay ABS/NYSE Bonds from Gaining Access to Bloomberg's Trade Order Management System ("TOMS")**

153.    As discussed above, prior to the Great Depression, exchange-based trading of corporate bonds predominated in the United States.  In 1976, the New York Stock Exchange ("NYSE") attempted to revitalize bond exchange trading by introducing the Automated Bond System ("ABS"), an electronic bond order book with time and price priority.  The ABS originally allowed trading in 1,000 debt security issues, including corporate bonds.

154.    However, despite backing by the NYSE and the historical success of exchange-based trading for corporate bonds, ABS failed.  By 2002, only 5% of all corporate bonds were listed on ABS for trading.  By 2006, only 333 U.S. corporate bond issues (around 1% of the total number of unique TRACE-eligible corporate bond issues traded that year) traded on ABS.

155.    In 2007, ABS was replaced by NYSE Bonds, which stated that its goal was to allow trading in 6,000 debt security issues, mostly corporate bonds.[34]  NYSE Bonds offered pre-trade transparency for investors on pricing, and had a pro-investor impact on bond pricing:  a 2014 study found that corporate bonds listed on NYSE Bonds between 2008-2011 had bid-offer spreads – even when traded OTC – that were 10 basis points lower than comparable bond issues not listed on NYSE Bonds and only traded OTC.[35]  The positive effect on prices found for investors applied to all sizes of trades, but was greatest for so-called retail-sized trades of less than $100,000.

156.    Despite its success at improving transaction costs for bond investors (in particular retail bond investors trading exclusively in odd-lots), NYSE Bonds failed to gain traction in trading

---

[34]     Liz Moyer, *NYSE Plunges Into Bonds*, Forbes (March 23, 2007), https://www.forbes.com/2007/03/23/nyse-bonds-trading-biz-cx_lm_0323nyse.html#e370b23d7 d3e.

[35]     Fan Chen and Zhuo Zhong, *Pre-Trade Transparency in Over-the-Counter Markets* (July 2014).

among dealers.  As of November 2017, only 25 bond dealers continued to participate in NYSE Bonds.  Even this number might overstate participation in trading corporate bonds on NYSE Bonds – NYSE Bonds does not identify what dealer participants trade in or at what volumes they trade, so participants may be trading only limited numbers of corporate bonds, or even none at all, since NYSE Bonds also provides municipal bond trading, and U.S. and foreign government bond trading.

157.    ABS and NYSE Bonds failed to achieve larger-scale success among investors because of (a) a concerted boycott of the platforms by Defendants, and (b) collusive efforts by Defendants to deny or delay NYSE Bonds access to the Bloomberg TOMS facility, an essential venue necessary for any newcomer seeking to participate in and compete within the corporate bond market.  By impeding the growth and success of ABS and NYSE Bonds, Defendants hindered increased pre-trade price transparency in the odd-lot bond market, thereby preventing increased price competition within that market.

158.    Defendants engaged in a group boycott to not provide or allow order flow to ABS/NYSE Bonds, or to severely limit such order flow to a small number of corporate bond issues.

159.    All entities trading securities electronically use trade order management systems for execution, administration, accounting, compliance, and other related trading needs.  Generally speaking, a given type of security will only have one dominant trade order management system, as it is time- and cost-prohibitive for all parties to support multiple systems.

160.    A new entrant in the electronic trading market for a given security must offer connectivity to the pre-existing dominant trade order management system in place for that security.  These trade management systems are necessary portals to the market for electronic trading in that

type of security, and, as such, are essential facilities for interconnected access for any new electronic trading platform.

161.    With respect to the electronic trading of corporate bonds, the sole trade order management system in place in the market during the Class Period is Bloomberg's TOMS. Bloomberg advertises TOMS as "deliver[ing] global, multi-asset solutions for front-end inventory, trading and middle- and back-office operations" that allow users to "optimize your voice and electronic trade workflow, increase global distribution to markets, manage risk and compliance and improve operational efficiency."  Everyone trading corporate bonds electronically, including Defendants, must use Bloomberg TOMS.  Thus, access to Bloomberg TOMS is essential for participating and competing in this market.

162.    Obtaining access to Bloomberg TOMS should have taken a short period of time for NYSE Bonds, particularly given the significance and power of the New York Stock Exchange – at most, five months.  Instead, NYSE Bonds was not given a connection to Bloomberg TOMS for 18-19 months – a delay that crippled NYSE Bonds' ability to gain traction in the electronic bond trading market.

163.    Defendants – which are large financial institutions with significant accounts with Bloomberg's separate and profitable Bloomberg Terminal business – used their market power and value to Bloomberg as Bloomberg Terminal customers to force Bloomberg to materially delay NYSE Bonds' connection to the essential facility of Bloomberg TOMS.  Defendants forced Bloomberg to delay NYSE Bonds' connectivity through Bloomberg TOMS by threatening to terminate or reduce their Bloomberg Terminal leases if Bloomberg failed to do so.

**E.    Defendants' Refusal to Participate with Bonds.com**

164.    Another example of Defendants' collusive conduct designed to prevent competition from electronic platforms is their refusal to deal with Bonds.com.

165.    Bonds.com was founded in 2005 by John J. Barry IV, a former bond underwriter and trader at ABN-AMRO Bank.  According to Barry, Bonds.com had "a single goal in mind: Empower the self-directed individual and institutional investors with a no cost trading platform, enabling execution, aggressive pricing and education in the fragmented fixed income market place."[36]  Bonds.com sought to do this with electronic, all-to-all, anonymous exchange-like trading focused on retail and institutional investors transacting in odd-lots of corporate bonds.

166.    Bonds.com's initial bond trading platform, BondStation, launched in January 2008, and was open to both retail and institutional investors.  BondStation's marketing materials boasted that it was "The End of the Middle Man" and cast itself as the solution to "Price gauging [sic] by dealers" that could result in markups of "3% or more along the way," with "100% price and product visibility," "fee-less transactions," and "no liquidity provider fees."

167.    After just three months, however, Bonds.com jettisoned BondStation's retail odd-lot focus amidst pressure from dealers such as Defendants.  In April 2008, the company "[r]efocused from the retail segment to the institutional segment due to market conditions and other economic factors."  One of those "market conditions" was a group boycott of the retail-focused BondStation by dealers.  The majority of trades executed on BondStation remained retail up through May 2008; after that point, institutional trades predominated.

168.    In 2010, the company discontinued its use of BondStation and its service for "institutional and self-directed individual fixed income investors," and shifted to a platform called BondsPro, which "offers professional traders and large institutional investors an alternative trading system to trade odd-lot fixed income securities."  This shift to a focus on institutional odd-lot

---

[36]    *Bonds.com CEO John J. Barry IV Provides Comprehensive Company Update in Open Letter to Investors*, BONDS.COM, http://files.shareholder.com/downloads/BONDS/0x0x239374/ 45717632-ec8f-4b11-80b1-97b56386fa33/BDCG_News_2008_10_7_General_Releases.pdf.

investors rather than retail investors allowed Bonds.com to secure two rounds of funding to continue operations. BondsPro, however, continued to allow all-to-all, anonymous, exchange-style trading – trading that would eliminate Defendants as middlemen, or force them through anonymous pricing competition to lower odd-lot bid-offer spreads.

169.    Between 2012 and 2013, Bonds.com sought order flow and participation on its BondsPro platform from major corporate bond dealers like Defendants, including Bank of America, JPMorgan, and Morgan Stanley, among others.

170.    None of the dealers would participate with Bonds.com and the Defendants monitored and policed their conspiracy to make sure there would be no defectors. Bank of America indicated that it had interest in participating on BondsPro, but that it could not do so due to the blowback it would suffer from other Defendants. Of course, threatening to punish cartel defectors is further evidence of the existence of the conspiracy. Bank of America stated that it would only be willing to participate on Bonds.com if at least one or two of the larger dealers (such as Morgan Stanley or JPMorgan) also participated and could provide it cover from retribution.

171.    As a result of this group boycott by Defendants of Bonds.com's all-to-all, anonymous odd-lot trading platform, Bonds.com ran out of money by late 2013 and was sold in 2014 to MTS, a subsidiary of the London Stock Exchange Group.

**F.      Defendants Abused Their Board Positions on BondDesk to Remove Leadership that Had Pursued Offering Retail-Sized Odd-Lot Investors More Transparency and Better Pricing**

172.    BondDesk was founded in 1999 as a bond platform designed to "effectively distribute dealer inventory to regional broker-dealers, smaller shops and investment advisors."[37]

---

[37]     *See* REUTERS: *Alternative trading system BondDesk up for sale* (Aug. 31, 2013), https://www.reuters.com/article/idUS6254185320130901.

From its inception, BondDesk focused on retail-sized trades and catered to investment advisors representing retail investors, but it was not directly open to retail clients.

173.     By 2004, BondDesk had grown to a 100-employee company.  Much like TradeWeb and MarketAxess, however, it had sold ownership stakes to 14 major banks, including Defendants such as Goldman Sachs, Bank of America, JPMorgan, and Wells Fargo.

174.     In exchange for their investments in BondDesk, Goldman Sachs, Bank of America, JPMorgan, and Wells Fargo (themselves or via predecessors they later acquired) eventually secured six of the 11 seats on the Board of Directors of BondDesk in 2004 for individuals affiliated with Defendants: Brad Levy (Goldman Sachs), Richard Kolman (Goldman Sachs), Matthew Frymier (Bank of America), Charles Forrest (A.G. Edwards, later acquired by Wells Fargo), Ronald Hersch (Bear Stearns & Co., later acquired by JPMorgan), and Thomas Hoops (First Union Investors, Inc., later acquired by Wells Fargo).

175.     Despite investing in BondDesk, Defendants saw the innovations that BondDesk and its management had introduced to the bond market (including in regard to improving transparency and price competition for odd-lots) as a threat to the supracompetitive profitability they enjoyed from wider bid-offer spreads on odd-lots of corporate bonds.

176.     In response to this threat, Defendants conspired to use their positions on the BondDesk board to remove the existing management of BondDesk from their day-to-day leadership positions at the company in 2004.  Brad Levy of Goldman Sachs and Matthew Frymier of Bank of America, in particular, led this effort.

177.     Defendants pressured the leadership of BondDesk to leave by raising false concerns with the rest of BondDesk's board about the accounting BondDesk used for stock options.  At the time, BondDesk used Grant Thornton as its outside accounting firm.

178.    Levy and Frymier began by reaching out to Grant Thornton's partner in charge of the BondDesk account, and encouraged him to raise a red flag regarding the existing accounting treatment for stock options and the need to restate BondDesk's accounting statements.  Levy and Frymier realized that if there were any improprieties in the stock option accounting treatment, management would be held responsible.

179.    In exchange for raising the red flag, Levy and Frymier offered to refer additional accounting clients to Grant Thornton.

180.    Grant Thornton agreed to raise the red flag requested by Levy and Frymier, and the board (again controlled by a majority of directors affiliated with Defendants) used this stock options accounting issue as a ruse for a vote to remove BondDesk management, who was not supportive of the Defendants' interest in maintaining a corporate bond market in which odd-lot investors had little transparency and where Defendants could realize supracompetitive profits from wider bid-offer spreads resulting from them not having to compete.

181.    After odd-lot supportive management was forced out of, or sidelined from, BondDesk management, the Grant Thornton review of the stock options accounting issue was resolved without any changes being made to the existing accounting procedure.

**G.    Defendants Use TradeWeb (Which They Owned) to Acquire BondDesk and Permanently Foreclose BondDesk as a Retail-Focused Platform**

182.    Later, in 2006, Advent International Corporation, a private equity firm, bought a majority stake in BondDesk Group from its bank owners, thereby freeing BondDesk to pursue business from (and improve prices for) retail-focused odd-lot traders.  As a first step in this process, BondDesk announced in 2007 that it was extending its "online odd-lot fixed-income marketplace to institutional traders and portfolio managers," but not retail investors directly.  It did so via its

BondDesk Institutional platform, which "connect[ed] broker-dealers through a centralized marketplace by offering a diverse pool of liquidity."[38]

183.    By 2011, BondDesk was facilitating roughly a third of all retail-sized trades and was the primary bond trading platform for retail odd-lot-sized trades by several major retail and institutional investment advisors.   BondDesk's success was due, in part, to undercutting Defendants' pricing.  As one industry participant stated, BondDesk was "help[ing] the consumer to not absolutely get killed.  Consumers can buy 10 bonds for not so much higher a spread than what institutions pay for 10,000 bonds."[39]

184.    In August 2011, BondDesk hired Kim Bang from Bloomberg to be its CEO. Mr. Bang announced that his plan was to roll out a technology system at BondDesk for direct retail trading without the involvement of portfolio managers – directly threatening Defendants' role as intermediaries in the OTC market and the supracompetitive bid-offer spreads they charged retail odd-lot investors.  To this end, Mr. Bang implemented BondWorks, which created workstations for advisors and brokers to have direct access to BondDesk's fixed income wealth management platform.  Nineteen out of the top 20 bond brokers, including E*Trade, were expected to use BondWorks, which would eventually enable retail investors to access BondDesk for trading directly.

185.    By November 2011, BondDesk had also announced a partnership with Trade West Systems, a division of MarketAxess, to enable "BondDesk clients to seamlessly source liquidity

---

[38]     *See BondDesk Extends Largest Online Odd-Lot Fixed Income Marketplace*, BUSINESSWIRE (May 29, 2007), https://www.businesswire.com/news/home/20070529005238/en/BondDesk-Extends-Largest-Online-Odd-Lot-Fixed-Income-Marketplace.

[39]     *See* Brooke Southall, *Executive leaves Bloomberg with ambitious plan to unify the retail bond market*, RIABIZ (Aug. 18, 2011), https://www.riabiz.com/a/2011/8/19/executive-leaves-bloomberg-with-ambitious-plan-to-unify-the-retail-bond-market.

from third party platforms . . . in effect creating a retail supermarket for bonds."[40]  This service

was immediately made available to BondDesk's dealer clients, but not retail investors.  In August

2013, BondDesk reaffirmed its commitment to making "fixed income markets more transparent

and accessible to retail investors" by temporarily making its Factsheet bond pricing service free of

charge to any investor (up until then, the service had only been available to financial advisors using

BondWorks).[41]

186.    Threatened by these moves that would provide greater price transparency to retail

odd-lots investors and allow retail investors the opportunity to trade outside of the Defendant-

controlled and intermediated OTC market, Defendants took action.  Specifically, TradeWeb – an

electronic platform open only to institutional investors and owned in part by Bank of America

Merrill Lynch, Barclays, Citigroup, Goldman Sachs, JPMorgan, and Morgan Stanley – acquired

BondDesk on November 1, 2013 for a rumored $200 million (which was significantly less than

Advent had paid for it in 2006, and bewildering, given BondDesk's growth and the high and

increasing proportion of trades that were occurring via BondDesk in the odd-lot market).

187.    Initial reports suggested that BondDesk's purchase by TradeWeb would present an

opportunity for TradeWeb to expand into retail bond trading and to break the boundaries between

retail and institutional liquidity.  Reuters noted that BondDesk's sale was an opportunity to

"improve how bonds are presented to retail customers" and to "make pre-trade pricing and

---

[40]     *See BondDesk Announces Partnership with Trade West Systems to Include Aggregation to Extend to Rival Platforms*, BUSINESSWIRE (Nov. 21, 2011), https://www.businesswire.com/news/home/20111121005163/en/BondDesk-Announces-Partnership-Trade-West-Systems-Extend.

[41]     *See BondDesk's Bond Factsheet Service Now Free for a Limited Time to All Investors*, BUSINESSWIRE (Aug. 14, 2013), https://www.businesswire.com/news/home/20130814005758/en/BondDesk%E2%80%80 99s-Bond-Factsheet-Service-Free-Limited-Time.

benchmarks more accessible. . . .  [the] BondDesk platform is the perfect place for this information to be available.  Its new owner could take the lead in the odd-lot market."[42]

188.    Rather than use BondDesk's promise to improve trading, transparency, and ultimately prices for retail investors, Defendants (via TradeWeb) instead closed off BondDesk access for retail investors, unless those investors who were acting through Defendants or other institutional investors/dealers as middlemen.  BondDesk was folded into TradeWeb Direct – a platform that provided RFQ and click-to-trade trading in odd-lots, but was only open to institutional investors and dealers.[43]

189.    Today, TradeWeb Direct (formerly BondDesk) facilitates one in seven corporate bond trades reported to TRACE.  All of these trades, however, occur exclusively through dealers such as Defendants, as TradeWeb Direct is "on the desktop of every financial adviser at UBS, JPMorgan, Stifel Nicholas, RBS, Raymond James, BBNT, RW Baird. . . . [and in] pre-rollout/pilot stage at Morgan Stanley, Wells Fargo, Ameriprise Financial, Vanguard, and Fidelity."[44]  Because Defendants have prevented investors in odd-lots from using BondDesk as an actual all-to-all direct-trading platform, BondDesk does nothing to reduce the bid-offer spreads of odd-lot transactions relative to round lot transactions of the same bond issues, thereby perpetuating Defendants' ability to accrue supracompetitive profits from odd-lot investors.

---

[42]     *See* Reuters, *supra* note 35.

[43]     A FAQ on TradeWeb's website notes that "you must be an institutional investor to trade on TradeWeb" and that you are required to be "set up with dealers to trade on TradeWeb."

[44]     *See* https://events.wealthmanagement.com/tradeweb-direct (last visited Oct. 28, 2020).

**H.      Other Retail Focused Electronic Platforms for Trading Bonds Failed Due to Defendants' Resistance**

190.    Defendants' agreement to prevent competition from electronic platforms focused on retail bond investors dealing in odd-lots spanned nearly 20 years and continues to this day.

191.    In the late 1990s, with the advent of the internet, there was an explosion of bond e-trading startup companies.   According to a 2001 report by the Tuck School of Business at Dartmouth, 89 fixed-income trading platforms existed in the first quarter of that year.[45]  Almost all of these late 1990s-early 2000s electronic trading platforms for corporate bonds failed within a few years.   While some lacked sufficient capitalization, others had sub-standard technology, and still others had flawed business models, the largest impediment to the success of these platforms was (and remains) the resistance of Defendants.  As one journalist noted:

> Sell-side resistance to the wave of new [electronic] platforms was motivated by profit-and-loss (P&L).  Dealers controlled the corporate bond trade.  Something like an order book or matching system, where the buy side can trade directly with each other, would have pushed them farther toward the sidelines.  It is believed that they helped eliminate those platforms which might otherwise have gained traction and cut them out. . . .
>
> [A 2013] Tabb [Group] poll . . . showed 75 percent of [dealer] respondents calling "vested interests" the biggest reason why central limit order books [a.k.a. exchange-based electronic platforms] have had trouble finding a foothold in fixed income.[46]

192.    Even when such electronic platforms had success, they were quickly acquired and shuttered by Defendant-backed platforms, as occurred with BondDesk.  For instance, Trading Edge had some success in 1999-2000 with an exchange-like electronic trading platform that

---

[45]      Examples of such platforms included BondConnect, BondGlobe, BondHub, BondLink, InterVest, Visible Markets, XBond, Limit Trader, and Trading Edge.  *See* Jake Thomases, *Corporate Bonds: The Lost Generation of Corporate Bond Platforms*, WATERSTECHNOLOGY (May 31, 2013).

[46]      *Id.*

allowed anonymous matching on bond trades designed to increase available liquidity to investors and thereby decrease bid-offer spreads.

193.    However, in March 2001, Trading Edge was acquired by MarketAxess, an electronic trading platform open only to institutional investors and founded in 2000 by, among others, JPMorgan.  As late as 2011, JPMorgan Asset Management Holdings Inc. still held a 17.5% stake in MarketAxess.  Richard McVey, CEO of MarketAxess, said that the company "believe[s] investor response to having both multi-dealer and anonymous trading models on one platform will be overwhelmingly positive," and MarketAxess stated that it would integrate Trading Edge's anonymous trading capability to its current platform, offering investors the option of immediate liquidity through disclosed counter party or anonymous trading.

194.    However, within seven months of the acquisition, MarketAxess shuttered Trading Edge's anonymous trading platform, stating that it had "decided to terminate [Trading Edge's] anonymous convertible and municipal bond trading platforms and currently offer U.S. corporate bond and emerging bond trading on a fully disclosed [*i.e.*, non-anonymous] basis only."  As one analyst later noted, Trading Edge was "an anonymous model that could have threatened MarketAxess's business model" – and also therefore threatened the centrality and control over bid-offer spreads that MarketAxess's bond dealer backers (including Defendants) enjoyed.

## I.    The Survival of Electronic Platforms that Are Only Open to Institutional Investors Is Further Proof of Defendants' Anticompetitive Conduct

195.    Platforms restricted to institutional investors are the only corporate bond electronic trading platforms on which Defendants participate, and hence, the only platforms that have sufficient market connectivity to survive.  This is clear evidence that Defendants agreed to stop the emergence of electronic trading platforms that sought to increase pre-trade pricing transparency and increase pricing competition for retail investors trading in odd-lots.  At present,

three electronic trading platforms – MarketAxess, TradeWeb, and Bloomberg TOMS – represent approximately 97% of the market in electronic trading of corporate bonds.  All three of these platforms have significant relationships with Defendants, and all three of these platforms are only available to institutional investors.

196.    Defendants collectively held a 46% ownership stake in TradeWeb as of the filing of its Form S-1 Registration Statement with the SEC on March 7, 2019 as part of TradeWeb's initial public offering.

197.    While Bloomberg is not itself a dealer, its business is significantly dependent upon its relationships with dealers such as Defendants, who utilize and subscribe to both the Bloomberg TOMS for corporate bonds, and the extensive Bloomberg Terminal system.

198.    While not exchange-based trading platforms (they are more accurately described as electronic versions of traditional OTC/dealer market trading), these three electronic trading platforms nonetheless allow investor-to-investor direct trading (without intermediary dealers), and increase pre-trade pricing transparency, which results in better competition on pricing and lower transactional costs for institutional investors trading in corporate bonds.

199.    All three platforms also allow their institutional investor customers to trade in odd-lot transactions, demonstrating that these platforms could accommodate retail investors dealing exclusively in odd-lot transactions.

200.    Despite this fact, all three of these electronic trading platforms are closed to retail investors – investors who deal exclusively in odd-lot transactions.  Even as other markets with a great deal of risk to investors – foreign exchange, options, futures, stocks – are open to retail investors on electronic platforms, the corporate bond market remains closed.

201.     Another recent site in the U.S. corporate bond space, BondCliQ, is an electronic quote feed that claims to be attempting to modernize corporate bond trading by "enabl[ing] all participants to see the same quotes, including size, at the same time."  BondCliQ provides quotes from dealers on corporate bonds, but requires participants to arrange trades themselves rather than providing a platform for direct trading.

202.     While BondCliQ has persuaded four of the top 10 U.S. corporate bond underwriters to provide quotes on the site, it has only secured this participation because, like MarketAxess, TradeWeb, and Bloomberg, it is only open to institutional round lot traders, advertising that it is "focused on improving the institutional >=$1MM market for corporate bonds."  BondCliQ again demonstrates that Defendants are only willing to participate in improving pre-trade price transparency and competition for institutional round lot traders, and will not participate if such benefits might flow to retail investors so as to maintain their supracompetitive pricing on retail sized odd-lot trades.

203.     The fact that electronic trading platforms (like MarketAxess, TradeWeb, and Bloomberg TOMS) and electronic pricing services (like BondCliQ) with pre-trade pricing transparency and greater competition on pricing for odd-lots of corporate bonds are open to institutional investors, but not retail investors, defies any economic, competitive justification. Consequently, Plaintiffs and the Class members were required to buy odd-lots of corporate bonds at higher prices and to sell odd-lots of corporate bonds at lower prices as a direct result of this, and other, anticompetitive conduct by Defendants.

IV.   **DEFENDANTS ARE ALLEGED TO HAVE ENGAGED IN SUBSTANTIALLY SIMILAR CONDUCT IN OTHER TRADING MARKETS TO RESTRAIN THE EVOLUTION FROM OTC TRADING TO ELECTRONIC TRADING, INCLUDING EXCHANGES**

204.   Defendants' anticompetitive conspiracy to restrict competition on pricing for odd-lots of corporate bonds is not an isolated occurrence.  Defendants engaged in multiple, similar anticompetitive conspiracies in other markets for financial instruments during the Class Period that led to government investigations, criminal trials and convictions, billions of dollars in fines, and successful litigation by injured investors.  Plaintiffs briefly describe in this and the next section *10* such cases of Defendants' recidivist behavior in terms of antitrust law violations.

205.   These findings further support the conspiracy alleged in this complaint because they demonstrate each Defendant's previous willingness to collude in precisely this fashion before and/or collude in other anticompetitive ways in connection with financial instruments.  They also demonstrate the Defendants' deficient sales and trading compliance and oversight during the Class Period to prevent this type of conduct.  Furthermore, their history of past anticompetitive collusion in the financial markets supports the feasibility and plausibility of the anticompetitive odd-lot conspiracy alleged herein, and Defendants' failure to employ sufficient compliance and oversight systems in their sales and trading businesses to detect such anticompetitive conduct during the Class Period.

A.   **Credit Default Swaps**

206.   The conduct in the CDS litigation[47] was almost identical to the anticompetitive conduct alleged in this complaint, and the CDS litigation involved most of the same defendants as this complaint.  The CDS defendants had been enjoying supracompetitive profits from inflated

---

[47]   *In re Credit Default Swaps Antitrust Litigation*, No. 13-md-2476 (DLC) (S.D.N.Y.).

bid-offer spreads in the market as a result of the inefficiency of the market and their dominance of the CDS OTC market.  In the CDS litigation, plaintiffs alleged that the development of electronic exchanges for CDS transactions threatened to introduce price transparency and other efficiencies that would have eliminated CDS defendants' ability to charge artificially inflated bid/ask spreads. In order to protect their market power and to block low-cost exchange trading platforms from entering the market, the CDS defendants allegedly conspired to successfully boycott electronic exchanges and clearinghouses for CDS transactions.  The CDS defendants used their influence as the largest customers and members of the boards of IHS Markit and ISDA to pressure both entities to agree not to grant licenses to CMDX, an exchange for trading CDS.  CDS defendants' concerted efforts killed the exchange and deterred potential new entrants from setting up exchange trading platforms, and thus, inefficient and expensive transactions persist in the CDS market, to the benefit of CDS defendants and at great expense to investors.

207.     The CDS litigation ultimately settled, with the CDS defendants agreeing to collectively pay over $1.86 billion to plaintiffs harmed by the antitrust conspiracy.

## B.     Interest Rate Swaps

208.     Investors filed an antitrust class action alleging a group boycott conspiracy among major interest rate swaps ("IRS") dealers including Defendants Bank of America, Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, and RBS (now NatWest) as well as other banks.  The IRS complaint alleged that the IRS market was historically an OTC market and the opaque nature of the OTC market allowed IRS defendants to inflate the bid/ask spreads without buy-side customers having an effective way to obtain competitive quotes on a real-time basis.  When the IRS market became increasingly ripe for a shift away from the traditional OTC model in favor of electronic exchange-like execution and clearing, IRS defendants collusively blocked the entry of exchange-like electronic trading platforms that

threatened to disrupt the status quo.  Defendants Goldman Sachs, Bank of America, Barclays, Citi, Deutsche Bank, JPMorgan, and Morgan Stanley utilized "strategic investment groups" to coordinate with other defendants to control how the IRS market would evolve so as to protect their supracompetitive profits.

209.    Specifically, in 2007, TradeWeb was planning to introduce electronic all-to-all trading to the IRS market.  In response to this threat, Defendants Bank of America, Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, and RBS joined an initiative they named "Project Fusion" and took control of TradeWeb's IRS business to prevent it from pursuing all-to-all electronic IRS trading, but without attracting scrutiny.  Under the cover of a supposedly lawful and independent enterprise, IRS defendants also used TradeWeb as a forum to hold secret conspiratorial discussions and coordinate their efforts to squash any other threats that arose going forward.  The IRS defendants collectively starved and punished the new platforms attempting to offer the buy-side access to an anonymous all-to-all trading until they failed.  In addition, the IRS defendants also worked together to systematically deny buy-side customers to inter-dealer swap execution facilities, which they controlled, and used their market power to threaten and retaliate against buy-side entities that attempted to participate in exchange-style IRS execution.  As a result of the conspiracy, the IRS market is artificially bifurcated:  on one side is an efficient dealer-to-dealer market, which is exclusively for dealers and allows anonymous, competitive exchange-like trading; on the other side is an opaque and inefficient dealer-to-customer OTC market where investors must trade with select dealers and cannot trade with one another – a bifurcation similar to the one between odd-lots and round lots of corporate bonds trading.  This conspiracy allowed the IRS defendants to extract billions of dollars in higher trade costs from the IRS investors.

210.    The IRS defendants' motion to dismiss was partially denied and the case is pending in the United States District Court for the Southern District of New York.[48]

### C.    Stock Loan Market

211.    Plaintiffs in the stock loan market litigation[49] allege that defendants conspired to prevent modernization of the stock loan market.  While technological progress has improved other financial markets, stock lending remains an opaque OTC market in which there is no central marketplace for stock borrowers and lenders to trade directly with one another or see real-time pricing that could help secure better financial terms.  Instead, stock lenders and borrowers must transact through intermediaries, also known as "prime brokers," who take a massive cut of nearly every stock loan transaction.  The six investment banks named in the Stock Loan action are the dominant prime brokers in the U.S., including Bank of America, Credit Suisse, Goldman Sachs, JP Morgan, and Morgan Stanley, together with other investment banks.

212.    Recognizing the nascent threat posed by all-to-all electronic trading, Stock Loan defendants conspired together to protect their mutual interests.  Specifically, in 2001, Defendants Barclays, Goldman Sachs, JPMorgan, and Morgan Stanley, along with a handful of other market participants, formed a company called EquiLend and made it clear to market participants that all new entrants into the market would need to go through EquiLend.  Therefore, defendants used EquiLend as a vehicle through which they could protect their privileged role as a broker on every stock loan trade.  Stock Loan defendants also used their membership in EquiLend as a pretext to meet and discuss threats they saw to their privileged position in the stock loan market and how to combat them.  A major threat they identified was the development of competitive exchange

---

[48]    *In re: Interest Rate Swaps Antitrust Litigation*, No. 1:16-md-02704 (S.D.N.Y.).

[49]    *Iowa Public Employees' Retirement System v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., No. 17-Civ-6221 (KPF) (S.D.N.Y.).

platforms like AQS and SL-x for stock lending. In response, Stock Loan defendants starved those start up platforms of liquidity and they used their influences with clearing houses to block these platforms access to central clearing.   In addition, Stock Loan defendants also used threats and intimidation to discourage their customers from using these platforms.   In order to prevent similar threats from emerging in the future, Stock Loan defendants used EquiLend jointly to purchase the intellectual property underlying those exchanges simply to make sure that no future entrant could offer the same functionality to challenge their stock loan hegemony.   Stock Loan defendants collectively, again, via the vehicle of EquiLend, took a controlling ownership stake in AQS in order to ensure that they would control all commercially viable paths to central clearing.   As a result of these alleged actions, Stock Loan defendants maintained their monopoly grip as prime broker intermediaries, and, by extension, their ability to charge excessive fees under the cover of price opacity – the precise pattern of conduct engaged in by Defendants in this case in connection with odd-lots of corporate bonds.

213.    On September 27, 2018, Judge Failla denied a motion to dismiss the class complaint against defendants in the stock loan market antitrust class action; that case remains pending.[50]

## V.    OTHER SECTION 1 VIOLATIONS SHOW DEFENDANTS' CALLOUS INDIFFERENCE TOWARD THE ANTITRUST LAWS

### A.    LIBOR/Euribor/Yen LIBOR/Swiss Franc LIBOR

214.    Government investigations and civil lawsuits have revealed widespread collusion among banks to manipulate benchmark interest rates for multiple currencies (U.S. Dollar LIBOR, Euribor, Yen LIBOR, Swiss franc LIBOR).   These investigations have led to fines of upward of $9 billion and civil settlements over $500 million for price fixing.   Barclays, Bank of America,

---

[50]     *Id.* at ECF No. 123.

Deutsche Bank, Citigroup, and JPMorgan have all been fined or pleaded guilty.  Regulators found that these banks engaged in widespread misconduct, including coordinating false submissions by panelists to the benchmark-setting panel, sharing customer and order information, and manipulating market prices by submitting false orders (*i.e.*, "spoofing").

### B.    Foreign Currency Exchange Spot Market

215.    Defendants in this complaint have also been accused of fixing bid-offer spreads, coordinating trading strategies with competitors to manipulate benchmark prices, and sharing confidential customer order information and proprietary information on trading positions with competitors in the foreign exchange ("FX") market.

216.    Investigations by financial regulators from around the globe resulted in criminal guilty pleas, settlements, and fines totaling over $11 billion, as well as the release of orders, notices, and reports detailing exactly how the banks colluded to manipulate the FX market.

217.    For instance, the Commodity Futures Trading Commission ("CFTC") and U.K. Financial Conduct Authority entered orders imposing over $2.17 billion in fines on JPMorgan, Citigroup, Barclays, and other entities for manipulating the FX market.  The Office of the Comptroller of the Currency likewise fined Bank of America, JPMorgan, and Citigroup another $950 million for manipulation, collusion, and other market-abusive conduct in the FX market. Additionally, on May 20, 2015, the DOJ announced that JPMorgan, Barclays, and Citi (along with other entities) were fined a total of over $2 billion by the DOJ, and each pleaded guilty to criminal conspiracy charges for manipulating FX prices and the benchmark rates.  And the Federal Reserve imposed more than $1.4 billion in additional fines on Bank of America, JP Morgan, Barclays, Citigroup, Deutsche Bank, and Goldman Sachs (along with other entities) for their "unsafe and unsound practices in the foreign exchange markets," and the NYDFS fined Barclays, Credit Suisse, Deutsche Bank, and Goldman Sachs (along with other entities) a total of over $879 million for

conspiring with other banks, including JPMorgan, to manipulate FX prices.  In May 2019, the European Commission fined Barclays, Citigroup, and JPMorgan (along with other entities) about $840 million for taking part in two cartels in the spot FX market.

### C.     ISDAfix

218.    Bank of America, Goldman Sachs, and JPMorgan (along with other entities) have collectively paid over $222 million to settle private antitrust and common law claims concerning these banks' collusive manipulation of the ISDAfix benchmark.  Goldman Sachs paid an additional $120 million to settle "particularly brazen" manipulation of the ISDAfix benchmark; Barclays and Citigroup, too, have paid large settlement sums to the CFTC for their manipulation of ISDAfix.

219.    The Defendants' misconduct related to ISDAfix was undertaken, like that described above, to line their own pockets at the expense of their customers and competition, providing another illustration of a lack of internal controls, horizontal collusion between Defendants that harmed competition and increased prices, and a culture where preserving the bottom line was used to justify serious misdeeds.

### D.     Mexican Government Bonds

220.    The Mexican antitrust regulator, the Comisión Federal de Competencia Económica ("COFECE") announced in April 2017 that it discovered evidence of anticompetitive conduct among dealers in the Mexican Government Bond ("MGB") market, including subsidiaries of Barclays, Citigroup, JPMorgan, Bank of America, and Deutsche Bank.  At least one bank was accepted into its cartel leniency program after admitting to participation in a conspiracy to fix Mexican Government Bond prices.  After three years of investigation, on October 14, 2019,

COFECE announced that it found evidence of collusion to manipulate MGB prices during a span of 10 years.[51]

### E.     GSE Bonds

221.    In 2018, DOJ opened a criminal investigation into whether some traders manipulated prices in the market for unsecured bonds issued by government sponsored entities ("GSEs").  Deutsche Bank is cooperating with the DOJ in this antitrust investigation.

222.    Buy side GSE bonds investors also filed a class action[52] against 16 banks, including all the Defendants in this litigation as well as other entities, accusing them of conspiring to manipulate the prices of GSE bonds.  Defendants' alleged misconduct in the GSE bonds market involves fixing the "free to trade" ("FTT") prices of newly issued GSE bonds and artificially inflating the bid-ask spreads.  Defendants in the GSE antitrust litigation agreed to pay a combined $386.5 million to settle the case.

### F.     Precious Metals

223.    In 2015, DOJ, CFTC, Swiss Competition authority, WEKO, and antitrust regulators from the European Union all announced that they opened investigations into possible collusion in the precious metals market by several major banks, including, among others, Barclays, Credit Suisse, Deutsche Bank, Goldman Sachs, and JPMorgan.  Several former traders from Deutsche Bank and JPMorgan pleaded guilty to manipulate the prices of gold, silver, platinum and palladium futures contracts.  Deutsche Bank also paid $60 million to settle the related civil action.

---

[51]    Michael O'Boyle, *Mexico's Big Banks Unrevealed in Bond Market Collusion Probe*, BLOOMBERG (Oct 14, 2019), https://www.bloomberg.com/news/articles/2019-10-14/mexico-s-big-banks-unveiled-in-bond-market-collusion-probe-leak.

[52]    *In re GSE Bonds Antitrust Litigation*, No. 1:19-cv-01704-JSR (S.D.N.Y.).

## VI.   PLUS FACTORS DEMONSTRATE DEFENDANTS' CONDUCT CANNOT BE EXPLAINED AWAY AS MERE PARALLEL CONDUCT

224.   Defendants' conduct – consistently charging unjustified higher transaction costs for odd-lot bonds versus round lot bonds – is not mere parallel conduct.   Numerous plus factors, recognized by the antitrust enforcement agencies and the courts as indicia suggesting collusive conduct, exist to demonstrate the plausibility of Plaintiffs' alleged conspiracy.[53]

### A.   Peer-Reviewed Research Demonstrates Actions Against Unilateral Self-Interest in the Absence of an Agreement

225.   As discussed in Section II.A, peer-reviewed research on odd-lot versus round lot trading in the corporate bond market demonstrates that dealers charge odd-lot investors higher selling prices and pay them lower purchase prices than round lot investors for the same bond issue. This "adverse pricing" results in wider spreads, and therefore higher costs, for odd-lot investors than round lot investors, at a statistically significant magnitude.

226.   Antitrust scholars have concluded that such statistically significant differences between actual and competitive prices constitute a plus factor consisting of "actions or conduct that could occur in the presence of a collusive agreement but that are highly unlikely to occur in its absence."[54]   In the present case, 11 different peer-reviewed studies have found "adverse pricing," thus providing ample empirical evidence in support of this plus factor.

---

[53]      *See*, *e.g.*, ABA Section of Antitrust Law (2018), *Proof of Conspiracy Under Federal Antitrust Laws*, Section III.E.3, quoting from *Merck-Medco Managed Care v. Rite Aid Corp.*, 201 F.3d 436, at *10 (4th Cir. 1999). ("Courts discuss conduct against self-interest as a plus factor and the fundamental principle underlying many other kinds of conduct to which the plus factor label is attributed.  The basic concept behind this factor is that if the defendants have engaged in conduct that would further the interests of a conspiracy but would be against each defendant's interest if it were acting separately, the actions taken by the defendants are circumstantial proof of conspiracy. Such evidence has been described as 'perhaps the strongest plus factor indicative of a conspiracy.'") *Id*.

[54]      W. Kovacic, R. Marshall, L. Marx, and H. White, "*Plus Factors and Agreement in Antitrust*

**B.     Analysis of Riskless Principal Trades Demonstrates Actions Against Unilateral Self-Interest in the Absence of an Agreement**

227.     As discussed in Section II.B, economic analysis demonstrates that RPT spreads on transactions implemented by Defendants show economically and statistically significant differences in transaction costs for round lot and odd-lot trades.

228.     As noted above, antitrust scholars have concluded that such statistically significant differences between actual and competitive prices constitute a plus factor consisting of "actions or conduct that could occur in the presence of a collusive agreement but that are highly unlikely to occur in its absence."[55]   In the present case, the fact that RPT spreads on transactions implemented by Defendants show economically and statistically significant differences in transaction costs for round lot and odd-lot trades demonstrates the existence of this plus factor.

**C.     The Market Is Highly Concentrated**

229.     As noted above, Defendants control the vast majority of trading, such that the market is highly concentrated.  The existence of dealers who might not have been part of the conspiracy does not prevent Defendants' ability to conspire, or serve to constrain the conspiratorial pricing in the sale of odd-lot bonds, because Defendants control the necessary capital to have the largest inventory of bonds, and therefore to compete for the most business.   In short, the Defendants control the largest inventory of bonds because they serve as underwriters and issuers of those bonds.   That dominance over the supply of U.S. corporate bonds has allowed them to effectively conspire to inflate the spreads of odd-lot bonds in the secondary bond trading market.

---

*Law*," MICHIGAN LAW REVIEW, vol. 110, pp. 393-436, at 428 (2011).  *See also* E. Marshall, and L. Marx, *The Economics of Collusion*, MIT PRESS, Ch. 4 (2012).

[55]      *Id.*

230.    Nor would a smaller participant in the U.S. corporate bond market who did not participate in the conspiracy wrought by the largest underwriter dealers have the incentive to undercut the inflated prices resulting from the conspiracy.  That smaller dealer would also benefit from those inflated prices and would not be able to garner enough capital to support a significant number of trades to justify offering lower, competitive prices in any event.

**D.      Common Motive to Conspire**

231.    Given their collective control of the concentrated Relevant Market, Defendants share a common motive to conspire to charge adverse prices to odd-lot bond investors.  By conspiring to do so, Defendants retain their respective controlling shares of the market while still securing supracompetitive profits for each colluding Defendant; these supracompetitive profits compensate Defendants for the lost opportunity to compete individually and secure more of the odd-lot bond business.

**E.      No Legitimate Economic Justifications Explain the Magnitude of Adverse Pricing for Odd-Lot Trades of Corporate Bonds vs. Round Lot Trades of the Same Bond Issue**

232.    The costs to Defendants for actual transmission and trading execution is, on information and belief, the same whether the Defendants are dealing in odd-lots or round lots of corporate bonds.  The round lot spread differentials charged by Defendants for their dealer function in corporate bonds presumably suffices to cover the costs incurred by Defendants and to realize an adequate profit.

233.    The existence and persistence of significantly wider spreads for odd-lot corporate bond trades than for round lot trades (as demonstrated in the research summarized above) is itself evidence that Defendants are acting against their unilateral interest by failing to compete on pricing for odd-lot trades.  The magnitude of adverse pricing for odd-lot trades cannot be the result of legitimate, individual economic decisions given that round lot trade prices for the same bonds are

substantially lower – yet still profitable.  In a competitive market untainted by collusive conduct, any individual Defendant could easily narrow its odd-lot spreads toward greater parity with its round lot spreads while making a profit, and thereby capture a greater percentage of the total market in odd-lot trading at still profitable round lot spreads.

234.    Indeed, FINRA Rule 5310 would assist Defendants in seizing greater odd-lot market share if they provided more competitive odd-lot spreads.  Under Rule 5310, FINRA members (such as wealth management advisors representing retail investors in bond transactions) have a duty to "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions."  Thus, any individual Defendant who offered better pricing for odd-lots would, given the FINRA Rule 5310 best execution requirements, eventually succeed in winning market share from those Defendants who refused to offer more competitive odd-lot pricing.

235.    That adverse pricing for odd-lots continues even as FINRA Rule 5310 requires members to seek best pricing for customers suggests that responsibility for higher odd-lot pricing lies not with retail customers or their wealth management advisors (since FINRA Rule 5310 presumably requires customers' wealth management advisors to seek out best pricing), but rather, is a direct result of Defendants' conspiracy to suppress competition in odd-lot pricing.  This is especially true in the case of RPTs, where Defendants know a better price is available for their customers (represented by the other leg of the RPT that Defendants trade), and yet still provide adverse prices to odd-lot RPTs compared to round lot RPTs.

236.    The failure to obtain the best execution price available is a direct result of Defendants' conspiracy, and it deprives customers of billions of dollars.

### F.    There Are High Levels of Interfirm Communication Between Defendants

237.    Defendants' collusion is facilitated by the high levels of interfirm communication between Defendants in the Relevant Market, which makes fixing prices in odd-lots of corporate bonds easier to accomplish.

238.    Within Defendants themselves, bond trading desks are organized in such a fashion that one individual is responsible for all bonds in a particular industry, or all bonds issued by a particularly large issuer.  Thus, each Defendant might have a specific bond trader responsible for corporate bonds issued by energy companies, one trader responsible for automotive manufacturers, or even one trader responsible for all bonds issued by a large issuer such as AT&T.

239.    These traders, in turn, are responsible for publishing via Bloomberg messages pricing for these bonds to salespeople in the market, many of whom work at other Defendants, and who then communicate this pricing to their own bond traders.  The result is a constant communication loop among a small group of bond trading insiders.

240.    This communication loop is bolstered by online platforms – such as MarketAxess and TradeWeb – where Defendants' traders see live quotes from their competitors and likewise coordinate their pricing.  These platforms are controlled by and/or owned by dealers such as Defendants, and are closed to retail investors.  Further, Defendants' traders also see the prices at which their competitors are executing odd-lot trades via TRACE.

241.    In short, interfirm communication of bond pricing occurs via Bloomberg messages, via dealer-to-sales-desk-to-dealer channels, and on online platforms closed to retail investors.  Given the persistence and magnitude of supracompetitive corporate bond odd-lot pricing, it appears that Defendants use these channels of interfirm communication to collude, rather than to find ways to compete that would improve prices for odd-lot investors.

**G.      The Higher Prices for Odd-Lot Transactions Have Persisted Even as Advances in Electronic Trading Have Driven Defendants' Trading Costs Down and Demand for Odd-Lot Bond Transactions Has Increased**

242.     The persistence of higher pricing for odd-lots is further evidence that Defendants are colluding.

243.     Given the significant and growing share of the market that odd-lot trading represents, Defendants should be vigorously competing over odd-lot pricing to capture a larger share of this market.  Instead, odd-lot investors continue to face spreads that are wider than those offered to round lot investors in the same corporate bond issues.

244.     The higher pricing for odd-lots is even more incongruous, given the advances in electronic trading, transmission, and record-keeping that have made OTC bond trading more efficient and less costly to Defendants.  These advances should have led to lower odd-lot trading costs and spreads, as cost-savings to the Defendants were passed on, via competition, to investors.  That odd-lot investors instead still face much higher pricing compared to round lot investors in the same corporate bond issues is further evidence of collusion.

245.     Even as transparency regarding post-trade data on corporate bonds has increased following the adoption of the publicly available TRACE database, the lack of transparency of pre-trade pricing has continued the adverse pricing for odd-lot trades of corporate bonds.  If Defendants were actively competing against each other to obtain more odd-lot business, the data in TRACE would show them that they could increase their share of odd-lot trading volumes by improving their odd-lot pricing.

## VII.   RELEVANT MARKET DEFINITION

246.     The relevant product market is the secondary market for odd-lots of United States corporate bonds (bond lots with a size of less than $1 million).  Hereinafter, the market will be referred to as "the relevant market."

247.     Most U.S. corporate bonds are traded OTC, and thus every investor must use OTC trading to transact with dealers in order to have access to and trade in U.S. corporate bonds.  There are few, if any, substitutes for OTC trading in the secondary market for investors who wish to trade in U.S. corporate bonds.

248.     Defendants' role and dominant market share in OTC trading in the secondary market for U.S. corporate bonds provides Defendants with the power to limit competition on bid-offer spreads for odd-lots, and by doing so allows Defendants and others to charge supracompetitive prices on odd-lots versus round lots of the same U.S. corporate bonds in the relevant market.

249.     Via their agreement to restrain competition on bid-offer spreads of odd-lots, the Defendants have preserved their dominant market share of OTC trading in the secondary market, and maintained supracompetitive prices.

250.     The higher costs that result from Defendants' agreement not to compete on bid-offer spreads for odd-lots of corporate bonds raises prices for odd-lot investors.  The persistence of the wider bid-offer spread incentivizes Defendants to continue to avoid competition on odd-lot pricing.

251.     Defendants' agreement among themselves not to compete on pricing of odd-lot transactions is a horizontal conspiracy in restraint of trade to affect, raise, fix, maintain, and stabilize prices in the market for odd-lots of U.S. corporate bonds.

252.     Defendants' concerted effort to deny an essential facility to an electronic trading platform that sought to provide retail investors dealing in odd-lot transactions of corporate bonds with greater pre-trade pricing transparency and increased competition on odd-lot pricing was a

horizontal conspiracy in restraint of trade to affect, raise, fix, maintain, and stabilize prices in the markets for odd-lots of U.S. corporate bonds.

253.     Defendants' group boycott of electronic trading platforms that sought to provide retail investors dealing in odd-lot transactions of corporate bonds with greater pre-trade pricing transparency and increased competition on odd-lot pricing was a group boycott in restraint of trade to affect, raise, fix, maintain, and stabilize prices in the markets for odd-lots of U.S. corporate bonds.

254.     The effect of this unlawful conduct has been and will continue to be to restrain or eliminate competition among Defendants in regards to the pricing of odd-lots, and will allow Defendants to reap inflated, supracompetitive profits generated by the wider bid-offer spread on odd-lots of U.S. corporate bonds.

255.     The geographic scope of the market is the United States.

## VIII.   IMPACT OF DEFENDANTS' CONDUCT ON RELEVANT MARKETS AND INVESTORS

256.     Publicly available data (including the academic studies discussed above) suggests that Defendants earn supracompetitive fees by maintaining a wider bid-offer spread on odd-lots of corporate bonds as a result of their anticompetitive conduct.

257.     Given the total volume of trading during the Class Period (over $35.2 trillion in par value of corporate bonds traded just between 2013-2017) and the findings of the aforementioned academic studies that odd-lots transaction costs exceeded the costs of round lots by a conservative 10 basis points (if not more), Plaintiffs reasonably believe the potential damages to investors

during the relevant time period could amount to billions of dollars of damages caused by Defendants' anticompetitive practices.[56]

## **ANTITRUST INJURY**

258.    As a result of Defendants' conduct, Plaintiffs and the Class have suffered antitrust injury.  Defendants are horizontal competitors who compete to buy and sell odd-lots of corporate bonds to Plaintiffs and the Class.  Plaintiffs and the Class are their customers who directly buy from Defendants and sell to Defendants odd-lots of corporate bonds.  Defendants conspired to charge unlawful, artificial bid and offer prices for odd-lots of corporate bonds.  Plaintiffs and the Class directly paid the supra-competitive price to Defendants when buying odd-lots of corporate bonds, or directly received the worse price from Defendants when selling odd-lots of corporate bonds.  Plaintiffs and the Class have suffered the quintessential antitrust injury – purchasing a price-fixed product directly from horizontal competitors.

## **FRAUDULENT CONCEALMENT**

259.    During the Class Period, Defendants actively, fraudulently, and effectively concealed their collusion, as alleged herein, from Plaintiffs and members of the Class.  Plaintiffs did not discover and could not have discovered through the exercise of reasonable due diligence that they were injured by Defendants' conspiracy.

---

[56]    Plaintiffs believe a total damages value in the billions may even be conservative.  From 2013-2018, over $43.1 trillion in notional value of corporate bonds were traded in the United States.  If White (2017) is correct that odd-lot trades represent around 18% of daily market volume ($7.77 trillion) and Plaintiffs could demonstrate that Defendants' anticompetitive conduct resulted in odd-lots having just a 10 basis point higher transaction cost (again, conservative based on the academic literature) than comparable round lot transactions, that would indicate potential damages of $7.77 billion during just 2013-2018.  That number would still be a conservative estimate, because it would not include the August 1, 2006-December 31, 2012 period or the trading to-date in 2019 (times covered by the Class Period but not reflected in the calculation), nor any trebling of damages, and is based off a conservative 10 basis point estimate of the odd-lot pricing differential (the evidence could support a higher differential).

260.   By its very nature, the unlawful activity alleged herein was self-concealing. Defendants conspired to unreasonably restrain the trade of odd-lots of corporate bond in the secondary market and artificially inflated bid/offer spreads to the benefit of Defendants and to the detriment of Plaintiffs and members of the Class.  Defendants also conspired to keep their collusive and manipulative conduct secret, including to communicate via channels that are unavailable to the public, because their joint efforts would not have been successful if they had been made public.

261.   Defendants' collusion is facilitated by the high levels of interfirm communication between Defendants.  The details of these communications were secret, as well as identities of the individuals conducting these communications.  The communications among Defendants occurs via Bloomberg messages, via dealer-to-sales desk-to-dealer channels, and on online platforms closed to retail investors.  Plaintiffs and the Class have no way to access such communications, rendering impossible any ascertainment of the fact and details of the conspiracy as a whole.

262.   None of the facts or information available to Plaintiffs and the Class, if investigated with reasonable due diligence, could or would have led to the discovery of the conspiracies alleged in this complaint.

263.   Defendants also took active steps to conceal evidence of their misconduct from Plaintiffs, the Class, and the public by holding out their activities in the financial markets, including the corporate bond market, as good-faith conduct.  Indeed, each Defendant's code of conduct represented that their operations were above-board, providing a false sense of security to corporate bond investors:

(a) **Bank of America**.  Bank of America's 2020 Code of Conduct[57] states that " we are expected to deal fairly with our employees, customers, suppliers, competitors and other third parties" and Bank of America employees should refrain from taking "unfair advantage of any employee, customer, supplier, competitor or other third party through manipulation, concealment, misuse of proprietary and/or confidential information, known misrepresentation of facts or any other unfair business practice."[58]

(b) **Barclays**.  Barclays's Code of Conduct, which is titled "the Barclays Way," states that "we act fairly, ethically and openly and abide by standards which are in many cases higher than those set by the laws and regulations which apply to our business."[59]  The code also prohibits anyone working for Barclays from making "any agreements of a formal or informal nature with competitors to fix or set prices or interest rates, restrict the supply of goods or services, conduct bid rigging, marking sharing or any other anticompetitive practice."[60]

---

[57]    Bank of America's 2020 Code of Conduct applies to employees of "Bank of America Corporation and each of its direct and indirect subsidiaries."  Bank of America 2020 Code of Conduct, at 6, available at http://investor.bankofamerica.com/static-files/a359ed51-ef9b-4746-be90-bfbc892b3b02.

[58]    *Id*. at 10.

[59]    Barclays, The Barclays Way How We do Business, at 6, https://home.barclays/content/dam/home-barclays/documents/citizenship/the-way-we-do-business/The%20Barclays%20Way%202020_Online.pdf.

[60]    *Id*. at 13.

(c) **Citi.**  Citi's Code of Conduct[61] states that "[w]e are committed to dealing fairly and honestly with our clients, suppliers, distributors, competitors, and employees,"[62] and people working at Citi must "[n]ot engage in manipulation, concealment, abuse of confidential information, misrepresentation of material facts, or other unfair dealings or practices."[63]

(d) **Credit Suisse.**  Credit Suisse's Code of Conduct[64] states that the bank "strive to maintain an exemplary control and compliance culture" and people working at Credit Suisse are responsible for "[l]eading by example, particularly in supervisory roles by setting the right tone for compliance with applicable laws, regulations and policies" and "acting in good faith and with due care at all times."[65]

(e) **Deutsche Bank**.  Deutsche Bank's Code of Conduct states that "all business conducted by our employees must be driven by legitimate reasons and must be conducted in a manner that avoids or minimizes market disruption."[66]  Deutsche Bank employees "must not engage in activities, practices or conduct that are manipulative, illegal,

---

[61]    Citi's Code of Conduct "has been adopted by the Board of Directors of Citigroup Inc. ("Citi") and applies to every director, officer, and employee of Citigroup Inc. and its consolidated subsidiaries . . ."  Citi Code of Conduct a Citi of Leaders: Enabling Growth and Progress, at 2, https://www.citigroup.com/citi/investor/data/codeconduct_en.pdf.

[62]    *Id*. at 24.

[63]    *Id.*

[64]    Credit Suisse's Code of Conduct applies to "all members of the Board of Directors and employees of the Credit Suisse Group AG and all of its subsidiaries."  Credit Suisse Code of Conduct, at 3, https://www.credit-suisse.com/about-us/en/our-company/our-governance/standards -policies/code-of-conduct.html.

[65]    *Id*. at 14.

[66]    Deutsche Bank Group Code of Conduct, at 14, https://www.db.com/ir/en/download/ Code_of_Business_Conduct_and_Ethics_for_Deutsche_Bank_Group.pdf.

anticompetitive, or unethical, that exacerbate conflicts between or among our bank and/or its clients, that are contrary to industry standards or applicable regulations, or that are otherwise damaging [Deutsche Bank's] reputation."

(f) **Goldman Sachs**.  The Goldman Sachs Code of Business Conduct and Ethics states: "Our values demand that we deal fairly with our clients, service providers, suppliers, competitors and each other. No one at the firm may seek competitive advantage through illegal or unethical business practices.   Taking advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice is a violation of this Code."[67]

(g) **JPMorgan.**  JPMorgan's Code of Conduct[68] requires people working for the bank to "[a]lways deal fairly and in good faith with [its] customers, suppliers, competitors, business partners, regulators and other employees" and "[n]ever take unfair advantage of anyone through manipulation, concealment, abuse of privileged or confidential information, misrepresentation of material facts or any other unfair dealings or practices."[69]

(h) **Morgan Stanley**.  The Morgan Stanley Code of Conduct states that "Morgan Stanley is committed to promoting free, fair and competitive market."[70]  It also prohibits people

---

[67]     Goldman     Sachs     Code     of     Business     Conduct     and     Ethics,     at     3, https://www.goldmansachs.com/investor-relations/corporate-governance/corporate-governance-documents/revise-code-of-conduct.pdf.

[68]     JPMorgan's Code of Conduct applies to "employees and directors of JPMorgan Chase & Co. and its direct and indirect subsidiaries."   JPMorgan Code of Conduct 2020, at 2, https://institute.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/documents/code-of-conduct.pdf.

[69]     *Id*. at 15.

[70]     Morgan Stanley, 2020 Code of Conduct, at 7, https://www.morganstanley.com/

working at Morgan Stanley from "agree[ing] with a competitor to fix prices or otherwise distort the market" or "deal[ing] with anyone if the purpose is to impede another party from competing in the market."[71]

(i) **Natwest**.  The Natwest Code of Conduct states that its people "demonstrate high ethical standards and do the right thing"[72] and they "comply with the legal and regulatory requirements that are critical in a highly regulated industry."[73]

(j) **Wells Fargo**.  Wells Fargo's Code of Ethics and Business Conduct[74] claims that the bank gain its competitive advantage "through superior performance rather than through unethical or illegal business practices"[75] and people at Wells Fargo should always avoid "[e]ntering into anticompetitive agreements with competitors, include price fixing, bid rigging, market allocation, and agreements to restrict supply or fix resale prices."[76]  The code also requires its people to refrain from "[b]oycotting certain customers or third-party service providers"[77] or "[a]busing a position of market dominance."[78]

---

assets/pdfs/Code_of_Conduct_Morgan_Stanley_2020.pdf.

[71]   *Id.* at 7.

[72]   NatWest Group, This Is Our Code, at 9, file:///C:/Users/klv/Desktop/Odd%20Lots%20SOL/Natwest%20our-code-external.pdf.

[73]   *Id*. at 10.

[74]   Wells Fargo's Code of Ethics and Business Conduct "applies to all team members, including officers, as well as directors of Wells Fargo & Company and its subsidiaries, regardless of location or employee classification."  Wells Fargo, Our Code of Ethics and Business Conduct, at 4, https://www08.wellsfargomedia.com/assets/pdf/about/corporate/code-of-ethics.pdf.

[75]   *Id*. at 14.

[76]   *Id.*

[77]   *Id.*

[78]   *Id.*

264.     As a result of Defendants' affirmative steps to conceal their misconduct, Plaintiffs and the Class were prevented from learning of the facts needed to commence suit against Defendants for the manipulative and anticompetitive conduct alleged in this complaint.

265.     Because of the self-concealing nature of the conspiracy and Defendants' active steps, including fraudulent concealment of their conspiracy to prevent Plaintiffs and the Class from suing them for the anticompetitive activities alleged in this complaint, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLASS ACTION ALLEGATIONS

266.     Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

> All persons in the United States who, between August 1, 2006 to the present ("Class Period"), bought and/or sold odd-lots (lots of total size below $1 million) of corporate bonds in the secondary market directly from or to a Defendant. Specifically excluded from the Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant and any person acting on their behalf.

> Also excluded from the Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

267.     The Class is readily ascertainable and the records for the Class should exist, including, specifically, Defendants' own records and transaction data.

268.     Due to the nature of the trade and commerce involved, Plaintiffs believe that there are thousands of geographically dispersed Class members in the Class, the exact number and their identities being known to Defendants.

269.     Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and members of the Class sustained damages arising out of Defendants' common course of

conduct in violation of the laws alleged herein.  The damages and injuries of each member of the Class were directly caused by Defendants' wrongful conduct.

270.    There are questions of law and fact common to the Class, including, but not limited to, the following:

(a)  whether investors traded in odd-lots of U.S. corporate bonds during the Class Period;

(b)  whether investors trading in odd-lots of U.S. corporate bonds were charged higher transaction costs via a wider bid-offer spread than the transaction costs charged to investors trading in round lots of those same bonds;

(c)  whether Defendants entered into a horizontal conspiracy not to compete amongst each other in regards to transaction costs (and the related bid-offer spreads) on odd-lot transactions of corporate bonds;

(d)  whether Defendants engaged in an anticompetitive group boycott of electronic platforms that threatened to give retail investors trading almost exclusively in odd-lots greater price transparency;

(e)  whether Defendants engaged in a horizontal conspiracy to deny and/or delay NYSE Bonds from having access to Bloomberg TOMS, a trade order management system for electronic trading of corporate bonds that was an essential facility that competitors to Defendants needed access to in order to enter the market; and

(f)  the appropriate Class-wide measures of damages.

271.    Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class, and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and financial institution-related litigation to represent themselves and the Class.

272.     Questions of law or fact that are common to the members of the Class predominate over any questions affecting only individual members of the Class.

273.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual members of the Class would impose heavy burdens on the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.  Absent a class action, it would not be feasible for the vast majority of the Class members to seek redress for the violations of law alleged herein.

## CLAIM FOR RELIEF

### Violation of §1 of the Sherman Act, 15 U.S.C. §1

274.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this complaint.

275.     The relevant market defined above is a valid antitrust market.

276.     Defendants are competitors in the relevant market.

277.     Plaintiffs and the proposed Class allege a contract, combination, or conspiracy exists between or among Defendants and/or others that unreasonably restrains and/or eliminates trade, so as to fix artificially high prices for trading in odd-lots of corporate bonds and prevent competition in that pricing.

278.     Defendants are engaged in commerce in the United States, and the anticompetitive conduct alleged herein involves U.S. corporate bonds that are in the flow of interstate commerce. Defendants' anticompetitive conduct has substantially impacted and will continue to substantially

impact interstate commerce, because U.S. corporate bonds are traded by investors throughout the United States.

279.    As alleged above, Defendants have conspired and agreed with each other to engage in a group boycott as alleged above of certain odd-lot focused electronic trading platforms (including, but not limited to, ABS/NYSE Bonds and Bonds.com's BondStation/BondsPRO platforms) that sought to increase pre-trade pricing transparency, allow all-to-all direct trading and/or anonymous trading, and/or otherwise promote pricing competition for odd-lot investors.

280.    Also as alleged above, Defendants have also used their market power as oligopsony subscribers to Bloomberg's terminal service and their role as providers of liquidity and order flow to Bloomberg's electronic corporate bond trading platform in anticompetitive ways in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.  Specifically, Defendants forced Bloomberg to deny and/or delay access to Bloomberg's TOMS – an essential facility necessary to participate in electronic trading of corporate bonds to platforms such as NYSE Bonds that sought to increase pre-trade pricing transparency, allow all-to-all direct trading and/or anonymous trading, and/or otherwise promote pricing competition for odd-lot investors.

281.    By engaging in this group boycott and forcing a refusal to deal by Bloomberg in connection with an essential facility, Defendants were able to further their goal of securing supracompetitive pricing to the detriment of odd-lot investors versus the competitive pricing provided to round lot investors in the same underlying bonds.

282.    This group boycott and refusal to deal agreement between Defendants constitutes a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1, the purpose of which is to unreasonably restrain trade and suppress

price competition in the relevant market and reap supracompetitive prices on the odd-lot transactions in which Plaintiffs and the Class members traded.

283.    Plaintiffs and the Class members request the Court to enter judgment in their favor against Defendants, jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs and the Class members request the Court to enter judgment in their favor against Defendants, awarding all such relief as the Court deems appropriate and just.

Plaintiffs  request the following relief:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to Class members;

B.    That the  Court enter an  order declaring that Defendants' actions, as alleged herein, violate the law;

C.    That the Court award Plaintiffs and Class members damages, treble damages, punitive damages, and/or restitution in an amount to be determined at trial;

D.    That the Court permanently enjoin Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof from continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.    That the Court award Plaintiffs and Class members pre- and post-judgment interest;

F.      That the Court award Plaintiffs and Class members their costs of suit, including reasonable attorneys' fees and expenses; and

G.      That the Court award any and all such other relief as the Court may deem proper.

## <u>JURY TRIAL DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial of all issues so triable.

Dated: October 29, 2020                  s/ Christopher M. Burke
                                         Christopher M. Burke (CB-3648)
                                         SCOTT+SCOTT ATTORNEYS AT LAW LLP
                                         The Helmsley Building
                                         230 Park Ave., 17th Floor
                                         New York, NY 10169
                                         Telephone: (212) 223-6444
                                         cburke@scott-scott.com

                                         Walter W. Noss (WN-0529)
                                         Kate Lv (*pro hac vice*)
                                         SCOTT+SCOTT ATTORNEYS AT LAW LLP
                                         600 W. Broadway, Suite 3300
                                         San Diego, CA 92101
                                         Telephone: (619) 233-4565
                                         wnoss@scott-scott.com
                                         klv@scott-scott.com

                                         George A. Zelcs (*pro hac vice*)
                                         Robert E. Litan
                                         Randall P. Ewing, Jr. (*pro hac vice*)
                                         Chad E. Bell
                                         Ryan Z. Cortazar (*pro hac vice*)
                                         KOREIN TILLERY LLC
                                         205 North Michigan Avenue, Suite 1950
                                         Chicago, IL 60601
                                         Telephone: (312) 641-9750
                                         gzelcs@koreintillery.com
                                         rlitan@koreintillery.com
                                         rewing@koreintillery.com
                                         cbell@koreintillery.com
                                         rcortazar@koreintillery.com

Stephen M. Tillery
Robert L. King
Steven M. Berezney (SB-1978)
Michael E. Klenov
Carol L. O'Keefe
KOREIN TILLERY LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
stillery@koreintillery.com
rking@koreintillery.com
sberezney@koreintillery.com
mklenov@koreintillery.com
cokeef@koreintillery.com

Michael E. Criden
Kevin B. Love (*pro hac vice*)
Lindsey C. Grossman
CRIDEN & LOVE, P.A.
7301 SW 57th Court, Suite 515
South Miami, FL 33143
Telephone: (305) 357-9000
mcriden@cridenlove.com
klove@cridenlove.com
lgrossman@cridenlove.com

Jeffrey Erez
EREZ LAW, PLLC
SunTrust International Center
1 SE 3rd Avenue, Suite 1670
Miami, FL 33131
Telephone: (305) 728-3320
jerez@erezlaw.com

Eliezer Aldarondo
ALDARONDO & LOPEZ-BRAS
ALB Plaza, Suite 400
16 Las Cumbres Ave. (Road 199)
Guaynabo, PR 00969
Telephone: (787) 474-5447
eliezer.aldarondo@gmail.com

*Attorneys for Plaintiff Isabel Litovich*

Michael E. Criden
Kevin B. Love
Lindsey C. Grossman
CRIDEN & LOVE, P.A.
7301 SW 57th Court, Suite 515
South Miami, FL 33143
Telephone: (305) 357-9000
mcriden@cridenlove.com
klove@cridenlove.com
lgrossman@cridenlove.com

*Attorneys for Plaintiff Holdcraft Marital Trust*

Joshua H. Grabar (*pro hac vice*)
GRABAR LAW OFFICE
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
jgrabar@grabarlaw.com

Seth D. Rigrodsky
Timothy J. MacFall
RIGRODSKY & LONG, PA
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
sdr@rl-legal.com
tjm@rl-legal.com

Marc H. Edelson
EDELSON LECHTZIN LLP
3 Terry Drive, Suite 205
Newtown, PA 18940
Telephone: (215) 867-2399
medelson@edelson-law.com

*Attorneys for Plaintiff Michael V. Cottrell*

Michael J. Freed
Douglas A. Millen
Robert J. Wozniak
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Rd, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
mfreed@fklmlaw.com
dmillen@fklmlaw.com
rwozniak@fklmlaw.com

R. Alexander Saveri
Cadio Zirpoli
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
rick@saveri.com
cadio@saveri.com

*Attorneys for Plaintiff Frank Hirsch*

John Radice
Kenneth Pickle
Daniel Rubenstein
RADICE LAW FIRM, PC
475 Wall Street
Princeton, NJ 08540
Telephone: (646) 245-8502
jradice@radicelawfirm.com
kpickle@radicelawfirm.com
drubenstein@radicelawfirm.com

Glen E. Summers
Karma M. Giulianelli
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100
glen.summers@bartlitbeck.com
karma.giulianelli@bartlitbeck.com

James C. Shah
Eric L. Young
SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
jshah@sfmslaw.com
eyoung@sfmslaw.com

James E. Miller
Laurie Rubinow
SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
jmiller@sfmslaw.com
lrubinow@sfmslaw.com

*Attorneys for Plaintiff United Food and
Commercial Workers Union and Participating
Food Industry Employers Tri-State Pension Fund*

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

 s/ Christopher M. Burke
Christopher M. Burke