# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ISABEL LITOVICH, MICHAEL V.
COTTRELL, FRANK HIRSCH,
HOLDCRAFT MARITAL TRUST, and
UNITED FOOD AND COMMERCIAL
WORKERS UNION AND PARTICIPATING
FOOD INDUSTRY EMPLOYERS TRI-
STATE PENSION FUND, on Behalf of
Themselves and All Others Similarly Situated,

                   Plaintiffs,

        v.

BANK OF AMERICA CORPORATION;
MERRILL LYNCH, PIERCE, FENNER &
SMITH, INC.; BofA SECURITIES, INC.;
BARCLAYS CAPITAL INC.; CITIGROUP
INC.; CITIGROUP GLOBAL MARKETS
INC.; CREDIT SUISSE SECURITIES (USA)
LLC; DEUTSCHE BANK SECURITIES
INC.; THE GOLDMAN SACHS GROUP,
INC.; GOLDMAN, SACHS & CO., LLC;
JPMORGAN CHASE & CO.; J.P. MORGAN
SECURITIES LLC; MORGAN STANLEY;
MORGAN STANLEY & CO., LLC;
MORGAN STANLEY SMITH BARNEY
LLC; NATWEST MARKETS SECURITIES
INC.; WELLS FARGO & CO.; WELLS
FARGO SECURITIES LLC; and WELLS
FARGO CLEARING SERVICES, LLC,

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Case No. 1:20-cv-03154 (LJL)

ORAL ARGUMENT REQUESTED

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR JOINT MOTION TO DISMISS THE AMENDED CONSOLIDATED
## CLASS ACTION COMPLAINT FOR FAILURE TO STATE A CLAIM

December 15, 2020

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ....................................................................................................................4

    A.    Corporate Bonds ...................................................................................................4

    B.    The Parties ...........................................................................................................7

    C.    Plaintiffs' Claim ..................................................................................................7

ARGUMENT .........................................................................................................................9

I.    Plaintiffs Fail to Plead a Plausible Conspiracy to Fix Prices for Odd Lots of Bonds ......................................................................................................................9

    A.    Plaintiffs Plead No Facts to Support Their Alleged Price-Fixing Conspiracy ........................................................................................................10

    B.    Plaintiffs Allege No Direct Evidence of Conspiracy ..........................................13

    C.    Plaintiffs Allege No Circumstantial Evidence of Conspiracy ..............................13

        1.    Plaintiffs Fail to Plead Parallel Conduct...................................................13

            a.    The market-wide averages reported in academic articles do not show parallel conduct ......................................................15

            b.    Plaintiffs' "expert analysis" does not show parallel conduct...................................................................................16

        2.    Plaintiffs Plead No Viable "Plus Factors" .................................................21

II.    Plaintiffs Fail to Plead a Plausible Group-Boycott Conspiracy.........................................28

    A.    Plaintiffs' Boycott Allegations Fail for Two Overarching Reasons .....................28

        1.    Plaintiffs Fail to Plead Direct Evidence, Parallel Conduct or Plus Factors That Raise a Plausible Inference of a Boycott Conspiracy..........29

        2.    Plaintiffs' Boycott Theory Is Fundamentally Implausible.........................33

B.     Plaintiffs' Allegations About Each Individual Trading Platform Are Defective .................................................................................37

    1.    Plaintiffs' Allegations That Defendants "Boycotted" Three Trading Platforms Are Defective ................................................38

    2.    Plaintiffs' Allegations That Defendants Acquired Control of Three Trading Platforms Are Defective ................................................42

III.   Plaintiffs' Group Pleading Does Not Connect Any Defendant to a Conspiracy ..............46

IV.   Plaintiffs' Claim Is Time-Barred ...................................................50

   A.     Plaintiffs Cannot Invoke Equitable Tolling Because They Fail to Plead Fraudulent Concealment with the Requisite Particularity ....................................50

    1.    Plaintiffs Had Notice of Their Potential Claim Before April 2016 ..........51

    2.    Plaintiffs Do Not Allege Due Diligence ...................................54

    3.    Plaintiffs Do Not Adequately Allege Concealment by Defendants..........55

   B.     Plaintiffs Do Not Allege Any Anticompetitive Conduct After April 2016 ..........57

V.   No Plaintiff Has Antitrust Standing to Assert a Group Boycott Claim, and Two Plaintiffs Lack Antitrust Standing to Assert Any Claim ...................................59

   A.     No Plaintiff Pleads Antitrust Injury Caused by the Alleged Group Boycott.........59

   B.     Two Plaintiffs Are Not Efficient Enforcers of the Antitrust Laws ......................60

CONCLUSION.................................................................................61

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*131 Maine St. Assocs.* v. *Manko,*
179 F. Supp. 2d 339 (S.D.N.Y.), *aff'd,* 54 F. App'x 507 (2d Cir. 2002) ................................51

*7 W. 57th St. Realty Co.* v. *Citigroup, Inc.,*
2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015), *aff'd,*
771 F. App'x 498 (2d Cir. 2019) ........................................17

*Abbott Labs.* v. *Adelphia Supply USA,*
2017 WL 5992355 (E.D.N.Y. Aug. 10, 2017) ........................................21

*In re Actos End-Payor Antitrust Litig.,*
848 F.3d 89 (2d Cir. 2017) ........................................34

*AD/SAT, Div. of Skylight, Inc.* v. *Associated Press,*
181 F.3d 216 (2d Cir. 1999) ........................................46

*Alaska Elec. Pension Fund* v. *Bank of Am. Corp.,*
175 F. Supp. 3d 44 (S.D.N.Y. 2016) ........................................14

*Allen* v. *Dairy Farmers of Am., Inc.,*
748 F. Supp. 2d 323 (D. Vt. 2010) ........................................51, 53

*In re Aluminum Warehousing Antitrust Litig.,*
2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014), *aff'd,*
833 F.3d 151 (2d Cir. 2016) ........................................ 27-28

*In re Aluminum Warehousing Antitrust Litig.,*
2015 WL 1344429 (S.D.N.Y. Mar. 23, 2015) ........................................48

*Apex Oil Co.* v. *DiMauro,*
822 F.2d 246 (2d Cir. 1987) ........................................13, 29

*Ashcroft* v. *Iqbal,*
556 U.S. 662 (2009) ........................................9, 12, 29, 38

*Bais Yaakov of Spring Valley* v. *Educ. Testing Serv.,*
251 F. Supp. 3d 724 (S.D.N.Y. 2017) ........................................50

*Behrens* v. *JPMorgan Chase Bank, N.A.,*
2019 WL 1437019 (S.D.N.Y. Mar. 31, 2019) ........................................55

*Bell Atl. Corp.* v. *Twombly,*
550 U.S. 544 (2007) ........................................ *passim*

*Bona Fide Conglomerate, Inc.* v. *SourceAmerica*,
    691 F. App'x 389 (9th Cir. 2017) ........................................................21

*Burtch* v. *Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011)................................................................9

*Butala* v. *Agashiwala*,
    916 F. Supp. 314 (S.D.N.Y. 1996)................................................. 55-56

*Capital Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs., Inc.*,
    996 F.2d 537 (2d Cir. 1993)...............................................................27

*Chubirko* v. *Better Bus. Bureau of S. Piedmont, Inc.*,
    763 F. Supp. 2d 759 (W.D.N.C. 2011) ................................................12

*In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*,
    213 F. Supp. 3d 631 (S.D.N.Y. 2016)..................................................28

*Concord Assocs., L.P.* v. *Entm't Props. Tr.*,
    2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014), *aff'd*,
    817 F.3d 46 (2d Cir. 2016)................................................................47

*Copperweld Corp.* v. *Indep. Tube Corp.*,
    467 U.S. 752 (1984)..........................................................................45

*In re Crude Oil Commodity Futures Litig.*,
    913 F. Supp. 2d 41 (S.D.N.Y. 2012)...................................................56

*In re Currency Conversion Fee Antitrust Litig.*,
    773 F. Supp. 2d 351 (S.D.N.Y. 2011) .................................................14

*Donahue* v. *Pendleton Woolen Mills, Inc.*,
    633 F. Supp. 1423 (S.D.N.Y. 1986).....................................................51

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)...........................................................12, 28

*In re European Gov't Bonds Antitrust Litig.*,
    2020 WL 4273811 (S.D.N.Y. July 23, 2020) ..................................57, 61

*Fire & Police Pension Ass'n of Colo.* v. *Bank of Montreal*,
    368 F. Supp. 3d 681 (S.D.N.Y. 2019)........................................ *passim*

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    74 F. Supp. 3d 581 (S.D.N.Y. 2015).....................................................50

*FrontPoint Asian Event Driven Fund, L.P.* v. *Citibank, N.A.*,
    2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) .......................................17

*Gelboim* v. *Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016)........................................................................59

*Ginx, Inc.* v. *Soho All.*,
    720 F. Supp. 2d 342 (S.D.N.Y. 2010)....................................................24

*In re GSE Bonds Antitrust Litig.*,
    396 F. Supp. 3d 354 (S.D.N.Y. 2019)............................................... 18-19

*Harry* v. *Total Gas & Power N. Am., Inc.*,
    889 F.3d 104 (2d Cir. 2018)........................................................................59

*Hinds Cnty., Miss.* v. *Wachovia Bank N.A.*,
    620 F. Supp. 2d 499 (S.D.N.Y. 2009)................................ 46-47, 50, 55, 58

*In re ICE LIBOR Antitrust Litig.*,
    2020 WL 1467354 (S.D.N.Y. Mar. 26, 2020) ........................................17

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)................................................................. 22-23

*In re Interest Rate Swaps Antitrust Litig.*,
    2018 WL 2332069 (S.D.N.Y. May 23, 2018) ......................... 15, 49-50

*In re Interest Rate Swaps Antitrust Litig.*,
    261 F. Supp. 3d 430 (S.D.N.Y. 2017)........................................... *passim*

*InterVest, Inc.* v. *Bloomberg, L.P.*,
    340 F.3d 144 (3d Cir. 2003)......................................................... 38-39, 53

*Kendall* v. *Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ..............................................................44

*Klehr* v. *A.O. Smith Corp.*,
    521 U.S. 179 (1997)...................................................................................58

*In re Late Fee & Over-Limit Fee Litig.*,
    528 F. Supp. 2d 953 (N.D. Cal. 2007), *aff'd*,
    741 F.3d 1022 (9th Cir. 2014) ...............................................................27

*LC Capital Partners, LP* v. *Frontier Ins. Grp., Inc.*,
    318 F.3d 148 (2d Cir. 2003)........................................................................57

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) .....................................60

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    27 F. Supp. 3d 447 (S.D.N.Y. 2014)....................................................48

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    935 F. Supp. 2d 666 (S.D.N.Y. 2013), *vacated and remanded on other*
    *grounds sub nom. Gelboim* v. *Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016) ...................57

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
    213 F. Supp. 3d 530 (S.D.N.Y. 2016)...................................................................................48

*MacNealy* v. *Dayton Osteopathic Hosp. Inc.*,
    1993 WL 1377513 (S.D. Ohio Mar. 3, 1993) ..........................................................................42

*In re Magnesium Oxide Antitrust Litig.*,
    2011 WL 5008090 (D.N.J. Oct. 20, 2011)...............................................................................55

*Mandala* v. *NTT Data, Inc.*,
    975 F.3d 202 (2d Cir. 2020)......................................................................................................17

*Mayor & City Council of Balt.* v. *Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)............................................................................................. *passim*

*In re Merrill Lynch Ltd. P'ships Litig.*,
    154 F.3d 56 (2d Cir. 1998)........................................................................................................54

*In re Mexican Gov't Bonds Antitrust Litig.*,
    412 F. Supp. 3d 380 (S.D.N.Y. 2019)............................................................................. *passim*

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ............................................................................12, 21, 22, 27

*In re Nine W. Shoes Antitrust Litig.*,
    80 F. Supp. 2d 181 (S.D.N.Y. 2000).................................................................................. 58-59

*In re Parcel Tanker Shipping Servs. Antitrust Litig.*,
    541 F. Supp. 2d 487 (D. Conn. 2008)......................................................................................12

*In re Platinum & Palladium Antitrust Litig.*,
    2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) .........................................................................60

*In re Pork Antitrust Litig.*,
    2019 WL 3752497 (D. Minn. Aug. 8, 2019) ..................................................................... 15-16

*In re Processed Egg Prods. Antitrust Litig.*,
    2012 WL 6645533 (E.D. Pa. Dec. 20, 2012)...........................................................................51

*In re Publ'n Paper Antitrust Litig.*,
    2005 WL 2175139 (D. Conn. Sept. 7, 2005)...........................................................................55

*Quality Auto Painting Ctr. of Roselle, Inc.* v. *State Farm Indem. Co.*,
    917 F.3d 1249 (11th Cir. 2019) ...............................................................................................29

*Rio Tinto PLC* v. *Vale*,
    2015 WL 7769534 (S.D.N.Y. Nov. 20, 2015) ........................................................54

*Rite Aid Corp.* v. *Am. Exp. Travel Related Servs. Co.*,
    708 F. Supp. 2d 257 (E.D.N.Y. 2010) ..................................................................58

*Ross* v. *Am. Exp. Co.*,
    35 F. Supp. 3d 407 (S.D.N.Y. 2014), *aff'd sub nom. Ross* v. *Citigroup, Inc.*,
    630 F. App'x 79 (2d Cir. 2015) ...........................................................................44

*RxUSA Wholesale, Inc.* v. *Alcon Labs., Inc.*,
    661 F. Supp. 2d 218 (E.D.N.Y. 2009), *aff'd*, 391 F. App'x 59 (2d Cir. 2010).......................30

*Singh* v. *Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019).............................................................................56, 57

*Sonterra Capital Master Fund, Ltd.* v. *Barclays Bank PLC*,
    366 F. Supp. 3d 516 (S.D.N.Y. 2018).....................................................................60

*Sonterra Capital Master Fund Ltd.* v. *Credit Suisse Grp. AG*,
    277 F. Supp. 3d 521 (S.D.N.Y. 2017)................................................................ 47-48

*In re SSA Bonds Antitrust Litig.*,
    2018 WL 4118979 (S.D.N.Y. Aug. 28, 2018) ....................................................18, 59

*Starr* v. *Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010)...........................................................................14, 26

*Stratte-McClure* v. *Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015)................................................................................4

*Tera Grp., Inc.* v. *Citigroup, Inc.*,
    2019 WL 3457242 (S.D.N.Y. July 30, 2019) .............................................27, 47, 49

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) ..........................................................................14, 26

*TheECheck.com, LLC* v. *NEMC Fin. Servs. Grp. Inc.*,
    2017 WL 2627912 (S.D.N.Y. June 16, 2017) .........................................................47

*Thompson* v. *Metro. Multi-List, Inc.*,
    934 F.2d 1566 (11th Cir. 1991) ..........................................................................59

*United Magazine Co.* v. *Murdoch Magazines Distrib., Inc.*,
    146 F. Supp. 2d 385 (S.D.N.Y. 2001), *aff'd sub nom. United Magazine Co.* v.
    *Curtis Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008) ...........................................36

*Vantone Grp. Ltd. Liab. Co.* v. *Yangpu NGT Indus. Co.*,
   2015 WL 4040882 (S.D.N.Y. July 2, 2015) ...................................................................50

*Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*,
   127 F. Supp. 3d 156 (S.D.N.Y. 2015) .........................................................................35

*Williams* v. *Citigroup, Inc.*,
   2009 WL 3682536 (S.D.N.Y. Nov. 2, 2009), *aff'd in relevant part*,
   433 F. App'x 36 (2d Cir. 2011) ...................................................................................46

*Woori Bank* v. *Merrill Lynch*,
   923 F. Supp. 2d 491 (S.D.N.Y.), *aff'd*, 542 F. App'x 81 (2d Cir. 2013) ...................53

*Yellow Page Sols., Inc.* v. *Bell Atl. Yellow Pages Co.*,
   2001 WL 1468168 (S.D.N.Y. Nov. 19, 2001) .............................................................10

*Zenith Radio Co.* v. *Matsushita Elec. Indus. Corp.*,
   513 F. Supp. 1100 (E.D. Pa. 1981), *aff'd in part, rev'd in part*,
   *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238 (3d Cir. 1983),
   *rev'd*, 475 U.S. 574 (1986) .........................................................................................23

*In re Zinc Antitrust Litig.*,
   155 F. Supp. 3d 337 (S.D.N.Y. 2016) .....................................................................47, 48

**Statutes, Rules and Regulations**

15 U.S.C. § 15b .................................................................................................................50

Fed. R. Civ. P. 9(b) ..................................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ......................................................................................................1

17 C.F.R. § 230.144A .......................................................................................................37

17 C.F.R. § 230.506 ..........................................................................................................37

17 C.F.R. § 240.15c6-1 ......................................................................................................36

**Treatise**

PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW (4th ed. 2016) ..............13, 14, 21

Defendants respectfully submit this memorandum of law in support of their joint motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Amended Consolidated Class Action Complaint (ECF No. 128) ("AC") for failure to state a claim.

## PRELIMINARY STATEMENT

Instead of standing on their initial pleading, Plaintiffs elected to amend their complaint in response to Defendants' original motion to dismiss. Yet the AC still pleads two impossibly broad and legally insufficient conspiracies among 19 Defendants that supposedly inflated the prices of all trades of "odd lots" of corporate bonds since at least 2006. Plaintiffs allege that Defendants (i) conspired to fix prices for tens of millions of odd-lot trades in tens of thousands of different bonds for over 14 years, and (ii) participated in a farfetched 20-year group boycott of electronic trading platforms in an effort to deny retail investors access to electronic trading. The massive scope of these alleged conspiracies contrasts sharply with the absence of well-pled facts to sustain them. Rather than fix this fatal defect, the AC adds only more flawed "expert analysis" of odd-lot prices, recycled boycott allegations from the 1990s, and isolated episodes of single-firm conduct.

The AC should be dismissed in its entirety for multiple, independent reasons: Plaintiffs fail to plead a plausible conspiracy under either theory; they engage in improper group pleading; the statute of limitations bars their claim; and their allegations of antitrust standing are deficient.

**Failure to Plead a Plausible Price-Fixing Conspiracy.** Plaintiffs fail to plead *any* facts to support their allegation of a vaguely defined agreement to fix prices. The AC does not even describe the contours of this alleged agreement. Instead, Plaintiffs predicate their claim of a massive price-fixing conspiracy on nothing more than the longstanding pricing disparity between odd lots and round lots of corporate bonds that even Plaintiffs allege has existed since at least the 1940s. Plaintiffs cannot state a conspiracy claim under the *Twombly*/*Iqbal* pleading standard based only on market-wide price differences that have existed for decades.

Nor does the AC adequately plead any of the traditional indicia of a price-fixing agreement, *i.e.*, any direct evidence, parallel conduct, or "plus factors" raising a plausible inference of conspiracy.  Unlike other recent antitrust complaints that have survived motions to dismiss in this District, the AC pleads no direct evidence of price fixing based on electronic chatroom communications, emails, confidential informants, or cooperating co-conspirators.  Plaintiffs do not identify a single collusive communication by or among any of the Defendants, even though it would have taken constant daily communications among an ever-changing group of traders to orchestrate the sweeping price-fixing conspiracy Plaintiffs imagine.  Rather, Plaintiffs attempt to plead parallel conduct suggestive of a conspiracy by relying on various academic articles and their own "expert analysis."  But Plaintiffs' academic articles do not even discuss *Defendants'* trades, and the articles identify legitimate reasons for the observed market-wide pricing disparity between round-lot and odd-lot trades that have nothing to do with a conspiracy.  Plaintiffs' purported "expert analysis" similarly fails to show parallel conduct by Defendants.  Plaintiffs' analyses (i) rely on aggregated, market-wide data not limited to Defendants' trades, (ii) treat Defendants as a collective bloc and thus obscure whether individual Defendants were behaving in parallel fashion, and/or (iii) show widely divergent pricing among various Defendants rather than parallel behavior.  Unable to plead parallel conduct, Plaintiffs' allegations of "plus factors" are irrelevant and, in any event, do not support a plausible inference of conspiracy.

**Failure to Plead a Plausible Boycott Conspiracy.**  Plaintiffs' allegations of a conspiracy to boycott certain electronic trading platforms are equally deficient.  Once again, the AC pleads no direct evidence, parallel conduct or "plus factors" suggestive of the decades-long conspiracy Plaintiffs attempt to invent.  Nor do Plaintiffs plead any facts suggesting that Defendants' alleged

reluctance to support new electronic trading platforms that supposedly threatened their profits was anything more than the natural, unilateral reaction of each Defendant acting in its own self-interest.

Plaintiffs' boycott theory is also fundamentally implausible. According to Plaintiffs, the alleged boycott was intended to prevent *retail* investors—*i.e.*, individuals—from obtaining direct access to electronic trading platforms for odd lots of corporate bonds. But Plaintiffs concede that *institutional* investors—which account for over 80% of corporate-bond trading by volume—have direct access to electronic trading platforms and that those platforms offer competitive prices. Plaintiffs also acknowledge that retail investors can access electronic platforms indirectly through brokers and financial advisors. It defies economic sense that Defendants would mount a massive conspiracy aimed at denying retail investors direct access to electronic trading platforms even though retail investors admittedly can access those platforms indirectly and institutional investors can access them at will.

**Impermissible Group Pleading.** Even if Plaintiffs had adequately pled a plausible antitrust conspiracy—which they do not—the AC fails to connect each individual Defendant to the alleged conspiracy. In a textbook case of group pleading, the AC relies almost exclusively on blunderbuss allegations about "Defendants" as an undifferentiated bloc, without pleading any facts about each Defendant's supposed role in either purported conspiracy. This pleading failure is independently fatal to Plaintiffs' claim.

**Plaintiffs' Claim Is Time-Barred.** The AC's allegations establish with unusual clarity that the Clayton Act's four-year statute of limitations bars Plaintiffs' claim. Plaintiffs filed their original complaint on April 21, 2020, but fail to allege any anticompetitive conduct in the four years before that date. Plaintiffs cannot salvage their claim by invoking equitable tolling because the AC fails to plead *any* of the elements of fraudulent concealment with the particularity required

by Rule 9(b).  Accepting the AC's allegations as true, Plaintiffs were on inquiry notice of their claim well before April 21, 2016.  Plaintiffs cannot simultaneously contend that their allegations based on articles and reports published well before 2016 are sufficient to state a claim but that those same articles and reports nevertheless did not put them on inquiry notice and cause the statute of limitations to run.  Plaintiffs also fail to allege that they exercised diligence in investigating a potential claim or that Defendants engaged in acts of concealment.  With no allegations of anticompetitive conduct occurring after April 21, 2016—just a conclusory assertion that odd-lot prices continue to be inflated—the AC should be dismissed as time-barred.

**Lack of Antitrust Standing.**  No Plaintiff pleads antitrust injury attributable to the alleged group boycott.  The AC does not allege that Plaintiffs (or an intermediary acting on their behalf) sought to trade odd lots on an electronic platform but were blocked from doing so.  With no allegation that they or their intermediaries could not access electronic trading platforms, Plaintiffs do not allege an antitrust injury.  Moreover, two of the five Plaintiffs are not efficient enforcers of the antitrust laws because they do not allege that they ever traded with a Defendant.

## BACKGROUND

All of the factual statements in this memorandum are based on the AC's allegations, the articles and materials cited in the AC, and matters of public record, all of which can be considered on a motion to dismiss.  *See*, *e.g.*, *Stratte-McClure* v. *Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015) (in assessing sufficiency of complaint, court may consider "any statements or documents incorporated in it by reference" and "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit").

### A.    Corporate Bonds

Corporate bonds are debt instruments issued through individual offerings underwritten by banks.  (AC ¶¶ 3, 59, 79.)  The U.S. corporate bond market is "among the world's largest and

deepest sources of business capital." (*Id.* ¶ 3.)  Tens of thousands of distinct corporate bonds were issued or outstanding during Plaintiffs' proposed 14-year class period; indeed, one source cited in the AC identified more than 20,000 unique CUSIPs for corporate bonds traded between January 2006 and October 2016.[1]

After corporate bonds are issued, broker-dealers and investors trade them in the secondary market "over-the-counter" ("OTC") rather than on exchanges.  (*Id.* ¶ 65.)  Plaintiffs allege that there were over ten million corporate-bond trades each year between 2013 and 2019 (*id.* ¶ 63), approximately 90% of which were of odd lots (*id.* ¶¶ 9, 116).  According to the AC, an investor seeking to buy or sell a corporate bond issues a request for quote ("RFQ") to one or more dealers. (*Id.* ¶ 69.)  RFQs can be submitted by telephone, by Bloomberg messages or through electronic trading platforms.  (*Id.* ¶ 72.)  For retail investors, a broker or financial advisor ordinarily facilitates the RFQ process.  (*Id.* ¶¶ 24-25, 76.)

Bond dealers respond to RFQs by providing a "bid" price at which they are willing to buy the requested bond or an "offer" price at which they are willing to sell the bond.  (*Id.* ¶ 6.)  These prices are "expressed as a percentage of the bond's par value."  (*Id.* ¶ 59.)  The difference between the bid and offer prices is the "bid-offer spread."  (*Id.* ¶¶ 7, 74, 76.)  The SEC and the U.K.'s Financial Conduct Authority ("FCA") identified at least 51 different "bank dealers" that traded corporate bonds in the secondary market between August 2011 and December 2016.[2]

---

[1] *See* Ex. 1 (Hendrik Bessembinder, Stacey Jacobsen, William Maxwell & Kumar Venkataraman, *Capital Commitment and Illiquidity in Corporate Bonds* 13 (2017) ("Bessembinder (2017)") (cited at AC ¶¶ 89-91, 93)).  All exhibits cited herein are exhibits to the Declaration of Richard C. Pepperman II, dated December 15, 2020.

[2] *See* Ex. 2 (Plamen Ivanov, Alexei Orlov & Michael Schihl, *Bond Liquidity and Dealer Inventories: Insights from US and European Regulatory Data* 17 (SEC & FCA DERA Working Paper No. 52, 2020), *available at* https://www.sec.gov/files/Bond_liquidity_and_dealer_inventories.pdf).

Plaintiffs allege that corporate-bond trades in the secondary market are categorized by trade size. According to the AC, a "round lot" is a trade for an amount greater than and divisible by $1 million in par value, whereas an "odd lot" is a smaller trade for an amount less than $1 million in par value. (*Id*. ¶ 5.) Round-lot trades make up the vast majority—approximately 82%—of total trading volume of U.S. corporate bonds. (*Id*. ¶¶ 93, 116, 257 n.56.) "For any individual corporate bond issue, the characteristics of each bond in that issue . . . are identical regardless of whether an investor is trading that bond in an odd-lot or round lot transaction." (*Id*. ¶ 64.) Because bonds from the same issue are fungible, "odd-lots of that issue can be combined into a round lot, and, conversely, a round lot of a given issue can be broken into odd-lots of that issue." (*Id.* ¶ 5.)

Due to their larger size, round lots of bonds are traded primarily by institutional investors (*e.g.*, pension funds, mutual funds and hedge funds) that are "sophisticated, repeat participants in the market that maintain longstanding relationships with dealers and are willing and able to shop around for the best pricing." (*Id.* ¶ 81.) By contrast, retail investors, "who typically trade infrequently" and are "less sophisticated," primarily trade odd lots. (*Id.* ¶¶ 81, 83.) Plaintiffs acknowledge that institutional investors trading round lots "tend to be better informed than odd-lot or retail investors." (*Id.* ¶ 81.) Unlike retail investors, institutional investors are "(a) price sensitive; (b) willing and able to obtain multiple quotes from other dealers; (c) knowledgeable regarding the market and pricing due to their repeated role in trading; and (d) in control of large portfolios of bonds that offer additional trading opportunities in the future if the dealer is competitive in its pricing." (*Id.* ¶ 82.)

Plaintiffs also allege that dealers' fixed trading costs are "the same whether the Defendants are dealing in odd-lots or round lots of corporate bonds." (*Id.* ¶ 232.) As a matter of simple arithmetic, those fixed costs make up a higher percentage of the prices of smaller, odd-lot trades.

B.    **The Parties**

Although the AC names five Plaintiffs, only three of them allege that they ever traded a corporate bond with a Defendant:  (i) Isabel Litovich, (ii) Holdcraft Marital Trust, and (iii) an institutional investor named United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund ("UFCW").  (*Id.* ¶¶ 22, 25-26, 113-115.)  The other two Plaintiffs—Michael Cottrell and Frank Hirsch—vaguely allege that they traded odd lots of corporate bonds "at prices that were impacted by Defendants' misconduct ***and/or*** in transactions that occurred directly with one or more Defendant," but neither identifies a specific trade with a Defendant.  (*Id.* ¶¶ 23-24 (emphasis added).)  None of the Plaintiffs allege that they ever sought to trade on an electronic platform but were prohibited from doing so.  Nor does any Plaintiff allege that their broker or financial advisor could not access an electronic trading platform on their behalf.

The AC names a total of 19 Defendants that today comprise ten separate Defendant groups.  (*Id.* ¶¶ 27-55.)  Defendants are only some of the dozens of dealers engaged in secondary-market trading of U.S. corporate bonds.  (*See id.* ¶¶ 79-80.)  Although Plaintiffs allege that Defendants "have been among the top firms by market share in the U.S. corporate bond *underwriting* market" (*id.* ¶ 79 (emphasis added)), the AC contains no factual allegations relating to Defendants' market share in the secondary market for trading of corporate bonds, let alone their share of odd-lot trades.

C.    **Plaintiffs' Claim**

The AC asserts a single cause of action under Section 1 of the Sherman Act on behalf of all investors "who, between August 1, 2006 to the present . . . , bought and/or sold odd-lots (lots of total size below $1 million) of corporate bonds in the secondary market directly from or to a Defendant."  (*Id.* ¶¶ 266, 274-283.)  Although they assert only one claim, Plaintiffs allege two distinct conspiratorial agreements:  (i) an agreement to fix prices for odd lots of corporate bonds, and (ii) an agreement to "boycott" or suppress access to certain electronic trading platforms.  (*See*,

*e.g.*, *id.* ¶ 251 (alleging "agreement . . . not to compete on pricing of odd-lot transactions"); *id.* ¶ 253 (alleging "group boycott of electronic trading platforms"); ¶ 262 (referring to "the conspiracies alleged in this complaint"); *id.* ¶ 270(c) & (d) (listing separate alleged price-fixing and boycott conspiracies).)

    **The Alleged Price-Fixing Conspiracy.**  Plaintiffs allege that Defendants agreed "to fix artificially high prices for trading in odd-lots of corporate bonds and prevent competition in that pricing." (*Id.* ¶ 277.)  The AC predicates its price-fixing allegations entirely on the market-wide pricing disparity between odd lots and round lots of corporate bonds that has existed since at least World War II.  (*Id.* ¶¶ 10-12, 86-115, 127-130.)  As support, the AC cites (i) academic articles observing that average bid-offer spreads for smaller corporate-bond trades generally have been wider than those for larger trades for many years, (ii) an "expert analysis" of "riskless-principal trades" that supposedly shows higher average transaction costs for odd-lot trades than for round-lot trades, and (iii) an "expert analysis" of average odd-lot and round-lot prices for particular trades between Defendants and insurance companies, a tiny subset of all corporate-bond trades.  (*See id.* ¶¶ 63, 86-130.)

    **The Alleged Boycott Conspiracy.**  Plaintiffs also assert that Defendants conspired to boycott certain electronic trading platforms in an effort to block retail investors from gaining direct access to electronic trading.  (*Id.* ¶¶ 13-15, 131-203.)  The AC alleges that "bond dealers . . . complain[ed] to Bloomberg" in the mid-1990s about a new electronic trading system offered by InterVest that Bloomberg had included on its terminals.  (*Id.* ¶¶ 141-142.)  Defendants also allegedly agreed not to use (i) the Automated Bond System ("ABS")/NYSE Bonds platform backed by the New York Stock Exchange ("NYSE"), and (ii) trading platforms developed by Bonds.com.  (*Id.* ¶¶ 153-171.)  Plaintiffs further contend that certain Defendants used their

supposed control of three other platforms—Tradeweb, BondDesk and Trading Edge—to prevent them from offering direct access to retail investors.  (*Id*. ¶¶ 143-152, 172-203.)  Plaintiffs concede, however, that institutional investors—including pension funds like Plaintiff UFCW—have direct access to electronic trading platforms and that retail investors can access such platforms indirectly through brokers and financial advisors.  (*See id.* ¶¶ 72, 134, 188-189, 195, 198.)  Plaintiffs also admit that these platforms offer transparent and competitive pricing for odd lots of corporate bonds.  (*See id*. ¶¶ 82-85, 131, 198-203.)

## ARGUMENT

**I.     Plaintiffs Fail to Plead a Plausible Conspiracy to Fix Prices for Odd Lots of Bonds.**

"A plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough *facts* to support the inference that a conspiracy actually existed."  *Mayor & City Council of Balt.* v. *Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (emphasis added).[3]  The AC's factual allegations fail to support the inference that 19 different Defendants participated in a 14-year conspiracy to fix the prices of tens of millions of individually negotiated trades in tens of thousands of different bonds.  Although Plaintiffs took advantage of the opportunity to amend their complaint, the AC still offers only vague and conclusory allegations of a purported agreement to fix prices for odd-lot trades.  Plaintiffs plead no "factual content that allows the court to draw the reasonable inference" that any Defendant, let alone all 19 of them, is liable for price fixing. *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

"[T]here are two ways" to plead an antitrust conspiracy.  *Citigroup*, 709 F.3d at 136.  First, a plaintiff may allege "direct evidence" of conspiracy—*i.e.*, "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted."  *Burtch* v. *Milberg*

---

[3] Unless otherwise stated, all internal citations, alterations and quotation marks are omitted.

*Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011).  Such "smoking gun" evidence "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level."  *Citigroup*, 709 F.3d at 136.  Second, a plaintiff may allege "circumstantial facts supporting the *inference* that a conspiracy existed."  *Id.*  Those "circumstantial facts" ordinarily consist of allegations that defendants engaged in parallel conduct, together with allegations of so-called "plus factors" that raise a plausible inference that the parallel conduct "flowed from a preceding agreement."  *Id.* at 137-38.  Plaintiffs plead neither here.

### A.    Plaintiffs Plead No Facts to Support Their Alleged Price-Fixing Conspiracy.

As a threshold matter, the AC fails to plead facts explaining what each Defendant supposedly agreed to do in pricing odd lots of corporate bonds.  Plaintiffs instead offer vague and conclusory allegations that Defendants agreed "to restrain competition in the secondary trading market for odd-lots of corporate bonds" (AC ¶ 17), "not to compete amongst each other in regards to transaction costs (and the related bid-offer spreads)" (*id.* ¶ 270(c)), and "to fix artificially high prices for trading in odd-lots" (*id.* ¶ 277).  None of these amorphous formulations of the alleged conspiracy put Defendants on notice of the terms of the purported price-fixing agreement.  Nor do they describe a plausible agreement that could be implemented and enforced by 19 Defendants over a 14-year period.  *See Yellow Page Sols., Inc.* v. *Bell Atl. Yellow Pages Co.*, 2001 WL 1468168, at *14 (S.D.N.Y. Nov. 19, 2001) (conspiracy inadequately pled where "the court is left to speculate as to [the] specific terms" of the agreement).

The AC is also devoid of factual allegations that describe the mechanics of the alleged price-fixing agreement or that delineate each Defendant's supposed role.  "Apart from identifying a [14]-year span in which the § 1 violations were supposed to have occurred," the AC "mention[s] no specific time, place, or person involved in the alleged conspirac[y]."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 565 n.10 (2007).  The AC thus "furnishes no clue as to which of the [19

Defendants] (much less which of their employees) supposedly agreed [to fix prices], or when and where the illicit agreement took place." *Id*. Plaintiffs further fail to explain, even at a basic level, how, over more than a decade, (i) ever-changing groups of traders at 19 Defendants coordinated prices on tens of millions of individually negotiated trades, (ii) Defendants could have monitored and enforced compliance with a vague agreement "not to compete amongst each other" or charge "artificially high prices" for odd lots of bonds, or (iii) Defendants eliminated competition from dozens of other dealers not alleged to be conspirators. Rather than allege these essential facts, Plaintiffs predicate their price-fixing allegations entirely on a pricing disparity between odd lots and round lots that supposedly has existed since World War II. (AC ¶¶ 10-12, 86-115, 127-130.)

In addition, the massive price-fixing conspiracy that Plaintiffs posit is facially implausible. If odd-lot prices have been artificially inflated for decades as Plaintiffs claim, the dozens of other dealers not alleged to be conspirators presumably would have spotted, exploited and eliminated that pricing disparity years ago. For example, Plaintiffs admit that "[b]ecause bonds being traded from the same issue are fungible, . . . a round lot of a given issue can be broken into odd-lots of that issue." (*Id*. ¶ 5.) As a result, if odd-lot prices really have been supra-competitive as Plaintiffs suggest (*id*. ¶ 248), non-defendant dealers would have purchased round lots, broken them into smaller odd lots, and resold the odd lots until prices fell to competitive levels. Plaintiffs also acknowledge that corporate bonds with comparable credit ratings and maturities are "highly interchangeable," which means that investors easily can switch to other bonds if the spreads for a particular issue are inflated. (*Id*. ¶¶ 5, 64.) For Plaintiffs' purported conspiracy to work, dealers would have to agree to inflate the spreads for *thousands* of different bonds in order to prevent such switching. Plaintiffs nowhere explain how the alleged conspiracy could be sustained for over a decade in the face of market pressure by dozens of non-conspiring dealers and the availability of

tens of thousands of corporate bonds.  *See Chubirko* v. *Better Bus. Bureau of S. Piedmont, Inc.*, 763 F. Supp. 2d 759, 765 (W.D.N.C. 2011) (holding that "the sheer breadth and scope of the conspiracy alleged . . . alone renders Plaintiff's claims facially implausible" because it would require a degree of "organization and cooperation [that is] practically impossible").

In the absence of any well-pled allegations as to the contours of the alleged price-fixing conspiracy, how it functioned, which Defendants were involved, and what role each played, the AC's "conclusory allegations" of a vaguely defined agreement "do not supply facts adequate" to state a claim.  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007).  Plaintiffs' unsupported "assertion of an unlawful agreement [is] a legal conclusion and, as such, [is] not entitled to the assumption of truth."  *Iqbal*, 556 U.S. at 680; *accord Citigroup*, 709 F.3d at 135-36 ("The ultimate existence of an 'agreement' under antitrust law . . . is a legal conclusion, not a factual allegation.").  Accordingly, the AC's price-fixing claim should be dismissed for failure to satisfy the *Twombly/Iqbal* pleading standard.  *See In re Elevator*, 502 F.3d at 50-51 (affirming dismissal of conspiracy claims where allegations were framed in "entirely general terms without any specification of any particular activities by any particular defendant"); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015) ("The requirement that plaintiffs allege nonconclusory facts means that plaintiffs cannot plead merely parallel conduct and allege conspiracy.  Conspiracy is a legal conclusion.  Rather, plaintiffs must plead evidentiary facts:  'who, did what, to whom (or with whom), where, and when.'"); *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 491-92 (D. Conn. 2008) ("This lack of specifics with respect to the acts of a particular defendant or defendants renders the complaint inadequate after [*Twombly*].").

### B.     Plaintiffs Allege No Direct Evidence of Conspiracy.

Despite amending their complaint in response to Defendants' original motion to dismiss, Plaintiffs still fail to plead any direct evidence of a conspiracy to fix the price of any bond.  Like its predecessor, the AC does not identify a single communication by or between any Defendants. Plaintiffs' inability to plead any direct evidence is telling.  Conspiracies "concern[ing] long-term complex relationships among competitors" (as is alleged here) should be "more susceptible of direct proof."  *Apex Oil Co.* v. *DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987).  Such a "long-term cartel" involving so many entities and individuals could hardly arise, much less survive for over a decade, without "explicit agreements" among the participants.  VI PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ("AREEDA") ¶ 1413 (4th ed. 2016).

### C.     Plaintiffs Allege No Circumstantial Evidence of Conspiracy.

#### 1.     Plaintiffs Fail to Plead Parallel Conduct.

To plead parallel conduct suggestive of a price-fixing conspiracy, Plaintiffs must allege facts that go beyond the type of commonplace parallel behavior that is fully consistent with "independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties."  *Citigroup*, 709 F.3d at 137.  "[T]he mere fact that firms are rational profit maximizers in the same market implies that they will do a fair number of things in parallel fashion," and in most cases, "the first inference to be drawn is not that the firms are conspiring with each other, but that competition, consumer preference, or market conditions have forced them to behave in a similar way."  AREEDA ¶ 307d1.  As a result, the type of "parallel conduct allegations that might be sufficient under *Twombly*'s standard" are allegations such as "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason."  *Citigroup*, 709 F.3d at 137.

The AC nowhere alleges the type of simultaneous or unprecedented changes in pricing that sometimes are deemed suggestive of conspiracy. *Cf.*, *e.g.*, *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (alleging "that all at once the defendants changed their pricing structures, which were heterogeneous and complex, to a uniform pricing structure, and then simultaneously jacked up their prices by a third"); *Starr* v. *Sony BMG Music Entm't*, 592 F.3d 314, 323 (2d Cir. 2010) (alleging that "in or about May 2005, all defendants raised wholesale prices"). Instead, the AC alleges that Defendants, like every other dealer, have continued for decades to charge wider spreads for odd-lot trades than for round-lot trades. (*See* AC ¶¶ 86, 89, 94, 127, 130.)

Nor does the AC allege that Defendants' spreads were uniform at any point. *Cf.*, *e.g.*, *Alaska Elec. Pension Fund* v. *Bank of Am. Corp.*, 175 F. Supp. 3d 44, 54 (S.D.N.Y. 2016) (alleging that each defendant made ISDAfix submissions reflecting "exact same bid/ask spread" nearly every day over multi-year period); *In re Currency Conversion Fee Antitrust Litig.*, 773 F. Supp. 2d 351, 367-69 (S.D.N.Y. 2011) (alleging that each defendant implemented same foreign-currency conversion fee over multi-year period). To the contrary, the AC acknowledges a wide disparity in odd-lot spreads, including by Defendants. (*See*, *e.g.*, AC ¶ 10 ("Defendants demand odd-lot investors . . . pay spreads that are 25% to 300% higher than investors trading in round lots of the same issue."); *id.* ¶ 90 ("[O]dd-lot investors in corporate bonds pay average transaction costs (represented by the bid-offer spread) that are between 10% [and] 1,775% . . . greater than round lot investors."); *id.* ¶ 111 ("The price markdowns range from 27.3 (Goldman Sachs) to 154.4 (RBS/NatWest) basis points for the average customer-initiated odd-lot sale.").)

Plaintiffs thus are reduced to asserting that market-wide "pricing disparities between odd-lots and round lots" that have existed for decades alone "constitute parallel conduct." (*Id.* ¶ 11.) As support, they cite academic articles that purportedly "demonstrate that dealers . . . have . . .

charg[ed] odd-lot investors higher selling prices and pa[id] them lower purchase prices than round lot investors." (*Id.* ¶ 94.) Plaintiffs also rely on "expert analysis" that purportedly shows "differences in transaction costs for round lot and odd-lot trades." (*Id*. ¶ 102.) None of this is sufficient to plead parallel conduct.

### a. The market-wide averages reported in academic articles do not show parallel conduct.

According to the AC, academic research shows that "dealers" as a whole "charge odd-lot investors higher selling prices and pay them lower purchase prices than round lot investors." (*Id*. ¶ 86.) The AC cites eleven academic articles that observe, in the course of discussing other aspects of corporate-bond trading, that average spreads across the entire market have been wider for smaller trades than for larger trades between 2002 and 2017. (*Id*. ¶¶ 10, 16, 89.)[4] Plaintiffs' "generalized claims of parallel conduct" based on market-wide averages are insufficient to plead parallel pricing by Defendants for two separate reasons. *In re Interest Rate Swaps Antitrust Litig.* ("*IRS II*"), 2018 WL 2332069, at *15 (S.D.N.Y. May 23, 2018).

First, none of Plaintiffs' articles analyzes spreads on trades by *Defendants*: they instead discuss market-wide pricing by dealers generally with no information at all about Defendants' prices. (*See* AC ¶¶ 86, 89-90, 94.) "Without specific information regarding each Defendant, the Court has no basis to analyze which, how many, or when any of the individual Defendants may have . . . acted . . . . And that type of information is vital to pleading parallel conduct." *In re Pork*

---

[4] *See*, *e.g.*, Ex. 3 (Amy K. Edwards, Lawrence E. Harris & Michael S. Piwowar, *Corporate Bond Market Transaction Costs and Transparency*, 62 J. FIN. 1421, 1422 (2007) ("Edwards (2007)") ("[S]econdary transaction costs in the corporate bond market decrease with trade size.") (cited at AC ¶¶ 89-90)); Ex. 4 (Larry Harris, *Transaction Costs, Trade Throughs, and Riskless Principal Trading in Corporate Bond Markets* 7 (2015) ("Harris (2015)") ("[S]tudies show that transaction costs per bond decrease with trade size . . . .") (cited at AC ¶¶ 89, 117 n.15)); Ex. 5 (Terrence Hendershott & Ananth Madhavan, *Click or Call? Auction versus Search in the Over-the-Counter Market*, 70 J. FIN. 419, 427-28 (2015) (study showing "steep decline in trading costs with trade size") (cited at AC ¶ 89)).

*Antitrust Litig.*, 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019) (rejecting allegations of parallel conduct because plaintiffs did "not plead with any specificity which Defendants reduced production" but rather "simply point to industry-wide decreases").

Second, average prices by their very nature cannot show parallel pricing by dealers because all variations in dealers' prices (even substantial ones) are lost when market-wide prices are reduced to a single average number.  As a result, the articles' statements about average and median spreads for odd-lot and round-lot trades across the entire market over multi-year time periods as long as 13 years say nothing about individual dealers' prices.  (*See* AC ¶ 89.)  With no details of individual dealers' prices, the articles cannot evidence parallel pricing.  *See In re Mexican Gov't Bonds Antitrust Litig.* ("*MGB*"), 412 F. Supp. 3d 380, 390 (S.D.N.Y. 2019) ("'[A]verages' and medians . . . obscure any given Defendant's contribution to an observed trend.").

It is also telling that none of the cited articles suggests that the market-wide differences in average spreads are attributable to a conspiracy.  The articles instead provide non-collusive explanations for the observed pricing disparity between odd lots and round lots, such as important differences between customers who trade round lots (institutional investors) and those who trade odd lots (retail investors).  *See infra* at 24 & n.7.

### b.    Plaintiffs' "expert analysis" does not show parallel conduct.

Plaintiffs' "expert analysis" of transaction costs for so-called riskless-principal trades ("RPTs"), a tiny subset of all relevant trades of U.S. corporate bonds, similarly fails to plead parallel conduct.  (*See* AC ¶¶ 95-108.)  According to Plaintiffs, this analysis shows "significant differences in transaction costs between round lot and odd-lot trades."  (*Id*. ¶ 16.)  Even if true, differences in average spreads do not show parallel conduct.

To start, Plaintiffs plead none of the specifics underlying their "expert analysis," but rather relay only the ultimate conclusions in various summary charts and tables.  (*Id*. ¶¶ 98-99, 102, 107-

108, 110-113, 115.)  With no specifics, the Court cannot assess whether this analysis raises a plausible inference of anything.  *See 7 W. 57th St. Realty Co.* v. *Citigroup, Inc.*, 2015 WL 1514539, at *12 (S.D.N.Y. Mar. 31, 2015) (dismissing antitrust claims based on faulty "econometric evidence" of "unexpected [pricing] pattern"), *aff'd*, 771 F. App'x 498 (2d Cir. 2019); *see also Mandala* v. *NTT Data, Inc.*, 975 F.3d 202, 205 (2d Cir. 2020) ("Facts are stubborn things, but statistics are pliable.").

Moreover, a mounting body of cases in this District have dismissed conspiracy claims based on summary statistical analyses that rely on multi-year averages and that do not identify trades by specific defendants, like those offered by Plaintiffs here.  *See, e.g.*, *In re ICE LIBOR Antitrust Litig.*, 2020 WL 1467354, at *6 (S.D.N.Y. Mar. 26, 2020) (rejecting plaintiffs' "statistical analyses" that purportedly "demonstrate that ICE LIBOR rates were depressed during the class period"); *MGB*, 412 F. Supp. 3d at 389 ("[T]he statistical analyses proffered by Plaintiffs are simply 'group pleading in another form.'"); *Fire & Police Pension Ass'n of Colo.* v. *Bank of Montreal*, 368 F. Supp. 3d 681, 706 (S.D.N.Y. 2019) ("Plaintiff's statistical economic evidence fail[s] to support Plaintiff's assertion that CDOR was suppressed . . . ."); *FrontPoint Asian Event Driven Fund, L.P.* v. *Citibank, N.A.*, 2017 WL 3600425, at *11 (S.D.N.Y. Aug. 18, 2017) ("Plaintiffs' so-called 'economic evidence' . . . does not support an inference of the existence of an antitrust conspiracy.").

Like their academic articles, "[s]ome of Plaintiffs' statistical analyses do not distinguish between Defendants and non-defendant[s] . . . *at all*."  *MGB*, 412 F. Supp. 3d at 389.  Based on market-wide, anonymous trading data from TRACE, these analyses instead calculate average spreads for all dealers.  (AC ¶¶ 95-99, 107-108.)  At most, they show that between January 2006 and December 2019, dealers generally—not Defendants in particular—on average charged

"higher transaction costs for odd-lot RPTs when compared to round lot RPTs."  (*Id*. ¶ 98; *see also id*. ¶ 107.)  The AC's four charts summarizing these market-wide analyses do not even attempt to compare Defendants' pricing to non-defendants' pricing, much less to each other's pricing.  (*Id*. ¶¶ 98-99, 107-108.)  They also show only "average spreads" over a 14-year period, which by definition eliminate all variations in individual dealers' prices.  These defects render Plaintiffs' charts useless for purposes of pleading parallel conduct by Defendants.[5]

    In response to Defendants' original motion to dismiss, Plaintiffs purportedly "analyzed a subset of actual trades by Defendants."  (*Id*. ¶ 100.)  According to the AC, Plaintiffs were able to identify Defendants' corporate-bond trades with insurance companies from filings with the National Association of Insurance Commissioners ("NAIC") and match those trades to data obtained from TRACE.  (*Id*. ¶ 101.)  Plaintiffs then allegedly calculated average RPT spreads charged by Defendants as a group between 2006 and 2019, which supposedly show the same "differences in transaction costs for round lot and odd-lot trades."  (*Id*. ¶ 102.)  Plaintiffs also allegedly compared Defendants' average RPT spreads with non-defendants' average RPT spreads over the same 14-year period, which supposedly shows that on average Defendants' spreads were wider than non-defendants' spreads for odd-lot trades below $100,000.  (*Id*. ¶ 103.)  Because all of these aggregated statistics "rely on 'averages'" over a multi-year period, they likewise say nothing about any individual Defendant's prices.  *MGB*, 412 F. Supp. 3d at 390.  As one court recently observed, "[t]he effects of any given defendant's trading activity and pricing choices might well be swallowed in plaintiffs' aggregated statistics."  *In re GSE Bonds Antitrust Litig.*,

---

[5] The AC's charts also do not attempt to compare pricing during the alleged conspiracy period to pricing during a control period.  *See In re SSA Bonds Antitrust Litig.*, 2018 WL 4118979, at *7 (S.D.N.Y. Aug. 28, 2018) (dismissing antitrust claim where plaintiffs provided no "comparison of spreads paid during and after the period of collusion").  For example, Plaintiffs do not allege any change in odd-lot prices after this lawsuit was filed in April 2020.

396 F. Supp. 3d 354, 365 (S.D.N.Y. 2019).  It is thus "impossible to have any confidence" that Plaintiffs' multi-year averages "actually capture something different about *each and every* defendant" that might show parallel conduct.  *Id.*

The one and only instance in which Plaintiffs report average spreads of individual Defendants as opposed to highly aggregated averages demolishes their claim of parallel conduct. According to the AC, Plaintiffs identified from NAIC data 36,545 corporate-bond trades in which a Defendant purchased an odd lot from an insurance company at the insurer's request, and those transactions supposedly show that Defendants paid insurance companies prices for odd lots that were "significantly lower than the prices they paid for round lot[s]."  (AC ¶¶ 109-110.)  As an initial matter, Plaintiffs themselves estimate that there were more than *90 million* corporate-bond trades between 2013 and 2019 alone (*id.* ¶ 63), which renders trivial the number of trades that Plaintiffs analyzed.  In addition, even under Plaintiffs' theory of the case, it is hard to understand how Defendants supposedly charged supra-competitive prices to insurance companies, sophisticated institutional investors that admittedly had access to competitive prices on electronic trading platforms.  (*See id.* ¶¶ 82-85, 131, 198-203.)

Even ignoring these flaws and the inherent problems with multi-year averages, the AC's allegations of individual Defendants' average prices show the *opposite* of parallel conduct. Plaintiffs acknowledge that the differences in Defendants' odd-lot and round-lot prices "range[d] from 27.3 (Goldman Sachs) to 154.4 (RBS/NatWest) basis points for the average customer-initiated odd-lot sale"—a more than fivefold range.  (*Id.* ¶ 111.)  Indeed, when Plaintiffs purport to compare Defendants' average prices with non-defendants' average prices, they omit two Defendants (Goldman Sachs and Credit Suisse) from their table because those Defendants' average "markdowns" were *lower* than non-defendants' average "markdowns"—27.3 and 39.5

basis points versus 41.7 basis points.  (*Id*. ¶ 112.)  The table below depicts the average prices alleged in the AC (*id*. ¶¶ 111-112) and shows that Defendants' prices were anything but uniform:



The significant variations in each Defendant's prices—with no clusters suggesting an agreement on pricing—defeat Plaintiffs' claim of parallel conduct.[6]

---

[6] Plaintiffs do not contend that their examples of 43 trades between three Plaintiffs (UFCW, Litovich and Holdcraft Marital Trust) and different Defendants show parallel pricing by those Defendants.  (*See* AC ¶¶ 113-115.)

### 2.    Plaintiffs Plead No Viable "Plus Factors."

Given the AC's failure to plead direct evidence of conspiracy or parallel conduct, Plaintiffs' allegations of so-called "plus factors" are irrelevant because "plus factors in the absence of parallel conduct or direct evidence are insufficient to state an antitrust claim." *MGB*, 412 F. Supp. 3d at 391; *see also In re Interest Rate Swaps Antitrust Litig.* ("*IRS I*"), 261 F. Supp. 3d 430, 471 (S.D.N.Y. 2017) ("Given the few well-pled allegations of parallel relevant activity among Dealers . . . there is, arguably, no charter to inquire into the existence of the three 'plus factors' . . . ."); *Bona Fide Conglomerate, Inc.* v. *SourceAmerica*, 691 F. App'x 389, 391 (9th Cir. 2017) ("Plus factors are relevant only if the complaint adequately alleges parallel conduct among the defendants."); *Abbott Labs.* v. *Adelphia Supply USA*, 2017 WL 5992355, at *10 (E.D.N.Y. Aug. 10, 2017) ("A court need not reach the question of the sufficiency of the alleged plus factors where plaintiffs have in the first instance failed to adequately allege parallel conduct.").

In any event, the AC's "plus factor" allegations are insufficient to sustain a plausible inference of conspiracy.

**Parallel Acts Against Self-Interest.**  Plaintiffs fail to allege any parallel acts against Defendants' self-interest.  "[A]n action contrary to self-interest is not merely a different judgment than an armchair observer would have made looking at the same factors . . . .  Rather, it must be an action that is so irrational that no firm would have engaged in it except on the understanding that others were in agreement."  AREEDA ¶ 1414; *see also In re Musical Instruments*, 798 F.3d at 1195 ("example" of "action against self-interest [that] may suggest prior agreement" is "where individual action would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement").  Plaintiffs allege nothing of the sort here.

-21-

Plaintiffs assert that the differences in odd-lot and round-lot prices are "evidence that Defendants are acting against their unilateral interest" because "any individual Defendant could easily narrow its odd-lot spreads toward greater parity with its round lot spreads while making a profit, and thereby capture a greater percentage of the total market in odd-lot trading." (AC ¶ 233; *see also id.* ¶¶ 225-228.) This conclusory assertion ignores that cutting prices on its face is contrary to self-interest and that each Defendant rationally could expect competing dealers to match any price cuts. *See In re Musical Instruments*, 798 F.3d at 1193 ("In an interdependent market, companies base their actions in part on the anticipated reactions of their competitors."). It is thus consistent with each Defendant's self-interest simply to continue pricing odd lots as it has done for decades—in other words, to "sit[] tight, expecting [other dealers] to do the same." *Twombly*, 550 U.S. at 554, 568 (no inference of conspiracy where conduct is consistent with "rational and competitive business strategy unilaterally prompted by common perceptions of the market").

The AC also lacks any well-pled allegations that attempt to quantify trading costs for odd lots and round lots of bonds. Without such facts, there is no basis to conclude that trading odd lots is as profitable for dealers as trading round lots or that any dealer would rationally cut its prices for odd lots in hopes of "captur[ing] a greater percentage" of those trades. (AC ¶ 233.) Plaintiffs themselves concede that non-defendant dealers have no incentive to reduce their odd-lot prices to the level of round-lot prices. (*Id.* ¶ 230.) Although the AC makes the conclusory assertion that non-defendant dealers lack the incentive to cut prices because they cannot "garner enough capital to support a significant number of trades" (*id.*), it pleads no supporting facts.

Plaintiffs undercut their claim of acts against self-interest suggestive of a conspiracy by acknowledging two "obvious alternative explanations" for the differences in odd-lot and round-lot prices. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010) ("*Twombly*

makes clear that a claim of conspiracy predicated on parallel conduct should be dismissed if . . . the facts alleged in the complaint . . . show that independent self-interest is an 'obvious alternative explanation' for defendants' common behavior."); *IRS I*, 261 F. Supp. 3d at 462 ("An inference of conspiracy will not arise when . . . there are obvious alternative explanations for the facts alleged.").

First, Plaintiffs recognize that "[r]ound lot transactions, given their size, almost always involve institutional investors," who are "sophisticated, repeat participants in the market that maintain longstanding relationships with dealers and are willing and able to shop around for the best pricing.  As a result, they tend to be better informed than odd-lot or retail investors, who typically trade infrequently."  (AC ¶ 81.)  Plaintiffs admit that:

> dealers responding to an RFQ for a round lot know that they are dealing with an institutional investor that is likely to be:  (a) price sensitive; (b) willing and able to obtain multiple quotes from other dealers; (c) knowledgeable regarding the market and pricing due to their repeated role in trading; and (d) in control of large portfolios of bonds that offer additional trading opportunities in the future if the dealer is competitive in its pricing.  Responding to these incentives, dealers provide quotes for round lots at their best competitive pricing, keeping their spreads narrow, in the hope of securing this (and other, future) trades from the round lot institutional investor—a process entirely consistent with economic and market microstructure theory.

(*Id*. ¶ 82.)  "By contrast, round lots are almost never traded by retail investors."  (*Id*. ¶ 83.)  Dealers thus can "use the size of a given RFQ for a corporate bond transaction" to quote better prices to more important, price-sensitive customers.  (*Id*. ¶ 84.)  "It does not militate against the self-interest of a seller to regularly charge substantially lower prices to its large preferred customers . . . ." *Zenith Radio Corp.* v. *Matsushita Elec. Indus. Co.*, 513 F. Supp. 1100, 1260 (E.D. Pa. 1981), *aff'd in part, rev'd in part*, *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238 (3d Cir. 1983), *rev'd*, 475 U.S. 574 (1986).

Plaintiffs' academic articles offer the same explanation for the market-wide price differences. *See Ginx, Inc.* v. *Soho All.*, 720 F. Supp. 2d 342, 345 (S.D.N.Y. 2010) ("To the extent that the complaint refers to or relies on a particular document, it is of course proper for the Court to consider the entire text of that document in deciding any motion to dismiss.").  Those articles explain that institutional investors receive better prices than retail customers because institutional investors are more sophisticated, will "shop around" for the best price, and are large and repeat customers that receive price discounts.  (*E.g.*, Ex. 4 (Harris (2015) at 22 ("The institutional-size trades probably are cheaper because institutional buy-side traders know more about values than do retail customers and thus negotiate better prices from dealers tha[n] do retail traders.") (cited at AC ¶¶ 89, 117 n.15).)[7]

Second, Plaintiffs concede that Defendants' fixed trading costs are "the same whether the Defendants are dealing in odd-lots or round lots."  (AC ¶ 232.)  Because corporate-bond prices in the secondary market are "expressed as a percentage of the bond's par value" (*id.* ¶ 59), recovery of otherwise identical fixed trading costs requires a higher percentage spread for small (odd-lot) trades than for large (round-lot) trades.  (*See* Ex. 10 (Eric Zitzewitz, *Paired Corporate Bond*

---

[7] *See also* Ex. 6 (Gopa Biswas, Stanislava Nikolova & Christof W. Stahel, *The Transaction Costs of Trading Corporate Credit* 30 (2015) ("[S]ophisticated participants . . . incur lower transaction costs.") (cited at AC ¶ 89)); Ex. 7 (*Corporate Bond Market Liquidity Redux: More Price-Based Evidence*, THE BIG PICTURE (2016) ("[D]ealers offer better prices to large clients with repeat business potential.") (cited at AC ¶ 89)); Ex. 3 (Edwards (2007) at 1438 ("[O]bserved discounts to large orders are due to dealers giving better prices to large clients with repeat business potential . . . .") (cited at AC ¶¶ 80-90)); Ex. 8 (Peter Feldhütter, *The Same Bond at Different Prices: Identifying Search Frictions and Selling Pressures*, 25 REV. FIN. STUDIES 1155, 1157 (2012) ("[C]ompared with small buyers, large buyers can more quickly 'shop around' among numerous sellers [and] negotiate larger price discounts.") (cited at AC ¶¶ 89-90)); Ex. 9 (Menachem Abudy & Avi Wohl, *Corporate Bond Trading on a Limit Order Book Exchange* 18 (2017) (price difference "is due to the weaker bargaining power of small traders") (cited at AC ¶ 120)).

*Trades* 2 (2010) ("[D]ealer costs likely have a fixed component per trade, whose recovery requires a higher percentage spread for smaller trades.") (cited at AC ¶ 89).)[8]

Finally, Plaintiffs cannot plead acts against self-interest by pointing to studies of corporate-bond trading on the Tel Aviv Stock Exchange in Israel and on Borsa Italiana's EuroTLX platform in Italy that purportedly show narrower bid-offer spreads for odd lots than in the United States. (*Id.* ¶¶ 116-126.) Those studies do not suggest that odd-lot and round-lot spreads are the same in those other markets, and they certainly do not show that Defendants' prices for odd lots in the United States are against their self-interest. Nor can Plaintiffs plead acts against self-interest by noting that wider spreads for odd-lot spreads have existed since World War II. (*Id.* ¶¶ 129-130, 242-245.) Dealers do not act against self-interest by continuing to price odd lots as they have for decades, "expecting [other dealers] to do the same thing." *Twombly*, 550 U.S. at 568.

**Market Concentration.** Plaintiffs contend that Defendants "have controlled 65% or more of the bond *underwriting* market every year since at least 2014." (AC ¶¶ 78-79 (emphasis added).)[9] But the relevant product market here is *secondary-market trading* of odd lots of U.S. corporate bonds. (*Id.* ¶ 246.) The AC contains no allegation whatsoever of Defendants' market

---

[8] FINRA regulations also recognize that a "transaction which involves a small amount of money," such as an odd-lot transaction, "may warrant a higher percentage of mark-up to cover the expenses of handling." FINRA Regul. 2121 (Fair Prices and Commissions).

[9] The AC alleges that the market share of NatWest (previously known as RBS, *see* AC ¶¶ 50, 208) in the underwriting market declined from 2.3% in 2014 to less than 1% in 2015 and to *0%* after 2015. (*Id.* ¶ 79 tbl.) This allegation of minimal and declining market shares, followed by a *0%* market share after 2015, belies the conclusory assertion that NatWest "was among the top firms by market share in the U.S. corporate bond underwriting market almost every year" or that its "share in the underwriting market" gave it any "power" over secondary-market trading. (*Id.* ¶¶ 79-80.) NatWest's alleged market share also underscores the implausibility of the AC's claims against it. *See Bank of Montreal*, 368 F. Supp. 3d at 702-03 (dismissing claims against defendant bank after it ceased to be involved in setting price of allegedly manipulated financial instrument).

share in that different product market.[10]  Plaintiffs incorrectly assert that "Defendants' collectively large market share in the underwriting market . . . gives them power over the secondary market" because they control "the supply of the bonds to be sold in the secondary trading market."  (*Id*. ¶ 80; *see also id*. ¶ 229.)  Bond underwriters purchase new bonds from issuers and resell them to investors and other dealers in the primary market.  (*Id*. ¶¶ 3-4.)  After the underwriters resell the bonds, investors and other dealers trade them in the secondary market.  (*Id*. ¶ 4.)  The underwriters have no control over the bonds in the secondary market once they sell them in the primary market.

In any event, Defendants' alleged market shares in the underwriting market do not plead a highly concentrated market.  In their Horizontal Merger Guidelines, the DOJ and the Federal Trade Commission generally consider any market with a Herfindahl-Hirschman Index ("HHI") below 1500 to be "*unconcentrated*."[11]  Plaintiffs' market-share table for bond underwriting (*id*. ¶ 79) implies an HHI less than 700, far below that 1500 threshold.  Indeed, Plaintiffs' allegation that ten firms collectively have 65% of the market falls well short of what other cases have found to be a highly concentrated market.  *See*, *e.g.*, *Starr*, 592 F.3d at 318, 323 (four defendants controlled over 80% of market); *In re Text Messaging*, 630 F.3d at 628 ("four defendants sell 90 percent of U.S. text messaging services").

**Common Motive to Conspire.**  Plaintiffs assert that "Defendants share a common motive to conspire to charge adverse prices to odd-lot bond investors."  (AC ¶ 231.)  To plead a common

---

[10] Plaintiffs also cite a 2015 "survey" by Greenwich Associates.  (AC ¶ 80 n.10; Ex. 11.) But that survey does not purport to measure actual trading activity across the proposed class period. Rather, Greenwich Associates' survey was limited to 13 unidentified bond dealers and 112 investors and confined to a single year—2015.  Plaintiffs also cite the Municipal Securities Rulemaking Board's *2016 Fact Book* (AC ¶ 80 n.10; Ex. 12), but that source addresses municipal bonds, not corporate bonds, and again is limited to a single year.

[11] The HHI is calculated by summing the squares of the individual firms' market shares. *See* U.S. Dep't of Just. & FTC, *Horizontal Merger Guidelines* § 5.3 (2010), *available at* https://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf.

motive to conspire, however, a plaintiff must do more than allege that defendants shared a motive to charge higher prices and maximize their profits, which is always the case.  *See*, *e.g.*, *In re Musical Instruments*, 798 F.3d at 1194 n.8 ("[C]ommon motive for increased profits always exists."); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007) ("[I]f a motive to achieve higher prices were sufficient, every company in every industry could be accused of conspiracy because they all would have such a motive."), *aff'd*, 741 F.3d 1022 (9th Cir. 2014).  Rather, a plaintiff must allege that the defendants shared a strong interest in *conspiring* to engage in conduct that they were unlikely to undertake absent a conspiracy.  *See Twombly*, 550 U.S. at 566 ("no reason to infer that the companies had agreed among themselves to do what was only natural anyway").  The AC makes no effort to allege such a common motive here.

**Interfirm Communications.**  Despite failing to plead a single communication by or between any of the Defendants, Plaintiffs allege that there is "a constant communication loop among . . . bond trad[ers]."  (AC ¶ 239.)  But in an OTC market like the one alleged here, routine communications among traders are necessary to explore and effectuate trades.  *See Capital Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993) ("The mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred."); *Tera Grp., Inc.* v. *Citigroup, Inc.*, 2019 WL 3457242, at *20 n.14  (S.D.N.Y. July 30, 2019) (declining to consider "bald assertion" of interfirm communications).  Plaintiffs make no allegations about any suspicious communications, asserting instead that traders engage in routine communications via Bloomberg messages and on online platforms in trading bonds.  Such generalized allegations of "interfirm communications" cannot support a conspiracy claim.  *See In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *33 (S.D.N.Y. Aug. 29, 2014) ("[P]laintiffs' allegations . . . amount only to a potential[]

opportunity to communicate, which is nothing more than a bare assertion incapable of supporting a plus-factor on its own."), *aff'd*, 833 F.3d 151 (2d Cir. 2016).[12]

## II.     Plaintiffs Fail to Plead a Plausible Group-Boycott Conspiracy.

Plaintiffs also assert that, for "nearly 20 years" (AC ¶ 190), Defendants have conspired to deny retail investors access to electronic trading platforms that allegedly offer attractive prices for odd lots of corporate bonds (*id.* ¶¶ 14, 133-134).  Plaintiffs concede that *institutional* investors have access to competitive pricing on electronic trading platforms (*id.* ¶ 198-199), but assert that *retail* investors lack such access because of a massive conspiracy allegedly orchestrated by Defendants (*id.* ¶¶ 131-194).  Plaintiffs fail to plead facts that sustain a plausible inference of such a conspiracy.

### A.     Plaintiffs' Boycott Allegations Fail for Two Overarching Reasons.

Plaintiffs allege that Defendants either boycotted or acquired control of a series of trading platforms to prevent them from providing retail investors with access to electronic trading.  For two overarching reasons, none of those allegations states a plausible conspiracy claim.  First, Plaintiffs fail to plead any of the traditional indicia of a boycott conspiracy, *i.e.*, any direct evidence, parallel conduct, or plus factors indicative of a group boycott.  Second, Plaintiffs' own allegations reveal that the alleged conspiracy is fundamentally implausible.

---

[12] Although they do not describe these allegations as a plus factor, Plaintiffs allege that Defendants engaged in "conspiracies in other markets." (AC ¶ 204.)  Plaintiffs cannot plead a conspiracy to fix the prices of odd lots of corporate bonds by referring to prior cases and investigations involving different markets and financial instruments.  (*See id.* ¶¶ 204-223.) "[E]vidence of [certain] Defendants' wrongdoing with respect to LIBOR and FX and the existence of regulatory investigations into the precious metals markets do not substantiate Plaintiffs' antitrust claim[]" with respect to corporate bonds.  *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 213 F. Supp. 3d 631, 661-62 (S.D.N.Y. 2016).  Those are the kind of "if it happened there, it could have happened here" allegations that the Second Circuit consistently has rejected. *In re Elevator*, 502 F.3d at 52.

### 1. Plaintiffs Fail to Plead Direct Evidence, Parallel Conduct or Plus Factors That Raise a Plausible Inference of a Boycott Conspiracy.

**No Direct Evidence.** Plaintiffs never even attempt to plead direct evidence of a group boycott. Despite alleging a decades-long conspiracy to boycott over a half dozen electronic trading platforms, the AC fails to identify a single collusive communication that supposedly furthered the purported conspiracy. The absence of any such allegations speaks volumes. *See*, *e.g.*, *Apex Oil*, 822 F.2d at 253 ("long-term" conspiracies involving "complex relationships among competitors" are more susceptible to direct proof than "short-term and relatively simple" conspiracies).

**No Parallel Conduct.** The AC is equally devoid of any well-pled allegations of parallel boycott conduct. To plead parallel conduct suggestive of a boycott conspiracy, Plaintiffs would have to plead that a number of individual Defendants engaged in "unexpected or idiosyncratic" parallel conduct that would be unlikely in the absence of a boycott agreement. *See*, *e.g.*, *Quality Auto Painting Ctr. of Roselle, Inc.* v. *State Farm Indem. Co.*, 917 F.3d 1249, 1272 (11th Cir. 2019) ("The alleged boycotting methods are not so idiosyncratic that they suggest conspiracy."). The AC pleads nothing of the kind. There are no allegations, for example, that a number of Defendants all abruptly and simultaneously suspended doing business with the alleged boycott victims. Indeed, Plaintiffs never even allege that most Defendants so much as declined to trade on the allegedly boycotted trading platforms, relying instead on vague and conclusory allegations that "Defendants" as an undifferentiated bloc engaged in "group boycotts" of platforms that offered access to retail investors. (*See*, *e.g.*, AC ¶¶ 14, 158, 164, 176.) These conclusory group-pleading allegations fail as a matter of law to supply the necessary "nonconclusory *factual* allegation[s] of parallel behavior." *Iqbal*, 556 U.S. at 680 (emphasis added); *see also MGB*, 412 F. Supp. 3d at 388 ("[G]eneralized claims of parallel conduct[] must . . . be set aside . . . as impermissible group pleading.").

Even if Plaintiffs had adequately alleged that Defendants declined to deal with the trading platforms at issue, their allegations still would be insufficient. The platforms that Defendants supposedly boycotted were new market entrants that allegedly "threatened" Defendants' trading profits. (AC ¶¶ 15, 131.) Certain Defendants allegedly responded to the new entrants by engaging in a limited amount of parallel *inaction*, *i.e.*, a minority of Defendants allegedly never began trading on the new-entrant platforms. (*See*, *e.g.*, *id.* ¶ 170 (alleging that up to three Defendants never traded on BondsPro).) The law is clear, however, that no inference of conspiracy should be drawn from allegations that a group of incumbent market participants simply declined to do business with a startup firm that purportedly threatened their profits. *See*, *e.g.*, *Twombly*, 550 U.S. at 566 (declining to infer conspiracy from allegations of parallel refusals to deal with threatening new market entrants); *IRS I*, 261 F. Supp. 3d at 475 (allegations of parallel refusals to deal with electronic trading platforms, without more, were "not—at all—suggestive of conspiracy"); *RxUSA Wholesale, Inc.* v. *Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 231 (E.D.N.Y. 2009) (declining to infer conspiracy from conduct that was "nothing more than the continuation" of preexisting business behavior), *aff'd*, 391 F. App'x 59 (2d Cir. 2010).

*Twombly* illustrates these principles. There, the plaintiffs alleged that the defendant telephone-service providers engaged in parallel acts of resistance, obstruction and even "sabotage" designed to prevent certain startup firms from entering the market and competing with the defendants. *See* 550 U.S. at 550-51, 566. Although the plaintiffs urged the inference that the alleged parallel resistance to the startups was the product of a preceding agreement, the Supreme Court held that these allegations failed to sustain a plausible inference "that the resistance to the upstarts was anything more than the natural, unilateral reaction" of each defendant. *Id.* at 566. As the Court explained, the alleged parallel acts of resistance to the startups provided "no reason to

infer that the [defendants] had agreed among themselves to do what was only natural anyway; so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing." *Id.* Likewise here, there is no reason to infer that Defendants' alleged resistance to new trading platforms that supposedly threatened their profits "was anything more than the natural, unilateral reaction" of each Defendant. *Id*.

*IRS I* applies these principles in a factual setting much like this one. There, the plaintiffs alleged that the leading interest rate swaps dealers had conspired to resist new forms of electronic trading in two distinct time periods: a pre-2013 period and a post-2013 period. *See* 261 F. Supp. 3d at 463. In the pre-2013 period, the "main claim of parallel conduct" was of "parallel *inaction*," *i.e.*, each dealer allegedly had "not . . . taken steps to support[] the emergence" of new forms of electronic trading. *Id*. The court rejected those allegations under *Twombly*, reasoning that, "[a]s in *Twombly*, the pleadings here supply good reason, as a matter of 'rational and competitive business strategy,' for any individual Dealer independently to have sought to maintain the status quo and to discourage, not facilitate," new forms of electronic trading. *Id.* at 464. In the post-2013 period, by contrast, the court found that the complaint contained well-pled allegations of parallel conduct that were "improbable enough to support an inference of collaboration," including allegations that multiple defendants all made simultaneous and identical announcements that they were suspending further business with a new-entrant trading platform. *See id*. at 475-76.

The AC's allegations mirror the pre-2013 allegations that *IRS I* rejected, not the post-2013 allegations that *IRS I* sustained. There are no allegations here of any unusual parallel conduct by multiple Defendants that would be "improbable" in the absence of a preceding agreement. Instead, the only "parallel conduct" that Plaintiffs attempt to plead is that Defendants never began doing

business with startup platforms that allegedly threatened their profits.  Just as in *IRS I*, these allegations fail to sustain an inference of conspiracy because each Defendant had "good reason to independently discourage . . . and not encourage . . . development of a new trading paradigm that [allegedly] threatened, some day, to cannibalize their trading profits."  *Id*. at 464.

In response to Defendants' original motion to dismiss, the AC makes a single attempt to plead parallel conduct that extends beyond mere parallel decisions not to do business with new market entrants:  it asserts that "Defendants have engaged in a pattern of parallel conduct to threaten or inflict penalties on any market participant that might have engaged in competitive trading activity."  (AC ¶ 136.)  But all the AC pleads in support of that conclusion is that (i) *in the 1990s*, a single corporate-bond dealer unilaterally refused to deal with certain traders engaged in trading that was "deemed to be 'disruptive' of the market" (*id*. ¶ 137), and (ii) at unspecified times between 2015 and 2019, two Defendants each separately and unilaterally threatened to limit their business with another bond dealer upon learning that the rival dealer was undercutting the prices they quoted to BlackRock, a large institutional investor (*id*. ¶¶ 138-139).  Neither of those allegations of unilateral conduct has anything to do with an alleged conspiracy to deny *retail investors* access to electronic trading platforms.  Nor do those allegations plead any meaningful parallel conduct:  there are no allegations that multiple Defendants engaged in the type of abrupt or simultaneous parallel behavior that would be unlikely in the absence of a preceding agreement.  At most, Plaintiffs allege that two Defendants engaged in similar efforts to resist competition from a rival dealer, but *Twombly* holds that parallel decisions to resist competition are "only natural anyway" and therefore fail to support an inference of conspiracy.  *See Twombly*, 550 U.S. at 566.

**No Plus Factors.**  This Court need not consider whether Plaintiffs have pled "plus factors" that support their boycott claim because "plus factors in the absence of parallel conduct or direct

evidence are insufficient to state an antitrust claim." *MGB*, 412 F. Supp. 3d at 391.  In any event, Plaintiffs plead no plus factors suggestive of a boycott conspiracy.

Defendants' original motion to dismiss explained that Plaintiffs' proffered plus factors are directed solely at their price-fixing allegations, not their boycott allegations.  (ECF No. 117 at 26-27.)  The AC does nothing to correct that deficiency:  Plaintiffs' plus-factor allegations still are directed exclusively at their claim that Defendants conspired to "charg[e] unjustified higher transaction costs for odd-lot bonds."  (AC ¶ 224.)  Although Plaintiffs try to plead "high levels of interfirm communication" (*id.* ¶ 237), the AC fails to allege any communications among Defendants *about the allegedly boycotted platforms* as opposed to ordinary trading communications.  Similarly, although Plaintiffs assert that Defendants had a "common motive" to conspire (*id.* ¶ 231), the AC fails to allege that Defendants had any particular need to *conspire* to do what was "only natural anyway," *i.e.*, to refrain from doing business with startup platforms that allegedly threatened Defendants' profits.  *See Twombly*, 550 U.S. at 566; *see also IRS I*, 261 F.3d at 475 n.23 (observing that plaintiffs failed to allege "that a Dealer took any material risk" by "sitting tight and waiting to see if the new platforms attracted sufficient support to survive").

### 2. Plaintiffs' Boycott Theory Is Fundamentally Implausible.

Plaintiffs' boycott theory is an unusual one.  They concede that several electronic trading platforms offer competitive prices for odd lots of corporate bonds.  (AC ¶¶ 195, 198, 202.)  They further admit that institutional investors can access those platforms at will, that the platforms allow institutional investors to bypass dealers and trade directly with each other, and that institutional investors account for over 80% of corporate-bond trading by volume.  (*Id.* ¶¶ 93, 116, 195, 198, 203).  Plaintiffs nevertheless posit that the same corporate-bond dealers that admittedly lacked the inclination or the ability to exclude *institutional* investors from electronic trading platforms mounted a massive conspiracy to exclude *retail* investors from those platforms even though retail

investors account for less than 20% of the market.  (*Id*. ¶¶ 93, 116.)  This farfetched boycott theory is unsustainable for three independent reasons.

*First*, Plaintiffs plead no facts supporting their core assumption that *Defendants* are responsible for the alleged exclusion of retail investors from electronic trading platforms. Plaintiffs assert that the three leading electronic trading platforms—Bloomberg, MarketAxess and Tradeweb—account for 97% of electronic trading of corporate bonds.  (*Id*. ¶ 195.)  Although Plaintiffs contend that "all three of these platforms are only available to institutional investors" (*id*.), they never allege—even in conclusory terms—that *Defendants* brought about that outcome. The closest they come is a wholly unremarkable allegation that "[a]ll three of these platforms have significant relationships with Defendants."  (*Id*.)  Tellingly, however, there are no accompanying allegations that Defendants ever *did anything* to persuade the three platforms to deny access to retail investors.  (*See id*. ¶¶ 195-203.)[13]  In the absence of any such allegations, Plaintiffs fail to plead facts suggesting that *Defendants* are to blame for the alleged exclusion of retail investors from electronic trading platforms.  That alone is a sufficient basis for dismissing Plaintiffs' boycott allegations.  *See In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 98 (2d Cir. 2017) (dismissing antitrust claim as "implausible because it rests on a necessary premise that is not supported by well-pleaded factual allegations").

---

[13] Although Plaintiffs assert that Defendants collectively held a 46% minority ownership interest in Tradeweb before its initial public offering in 2019 (AC ¶ 196), they do not dispute that Thomson Reuters (later spun off into an entity called Refinitiv) held a majority interest in Tradeweb during that period.  *See* Ex. 13 (Tradeweb Form S-1 at iii (Mar. 7, 2019)).  Plaintiffs do not allege that Defendants ever held significant ownership stakes in Bloomberg or that any Defendant has held a stake in MarketAxess since 2011.  (*See* AC ¶¶ 153-163, 193.)  Even where Plaintiffs allege a former ownership stake in a platform, they fail to allege that Defendants actually *used* that stake to induce the platform to exclude retail investors.

*Second*, although Plaintiffs assert that retail investors lack *direct* access to electronic trading platforms, the AC confirms that retail investors can and do access such platforms indirectly.  For instance, Plaintiffs concede that retail investors access Tradeweb's electronic trading platform through "middlemen," *i.e.*, through the thousands of brokers, financial advisors and institutional investors that access Tradeweb directly.  (AC ¶¶ 188-189.)  Plaintiffs selectively quote Tradeweb's website for the proposition that "you must be an institutional investor to trade on Tradeweb" (*id*. ¶ 188 n.43), but this Court may "take notice of the full contents" of the website "from which the truncated quotation[] [is] drawn." *Twombly*, 550 U.S. at 568 n.13.[14]  Tradeweb's website goes on to explain in appended SEC filings and other documents that approximately 60,000 retail investors access Tradeweb through brokers and financial advisors:

> Tradeweb Direct serves over 45,000 financial advisors at more than 200 retail brokerage and advisory firms.  In addition, certain Tradeweb Direct clients provide access to approximately 60,000 retail clients through white-labeled, web-based front ends . . . .  Tradeweb Direct offers trading in a range of products, including U.S. corporate bonds . . . .  Participants on Tradeweb Direct have the ability to connect to our marketplaces via workstations or APIs or through access to websites that are white-labeled for our clients.[15]

Plaintiffs' underlying premise that retail investors lack access to electronic trading platforms is thus exposed as a fiction.  What is more, their boycott theory is exposed as economically

---

[14] *See also Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (courts can consider "documents publicly filed with the SEC or FINRA").

[15] Ex. 14 (Tradeweb 2019 10-K/A at 20 (Mar. 4, 2020)); *see also id.* (Tradeweb Direct "offers financial advisors *and their retail clients* access to micro-lot liquidity" in corporate bonds) (emphasis added); *id.* at 78 ("In our retail client sector, we provide advanced trading solutions for financial advisory firms and traders with our Tradeweb Direct platform.  We entered the retail sector in 2006 and launched our Tradeweb Direct platform following the 2013 acquisition of BondDesk Group LLC . . . .  Tradeweb Direct has provided financial advisory firms access to live offerings, accurate pricing in the marketplace and fast execution."); Ex. 15 (Tradeweb Press Release (Nov. 1, 2013)) (when Tradeweb acquired BondDesk in 2013, Tradeweb "rebranded its combined retail fixed income division as Tradeweb Direct" in order to "provid[e] traders, advisors and other retail fixed income investors with efficient trading tools").

implausible:  any Defendant that tried to charge "supracompetitive" bid-offer spreads to retail investors would be immediately undercut by the thousands of brokers and financial advisors that have access to electronic trading platforms.  *See United Magazine Co.* v. *Murdoch Magazines Distrib., Inc.*, 146 F. Supp. 2d 385, 402 (S.D.N.Y. 2001) (dismissing antitrust claim because "plaintiffs['] alleged conspiracy . . . makes no economic sense"), *aff'd sub nom. United Magazine Co.* v. *Curtis Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008).  Indeed, Plaintiffs themselves assert that BondDesk—which provided access to brokers and financial advisors "but not retail investors directly"—was "undercutting Defendants' pricing" and allowing retail investors to "buy 10 bonds for not so much higher a spread than what institutions pay for 10,000 bonds."  (AC ¶¶ 182-183.)

*Third*, although Plaintiffs assert that there is no "justification" for requiring retail investors to access electronic trading platforms through intermediaries (*id.* ¶ 203), the AC recognizes that other financial markets such as the NYSE require retail investors to trade through intermediaries (*id.* ¶ 66 (investors must trade on NYSE "through brokers")).[16]  The same justifications for requiring retail investors to use intermediaries in other markets apply to corporate bonds as well.  For example, if individual retail investors accessed electronic trading platforms directly and attempted to trade in their own names, their counterparties would have no way of knowing whether those investors could be trusted to complete their trades by delivering the necessary cash or bonds on the settlement date.  *See*, *e.g.*, 17 C.F.R. § 240.15c6-1 (securities transactions generally must be settled within two days of trade).  Furthermore, many corporate bonds are issued under

---

[16] *See also* NYSE Rule 300(a) (limiting trading access to organizations holding a "trading license issued by the Exchange"); Chicago Mercantile Exchange Group, *Get Started Trading Futures*, *available at* https://www.cmegroup.com/trading/why-futures/get-started-trading-futures.html ("In order to trade futures, you must have an account with a registered futures broker who will maintain your account and guarantee your trades."); Chicago Board of Options, *Investor FAQs*, *available at* http://ir.cboe.com/investor-faqs ("Cboe Global Markets shares can be purchased or sold by working with a registered broker.").

exceptions to the securities registration requirements such as Rule 144A,[17] and retail investors are barred by law from trading those unregistered bonds.[18]  These obvious practical problems foreclose any attempt to infer a massive antitrust conspiracy from the unsurprising fact that retail investors must use brokers or other intermediaries to engage in electronic trading of corporate bonds.  *See, e.g.*, *Twombly*, 550 U.S. at 567 (declining to infer conspiracy where there were "obvious" non-conspiratorial explanations for alleged conduct); *Citigroup*, 709 F.3d at 138 (declining to infer conspiracy from conduct that "made perfect business sense"); *IRS I*, 261 F. Supp. 3d at 462 ("An inference of conspiracy will not arise" when the alleged conduct "made perfect business sense" or "there are obvious alternative explanations for the facts alleged.").

## B.      Plaintiffs' Allegations About Each Individual Trading Platform Are Defective.

The overarching flaws in Plaintiffs' boycott allegations are compounded by additional defects in their allegations about the individual trading platforms that Defendants supposedly obstructed.  For three of the six platforms at issue, Plaintiffs assert that Defendants literally boycotted—*i.e.*, agreed not to do business with—the platforms.  For the other three platforms, Plaintiffs contend that Defendants acquired "control" of the platforms to prevent them from offering access to retail investors.  None of these allegations sustains an inference of conspiracy.

---

[17] *See* Ex. 16 (Scott Bauguess, Rachita Gullapalli, & Vladimir Ivanov, Div. of Econ. & Risk Analysis, SEC, *Capital Raising in the U.S.:  An Analysis of the Market for Unregistered Securities Offerings, 2009-2017*, at 7-9 & fig. 1 (2018) (in 2017, approximately $1.1 trillion in securities, "predominantly debt," were issued under Rule 144A, compared to approximately $1.3 trillion in registered debt)).

[18] *See* 17 C.F.R. § 230.144A(a)(1) and (d)(1) (Rule 144A exemption applies only to sale of securities to a "qualified institutional buyer"—generally an investment entity that owns at least $100 million in securities—or a party reasonably believed to be a qualified institutional buyer); *see also id.* § 230.506 (authorizing issuance of unregistered securities to "accredited investors" (and, under Rule 506(b), a small number of unaccredited investors) under certain conditions).

1.     **Plaintiffs' Allegations That Defendants "Boycotted" Three Trading Platforms Are Defective.**

The AC alleges that Defendants "boycotted" three trading platforms formerly operated by InterVest, ABS/NYSE Bonds and Bonds.com, but those allegations are wholly conclusory. Plaintiffs also fail to allege that *any* of those platforms offered direct access to retail investors.

**InterVest.**   In response to Defendants' original motion to dismiss, Plaintiffs added two brief and conclusory paragraphs alleging that Defendants conspired over 20 years ago to undermine a "new electronic trading system for corporate bonds" developed by InterVest.  (AC ¶¶ 141-142.)  According to the AC, InterVest "struck a deal with Bloomberg to provide its system on Bloomberg terminals," but Bloomberg terminated this arrangement in 1998 when "bond dealers began to complain." (*Id.*) These allegations fail to state a plausible boycott claim for three reasons.

*First*, Plaintiffs fail to plead any *facts* supporting their threadbare allegations of a purported conspiracy to undermine InterVest, let alone facts indicating that any *Defendant* conspired against InterVest.  Rather, Plaintiffs merely assert that certain unidentified "bond dealers" complained to Bloomberg about InterVest and then add a conclusory assertion that "Bloomberg terminated the service . . . due to pressure from Defendants."  (*Id.* ¶ 142.)  These wholly conclusory assertions "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

*Second*, InterVest litigated and lost the same conspiracy claim almost 20 years ago.  *See InterVest, Inc.* v. *Bloomberg, L.P.*, 340 F.3d 144 (3d Cir. 2003).  Not long after Bloomberg terminated its relationship with InterVest, InterVest filed an antitrust case accusing certain dealers of conspiring to destroy its trading platform.  *See id*. at 148-49.  The district court ultimately granted summary judgment for the one remaining defendant on the ground that InterVest had failed to present any viable evidence of conspiracy, and the Third Circuit affirmed.  *Id.* at 168.  Although dealers allegedly engaged in parallel refusals to deal with InterVest, the Third Circuit concluded

that this behavior was "in alignment with [the dealers'] economic interests." *Id.* at 165.  The court also observed that while dealers had complained to Bloomberg about InterVest, "[e]vidence of merely a complaint, without any other supporting evidence tending to show illegal pressure or a conspiracy, is insufficient" to support a conspiracy claim. *Id.* at 166.  As the court explained, "permitting an agreement to be inferred merely from the existence of complaints, or even from the fact termination came about in response to complaints, could deter or penalize perfectly legitimate conduct." *Id.*  Plaintiffs' allegations here of dealer complaints to Bloomberg are merely a watered-down version of the allegations that the Third Circuit deemed insufficient as a matter of law to sustain InterVest's claim of a boycott conspiracy.

*Third*, Plaintiffs' InterVest allegations do not even fit their narrative of a conspiracy to exclude retail investors from electronic trading platforms:  there are no allegations either that InterVest offered access to retail investors or that it had any particular implications for odd-lot trading.  (AC ¶¶ 141-142.)  Accordingly, even if Plaintiffs' InterVest allegations were well-pled, those allegations would fail to support Plaintiffs' boycott theory.

**ABS/NYSE Bonds.**  According to the AC, the NYSE launched an electronic trading platform known as "ABS" for corporate bonds in 1976 and then replaced it with a platform known as "NYSE Bonds" in 2007.  (*Id*. ¶¶ 153-155.)  Those trading platforms allegedly failed to achieve a substantial market share at any time in their 44-year history.  (*Id*. ¶¶ 154, 156.)  Plaintiffs attribute this lack of success to "a concerted boycott of the platforms by Defendants" (*id.* ¶ 157), but they plead no facts supporting that conclusion.

*First*, the AC does not allege that ABS/NYSE Bonds ever offered access to retail investors—even in its 25 years of operation before the start of the alleged conspiracy.  Plaintiffs'

allegations thus once again fail to fit their narrative of a conspiracy to block retail investors from gaining direct access to electronic trading platforms.

*Second*, Plaintiffs never allege that Defendants declined to trade on ABS/NYSE Bonds. To the contrary, Plaintiffs acknowledge that "25 bond dealers . . . participate in NYSE Bonds" (*id.* ¶ 156), and they fail to identify a single Defendant that is not among those 25.  Although Plaintiffs vaguely assert that "Defendants engaged in a group boycott to not provide or allow order flow to ABS/NYSE Bonds" (*id.* ¶ 158), courts "give no effect at all" to those sorts of bald assertions of an antitrust conspiracy.  *Citigroup*, 709 F.3d at 135-36.

*Third*, Plaintiffs' assertion that "Defendants . . . used their market power . . . to force Bloomberg to materially delay NYSE Bonds' connection" to Bloomberg's Trade Order Management System or "TOMS" (AC ¶ 163) is not supported by well-pled factual allegations. Furthermore, the AC belies Plaintiffs' suggestion that Defendants had "market power" over Bloomberg rather than vice versa:  it asserts that Bloomberg's TOMS is an "essential facility" and that "[e]veryone trading corporate bonds electronically, *including Defendants*, must use Bloomberg TOMS." (*Id.* ¶¶ 161-163 (emphasis added).)  Finally, although Plaintiffs assert that Bloomberg took 13 months longer than it should have to connect to NYSE Bonds in 2008 (*id.* ¶ 162), they never explain how that temporary delay a dozen years ago is somehow responsible for the platform's failure to achieve a substantial market share *at any time in its 44-year history*.

**Bonds.com.**  Plaintiffs next accuse Defendants of boycotting two electronic trading platforms operated by Bonds.com.  (*Id.* ¶¶ 164-171.)  According to the AC, Bonds.com initially launched a platform called "BondStation" in January 2008 that "was open to both retail and institutional investors."  (*Id.* ¶ 166.)  Three months later, however, BondStation "[r]efocused from the retail segment to the institutional segment due to market conditions and other economic

factors." (*Id.* ¶ 167.)  BondStation later was replaced by a platform known as BondsPro, which continued to "focus on institutional odd-lot investors rather than retail investors."  (*Id.* ¶ 168.) Although Plaintiffs admit that these platforms abandoned any focus on retail investors only three months after launching, they nonetheless assert that Defendants engaged in a six-year "group boycott" of the platforms from 2008 through 2014.  (*Id.* ¶¶ 167, 171.)

These "group boycott" allegations are nothing more than "labels and conclusions" that are not entitled to a presumption of truth.  *Twombly*, 550 U.S. at 555.  Plaintiffs assert that "[n]one of the dealers would participate with Bonds.com" (AC ¶ 170), but a bare allegation that no dealers participated on the platform is insufficient to plead a *collusive agreement* not to participate, much less an agreement *among Defendants* not to participate.  *See, e.g.*, *IRS I*, 261 F. Supp. 3d at 475 (allegations that dealers declined to participate on new entrant trading platforms, without more, were "not—at all—suggestive of conspiracy").

Plaintiffs also allege that "Bank of America stated that it would only be willing to participate on Bonds.com if at least one or two of the larger dealers (such as Morgan Stanley or JPMorgan) also participated" (AC ¶ 170), but there are *no* allegations of similar statements or conduct by any other Defendant.  Plaintiffs are thus left with nothing but a unilateral statement by a single Defendant allegedly expressing reluctance to be the only dealer to participate on an unproven startup platform, a perfectly reasonable position given Plaintiffs' allegation of an extremely high failure rate for new entrant trading platforms.  (*Id.* ¶ 191.)

Lastly, Plaintiffs' boycott allegations make no economic sense because, by Plaintiffs' own admission, Bonds.com abandoned its focus on retail investors by April 2008, only three months after it launched.  (*Id.* ¶ 167.)  Plaintiffs suggest that Defendants worried that Bonds.com allowed institutional investors to trade directly with each other, thus potentially eliminating Defendants'

role as "middlemen" (*id*. ¶ 168), but Bloomberg, MarketAxess and Tradeweb also allow "investor-to-investor direct trading [] without intermediary dealers" (*id*. ¶ 198), and none of those platforms was allegedly targeted by group boycotts. "It simply is not reasonable to infer that the Defendants engaged in a group boycott . . . to drive one competitor . . . from the marketplace when, after doing so, they allowed other competitors into that market." *MacNealy* v. *Dayton Osteopathic Hosp. Inc.*, 1993 WL 1377513, at *9 (S.D. Ohio Mar. 3, 1993).

### 2.    Plaintiffs' Allegations That Defendants Acquired Control of Three Trading Platforms Are Defective.

Plaintiffs also allege that Defendants jointly acquired control of three additional trading platforms—Tradeweb, BondDesk and Trading Edge—to prevent them from offering direct access to retail investors. The AC fails, however, to allege any facts suggesting that Defendants dictated those platforms' choices about retail-investor access. And, even if Defendants had used their joint ownership interests in those platforms to deny direct access to retail investors, such conduct would not be *per se* unlawful, but rather would be reviewable under the rule of reason. *See IRS I*, 261 F. Supp. 3d at 467 ("[M]odern antitrust law evaluates such joint conduct—including the creation of the joint venture itself, its business focus, its product selection, and its pricing—under the rule of reason."). The AC does not plead a rule-of-reason antitrust claim.

**Tradeweb.** Plaintiffs' allegations regarding Tradeweb mirror a similar set of allegations that were unsuccessfully asserted in *IRS I*. *See id.* at 447-49, 465-69. In *IRS I*, the plaintiffs contended that the leading interest rate swaps dealers entered into a joint venture known as "Project Fusion" to acquire an ownership interest in Tradeweb and then used that ownership stake to prevent Tradeweb from introducing new forms of trading that allegedly threatened the dealers' profits. *Id*. at 465-69. Plaintiffs here similarly assert that certain Defendants used Project Fusion to acquire a minority interest in Tradeweb and then used that minority interest to prevent Tradeweb

from allowing retail-investor access to electronic trading of corporate bonds.  (AC ¶¶ 151-152.)[19]
As in *IRS I*, these allegations fail to plead a plausible conspiracy claim.

*First*, Plaintiffs concede that retail investors can access Tradeweb through brokers and
other "middlemen."  (*Id*. ¶ 188.)  In fact, the same website that the AC selectively quotes confirms
that tens of thousands of retail investors access Tradeweb's corporate-bond platform through
brokers and financial advisors.  *See supra* Section II.A.2 & n.15.

*Second*, Plaintiffs fail to plead any facts supporting their implicit assumption that Tradeweb
would have offered direct access to retail investors if not for Project Fusion.  (AC ¶¶ 143-152.)  As
in *IRS I*, the AC "does not cite *any* evidence supporting its critical background premise—that
Tradeweb ever had [] a plan" to provide direct access to retail investors.  261 F. Supp. 3d at 466.
Nor are there any well-pled allegations that the investors in Project Fusion "agreed to put on ice"
any Tradeweb plans to provide such access.  *Id.*  Instead, Plaintiffs rely entirely on "conclusory
allegations" that provide no basis for inferring a conspiracy.  *See id*. (rejecting conclusory
allegations that Project Fusion was intended to derail new form of swaps trading).

*Third*, even assuming that the Project Fusion investors agreed to use their minority interest
in Tradeweb to prevent it from offering direct access to retail investors, the AC "does not plead
facts under which that agreement would be unlawful."  *Id*. at 467.  Any alleged agreement among
Tradeweb investors about the services to be offered by Tradeweb would be subject to challenge—
if at all—only "under the rule of reason, with the pleading requirements that standard imposes."
*Id.*  But Plaintiffs make no attempt to plead the elements of a rule-of-reason claim based on an
alleged agreement to restrict the scope of Tradeweb's services.  *See id*. at 468-69 (observing that
such a claim would require allegations that Tradeweb had market power and that the joint

---

[19] These allegations do not implicate Wells Fargo in Project Fusion.  (AC ¶¶ 151-152.)

investment in Tradeweb had net anticompetitive effects).  Plaintiffs thus cannot rely on certain Defendants' participation in Project Fusion—a lawful joint venture—to infer their participation in an unlawful conspiracy to suppress retail-investor access to electronic trading.  *See Kendall* v. *Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (declining to infer unlawful conspiracy from participation in lawful joint venture); *Ross* v. *Am. Exp. Co.*, 35 F. Supp. 3d 407, 452 (S.D.N.Y. 2014) (refusing "to read evidence of [a] benign agreement as evidence of a separate, illegal agreement"), *aff'd sub nom. Ross* v. *Citigroup, Inc.*, 630 F. App'x 79 (2d Cir. 2015).

**BondDesk.**  BondDesk was an electronic trading platform for corporate bonds that was founded in 1999.  (AC ¶ 172.)  Plaintiffs assert that four Defendants temporarily held ownership stakes in BondDesk between 2004 and 2006 and used those stakes to replace BondDesk's management with management more to their liking.  (*Id*. ¶¶ 174, 176, 182.)[20]  Plaintiffs also allege that Tradeweb acquired BondDesk for $200 million in November 2013 and did not thereafter open the platform to retail investors.  (*Id*. ¶¶ 186, 188.)  On this slender basis, Plaintiffs urge the inference that Defendants conspired to "prevent[] investors in odd-lots from using BondDesk as an actual all-to-all direct-trading platform."  (*Id.* ¶ 189.)

Plaintiffs' factual allegations do not remotely support their assertions of conspiracy.  As an initial matter, the AC's allegations fail to support the suggestion that retail investors would have had direct access to BondDesk if not for Defendants' temporary ownership stakes.  BondDesk was independently owned from 1999 through 2013 except for a two-year period between 2004 and 2006 (*id*. ¶¶ 172-173, 182, 186), but it *never* offered direct access to retail investors during that entire 14-year period.  Instead, BondDesk granted access "to institutional traders and portfolio

---

[20] These allegations do not pertain to Barclays, Citi, Credit Suisse, Deutsche Bank, Morgan Stanley or NatWest, none of which acquired any ownership interest in BondDesk.  (AC ¶ 174.)

managers, *but not retail investors directly*." (*Id.* ¶ 182 (emphasis added); *see also id.* ¶ 172 (BondDesk "was not directly open to retail clients"); *id.* ¶ 184 (access granted to "advisors and brokers"); *id.* ¶ 185 (access granted to "dealer clients, but not retail investors").) When Tradeweb acquired BondDesk in November 2013, it maintained the platform's preexisting practice of restricting direct access to institutional investors, while allowing retail investors to access the platform through brokers and financial advisors. *See supra* Section II.A.2 & n.15.

Plaintiffs argue that four Defendants "conspired to use their positions on the BondDesk board" to replace BondDesk's management team in 2004 (AC ¶ 176), but there are no allegations that the newly installed management team did anything at all that affected retail-investor access to BondDesk (*id.* ¶¶ 176-181). It is also well settled that agreements among the directors of a corporation about how best to manage the corporation cannot give rise to an antitrust conspiracy claim. *See*, *e.g.*, *Copperweld Corp.* v. *Indep. Tube Corp.*, 467 U.S. 752, 769 (1984) ("[I]t is perfectly plain that an internal 'agreement' to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police.").

Finally, there are no well-pled allegations that Tradeweb lacked legitimate reasons for acquiring BondDesk. To the contrary, Plaintiffs suggest that the $200 million purchase price was a bargain "given BondDesk's growth and the high and increasing proportion of trades that were occurring via BondDesk." (AC ¶ 186.) Plaintiffs assert that the acquisition "present[ed] an opportunity for Trade[w]eb to expand into retail bond trading" that Tradeweb failed to exploit (*id.* ¶ 187), but no inference of conspiracy may be drawn from an alleged failure to take advantage of a purported expansion opportunity. *See*, *e.g.*, *Twombly*, 550 U.S. at 569 ("[F]irms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets."); *IRS I*, 261 F. Supp. 3d at 468 n.17 (similar);

*Williams* v. *Citigroup, Inc.*, 2009 WL 3682536, at *4 (S.D.N.Y. Nov. 2, 2009) ("not pursu[ing] one avenue of profit . . . does not plausibly suggest an agreement"), *aff'd in relevant part*, 433 F. App'x 36 (2d Cir. 2011).

**Trading Edge.**  Plaintiffs briefly allege that MarketAxess acquired an electronic platform called Trading Edge in March 2001 and "shuttered Trading Edge's anonymous trading platform." (AC ¶¶ 193-194.)  The source quoted in the AC, however, reveals that MarketAxess did not simply "shutter" Trading Edge, but rather incorporated its "technology platform" as "the core of [its] product offerings."[21]  Plaintiffs' Trading Edge allegations fail to support their boycott claim because the AC does not allege that (i) Trading Edge offered direct access to retail investors, (ii) Trading Edge had any particular significance for odd-lot trading, or (iii) *Defendants* had anything to do with MarketAxess's decision to acquire Trading Edge or purportedly to "shutter" its anonymous trading capability.  (*Id.* ¶¶ 193-194.)  The AC also confirms that MarketAxess has long offered "investor-to-investor direct trading (without intermediary dealers)."  (*Id.* ¶ 198.)[22]

## III.   Plaintiffs' Group Pleading Does Not Connect Any Defendant to a Conspiracy.

To survive a motion to dismiss, Plaintiffs must allege that each of the Defendants, "in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective."  *AD/SAT, Div. of Skylight, Inc.* v. *Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999); *see also MGB*, 412 F. Supp. 3d at 388 ("Post-*Twombly* authorities overwhelmingly hold that a complaint that provides no basis to infer the culpability of the *specific* defendants named in the complaint fails to state a claim."); *Hinds Cnty., Miss.* v. *Wachovia Bank N.A.*, 620 F. Supp.

---

[21] Ex. 17 (MarketAxess 2005 10-K) at 42.  Paragraphs 193 and 194 of the AC quote Exhibit 17 without citation.

[22] *See also* Ex. 18 (MarketAxess 2019 10-K) at 3 ("Through our Open Trading™ protocols, we execute bond trades between and among institutional investor and broker-dealer clients in our leading all-to-all anonymous trading environment for corporate bonds.").

2d 499, 513 (S.D.N.Y. 2009) ("To state a claim against each Defendant, Named Plaintiffs must make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy."). The AC pleads no facts suggesting that a single Defendant consciously committed itself to a conspiracy, relying instead on impermissible "group pleading" directed at "Defendants" as an undifferentiated bloc. The AC also improperly "group[s] multiple defendants who are affiliated together with a single name." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016). These pleading defects are an independent ground for dismissal.

It is well-settled that collective allegations directed indiscriminately at "Defendants" as a group are "insufficient to withstand review on a motion to dismiss." *Concord Assocs., L.P.* v. *Entm't Props. Tr.*, 2014 WL 1396524, at *24 (S.D.N.Y. Apr. 9, 2014), *aff'd*, 817 F.3d 46 (2d Cir. 2016). Courts thus routinely dismiss claims of collusion among a group of financial institutions en masse as impermissible group pleading. *See*, *e*.*g*., *MGB*, 412 F. Supp. 3d at 389 ("[E]ven if Plaintiffs have alleged the plausible existence of an antitrust conspiracy—a question the Court does not reach—they have not alleged anything that would plausibly suggest that the *particular* defendants named in this suit were part of that conspiracy."); *Tera Grp.*, 2019 WL 3457242, at *11 ("[T]he Complaint's pervasive reliance on group allegations impacts the viability of [plaintiff's] claims because it results in a paucity of details linking certain of the Defendants to the alleged conspiracy."); *TheECheck.com, LLC* v. *NEMC Fin. Servs. Grp. Inc.*, 2017 WL 2627912, at *2 (S.D.N.Y. June 16, 2017) (dismissing allegations that attributed misconduct to defendants collectively, without differentiating between defendants and alleging facts about any individual defendant's conduct); *Sonterra Capital Master Fund Ltd.* v. *Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 536, 556 (S.D.N.Y. 2017) (dismissing antitrust claims against all but one defendant and "reject[ing] plaintiffs' attempts to shoehorn [the other] defendants into a broad-based antitrust

conspiracy").[23]  Instead of curing this defect in responding to Defendants' original motion to dismiss, Plaintiffs doubled down by adding over two dozen new paragraphs to the AC that refer to Defendants collectively.  (*See* AC ¶¶ 80, 100-107, 133, 135-136, 142, 145, 150, 229, 231, 232-236, 237-245.)

In attempting to plead a price-fixing conspiracy, the AC still relies entirely on group-pleading allegations directed at "Defendants" as a collective bloc.  (*See*, *e.g.*, *id.* ¶¶ 10-11, 16-17, 85, 94, 103-106, 109-112, 224, 232-237, 242-245, 251.)  Plaintiffs cannot connect each Defendant to an alleged price-fixing conspiracy by relying on academic articles that discuss corporate-bond trading generally or by pointing to "expert" analysis that purports to show that dealers generally charged investors wider spreads for certain odd-lot trades.  (*Id.* ¶¶ 86-102, 107-108.)  Market-wide averages do not plausibly suggest that any particular Defendant consciously committed itself to a conspiracy.  *See MGB*, 412 F. Supp. 3d at 389-90.  The same is true of Plaintiffs' statistical analyses that purport to calculate average odd-lot spreads charged by Defendants as a group.  (AC ¶¶ 100-106.)  Such averages "obscure any given Defendant's contribution to an observed trend" and fail to provide a link between Plaintiffs' "allegations [of conspiracy] and the specific defendants named in the complaint."  *MGB*, 412 F. Supp. 3d at 389-90.  Even the handful of paragraphs of the AC that purport to distinguish among Defendants' prices rely on averages and

---

[23] *See also In re Zinc*, 155 F. Supp. 3d at 384 (dismissing price fixing claims where "allegations as to a number of defendants" were "sparse to the point of near non-existence"); *In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 1344429, at *3 (S.D.N.Y. Mar. 23, 2015) (dismissing antitrust claims where "[n]either of the two complaints sets forth any specific facts that suggest any participation by any one of these specific entities in the allegedly unlawful conduct"); *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 575 (S.D.N.Y. 2016) (dismissing antitrust claims where "Plaintiffs fail[ed] to allege parallel conduct, circumstantial evidence, or plus factors suggesting that [one defendant] had an agreement with the [other defendants]"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 463 (S.D.N.Y. 2014) (rejecting plaintiffs' attempt to "lum[p] all defendants together" where complaint "provide[d] no basis to impute [one defendant's] actual conduct to other particular defendants").

medians, and they reveal that Defendants' spreads were far from uniform.  (AC ¶¶ 109-113.)  Such allegations do not satisfy Plaintiffs' "burden to set forth sufficient facts to establish that each Defendant, in [its] individual capacit[y], consciously committed" itself to a conspiracy.  *Tera*, 2019 WL 3457242, at *11.  "[I]n the absence of any other allegations that would allow the Court to infer the participation of individual Defendants [in a conspiracy]—for example, allegations of specific conduct by specific defendants . . . —[Plaintiffs'] group statistical pleadings cannot carry the day." *MGB*, 412 F. Supp. 3d at 390.

Plaintiffs likewise fail to plead any facts linking any individual Defendant to an alleged boycott conspiracy.   Rather, the AC still relies on vague and conclusory allegations that "Defendants" as a group participated in "boycotts" of electronic trading platforms.  (*See*, *e.g.*, AC ¶ 14 ("*Defendants* conspired to consistently shut down innovations in bond trading through group boycotts of electronic platforms that would increase pre-trade pricing transparency for investors dealing in odd-lots . . . ."); *id.* ¶ 131 ("*Defendants* have engaged in a pattern of parallel conduct and anticompetitive collusion . . . ."); *id.* ¶ 158 ("*Defendants* engaged in a group boycott" of ABS/NYSE Bonds.); *id.* ¶ 164 ("*Defendants'* collusive conduct" included a "refusal to deal with Bonds.com."); *id.* ¶ 190 ("*Defendants'* agreement to prevent competition from electronic platforms focused on retail bond investors dealing in odd-lots spanned nearly 20 years and continues to this day.") (emphases added); *see also id.* ¶¶ 133-134, 146, 148, 152, 157, 163, 167, 171, 175, 177-178, 186, 188-189, 191-192, 195 (similar group-pleading allegations).)  In *IRS II*, the court rejected similar boycott allegations that were pled "generically and in undifferentiated fashion, [without] specifying a particular defendant or defendants" but rather referring only to the "Dealer

Defendants." 2018 WL 2332069, at *17. Plaintiffs' allegations here are equally generic and undifferentiated, and thus fail to connect any individual Defendant to the alleged boycott.[24]

## IV.    Plaintiffs' Claim Is Time-Barred.

Plaintiffs attempt to plead a price-fixing conspiracy stretching back to "at least" August 1, 2006 (AC ¶¶ 2, 17 & n.3) and a group boycott that supposedly "spanned nearly 20 years" (*id.* ¶ 190). A claim under Section 1 of the Sherman Act, however, is subject to a four-year statute of limitations that begins to run when "the defendant commits an act that injures the plaintiff." *Hinds Cnty.*, 620 F. Supp. 2d at 519; *see* 15 U.S.C. § 15b. Because Plaintiffs did not file their initial complaint until April 21, 2020, any claim based on conduct that occurred before April 21, 2016 is time-barred. And because the AC alleges *no* anticompetitive conduct that occurred after April 21, 2016, the statute of limitations bars Plaintiffs' claim in its entirety.

### A.    Plaintiffs Cannot Invoke Equitable Tolling Because They Fail to Plead Fraudulent Concealment with the Requisite Particularity.

Plaintiffs try to salvage their untimely claim by contending that the statute of limitations should be equitably tolled on fraudulent-concealment grounds. (AC ¶¶ 259, 264.) To plead fraudulent concealment, a plaintiff must allege with particularity under Federal Rule of Civil Procedure 9(b) that (i) the plaintiff "remained in ignorance of [the] cause of action until some point

---

[24] This case is unlike the collusion cases in which complaints have survived a group-pleading challenge. *Cf., e.g.*, *IRS I*, 261 F. Supp. 3d at 478 (finding that complaint, unlike here, "contain[ed] many allegations against individual defendants that are quite particular, both as to the actor and the act"); *Bais Yaakov of Spring Valley* v. *Educ. Testing Serv.*, 251 F. Supp. 3d 724, 745 (S.D.N.Y. 2017) (distinguishing plaintiffs' allegations from complaints, like here, that contain "generalized allegations about broad conduct with no explanation as to why any particular defendant was responsible for the conduct"); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 593 (S.D.N.Y. 2015) ("[I]n addition to describing the alleged conspiracy in great detail, the U.S. Complaint makes specific allegations regarding each Defendant."); *Vantone Grp. Ltd. Liab. Co.* v. *Yangpu NGT Indus. Co.*, 2015 WL 4040882, at *4 (S.D.N.Y. July 2, 2015) (complaint contained "factual allegations that distinguish between the conduct of the Moving Defendants, listing specific actions taken by each of them").

within four years of the commencement of his action," (ii) the plaintiff's "continuing ignorance was not attributable to a lack of diligence," ***and*** (iii) "the defendant concealed from [the plaintiff] the existence of his cause of action." *IRS I*, 261 F. Supp. 3d at 487. "Courts have described the burden of establishing fraudulent concealment as a heavy one." *Allen* v. *Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 347 (D. Vt. 2010). Despite having already amended their complaint, Plaintiffs still offer only vague and perfunctory allegations of fraudulent concealment that come nowhere close to satisfying Rule 9(b). (*See* AC ¶¶ 259–265.)

### 1. Plaintiffs Had Notice of Their Potential Claim Before April 2016.

Plaintiffs cannot plead ignorance of their claim before April 21, 2016 because, at a minimum, they were on inquiry notice well before that date. "[A]ll that is necessary to cause the tolling period to cease is for there to be reason to suspect the probability of any manner of wrongdoing." *131 Maine St. Assocs.* v. *Manko*, 179 F. Supp. 2d 339, 348 (S.D.N.Y.) ("Notice of a potential claim is all that is necessary . . . ."), *aff'd*, 54 F. App'x 507 (2d Cir. 2002). When analyzing whether a plaintiff has pled ignorance, any "[f]acts that should arouse suspicion . . . are equated with actual knowledge of the claim." *Donahue* v. *Pendleton Woolen Mills, Inc.*, 633 F. Supp. 1423, 1443 (S.D.N.Y. 1986); *see also 131 Maine St. Assocs.*, 179 F. Supp. 2d at 348 (courts "equat[e] suspicion with knowledge in the context of fraudulent concealment" and "only inquiry notice is necessary"); *In re Processed Egg Prods. Antitrust Litig.*, 2012 WL 6645533, at *3 (E.D. Pa. Dec. 20, 2012) ("[I]n pleading fraudulent concealment, plaintiffs must plausibly suggest that they did not have knowledge or did not possess any information about the conspiracy that would have given rise to inquiry notice.").

The AC's allegations establish that Plaintiffs undeniably were on inquiry notice before April 2016. The core premise of Plaintiffs' allegations of a price-fixing conspiracy is that "[n]o reasonable economic justification explains the magnitude of the pricing disparity between odd-lot

and round lot trades." (AC ¶ 11.)  According to Plaintiffs, "[t]he existence and persistence of significantly wider spreads for odd-lot corporate bond trades than for round lot trades . . . is itself evidence that Defendants are . . . failing to compete on pricing for odd-lot trades [and] . . . cannot be the result of legitimate, individual economic decisions." (*Id*. ¶ 233.)  This "price disparity" between odd lots and round lots was publicly observable and the subject of extensive academic study long before April 2016.  Plaintiffs themselves cite numerous academic articles published between 2007 and 2015 that documented this price disparity. (*Id*. ¶ 89.)  Given the AC's allegation that "[t]here is no explanation consistent with a healthy, competitive market for why the differential in spreads between odd-lots and round lots has persisted" (*id*. ¶ 85), Plaintiffs were on inquiry notice of a potential price-fixing claim long before April 2016.

Plaintiffs' group-boycott allegations are equally inconsistent with any claim of fraudulent concealment.  Plaintiffs contend that collusive conduct is the *only* reasonable explanation for retail investors' alleged inability to access electronic trading platforms.  According to Plaintiffs, "[t]he fact that electronic trading platforms . . . are open to institutional investors, but not retail investors, defies any economic, competitive justification." (*Id*. ¶ 203.)  Plaintiffs further assert that the absence of electronic platforms that are open to retail investors "is clear evidence that Defendants agreed to stop the emergence of [such] electronic trading platforms." (*Id*. ¶ 195.)  Plaintiffs obviously cannot claim that they were unaware until April 2016 of the absence of electronic trading platforms open to them.  As in *IRS I*, "accepting class plaintiffs' premise that only a plot can explain the missing platforms, class plaintiffs had every basis, in real time, to smell a rat.  At a minimum, they were on inquiry notice." 261 F. Supp. 3d at 489.

Moreover, the acts cited by Plaintiffs as support for their boycott allegations all occurred in plain sight before April 2016.  For example, Plaintiffs allege that certain Defendants bought

stakes in BondDesk before 2006 (AC ¶ 173), certain Defendants acquired stakes in Tradeweb in 2008 (*id*. ¶ 151), Tradeweb purchased BondDesk in 2013 (*id*. ¶ 186), and Bonds.com failed in 2013 (*id*. ¶ 171).   These and other boycott allegations are based on news reports published well before the limitations period.   (*See id*. ¶¶ 143-189 nn.25-42.)   Making matters worse, Plaintiffs' newly added allegation that InterVest failed in the mid-1990s as a result of a dealer conspiracy (*id*. ¶¶ 141-142) simply repeats allegations from an unsuccessful lawsuit filed *in 1998*.   *See InterVest*, 340 F.3d at 145.   In light of "the public nature of the information upon which [Plaintiffs] base their claims," the AC cannot plead fraudulent concealment.   *Allen*, 748 F. Supp. 2d at 347-48; *see also IRS I*, 261 F. Supp. 3d at 489 n.38 ("Class plaintiffs based their [claims] on voluminous news articles and other public sources, many published well before November 25, 2011.   This too supports a finding that plaintiffs were on inquiry notice . . . .").

More fundamentally, Plaintiffs cannot "simultaneously claim[] that the generalized evidence cited as the basis of [their] complaint—the vast majority of which involves factual allegations published prior to [the limitations period]—is sufficiently detailed to state a cognizable claim for relief and that, nevertheless, these facts were somehow insufficiently particular to cause the statute of limitations to run."   *Woori Bank* v. *Merrill Lynch*, 923 F. Supp. 2d 491, 495-96 (S.D.N.Y.), *aff'd*, 542 F. App'x 81 (2d Cir. 2013).   In other words, Plaintiffs cannot have it both ways:   either their allegations based on information that was publicly available years ago are insufficient to state a claim or Plaintiffs were on inquiry notice well before April 2016.   *See Bank of Montreal*, 368 F. Supp. 3d at 708-09 (where plaintiffs "rel[y] *solely* on [their] economic analysis" of public data and on other public information, such evidence cannot be "insufficient to put [them] on inquiry notice in 2013, but sufficient to file a lawsuit in 2018").

Plaintiffs' counsel solidified the conclusion that Plaintiffs have been on inquiry notice since at least *2015* in their motion to be appointed interim class counsel.  Plaintiffs' attorneys explained that they have since "July 2015 . . . devoted themselves to an exhaustive and comprehensive investigation into . . . the secondary trading market for odd-lots of corporate bonds." (ECF No. 95 at 8.)  Counsel's suspicions were serious enough to "(1) engag[e] prominent academicians to discuss the microstructure, history, and pricing structure of the corporate bond market; (2) purchas[e] all the FINRA's Enhanced Trace Bond Trading data of corporate bonds trading . . . ; (3) engag[e] an economics consulting firm with a vast knowledge of corporate bond market operation to analyze the trading data in order to determine whether (and when) corporate odd lot bonds trading prices had been manipulated; and (4) interview[] multiple insiders and former bond traders."  (*Id.*)  Whatever those suspicions were in 2015, they were enough to put Plaintiffs on inquiry notice before the limitations period.

## 2.      Plaintiffs Do Not Allege Due Diligence.

Plaintiffs also are required to allege that they exercised diligence throughout the alleged tolling period.  *See Rio Tinto PLC* v. *Vale*, 2015 WL 7769534, at *8 (S.D.N.Y. Nov. 20, 2015).  Notwithstanding this requirement, Plaintiffs do not identify a single step they took during that time to investigate potential claims against Defendants.  Plaintiffs instead essentially concede that they undertook no diligence at all throughout that period by asserting that "[n]one of the facts or information available to Plaintiffs and the Class, if investigated with reasonable due diligence, could or would have led to the discovery of the conspiracies alleged in this complaint."  (AC ¶ 262.)  This conclusory assertion that any diligence would have been futile does not satisfy Plaintiffs' pleading obligations.  *See In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) (upholding dismissal where plaintiffs "make no allegation of any specific inquiries of Merrill Lynch, let alone detail when such inquiries were made, to whom, regarding what, and with

what response"); *Bank of Montreal*, 368 F. Supp. 3d at 703-04 (rejecting as insufficient allegation that "Plaintiff and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by exercise of due diligence"); *Behrens* v. *JPMorgan Chase Bank N.A.*, 2019 WL 1437019, at *8 (S.D.N.Y. Mar. 31, 2019) (equitable tolling unavailable where "Plaintiffs do not identify any steps they took to determine whether they had a claim against the MTD Defendants during the limitations period"); *In re Publ'n Paper Antitrust Litig.*, 2005 WL 2175139, at *6 (D. Conn. Sept. 7, 2005) ("[B]ecause the plaintiffs have not alleged anything regarding inquiries made into the activities alleged in the complaint or why such inquiries were not made, they have not satisfied their burden of pleading reasonable diligence.").

Plaintiffs also do not explain what previously unavailable information supposedly came to light within the last four years that enabled them to file their initial complaint in April 2020. "Without some level of specificity regarding Plaintiffs' discovery of the alleged conspiracy, it is impossible to discern whether Plaintiffs could or should have discovered [their claim] within the limitations period." *In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, at *25 (D.N.J. Oct. 20, 2011) (allegation of diligence "cannot satisfy the requirements of Rule 9(b), particularly when it fails to encompass when and how Plaintiffs ultimately discovered the alleged . . . conspiracy—information that is certainly with Plaintiffs' control"); *see also Hinds Cnty.*, 620 F. Supp. 2d at 520 ("The [complaint] does not specify when any Named Plaintiffs or Class members became aware of the antitrust violations, and therefore does not state 'with particularity the circumstances constituting fraud or mistake.'" (quoting Fed. R. Civ. P. 9(b))).

### 3.      Plaintiffs Do Not Adequately Allege Concealment by Defendants.

To plead concealment, Plaintiffs must allege with particularity that Defendants took "affirmative steps to prevent the discovery of the plaintiff's injury" or that the alleged wrong was

"self-concealing." *Butala* v. *Agashiwala*, 916 F. Supp. 314, 319 (S.D.N.Y. 1996). Plaintiffs do neither here.

The AC offers a conclusory statement that, "[b]y its very nature, the unlawful activity alleged herein was self-concealing." (AC ¶ 260.) But "merely stat[ing] in a conclusory fashion that the defendants' fraud was self-concealing" is not enough to plead concealment under Rule 9(b). *Butala*, 916 F. Supp. at 320. Plaintiffs fare no better with the allegation that "Defendants' collusion [was] facilitated by the high levels of interfirm communication between Defendants," the details of which "were secret." (AC ¶ 261.) Simply alleging that Defendants had non-public communications and "did not disclose [those communications] to others" does not plead concealment. *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 58-59 (S.D.N.Y. 2012) (confidential nature of commodities trading and "complex series of [market] maneuvers" employed by defendants did not "conceal" allegedly deceptive conduct). In any event, Plaintiffs did not file suit based on recently discovered communications among Defendants—the AC does not allege any specific communications between Defendants at all.

In response to Defendants' original motion to dismiss, Plaintiffs added the allegation that Defendants took "steps to conceal evidence of their misconduct" by adopting generic "code[s] of conduct" that allegedly "represented that their operations were above-board." (AC ¶ 263.) But the quoted language from Defendants' codes of conduct dates from 2020, not the relevant period, and Plaintiffs nowhere allege that they relied on that language in declining to assert their claim until 2020. The Second Circuit also has unequivocally held that "Code[s] of Ethics are a textbook example of 'puffery'" that "do not invite reasonable reliance." *Singh* v. *Cigna Corp.*, 918 F.3d 57, 60-63 (2d Cir. 2019). Although *Singh* was a securities-fraud case, the underlying principle that investors cannot reasonably rely on general statements in a code of ethics forecloses Plaintiffs'

suggestion that such statements excused them from their obligation to assert their antitrust claim in a timely manner. *See LC Capital Partners, LP* v. *Frontier Ins. Grp., Inc.*, 318 F.3d 148, 155 (2d Cir. 2003) ("[R]eassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern."); *see also Bank of Montreal*, 368 F. Supp. 3d at 704 (rejecting tolling where "[a]n ordinary investor would not be allayed by Defendants' representations"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 710-11 (S.D.N.Y. 2013) (rejecting fraudulent-concealment allegation in antitrust case because plaintiffs "could not have reasonably relied on defendants' . . . reassurances" that there was no wrongdoing), *vacated and remanded on other grounds sub nom. Gelboim* v. *Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016). Any other conclusion would all but repeal the statute of limitations in antitrust cases because virtually all sizable corporations maintain codes of conduct requiring "above-board" behavior.[25]

### B.   Plaintiffs Do Not Allege Any Anticompetitive Conduct After April 2016.

Plaintiffs fail to plead a single anticompetitive act that allegedly occurred after April 21, 2016. In the 283 paragraphs of the AC, the closest Plaintiffs come is the entirely conclusory assertion (AC ¶¶ 138-139) that two Defendants each separately and unilaterally threatened to limit their business with another bond dealer upon learning that the rival dealer was undercutting the

---

[25] In *In re European Government Bonds Antitrust Litigation* ("*EGB*"), 2020 WL 4273811, at *11 (S.D.N.Y. July 23, 2020), the court held that plaintiffs adequately pleaded due diligence because they "allege[d] reliance on Defendants' affirmative representations in their codes of conduct." The AC alleges no such reliance here. *EGB* also did not address the Second Circuit's holding in *LC Capital* that "reassuring statements" do not eliminate the duty to inquire unless an ordinary investor would "reasonably rely" on those statements or explain how the plaintiffs in that case satisfied that pleading requirement in light of the Second Circuit's holding in *Singh* that codes of conduct "do not invite reasonable reliance." *See LC Capital*, 318 F.3d at 155; *Singh*, 918 F.3d at 60.

prices they quoted to a large institutional investor, an allegation that Plaintiffs fail to connect to either of their alleged conspiracies.  Although Plaintiffs also identify a handful of academic articles published after 2016, those articles simply repeat observations of differences in odd-lot spreads versus round-lot spreads that had been discussed in other articles dating back to at least 2007. None of these more recent articles includes an allegation of anticompetitive conduct, let alone an allegation that such conduct occurred after April 21, 2016.[26]

Plaintiffs' conclusory assertion that spreads for odd-lot trades continue to be artificially wide to this day (*id.* ¶ 99) cannot save their claim because Plaintiffs must plead anticompetitive conduct—not just lingering anticompetitive effects—within the limitations period.  Although "each overt act that is part of the violation . . . starts the statutory period running again," Plaintiffs cannot "recover for the injury caused by old overt acts outside the limitations period."  *Klehr* v. *A.O. Smith Corp.*, 521 U.S. 179, 189 (1997); *see also Rite Aid Corp.* v. *Am. Exp. Travel Related Servs. Co.*, 708 F. Supp. 2d 257, 268 (E.D.N.Y. 2010) ("The continuing violation exception only allows a plaintiff to recover damages caused by overt acts committed inside the limitations period.").  Because Plaintiffs do not allege any anticompetitive conduct inside the limitations period, the AC should be dismissed in its entirety.  *See*, *e.g.*, *Hinds Cnty.*, 620 F. Supp. 2d at 519-22 (dismissing claims where there were no allegations of misconduct during limitations period and complaint did not adequately plead fraudulent concealment); *In re Nine W. Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 191 (S.D.N.Y. 2000) ("An overt act committed more than four years prior to

---

[26] As shown above (*supra* note 9), the AC pleads that NatWest (then known as RBS) had a 0% share of the bond-underwriting market after 2015.  (AC ¶ 79 tbl.)  The AC therefore contains no plausible basis to infer that NatWest participated in any purported conspiracy after 2015, providing an additional reason to conclude that Plaintiffs' claim is "fully time barred" as to NatWest.  *Bank of Montreal*, 368 F. Supp. 3d at 702-03.

the filing of the complaint whose effects were first felt outside the limitations period . . . usually

will not support a cause of action even if the effects persist into the limitations period.").

**V.      No Plaintiff Has Antitrust Standing to Assert a Group Boycott Claim,
         and Two Plaintiffs Lack Antitrust Standing to Assert Any Claim.**

To plead antitrust standing, Plaintiffs must allege facts sufficient to show that they

(i) suffered "antitrust injury," and (ii) are "efficient enforcers of the antitrust laws." *Harry* v. *Total

Gas & Power N. Am., Inc.*, 889 F.3d 104, 115 (2d Cir. 2018).  To allege "antitrust injury," plaintiffs

must plead "(1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the type

of injury contemplated by the statute." *In re SSA Bonds*, 2018 WL 4118979, at *6.  The "efficient

enforcer" requirement, in turn, examines whether a plaintiff is a "proper party" to bring an antitrust

claim. *Gelboim* v. *Bank of Am. Corp.*, 823 F.3d 759, 780 (2d Cir. 2016).  Here, the AC fails to

plead that any Plaintiff suffered antitrust injury attributable to the alleged group boycott, and two

Plaintiffs do not allege that they are efficient enforcers of the antitrust laws.

**A.      No Plaintiff Pleads Antitrust Injury Caused by the Alleged Group Boycott.**

Plaintiffs lack antitrust injury from the alleged group boycott because they do not allege

that they or a broker or investment advisor acting on their behalf ever sought to trade corporate

bonds on an electronic platform but were blocked from doing so because of the supposed boycott.

*See Thompson* v. *Metro. Multi-List, Inc.*, 934 F.2d 1566, 1572 (11th Cir. 1991) (plaintiff had

standing to pursue group-boycott claim where defendants allegedly blocked plaintiff's attempt to

become customer of boycotted service).  Plaintiffs concede that institutional investors have ready

access to electronic trading platforms that offer competitive prices for corporate bonds.  (AC ¶¶ 72,

134, 188-189, 195, 198.)  As an institutional investor, Plaintiff UFCW never alleges (nor could it)

that it was denied access to any such trading platform.  (*See id.* ¶ 26.)  Although the four remaining

Plaintiffs are retail investors, each maintained an account at and traded through a brokerage firm.

(*Id.* ¶¶ 22-25; *see also id.* ¶ 76 ("[I]f Investor A wanted to buy $10,000 of a corporate bond issued by company XYZ, Investor A would direct her wealth management advisor to obtain an RFQ to purchase $10,000 of that bond.").)  The AC does not allege that those brokers (Charles Schwab, Fidelity, Morgan Stanley and Wells Fargo) could not access or refused to access electronic trading platforms on these Plaintiffs' behalf.  The AC thus does not plead that any Plaintiff suffered any injury because of the alleged boycott.

### B.      Two Plaintiffs Are Not Efficient Enforcers of the Antitrust Laws.

Two of the five Plaintiffs—Michael Cottrell and Frank Hirsch—also are not efficient enforcers because the AC does not allege that they traded corporate bonds with a Defendant.  In assessing efficient-enforcer standing, "courts in this District have drawn a line between plaintiffs who transacted directly with defendants and those who did not."  *Sonterra Capital Master Fund, Ltd.* v. *Barclays Bank PLC*, 366 F. Supp. 3d 516, 533 (S.D.N.Y. 2018).  Only the former can qualify as efficient enforcers.  *See id.*; *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *21-22 (S.D.N.Y. Mar. 28, 2017); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 7378980, at *15-16 & n.24 (S.D.N.Y. Dec. 20, 2016).

Although Defendants raised this issue in their original motion to dismiss—and Plaintiffs responded by amending their proposed class definition to limit the putative class to investors who "bought and/or sold odd-lots . . . of corporate bonds in the secondary market *directly from or to a Defendant*" (AC ¶ 266 (emphasis added))—Plaintiffs Cottrell and Hirsch still offer only the vague allegations, unchanged from the original complaint, that they "traded odd-lots of corporate bonds . . . at prices that were impacted by Defendants' misconduct ***and/or*** in transactions that occurred directly with one or more Defendant."  (*Id.* ¶¶ 23-24 (emphasis added).)  What is missing from these allegations is clear when they are compared with those related to the other three Plaintiffs. (*See id.* ¶ 22 (referencing Plaintiff Litovich's "transactions that occurred directly with one or more

Defendant (specifically Morgan Stanley)"); *id.* ¶ 25 (Plaintiff Holdcraft Marital Trust "traded with Wells Fargo as the broker dealer"); *id.* ¶ 26 ("Plaintiff UFCW traded odd-lots of corporate bonds directly with certain Defendants during the Class Period."); *id.* ¶¶ 113, 115 (alleging specific trades with Defendants).)  Because these two Plaintiffs do not allege that they bought or sold odd-lots of corporate bonds "directly from or to a Defendant" (*id.* ¶ 266), they lack antitrust standing and do not even appear to be members of the proposed class they seek to represent.[27]

## CONCLUSION

For the foregoing reasons, the AC should be dismissed with prejudice in its entirety.

Dated: December 15, 2020
       New York, New York


/s/ Adam S. Hakki                                     /s/ Barry G. Sher
Adam S. Hakki                                         Barry G. Sher
Richard F. Schwed                                     Anthony Antonelli
SHEARMAN & STERLING LLP                               PAUL HASTINGS LLP
599 Lexington Avenue                                  200 Park Avenue
New York, New York  10022                             New York, New York  10166
Telephone:  (212) 848-4000                            Telephone:  (212) 318-6085
Facsimile:  (212) 848-7179                            Facsimile:  (212) 230-5185
adam.hakki@shearman.com                               barrysher@paulhastings.com
rschwed@shearman.com                                  anthonyantonelli@paulhastings.com

*Attorneys for Defendants Bank of America*            *Attorneys for Defendant Barclays Capital Inc.*
*Corporation; BofA Securities, Inc.; and*
*Merrill Lynch, Pierce, Fenner & Smith*
*Incorporated*

---

[27] The other three Plaintiffs fail to allege that they traded with NatWest.  (AC ¶¶ 22, 25-26, 113, 115.)  All Plaintiffs' claims against NatWest thus should be dismissed on efficient-enforcer grounds.  *See EGB*, 2020 WL 4273811, at *14 (rejecting claim that "Plaintiffs would be efficient enforcers as to three defendants with whom they did not allegedly transact").

/s/ Jay Kasner
Jay Kasner
Karen M. Lent
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Manhattan West
New York, New York  10001
Telephone:  (212) 735-3276
Facsimile:  (917) 777-3276
jay.kasner@skadden.com
karen.lent@skadden.com

*Attorneys for Defendants Citigroup Inc. and
Citigroup Global Markets Inc.*

/s/ Herbert S. Washer
Herbert S. Washer
Sheila C. Ramesh
Tara H. Curtin
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York  10005
Telephone:  (212) 701-3000
hwasher@cahill.com
sramesh@cahill.com
tcurtin@cahill.com

*Attorneys for Defendant Credit Suisse
Securities (USA) LLC*

/s/ John Terzaken
John Terzaken
Adrienne V. Baxley
Lani Lear
SIMPSON THACHER & BARTLETT LLP
900 G Street, NW
Washington, DC  20001
Telephone:  (202) 636-5000
Facsimile:  (202) 636-5502
john.terzaken@stblaw.com
adrienne.baxley@stblaw.com
lani.lear@stblaw.com

Susannah S. Geltman
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York  10017
Telephone:  (212) 455-2762
Facsimile:  (212) 455-2502
sgeltman@stblaw.com

*Attorneys for Defendant Deutsche Bank
Securities Inc.*

/s/ Richard C. Pepperman II
Richard C. Pepperman II
Matthew J. Porpora
Jonathan S. Carter
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
peppermanr@sullcrom.com
porporam@sullcrom.com
carterjo@sullcrom.com

*Attorneys for Defendants The Goldman Sachs
Group, Inc. and Goldman Sachs & Co. LLC*

/s/ Robert D. Wick
Robert D. Wick
John S. Playforth
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, N.W.
Washington D.C.  20001
Telephone:  (202) 662-6000
Facsimile:  (202) 662-6291
rwick@cov.com
jplayforth@cov.com

*Attorneys for Defendants JPMorgan Chase &*
*Co. and J.P. Morgan Securities LLC*

/s/ Richard A. Rosen
Richard A. Rosen
Susanna Michele Buergel
Brad S. Karp
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3305
Facsimile:  (212) 492-0305
rrosen@paulweiss.com
sbuergel@paulweiss.com
bkarp@paulweiss.com

Jane Baek O'Brien
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
2001 K Street, N.W.
Washington, D.C.  20006
Telephone:  (202) 223-7300
Facsimile:  (202) 223-7420
jobrien@paulweiss.com

*Attorneys for Defendant Morgan Stanley;*
*Morgan Stanley & Co., LLC; and Morgan*
*Stanley Smith Barney LLC*

/s/ Paul S. Mishkin
Paul S. Mishkin
Adam G. Mehes
John M. Briggs
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4292
paul.mishkin@davispolk.com
adam.mehes@davispolk.com
john.briggs@davispolk.com

*Attorneys for Defendant NatWest Markets*
*Securities Inc.*

/s/ Jayant W. Tambe
Jayant W. Tambe
Laura W. Sawyer
JONES DAY
250 Vesey Avenue
New York, New York  10281
Telephone:  (212) 326-3604
jtambe@jonesday.com
lwsawyer@jonesday.com

*Attorneys for Defendants Wells Fargo & Co.;*
*Wells Fargo Securities LLC; and Wells Fargo*
*Clearing Services LLC*