# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ISABEL LITOVICH, MICHAEL V. :
COTTRELL, FRANK HIRSCH, :
HOLDCRAFT MARITAL TRUST, and :
UNITED FOOD AND COMMERCIAL :
WORKERS UNION AND PARTICIPATING :
FOOD INDUSTRY EMPLOYERS TRI- :
STATE PENSION FUND, on Behalf of :
Themselves and All Others Similarly Situated, :
            :
     Plaintiffs, :
            :
     v. :
            :
BANK OF AMERICA CORPORATION; :
MERRILL LYNCH, PIERCE, FENNER & :
SMITH, INC.; BOFA SECURITIES, INC.; :  Civil Case No. 1:20-cv-03154 (VEC)
BARCLAYS CAPITAL INC.; CITIGROUP :
INC.; CITIGROUP GLOBAL MARKETS :
INC.; CREDIT SUISSE SECURITIES (USA) :  ORAL ARGUMENT REQUESTED
LLC; DEUTSCHE BANK SECURITIES :
INC.; THE GOLDMAN SACHS GROUP, :
INC.; GOLDMAN, SACHS & CO., LLC; :
JPMORGAN CHASE & CO.; J.P. MORGAN :
SECURITIES LLC; MORGAN STANLEY; :
MORGAN STANLEY & CO., LLC; :
MORGAN STANLEY SMITH BARNEY :
LLC; NATWEST MARKETS SECURITIES :
INC.; WELLS FARGO & CO.; WELLS :
FARGO SECURITIES LLC; and WELLS :
FARGO CLEARING SERVICES, LLC, :
            :
     Defendants. :
            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR JOINT MOTION TO DISMISS THE SECOND AMENDED CONSOLIDATED
## CLASS ACTION COMPLAINT FOR FAILURE TO STATE A CLAIM

October 18, 2024

## TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ....................................................................1

BACKGROUND .........................................................................................3

ARGUMENT ..............................................................................................7

I.    Plaintiffs Fail to Plead a Plausible Boycott Conspiracy ....................7

    A.    Plaintiffs Do Not Adequately Allege That Defendants Conspired Against All-to-All Trading Platforms ....................................8

        1.    Plaintiffs' "Boycott" Allegations Are Insufficient ......................9

        2.    Plaintiffs' "Catch-and-Kill" Allegations Are Insufficient ........13

        3.    Plaintiffs Concede That Defendants Supported All-to-All Trading ..........15

    B.    Plaintiffs Fail to Plead Parallel Conduct Suggestive of a Preceding Agreement ....................................17

        1.    Purportedly Parallel Refusals to Deal Do Not Suggest Conspiracy ..........18

        2.    Purportedly Parallel Investment Activity Does Not Suggest Conspiracy ....................................20

        3.    Purportedly Parallel Threats and Pressure Tactics Do Not Suggest Conspiracy ....................................22

        4.    Plaintiffs' Allegations Are Even Weaker When Considered as a Whole ....................................23

    C.    Plaintiffs Fail to Plead "Plus Factors" That Raise an Inference of Conspiracy ....................................23

        1.    There Are No Allegations of Conduct Inconsistent With Self-Interest .....24

        2.    A Common Interest in Higher Profits Does Not Suggest Conspiracy .......28

        3.    Plaintiffs' Other Plus-Factor Allegations Are Meritless............................28

II.    Plaintiffs' Group Pleading Does Not Connect Any Individual Defendant to the Alleged Conspiracy....................................30

III.    Plaintiffs' Claim Is Time-Barred in Its Entirety ................................33

A.    Plaintiffs Do Not Allege Any Anticompetitive Act After April 2016 ................... 34

B.    Plaintiffs Fail to Plead Fraudulent Concealment .................................................. 35

    1.    Plaintiffs Do Not Adequately Plead Concealment .................................... 36

    2.    Plaintiffs Were on Inquiry Notice Well Before April 2016 ...................... 38

    3.    Plaintiffs Do Not Adequately Plead That They Exercised Diligence ........ 39

CONCLUSION .................................................................................................................... 40

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*AD/SAT, Div. of Skylight, Inc.* v. *Associated Press*,
    181 F.3d 216 (2d Cir. 1999)........................................................................................30

*Allen* v. *Dairy Farmers of Am., Inc.*,
    748 F. Supp. 2d 323 (D. Vt. 2010)........................................................................36, 38

*Andrews* v. *Metro N. Commuter R.R. Co.*,
    882 F.2d 705 (2d Cir. 1989)........................................................................................17

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009)..............................................................................................8, 10

*Bais Yaakov of Spring Valley* v. *Educ. Testing Serv.*,
    251 F. Supp. 3d 724 (S.D.N.Y. 2017)........................................................................31

*Behrens* v. *JPMorgan Chase Bank, N.A.*,
    2019 WL 1437019 (S.D.N.Y. 2019)..........................................................................40

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007)........................................................................................... *passim*

*Bradley* v. *Chiron Corp.*,
    1996 WL 441022 (N.D. Cal. 1996), *aff'd*, 136 F.3d 1317 (Fed. Cir. 1998)..........17

*Butala* v. *Agashiwala*,
    916 F. Supp. 314 (S.D.N.Y. 1996)............................................................................36

*City of Pontiac Police & Fire Ret. Sys.* v. *BNP Paribas Sec. Corp.*,
    92 F.4th 381 (2d Cir. 2024) .............................................................................. *passim*

*Colliton* v. *Cravath, Swaine & Moore LLP*,
    2008 WL 4386764 (S.D.N.Y. 2008), *aff'd*, 356 F. App'x 535 (2d Cir. 2009).......17

*Corcoran* v. *N.Y. Power Auth.*,
    202 F.3d 530 (2d Cir. 1999)....................................................................................36, 38

*Delaney* v. *Farley*,
    2014 WL 5795562 (S.D.N.Y. 2014)..........................................................................17

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)........................................................................................8, 30

*In re European Gov't Bonds Antitrust Litig.*,
   2020 WL 4273811 (S.D.N.Y. 2020)......................................................................37

*Fire & Police Pension Ass'n* v. *Bank of Montreal*,
   368 F. Supp. 3d 681 (S.D.N.Y. 2019)............................................29, 33, 39, 40

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
   74 F. Supp. 3d 581 (S.D.N.Y. 2015)...............................................................32

*Hinds Cnty., Miss.* v. *Wachovia Bank N.A.*,
   620 F. Supp. 2d 499 (S.D.N.Y. 2009)..............................................................40

*In re Interest Rate Swaps Antitrust Litig.*,
   2019 WL 1147149 (S.D.N.Y. 2019)..................................................................21

*In re Interest Rate Swaps Antitrust Litig.*,
   2018 WL 2332069 (S.D.N.Y. 2018).............................................................21, 31

*In re Interest Rate Swaps Antitrust Litig.*,
   261 F. Supp. 3d 430 (S.D.N.Y. 2017).......................................................*passim*

*InterVest, Inc.* v. *Bloomberg, L.P.*,
   340 F.3d 144 (3d Cir. 2003)..........................................................................9, 10

*Johnson* v. *Nyack Hosp.*,
   86 F.3d 8 (2d Cir. 1996)...................................................................................33

*Klehr* v. *A.O. Smith Corp.*,
   521 U.S. 179 (1997).........................................................................................34

*Koch* v. *Christie's Int'l PLC*,
   699 F.3d 141 (2d Cir. 2012).......................................................................36, 39

*Litovich* v. *Bank of Am. Corp.*,
   106 F.4th 218 (2d Cir. 2024) .........................................................................1, 7

*MacNealy* v. *Dayton Osteopathic Hosp., Inc.*,
   1993 WL 1377513 (S.D. Ohio 1993).................................................................16

*In re Magnesium Oxide Antitrust Litig.*,
   2011 WL 5008090 (D.N.J. 2011) .....................................................................40

*Mayor & City Council of Balt.* v. *Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013).......................................................................*passim*

*In re Mexican Gov't Bonds Antitrust Litig.*,
   412 F. Supp. 3d 380 (S.D.N.Y. 2019)...............................................................30

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ...................................................................22, 24, 28

*Ohio Carpenters' Pension Fund* v. *Deutsche Bank AG*,
   2024 WL 3938456 (S.D.N.Y. 2024) ...................................................................37

*Okla. Firefighters Pension & Ret. Sys.* v. *Deutsche Bank Aktiengesellschaft (f/k/a Deutsche Bank AG)*,
   2024 WL 4202680 (S.D.N.Y. 2024)...................................................................30

*Poindexter* v. *EMI Record Grp. Inc.*,
   2012 WL 1027639 (S.D.N.Y. 2012)...................................................................17

*In re Pork Antitrust Litig.*,
   495 F. Supp. 3d 753 (D. Minn. 2020).................................................................36

*Poster Exch., Inc.* v. *Nat'l Screen Serv. Corp.*,
   517 F.2d 117 (5th Cir. 1975) .............................................................................35

*Rite Aid Corp.* v. *Am. Express Travel Related Servs. Co.*,
   708 F. Supp. 2d 257 (E.D.N.Y. 2010) ................................................................34

*Rx.com* v. *Medco Health Sols., Inc.*,
   322 F. App'x 394 (5th Cir. 2009) .......................................................................36

*Singh* v. *Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019)..................................................................................37

*Sonterra Capital Master Fund Ltd.* v. *Credit Suisse Grp. AG*,
   277 F. Supp. 3d 521 (S.D.N.Y. 2017).................................................................31

*Starr* v. *Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010)................................................................................29

*Tera Grp., Inc.* v. *Citigroup, Inc.*,
   2019 WL 3457242 (S.D.N.Y. 2019)..............................................................30, 31

*Tera Grp., Inc.* v. *Citigroup, Inc.*,
   2024 WL 4501967 (2d. Cir. 2024)..............................................................25, 28, 29

*Texaco Inc.* v. *Dagher*,
   547 U.S. 1 (2006).................................................................................................21

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) ..............................................................................29

*TheECheck.com, LLC* v. *NEMC Fin. Servs. Grp. Inc.*,
   2017 WL 2627912 (S.D.N.Y. 2017).....................................................................31

*United States* v. *Grimm*,
    738 F.3d 498 (2d Cir. 2013)........................................................................34

*US Airways, Inc.* v. *Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019)........................................................................35

*Vantone Grp. Ltd. Liab. Co.* v. *Yangpu NGT Indus. Co.*,
    2015 WL 4040882 (S.D.N.Y. 2015)..........................................................32

*Woori Bank* v. *Merrill Lynch*,
    923 F. Supp. 2d 491 (S.D.N.Y.), *aff'd*, 542 F. App'x 81 (2d Cir. 2013)................................39

*Zenith Radio Corp.* v. *Hazeltine Research, Inc.*,
    401 U.S. 321 (1971)..................................................................................33

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016)........................................................33

**Statute**

15 U.S.C. § 15b...............................................................................................33

**Rules**

Fed. R. Civ. P. 9(b) .........................................................................................36

Fed. R. Civ. P. 12(b)(6)......................................................................................1

FINRA Rule 5310 ...........................................................................................26

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW (5th ed. 2022).............................8, 24

Defendants respectfully submit this memorandum of law in support of their joint motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Second Amended Consolidated Class Action Complaint (ECF No. 194) ("SAC") for failure to state a claim.

## PRELIMINARY STATEMENT

This is Plaintiffs' third attempt to plead a farfetched, decades-long antitrust conspiracy among 19 Defendants to boycott various electronic trading platforms that supposedly "would have provided pre-trade price transparency" in "odd lots" of corporate bonds.  (SAC ¶ 146.)  After two prior amendments, Judge Liman dismissed Plaintiffs' First Amended Complaint (ECF No. 128) ("FAC") for failure to state a claim on multiple alternative grounds in a well-reasoned, 62-page opinion.  (ECF No. 147.)  The Second Circuit, however, vacated that decision and remanded the action based on a "potential conflict" (Judge Liman's wife owned stock in a Defendant that was sold before he ruled on Defendants' motion to dismiss) that came to light only after the case was on appeal.  *Litovich* v. *Bank of Am. Corp.*, 106 F.4th 218, 225 (2d Cir. 2024).[1]  In vacating the judgment, the Second Circuit emphasized that it "d[id] not reach the merits of the case" and "d[id] not question the district judge's reasoned judgment."  *Id.* at 226-27.

On remand, Plaintiffs amended their complaint once again, but the SAC still suffers from the same fatal flaws as the prior complaints.  Plaintiffs continue to string together the same disparate allegations dating back to the mid-1990s concerning six different trading platforms without pleading any facts that create an inference of some overarching conspiracy.  Their principal addition to the SAC is to expand upon certain statistical analyses comparing prices of "odd lots" and "round lots" of corporate bonds.  Those *pricing* statistics, however, have little or nothing to do with the alleged conspiracy to *boycott* trading platforms.  Like its predecessors, the

---

[1] Unless otherwise noted, all internal citations, alterations and quotation marks are omitted.

SAC fails to state a claim for at least three independent reasons.

1. The SAC pleads no direct evidence, parallel conduct, or "plus factors" suggestive of the 20-year boycott conspiracy Plaintiffs have invented. Indeed, their boycott allegations are largely indistinguishable from those that the Second Circuit recently rejected in *City of Pontiac Police & Fire Retirement System* v. *BNP Paribas Securities Corp.* ("*Treasuries*"), 92 F.4th 381 (2d Cir. 2024). As in *Treasuries*, Plaintiffs fail to plead any facts to suggest that Defendants' alleged reluctance to support "new electronic trading platforms" that supposedly threatened their profits was anything other than the natural, unilateral reaction of each Defendant acting in its "[r]ational economic self-interest." *Id.* at 402-03. Plaintiffs also implausibly allege that Defendants spent decades conspiring to boycott trading platforms "that would have provided pre-trade price transparency" (SAC ¶ 146), while supporting three platforms (Bloomberg, MarketAxess, and Tradeweb) that offered transparent and competitive prices. Because all of Defendants' alleged conduct was "only natural anyway," *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 566 (2007), the SAC fails to plead a plausible antitrust conspiracy.

2. Even if Plaintiffs had adequately pled a plausible conspiracy, the SAC fails to connect any individual Defendant to the alleged conspiracy. In a textbook case of impermissible group pleading, the SAC relies almost exclusively on blunderbuss allegations directed at "Defendants" as an undifferentiated bloc, without pleading any facts about each Defendant's supposed role in the alleged conspiracy. This pleading failure is independently fatal to Plaintiffs' claim.

3. Plaintiffs' own allegations show that their claim is barred by the four-year statute of limitations. Plaintiffs filed their original complaint on April 21, 2020, but they allege no anticompetitive conduct in the four years before that date. Plaintiffs cannot salvage their claim by invoking equitable tolling because the SAC does not plead *any* of the elements of fraudulent

concealment.  Accepting the SAC's allegations as true, Plaintiffs were on inquiry notice years before April 2016.  Plaintiffs cannot simultaneously argue that their allegations based on academic articles and news reports published well before 2016 are sufficient to state a claim but that those same articles and reports did not put them on inquiry notice.  Plaintiffs also fail to allege that they exercised diligence in investigating their claims or that Defendants engaged in concealment.

## BACKGROUND

### A.    Corporate Bonds

After corporate bonds are issued, they are traded "over-the-counter" in the secondary market.  (SAC ¶ 66.)  An investor seeking to trade a corporate bond makes a request to one or more dealers, which respond by quoting a price.  (*Id.* ¶¶ 6, 71.)  These requests can be made by telephone or Bloomberg message or submitted electronically through a trading platform.  (*Id.* ¶ 74.)  Bond trades are typically categorized by size:  a "round lot" is a trade for an amount equal to or greater than, and divisible by, $1 million in par value, and an "odd lot" is a trade for less than $1 million in par value.  (*Id.* ¶ 5.)  Round-lot trades make up the vast majority—approximately 82%—of total trading volume of corporate bonds.  (*Id.* ¶¶ 84, 97.)

Institutional investors such as pension funds, mutual funds, and hedge funds primarily trade in round lots, and individual retail investors typically trade smaller odd lots.  (*Id.* ¶¶ 105, 109, 144.)  Unlike retail investors, institutional investors are "sophisticated," "repeat players" in the market (*id.* ¶ 138) that can "use their frequent trading activity to navigate around the opaque market structure" (*id.* ¶ 125).  As a result, institutional investors trading round lots are "likely to receive better pricing than retail customers" trading odd lots.  (*Id.* ¶ 138.)

Citing academic articles, Plaintiffs contend that "odd-lot trades cost significantly more to transact than larger round lot trades of corporate bonds."  (*Id.* ¶¶ 81-82, 120.)  But those same articles explain that the pricing differences arise from natural market forces, including "the

amortization of fixed costs over different trade sizes" and "the greater negotiating power that larger customers enjoy."[2] The fixed costs of trading contribute to pricing differentials because those per-trade costs can be spread across a larger volume of bonds in round-lot transactions. (*See* Ex. 2 (Zitzewitz (2010) at 2 ("[D]ealer costs likely have a fixed component per trade, whose recovery requires a higher percentage spread for smaller trades.") (cited at SAC ¶ 81)).) Institutional investors also receive better prices than retail customers because institutional investors are more sophisticated, will "shop around" for the best price, and are large and repeat customers that receive price discounts. (Ex. 3 (Harris (2015) at 22 ("The institutional-size trades probably are cheaper because institutional buy-side traders know more about values than do retail customers and thus negotiate better prices from dealers tha[n] do retail traders.") (cited at SAC ¶¶ 81, 98 n.19)).)[3]

Both odd lots and round lots of corporate bonds are traded on electronic trading platforms. (*See* SAC ¶¶ 142-146.) Institutional investors have direct access to those trading platforms, and retail investors can access the same platforms indirectly through brokers and financial advisors. (*See id.* ¶¶ 74, 144-146, 201; ECF No. 128 ¶¶ 188-189.) These trading platforms include Bloomberg, MarketAxess, and Tradeweb, all of which Defendants have supported. (SAC ¶¶ 74, 144-146, 160, 163, 183.)

### B.    Plaintiffs' Boycott Claim

Plaintiffs are three individuals, a trust, and an institutional investor that traded odd lots of corporate bonds. (*Id.* ¶¶ 19-23.) The SAC names 19 Defendants (which today comprise ten

---

[2] Ex. 1 (Harris (2020) at 20 (cited at SAC ¶ 120 & n.32).) All exhibits cited herein are exhibits to the Declaration of Richard C. Pepperman II, dated October 18, 2024.

[3] *See also* Ex. 4 (Biswas (2015) at 30 ("[S]ophisticated participants . . . incur lower transaction costs.") (cited at SAC ¶ 81)); Ex. 5 (Edwards (2007) at 1438 ("[O]bserved discounts to large orders are due to dealers giving better prices to large clients with repeat business potential . . . .") (cited at SAC ¶¶ 81-82)); Ex. 6 (Feldhütter (2012) at 1157 ("[C]ompared with small buyers, large buyers can more quickly 'shop around' among numerous sellers . . . [and] negotiate larger price discounts.") (cited at SAC ¶¶ 81-82)).

separate Defendant groups) that are among the dozens of dealers engaged in secondary-market trading of corporate bonds. (*Id.* ¶¶ 24-52, 63-65.) The SAC asserts a single claim against all 19 Defendants under Section 1 of the Sherman Act on behalf of all investors "who, between August 1, 2006 to the present . . . , bought and/or sold odd-lots (lots of total size below $1 million) of corporate bonds in the secondary market directly from or to a Defendant." (*Id.* ¶¶ 263, 271-280.)

Plaintiffs allege that Defendants conspired to boycott "odd-lot focused electronic trading platforms" that "sought to increase pre-trade pricing transparency . . . , allow all-to-all direct trading and/or anonymous trading, and/or otherwise promote pricing competition for odd-lot investors." (*Id.* ¶ 276.) According to the SAC, this alleged conspiracy spanned nearly two decades and involved six different trading platforms. (*Id.* ¶¶ 146, 202.) Plaintiffs allege that Defendants agreed to "boycott" three startup platforms: (i) the InterVest trading system introduced in the mid-1990s (*id.* ¶¶ 152-153); (ii) the ABS/NYSE Bonds platforms operated by the New York Stock Exchange since 1976 (*id.* ¶¶ 164-174); and (iii) two trading platforms developed by Bonds.com in 2008 and 2010 (*id.* ¶¶ 175-181). Plaintiffs also allege that certain Defendants used their ownership interests in three platforms—Trading Edge, Tradeweb, and BondDesk—to prevent them from offering transparent and competitive prices for odd lots. (*Id.* ¶¶ 154-163, 182-201, 204-206.)

### C.    Procedural History

1.    Since filing their first complaint on April 21, 2020 (ECF No. 1), Plaintiffs have repeatedly changed their theory of liability. Their initial complaint alleged two separate conspiracies: both (i) a price-fixing conspiracy (*id.* ¶¶ 237-244), and (ii) a group boycott (*id.* ¶¶ 245-254). Plaintiffs predicated their price-fixing claim on various academic studies and statistical analyses that purported to show wider spreads for odd-lot trades than round-lot trades. (*Id.* ¶¶ 79-95.) In response to Defendants' first motion to dismiss, Plaintiffs amended their complaint (ECF No. 128) and, in opposing Defendants' renewed motion to dismiss, abandoned

their price-fixing claim, thus limiting the case to their boycott claim (ECF No. 147 at 47). They also "expressly disavow[ed]" their allegation that Defendants conspired to boycott platforms "that were open to retail investors" (*id.* at 14), thus limiting their boycott claim to the allegation that Defendants colluded "to prevent the electronic platforms from offering all-to-all trading" of odd lots (SAC ¶ 142).

2. On October 25, 2021, Judge Liman granted Defendants' second motion to dismiss and dismissed the FAC with prejudice on multiple, separate grounds. (ECF No. 147.)

First, Judge Liman held that Plaintiffs failed to plead a plausible boycott conspiracy because "the conduct alleged to be parallel"—parallel refusals to deal, parallel investment activity, and parallel threats and pressure tactics—"is not suggestive of a preexisting agreement," but rather is consistent with the type of "independent competitive conduct" that would be expected absent a conspiracy. (*Id.* at 17-31.) Judge Liman also concluded that Plaintiffs failed to plead "plus factors" that gave rise to any "inference of conspiracy." (*Id.* at 31-48.)

Second, Judge Liman ruled that the complaint failed to connect "any individual Defendant to the alleged conspiracy" by relying on group-pleaded allegations that treated Defendants as a "collective bloc." (*Id.* at 48-53.) Judge Liman pointed out that the "vast majority" of allegations that referred to Defendants individually related to their "lawful ownership interests in platforms like TradeWeb and MarketAxess" and that, "[w]ith regard to the actual boycott activity itself," the complaint "is almost entirely devoid of allegations about any specific defendant." (*Id.* at 53.)

Third, Judge Liman determined that the four-year statute of limitations barred Plaintiffs' conspiracy claim because Plaintiffs failed to plead any overt acts in the four years before this action was filed. (*Id.* at 53-60.) Judge Liman rejected Plaintiffs' contention that each odd-lot trade after April 2016 at a supposedly inflated price was part of a "continuing violation," holding that those

trades were "merely an effect" of the alleged boycott, which "does not start the statutory period running again." (*Id.* at 55.) Judge Liman further concluded that Plaintiffs failed to plead multiple elements of fraudulent concealment. (*Id*. at 57-60.)[4]

3.   While Plaintiffs' appeal was pending, the Clerk informed the parties that a "potential conflict" had been "brought to [Judge Liman's] attention" arising from his wife's prior ownership of stock in one Defendant, which "neither affected nor impacted [Judge Liman's] decisions." (ECF No. 155.)   The Clerk later informed the parties that "the stock holding referenced in [the prior] letter was fully divested in July 2021," approximately three months before Judge Liman issued his decision dismissing the case. (ECF No. 159.)   On July 2, 2024, the Second Circuit vacated the judgment and remanded the case to this Court based solely on Judge Liman's "potential conflict," without "reach[ing] the merits of the case." *Litovich*, 106 F.4th at 225-27.

4.   On remand, Plaintiffs sought leave to amend their complaint yet again, and filed the SAC on September 3, 2024. (ECF No. 194.)   Even though they have abandoned their price-fixing claim, the vast majority of Plaintiffs' amendments simply expand their statistical analyses of odd-lot pricing, which have little to no connection to Plaintiffs' remaining boycott claim.   Plaintiffs previously acknowledged on appeal that their statistical analyses purportedly show, at most, that Defendants had a "motive" to engage in a boycott so that they could maintain high profits. (*Litovich* v. *Bank of Am. Corp.*, Case No. 21-2905 (2d Cir.), ECF No. 100, at 30-31.)

## ARGUMENT

### I.    Plaintiffs Fail to Plead a Plausible Boycott Conspiracy.

"[T]he first question in any Section 1 case is whether there is an agreement to conspire." *Treasuries*, 92 F.4th at 391.   An agreement may be alleged in one of two ways.   First, a plaintiff

---

[4] Judge Liman also held that Plaintiffs failed to plead any actual injury caused by the alleged boycott, which precluded them from plausibly alleging antitrust standing. (ECF No. 147 at 60-62.)

may plead "direct evidence" of a conspiracy such as "'a recorded phone call in which two competitors agreed to fix prices at a certain level.'" *Id.* (quoting *Mayor & City Council of Balt.* v. *Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)). Second, if a plaintiff is unable to plead direct evidence of a conspiracy, it may "present circumstantial facts supporting the inference that a conspiracy existed." *Citigroup*, 709 F.3d at 136. Such circumstantial facts ordinarily consist of allegations of parallel conduct and supporting "plus factors." *Treasuries*, 92 F.4th at 391.

It is well-settled, however, that allegations of parallel conduct that are merely "consistent" with conspiracy are insufficient. *Ashcroft* v. *Iqbal*, 556 U.S. 662, 680 (2009). "[T]he mere fact that firms are rational profit maximizers in the same market implies that they will do a fair number of things in parallel." Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 307d3 (5th ed. 2022). Accordingly, no inference of conspiracy may be drawn from (i) parallel acts "that could just as easily turn out to have been rational business behavior," *Citigroup*, 709 F.3d at 137; (ii) parallel conduct that "suggest[s] competition at least as plausibly as it . . . suggest[s] anticompetitive conspiracy," *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007); or (iii) parallel behavior that is "not only compatible with, but indeed [is] more likely explained by, lawful, unchoreographed free-market behavior," *Iqbal*, 556 U.S. at 680. To raise a plausible inference of conspiracy, parallel conduct must be reinforced by "plus factors" that "suggest[] an antecedent agreement, rather than 'parallel conduct that could just as well be independent action.'" *Treasuries*, 92 F.4th at 391 (quoting *Twombly*, 550 U.S. at 557).

Plaintiffs here fail to plead either direct evidence of conspiracy or parallel conduct and plus factors that raise a plausible inference of a 20-year boycott conspiracy.

### A.    Plaintiffs Do Not Adequately Allege That Defendants Conspired Against All-to-All Trading Platforms.

The Second Circuit's recent *Treasuries* decision forecloses Plaintiffs' boycott claim. In

that case, plaintiffs similarly alleged that defendants "colluded to boycott existing or new electronic trading platforms that sought to offer all-to-all trading [of Treasuries] for buy-side investors." 92 F.4th at 402.  In rejecting those allegations, the Court concluded that "[t]he most [p]laintiffs plausibly allege is that [defendants] . . . preferred to maintain a reliable and profitable market structure, and were averse to major market changes or reforms that might disadvantage them." *Id.* at 403.  Such allegations raise no inference of conspiracy because "[r]ational economic self-interest provides a ready explanation for [defendants'] supposed failure to patronize or invest in enterprises that could disrupt their business model." *Id.*  The Court thus concluded that "it is unremarkable that a group of the world's largest banks, which have well-established, profitable operations in the [market], would independently forgo supporting—and decide to not nurture . . . [—]fledgling startups" that sought to reduce the banks' profits. *Id.* at 409, 412-13.

Plaintiffs here try to plead a materially identical multi-decade conspiracy "to restrain all-to-all electronic trading of odd-lots of corporate bonds."  (SAC ¶ 2.)  They assert that, starting decades ago, Defendants boycotted—*i.e.*, agreed not to do business with—three trading platforms and that Defendants acquired "control" of three other platforms to prevent them from offering all-to-all trading of odd lots.  None of these allegations raises a plausible inference of conspiracy.

### 1.    Plaintiffs' "Boycott" Allegations Are Insufficient.

The SAC alleges that Defendants "boycotted" three trading platforms formerly operated by InterVest, ABS/NYSE Bonds, and Bonds.com.  These allegations all fail under *Treasuries*.

**InterVest**.  In two conclusory paragraphs, Plaintiffs contend that Defendants conspired in the mid-1990s to obstruct InterVest's electronic trading platform.  (*Id*. ¶¶ 152-153.)  The SAC alleges that InterVest "struck a deal with Bloomberg to provide its system on Bloomberg terminals," but that Bloomberg terminated this arrangement in 1998 after unidentified "bond dealers" allegedly "began to complain."  (*Id.*)  These allegations suffer from several fatal defects.

*First*, Plaintiffs plead no *facts* suggesting that any Defendant conspired against InterVest. Although the SAC vaguely asserts that unidentified "bond dealers" complained about InterVest and that "Bloomberg terminated the service" due to "pressure from Defendants" (*id*. ¶ 153), it fails to allege which specific "bond dealers" purportedly complained, which specific Defendants "pressure[d]" Bloomberg, what that purported "pressure" was, or when it occurred.  Conclusory, group-pleaded allegations like these "are not entitled to the assumption of truth."  *Iqbal*, 556 U.S. at 679; *see also Treasuries*, 92 F.4th at 407 (rejecting allegation that platform "was pressured" by certain defendants where "[p]laintiffs never name these other defendants").

*Second*, Plaintiffs' threadbare allegations about InterVest fail to explain why Defendants would attempt to boycott InterVest, but not the multiple other trading platforms Defendants concededly did support.  *See infra* at 15-17.  Plaintiffs do not allege, for example, that InterVest offered the kind of "all-to-all" trading allegedly targeted by the conspiracy, instead offering only a vague allegation that InterVest "promised anonymous, push-button trading."  (SAC ¶ 152.)

*Third*, Plaintiffs' InterVest allegations relate to the "mid-1990s" (*id.*), but the class period alleged in the SAC began nearly a decade later in August 2006 (*id.* ¶¶ 2, 263).  Plaintiffs' allegations are thus too "stale" to support their claim.  *Treasuries*, 92 F.4th at 405 (rejecting allegations of boycott conduct "ten years before the beginning of the class period").

*Finally*, InterVest litigated and lost the same claim in *InterVest, Inc.* v. *Bloomberg, L.P.*, 340 F.3d 144 (3d Cir. 2003).  There, the Third Circuit affirmed a grant of summary judgment rejecting InterVest's claim that various bond dealers boycotted it, reasoning that evidence that dealers had complained about InterVest, "without any other supporting evidence tending to show illegal pressure or a conspiracy, is insufficient."  *Id.* at 166.  Likewise here, a bare assertion that unidentified dealers "complain[ed]" about InterVest (SAC ¶ 153) is insufficient to state a claim.

*See Treasuries*, 92 F.4th at 413-14 (rejecting allegations of "complaining to a third party" about a trading platform that were "characterized by generic references to [defendants], and vague descriptions of the nature of the alleged misconduct").

**ABS/NYSE Bonds**.  Plaintiffs next allege that the NYSE launched an electronic trading platform for corporate bonds known as "ABS" in 1976 and replaced it with a platform known as "NYSE Bonds" in 2007, both of which failed to achieve a substantial market share at any time in their 48-year history.  (SAC ¶¶ 164-167.)  Plaintiffs attribute this lack of success to "a concerted boycott of the platforms by Defendants" (*id.* ¶ 168), but they plead "nothing—no threats, pressure, boycotts, or anything else—to show that [Defendants] caused, or to otherwise connect them to," the platforms' failure to attract substantial trading volume.  *Treasuries*, 93 F.4th at 415.  Although the SAC asserts the legal conclusion that there was a "boycott" (SAC ¶ 168), Plaintiffs acknowledge that "25 bond dealers" participated in "NYSE Bonds" and do not identify a single Defendant that was not among those 25 (*id.* ¶ 167).  The SAC also notably *fails* to allege that NYSE Bonds offered all-to-all trading, the alleged target of the purported conspiracy.  (*See id.* ¶ 166 (alleging only that NYSE Bonds offered "executable" prices).)

These allegations are not salvaged by Plaintiffs' claim that it took "18–19 months" to connect NYSE Bonds to Bloomberg's trade management system when it supposedly should have taken only "five months."  (*Id.* ¶ 173.)  The SAC never explains how that 14-month delay in 2007 is somehow to blame for the platform's failure to achieve substantial market penetration at any time in its history.  Moreover, Plaintiffs' own allegations undermine their vague assertion that Defendants "used their market power" to "force Bloomberg to materially delay NYSE Bonds' connection."  (*Id.* ¶ 174.)  According to the SAC, Bloomberg is a monopolist that Defendants were in no position to coerce:  its trade management system is allegedly an "essential facilit[y]" that

"[e]veryone trading corporate bonds electronically, *including Defendants*, must use." (*Id.* ¶¶ 171-172 (emphasis added).)  Plaintiffs also plead no facts supporting their conclusory assertion that unspecified "Defendants" "threaten[ed]" Bloomberg (*id.* ¶ 174), and *Treasuries* confirms that use of "labels like 'threat' and 'intimidation' without substance" is insufficient, 92 F.4th at 415.

**Bonds.com**.  Bonds.com allegedly launched a trading platform in 2008 that was open to both retail and institutional investors, but "refocused" on institutional investors three months later "due to market conditions and other economic factors." (SAC ¶ 178.)  In 2010, Bonds.com "shifted to a platform called BondsPro," which likewise focused on "professional traders and large institutional investors." (*Id.* ¶ 179.)  "Between 2012 and 2013, Bonds.com sought liquidity" from "major corporate bond dealers like Defendants," but allegedly found no takers. (*Id.* ¶¶ 180-181.)

Defendants' alleged decisions not to support BondsPro raise no inference of conspiracy under *Treasuries*.  Plaintiffs allege that a successful BondsPro platform would have "eliminate[d] Defendants as middlemen, or force[d] them . . . to lower odd-lot bid-offer spreads." (*Id*. ¶ 179.) Given that allegation, "[r]ational economic self-interest provides a ready explanation for the [Defendants'] supposed failure to patronize . . . enterprises that could disrupt their business model." *Treasuries*, 92 F.4th at 403; *see also In re Interest Rate Swaps Antitrust Litig.* ("*IRS I*"), 261 F. Supp. 3d 430, 475 (S.D.N.Y. 2017) ("Each Dealer's [alleged] decision to avoid [this] startup platform[], like the decision by each phone company in *Twombly* not to compete in new markets, is, in and of itself unremarkable.").

Nor is it suggestive of conspiracy that Bank of America allegedly stated that "it would only be willing to participate on Bonds.com if at least one or two of the larger dealers (such as Morgan Stanley or JPMorgan) also participated." (SAC ¶ 180.)  It is entirely natural and predictable that Bank of America would be reluctant to join a startup platform unless other major market

-12-

participants did so.  Plaintiffs themselves acknowledge that "[a]lmost all" startup platforms fail within a few years.  (*Id.* ¶ 203.)  Under these circumstances, the mere allegation that dealers did not flock to a given startup, without more, "is not—at all—suggestive of conspiracy"—it is instead unilaterally rational for each Defendant to "sit[] tight and wait[] to see" if the new platform "attracted sufficient support to survive."  *IRS I*, 261 F. Supp. 3d at 475 & n.23.  The SAC also does not actually allege that Morgan Stanley, JPMorgan, or any other Defendant made a communication similar to the one Bank of America allegedly made.  *See Treasuries*, 92 F.4th at 407 (rejecting allegation where plaintiffs "name only a single [defendant]" that engaged in purported conduct).  Rather, the SAC cites Morgan Stanley and JPMorgan only to illustrate the kind of dealer Bank of America allegedly had in mind in referring to "one or two of the larger dealers."  (SAC ¶ 180.)

### 2.      Plaintiffs' "Catch-and-Kill" Allegations Are Insufficient.

Plaintiffs allege that Defendants acquired control of three additional trading platforms—Trading Edge, Tradeweb, and BondDesk—to prevent them from offering all-to-all trading of odd lots.  None of these allegations, however, is sufficient to plead a plausible boycott conspiracy.

**Trading Edge**.  Plaintiffs briefly allege that the MarketAxess platform acquired a smaller platform called Trading Edge in 2001 and later terminated Trading Edge's anonymous trading protocol.  (*Id.* ¶¶ 205-206.)  Plaintiffs' own allegations acknowledge, however, that MarketAxess had a unilateral incentive to make this change because Trading Edge's anonymous model "could have threatened MarketAxess's business model."  (*Id.* ¶ 206.)  The SAC also is devoid of any factual allegation that *Defendants* colluded against Trading Edge, that *Defendants* caused MarketAxess to acquire Trading Edge, or that *Defendants* forced MarketAxess to change Trading Edge's trading protocols.  In addition, Plaintiffs' allegations predate the beginning of the alleged class period in 2006, rendering them irrelevant to Plaintiffs' boycott claim.  *See Treasuries*, 92 F.4th at 405 (rejecting "stale" allegations that pre-dated the class period).

**Tradeweb**.    Plaintiffs allege that in 1996 and 2008 certain Defendants invested in Tradeweb in exchange for minority ownership stakes.  (SAC ¶ 154.)  Plaintiffs concede that there were rational business reasons for these investments:  having an equity stake in Tradeweb was "a way of replacing money" that dealers "made on market-making" but that might be "lost" when the market went "electronic."  (*Id.* ¶ 157.)  Plaintiffs nevertheless assert that Defendants used their minority ownership of Tradeweb to turn it into a "stalking horse" that would "catch and kill" startup platforms and to limit Tradeweb's "ability to offer pre-trade price transparency inherent in all-to-all trading."  (*Id.* ¶ 163.)

Plaintiffs' Tradeweb allegations are even weaker than the Tradeweb allegations rejected in *IRS I* and *Treasuries*.  In *IRS I*, plaintiffs alleged that defendants used their minority investments in Tradeweb to stop it from offering all-to-all trading of interest rate swaps.  261 F. Supp. 3d at 466-67.  The court rejected those allegations because plaintiffs failed to allege any facts supporting their premise that Tradeweb had ever *planned* to offer all-to-all trading.  *Id.*  Similarly, in *Treasuries*, plaintiffs alleged that defendants used their ownership of Tradeweb "to effect boycotts of all-to-all trading."  92 F.4th at 409.  The Second Circuit rejected those allegations because they failed to "plausibly show that defendants were not merely acting pursuant to their independent self-interest in maintaining a market structure that was beneficial to each of them."  *Id.* at 411 n.14.

So too here.  As in *IRS I*, Plaintiffs fail to allege any facts suggesting that Tradeweb ever planned to offer all-to-all trading of corporate bonds or that Defendants ever thwarted such an effort.  *See* 261 F. Supp. 3d at 466.  And as in *Treasuries*, Plaintiffs fail to allege that Defendants ever undertook any action inconsistent with their "independent self-interest in maintaining" a beneficial market structure.  92 F.4th at 411 n.14.

**BondDesk**.  Last, Plaintiffs contend that Defendants supposedly targeted a platform named

BondDesk.  (SAC ¶¶ 182-201.)  BondDesk was independently owned and operated from 1999 to 2013, except for a two-year period from 2004 to 2006, when four Defendants allegedly held an ownership interest in the platform.[5]  (*Id*. ¶¶ 182-192.)  BondDesk was not available to "retail investors directly," but instead "catered to investment advisors representing retail investors."  (*Id.* ¶¶ 182, 192.)  In 2013, Tradeweb acquired BondDesk and renamed it Tradeweb Direct.  (*Id.* ¶¶ 198, 200.)  After the acquisition, the platform continued to cater to financial advisors representing retail investors, and Plaintiffs admit that Tradeweb Direct is "on the desktop of every financial adviser" at the leading retail brokerage firms.  (*Id.* ¶ 201.)

Although Plaintiffs assert that Defendants used Tradeweb to "catch-and-kill" BondDesk, the platform has been highly successful since Tradeweb acquired it, accounting for one in seven corporate-bond trades.  (*Id.*)  Plaintiffs also fail to allege that there were any changes in BondDesk's trading protocols after Tradeweb acquired it or that the platform ever offered the kind of all-to-all trading allegedly targeted by the purported conspiracy.  Furthermore, the SAC contains no non-conclusory allegations that any of the *Defendants* were responsible for Tradeweb's decisions regarding BondDesk.  The BondDesk allegations therefore lend no support to Plaintiffs' boycott theory.  *See Treasuries*, 92 F.4th at 410 (rejecting allegations relating to Tradeweb's operation of trading platform where the "operation of [the platform] was in line with a wide swath of rational and competitive business strategy that does not suggest a conspiratorial agreement").

### 3.    Plaintiffs Concede That Defendants Supported All-to-All Trading.

Plaintiffs' boycott theory suffers from an additional fatal defect:  Plaintiffs *admit* that Defendants supported three trading platforms—MarketAxess, Tradeweb, and Bloomberg—that offer precisely the kind of "all-to-all electronic trading of odd-lots of corporate bonds" (SAC ¶ 2)

---

[5] These allegations do not pertain to Barclays, Citi, Credit Suisse, Deutsche Bank, Morgan Stanley, or NatWest, none of which acquired any ownership interest in BondDesk.  (SAC ¶ 183.)

and "pre-trade pricing transparency" (*id.* ¶ 4) that Defendants supposedly boycotted.

According to Plaintiffs' FAC, the MarketAxess, Tradeweb, and Bloomberg platforms account for about 97% of electronic trading of corporate bonds.  (ECF No. 128 ¶ 195.)  The FAC further acknowledged that all three of these platforms "allow investor-to-investor direct trading (without intermediary dealers), and . . . pre-trade pricing transparency, which results in better competition on pricing."  (*Id.* ¶ 198.)[6] Those concessions reveal that, far from *boycotting* platforms that offered all-to-all trading of odd lots, Defendants actually *supported* three thriving platforms that offered such "investor-to-investor" trading.  (*Id.*)

Indeed, Plaintiffs fail to identify any substantive difference between the trading protocols offered by the fledgling platforms Defendants supposedly boycotted and the protocols offered by the three market-leading platforms that Plaintiffs admit Defendants supported.  Plaintiffs' allegations thus "do not fit [their] conspiracy theory—that the Boycott Defendants sought to prevent the widespread emergence of all-to-all trading."  *Treasuries*, 92 F.4th at 403; *see MacNealy* v. *Dayton Osteopathic Hosp., Inc.*, 1993 WL 1377513, at *9 (S.D. Ohio 1993) (holding that it is "not reasonable to infer" that defendants "engaged in a group boycott" to "drive [some] competitor[s]" from "the marketplace when, after doing so, they allowed other competitors into that market").

Unable to deny that Defendants supported trading platforms that offered all-to-all trading, Plaintiffs attempt to hide the problem by simply deleting their admissions on this subject from the

---

[6] In the FAC, Plaintiffs sought to distinguish between the access available to "institutional" versus "retail" investors, suggesting that Defendants' conduct may have targeted platforms that permitted trading by retail investors.  (ECF No. 128 ¶¶ 133-135.)  Plaintiffs later disavowed that theory, asserting that they were alleging a broader conspiracy "designed to maintain pricing opacity for odd-lot corporate bonds, *whether they were bought or sold by retail or institutional investors, and regardless of how those odd-lot investors accessed*" trading platforms.  (ECF No. 133 at 31 (emphasis added).)  Moreover, each of MarketAxess, Tradeweb, and Bloomberg permits retail investor access through brokers or financial advisors (ECF No. 128 ¶¶ 188-189) similar to the protocols available on the alleged victim platform BondDesk (SAC ¶ 192).

SAC.  (ECF No. 194-2 at 128-30 (redlined complaint reflecting deletion of FAC's admissions).)

But merely deleting these allegations does not undo the FAC's original admissions or prevent this

Court from considering them.[7]  To the contrary, where "a plaintiff blatantly changes his statement

of the facts in order to respond to the defendant's motion to dismiss . . . and directly contradicts

the facts set forth in his original complaint, a court is authorized to accept the facts described in

the original complaint as true."  *Colliton* v. *Cravath, Swaine & Moore LLP*, 2008 WL 4386764, at

*6 (S.D.N.Y. 2008), *aff'd*, 356 F. App'x 535 (2d Cir. 2009).

### B.    Plaintiffs Fail to Plead Parallel Conduct Suggestive of a Preceding Agreement.

Plaintiffs do not argue that their allegations about any of the above six platforms, standing

alone, raise a plausible inference of a boycott conspiracy.  Rather, they contend that their

allegations, taken together, depict three forms of loosely parallel behavior:  parallel refusals to

deal, parallel investment activity, and parallel threats and pressure tactics.  (SAC ¶¶ 147-206.)

"But parallel conduct—even 'conscious parallelism'—is generally insufficient, because parallel

acts, even if they are 'consistent with conspiracy,' may nevertheless be 'just as much in line with

a wide swath of rational and competitive business strategy unilaterally prompted by common

perceptions of the market'—or the product of 'chance, coincidence, independent responses to

common stimuli, or mere interdependence unaided by an advance understanding among the

parties.'"  *Treasuries*, 92 F.4th at 391 (quoting *Twombly*, 550 U.S. at 553-54, 556 n.4).  This

principle bars Plaintiffs' claims because their allegations "describe[] conduct as easily indicative

---

[7] *See Andrews* v. *Metro N. Commuter R.R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989); *Poindexter* v. *EMI Record Grp. Inc.*, 2012 WL 1027639, at *2 (S.D.N.Y. 2012); *see also Delaney* v. *Farley*, 2014 WL 5795562, at *5 (S.D.N.Y. 2014) (where allegations in amended pleading are inconsistent with or contradict prior allegations, prior allegations are deemed binding admissions); *Bradley* v. *Chiron Corp.*, 1996 WL 441022, at *3 (N.D. Cal. 1996) ("If a party will not be granted leave to amend to allege facts inconsistent with the dismissed pleading, it follows that, after granting leave to amend, the court is not required to accept such inconsistent allegations as true."), *aff'd*, 136 F.3d 1317 (Fed. Cir. 1998).

of common interests held, individually and separately, by the [Defendants] as any conspiracy." *Id.* at 415.

### 1.    Purportedly Parallel Refusals to Deal Do Not Suggest Conspiracy.

Plaintiffs assert that unidentified "Defendants" complained to Bloomberg about InterVest and refused to do business with ABS/NYSE Bonds and Bonds.com. (SAC ¶¶ 152-153, 169, 175.) For at least two reasons, *Treasuries* forecloses these allegations.

*First*, the SAC lacks sufficient allegations that Defendants either refused to do business with, or complained about, any of these platforms. With respect to InterVest and ABS/NYSE Bonds, there are no allegations about the conduct of even a *single* Defendant. "This failure to identify the involvement of particular defendants in the alleged conspiracy" is "a basic pleading defect" that "dooms" Plaintiffs' allegations as to those two platforms. *Treasuries*, 92 F.4th at 396. With respect to Bonds.com, only Bank of America is identified as having declined to trade on that platform (SAC ¶ 180), and no inference of conspiracy arises where "Plaintiffs identify only one" Defendant that supposedly engaged in purported boycott conduct, *Treasuries*, 92 F.4th at 409. Plaintiffs' pervasive failure to allege any facts relating to the activities of individual Defendants leaves them unable to plead the kind of parallelism that might suggest a preceding agreement. *See id.* at 414 ("With regard to the actual boycott activity itself . . . the Complaint is almost entirely devoid of allegations about any specific defendant, a defect fatal to Plaintiffs' boycott claims.").

*Second*, even if Plaintiffs had alleged that each Defendant declined to trade on InterVest, ABS/NYSE Bonds, and Bonds.com, those allegations would raise no inference of conspiracy under *Twombly* and *Treasuries*. In *Twombly*, plaintiffs attempted to plead a boycott conspiracy by alleging that defendants engaged in parallel acts of resistance, obstruction, and "sabotage" designed to prevent new market entrants from competing with them. *See* 550 U.S. at 550-51, 566. Although plaintiffs argued that this parallel resistance to new entrants supported an inference of

conspiracy, the Supreme Court held that the allegations failed to raise an inference that the alleged behavior "was anything more than the natural, unilateral reaction" of each defendant to a perceived competitive threat.  *Id.* at 566.  As the Court explained, the alleged parallel resistance to the startups provided "no reason to infer that the [defendants] had agreed among themselves to do what was only natural anyway; *so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a §1 violation against almost any group of competing businesses would be a sure thing*."  *Id.* (emphasis added).  Likewise here, it is "only natural anyway" that Defendants allegedly made parallel decisions to avoid dealing with startup trading platforms that allegedly threatened their market position.

*Treasuries* applies the same reasoning to a case almost exactly like this one.  Plaintiffs there alleged that seven Treasuries dealers "colluded to boycott existing or new electronic trading platforms that sought to offer all-to-all trading."  92 F.4th at 402.  Defendants allegedly boycotted these "startup platforms" by declining to "commit liquidity," expressing "disapproval" of the platforms, and interfering with the platforms' attempts to obtain clearing services.  *Id.* at 412-15 & n.16.  The Second Circuit drew no inference of conspiracy from those allegations because it is "unremarkable that a group of the world's largest banks, which have well-established, profitable operations in the . . . market, would independently forgo supporting—and decide to not nurture— a pair of fledgling startups."  *Id.* at 412-13.  The alleged parallel acts of resistance to the startup platforms were "only natural anyway" because defendants were "similarly situated participants in the same market" and "their objections to all-to-all trading are ones they would naturally have in common, absent any agreement."  *Id.* at 403.  The Second Circuit thus concluded that plaintiffs had "not alleged enough to make their claims 'conceivable,' let alone 'nudge' them 'across the line from conceivable to plausible.'"  *Id.* at 413 (quoting *Twombly*, 550 U.S. at 570).

Those holdings control here.  As in *Treasuries*, Plaintiffs allege that Defendants engaged in parallel refusals to deal with startup platforms that allegedly threatened their trading profits. (*E.g.*, SAC ¶ 142.)  Even accepting those allegations as true, they raise no inference of conspiracy because "[r]ational economic self-interest provides a ready explanation for . . . Defendants' supposed failure to patronize [trading platforms] that could disrupt their business model." *Treasuries*, 92 F.4th at 403; *see also id.* at 413 ("Defendants could have easily concluded that trading on this unproven startup was not in their individual business interests."); *IRS I*, 261 F. Supp. 3d at 475 ("Each Dealer's [alleged] decision to avoid the startup platforms . . . is, in and of itself unremarkable.  Considered alone, it is not—at all—suggestive of conspiracy.").

### 2. Purportedly Parallel Investment Activity Does Not Suggest Conspiracy.

Plaintiffs allege that (i) JPMorgan invested in MarketAxess in 2001, (ii) four Defendants had minority investments in BondDesk from 2004 to 2006, and (iii) certain Defendants invested in Tradeweb in 1996, 2004, and 2008.  (SAC ¶¶ 154-163, 182-191, 205-206.)  Plaintiffs assert that this "parallel" investment activity was designed to prevent three trading platforms—Trading Edge (later acquired by MarketAxess), Tradeweb, and BondDesk—from introducing price competition for odd lots.  These assertions fail to sustain a plausible inference of a multiple-decade conspiracy.

*First*, even if credited, these allegations of parallel *investment* activity would raise no inference of a *boycott* conspiracy.  Parallel conduct allegations can be helpful in pleading an antitrust conspiracy when they "raise[] a suggestion of a preceding agreement" to engage in the parallel behavior.  *Twombly*, 550 U.S. at 557.  As a result, such allegations are potentially suggestive of conspiracy *only* where the "parallel conduct—such as setting prices at the same level—is precisely the concerted action that is the conspiracy's object." *Citigroup*, 709 F.3d at 137.  Here, Plaintiffs do not allege that the "object" of the alleged conspiracy was to engage in

parallel investment activity as opposed to parallel boycott behavior. Their allegations of parallel investment activity thus do not fit their conspiracy theory. *See id.*; *IRS I*, 261 F. Supp. 3d at 464-65 (discounting parallel conduct allegations that were a step removed from "the ultimate act of refraining to compete"); *In re Interest Rate Swaps Antitrust Litig.* ("*IRS III*"), 2019 WL 1147149, at *17 (S.D.N.Y. 2019) (finding allegations relating to joint investments and joint ventures were "fundamentally different" from allegations of a "group boycott").

*Second*, Plaintiffs' parallel investment allegations all relate to actions undertaken by the trading platforms in their capacities as joint ventures. But, "[a]s a single entity, a joint venture, like any other firm, must have the discretion to determine" how it operates. *Texaco Inc.* v. *Dagher*, 547 U.S. 1, 7 (2006). Accordingly, allegations relating to the operation of joint ventures are not indicative of a boycott conspiracy. *See IRS I*, 261 F. Supp. 3d at 467-69 (rejecting similar allegations as to Tradeweb); *IRS III*, 2019 WL 1147149, at *14-19 (same).[8]

*Third*, Plaintiffs do not identify any specific decision by the three platforms that they plausibly plead was anticompetitive, *see supra* at 13-15, and *Twombly* rejects any assertion that a mere failure to enter into a new business line is suggestive of conspiracy, *see* 550 U.S. at 569 ("[f]irms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets").

*Finally*, Plaintiffs plead no facts suggesting that Defendants' investment activities were the product of a boycott agreement. For example, they do not plead that investing in the platforms

---

[8] Even if Plaintiffs had alleged an agreement among Defendants as to the strategic direction of any of the platforms in which they had invested, any such agreement would be subject to antitrust challenge at most under the rule of reason. *See In re Interest Rate Swaps Antitrust Litig.* ("*IRS II*"), 2018 WL 2332069, at *12 (S.D.N.Y. 2018) ("[E]ven assuming a well-pled agreement among owners to terminate a Tradeweb plan to open an all-to-all IRS trading platform, the Project Fusion joint venture as alleged remains subject to review only under the Rule of Reason."). Plaintiffs fail to plausibly allege the necessary elements of any such rule-of-reason claim. *Id.* at *12 (dismissing claim where complaint did "not make any allegations as to Tradeweb's market power").

would have been unprofitable in the absence of a conspiracy—to the contrary, they allege that those investments made perfect business sense.  *See supra* at 13-15.  Furthermore, they "offer no basis for inferring an anticompetitive motive" for Defendants' investments.  *See Treasuries*, 92 F.4th at 410 (rejecting allegations relating to same dealers' investment in Tradeweb).

### 3.    Purportedly Parallel Threats and Pressure Tactics Do Not Suggest Conspiracy.

Plaintiffs cite three sets of allegations to support their claim that Defendants engaged in parallel threats and pressure tactics:  (i) in the 1990s, Salomon Smith Barney allegedly refused to trade with certain InterVest traders; (ii) in 2012 or 2013, Bank of America allegedly expressed concern about participating on Bonds.com due to potential "blowback" from other Defendants; and (iii) at unidentified times between 2015 and 2019, Citibank and Morgan Stanley each allegedly threatened to limit its business with First Tennessee if First Tennessee competed against them for BlackRock's business.  (SAC ¶¶ 148-149, 180.)

Those isolated allegations, separated by over 20 years, hardly plead any parallel conduct at all, let alone parallel conduct suggestive of a decades-long boycott conspiracy.  First, the three alleged incidents are too narrow, disparate, and disconnected to raise a plausible inference of a preceding agreement among Defendants to engage in the challenged conduct.  *See Treasuries*, 92 F.4th at 403 (rejecting attempt to "connect dots far flung among isolated episodes involving different subsets of defendants over two decades"); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) (similar conduct widely separated in time "does not raise the specter of collusion").  Second, Plaintiffs' allegation that two Defendants each had narrow disputes with First Tennessee over *BlackRock's business* has ***no*** connection to Plaintiffs' theory that 19 Defendants conspired to *boycott electronic trading platforms*.  *See Treasuries*, 92 F.4th at 403 (rejecting allegations that "do not fit Plaintiffs' conspiracy theory—that the [defendants]

sought to prevent the widespread emergence of all-to-all trading").  Third, Plaintiffs' allegation that *one* Defendant made an isolated comment about its reluctance to participate on Bonds.com does not plead parallel conduct given the absence of any allegations of similar comments by other Defendants.  Without any well-pled allegation of parallel conduct, Bank of America's alleged fear of unspecified "blowback" is too slender a reed on which to base a massive antitrust conspiracy. *See id.* at 409 (rejecting allegation where "[p]laintiffs identify only one [defendant]").

In sum, "[t]he most Plaintiffs plausibly allege is that the [Defendants] . . . pursued their own respective business interests, preferred to maintain a reliable and profitable market structure, and were averse to major market changes or reforms that might disadvantage them."  *Id.* at 403.  Any such allegations of "parallel decisions to resist competition" are "only natural anyway," and cannot sustain a plausible inference of conspiracy.  *Twombly*, 550 U.S. at 566.

### 4.    Plaintiffs' Allegations Are Even Weaker When Considered as a Whole.

Here, as in *Treasuries*, Plaintiffs' scattershot allegations are "even weaker" when taken together "than when taken in series."  92 F.4th at 415.  Far from cohering into a unified conspiracy theory, the SAC "offers data points scattered over more than twenty years, many of them outside the class period; sketches conduct by largely unspecified actors, many of them anonymous; relies on the terminology of conspiracy, without an agreement to conspire; uses labels like 'threat' and 'intimidation' without substance; and describes conduct as easily indicative of common interests held, individually and separately, by [Defendants] as any conspiracy."  *Id.*  The allegations therefore fail to state a viable boycott claim, whether analyzed individually or as a whole.

### C.    Plaintiffs Fail to Plead "Plus Factors" That Raise an Inference of Conspiracy.

Because Plaintiffs fail to allege any parallel conduct suggestive of a preceding agreement, they "cannot demonstrate an agreement to conspire based on indirect evidence irrespective of their plus factors."  *Treasuries*, 92 F.4th at 401; *see also id.* at 415 n.17.  Even if this Court were

nevertheless to consider Plaintiffs' "plus factors," those "facts must still lead to an inference of conspiracy" for the complaint to survive dismissal. *Citigroup*, 709 F.3d at 137. Plaintiffs fall well short of meeting that standard.

### 1. There Are No Allegations of Conduct Inconsistent With Self-Interest.

Plaintiffs argue that all three types of parallel behavior attributed to Defendants—refusals to deal, platform investments, and threats and pressure tactics—were contrary to Defendants' self-interest absent a boycott conspiracy. (SAC ¶¶ 217-218.) They also rely on statistical analyses purporting to show pricing disparities between odd lots and round lots, which are irrelevant to the alleged *boycott* conspiracy, as conduct inconsistent with Defendants' self-interest. (*Id.* ¶¶ 208-216.) But "an action contrary to self-interest is not merely a different judgment than an armchair observer would have made looking at the same factors." Areeda, ANTITRUST LAW ¶ 1414. "Rather, it must be an action that is so irrational that no firm would have engaged in it except on the understanding that others were in agreement." *Id.*; *see also In re Musical Instruments*, 798 F.3d at 1195 (conduct contrary to self-interest occurs "where individual action would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement"). Plaintiffs come nowhere near pleading such conduct.

**Refusals to deal**. Plaintiffs contend that Defendants acted against their individual interests by declining to "support and participate on platforms" offering all-to-all odd-lot trading. (SAC ¶ 217.) But *Treasuries* squarely foreclosed that contention when it concluded under nearly identical circumstances that "[r]ational economic self-interest provides a ready explanation for [defendants'] supposed failure to patronize or invest in enterprises that could disrupt their business model." 92 F.4th at 403; *see also id.* at 413 (each defendant "could have easily concluded that trading on [these] unproven startup[s] was not in their individual business interests"). Consistent with *Treasuries*, the Second Circuit recently reaffirmed that allegations that a group of dealers

"refused to trade" on a new entrant, all-to-all platform failed to plead conduct against unilateral self-interest because each individual dealer "had a clear economic incentive to steer buy-side customers away from [the all-to-all platform] onto RFQ-friendly platforms." *Tera Grp., Inc.* v. *Citigroup, Inc.*, 2024 WL 4501967, at *2-3 (2d Cir. 2024).

Moreover, the SAC identifies two additional reasons why there was nothing risky or irrational about declining to trade on the platforms at issue. First, almost all startup platforms fail within a few years. (SAC ¶ 203.) Second, Defendants already were supporting three thriving platforms that offered all-to-all trading. *See supra* at 15-17. Accordingly, Plaintiffs "do[] not plead facts suggesting that it would not be a sound business strategy for each [dealer] to take a wait-and-see approach." *Tera*, 2024 WL 4501967, at *4. Indeed, "[i]f, once the dust settled, it was clear that [a new entrant all-to-all platform] would survive," then dealers "could simply elect to join the platform at that time." *Id.* A strategy of "sitting tight and waiting to see if the new platforms attracted sufficient support to survive," *IRS I*, 261 F. Supp. 3d at 475 n.23, thus "made perfect business sense," *Citigroup*, 709 F.3d at 138.

**Platform investments**. Plaintiffs suggest that four Defendants acted against their individual interests when they allegedly invested in BondDesk in 2004 (SAC ¶ 183), changed its management (*id.* ¶ 186), and then sold their interests to a private equity firm in 2006 (*id.* ¶ 192). But nothing about these allegations suggests that the four Defendants—or later Tradeweb—operated BondDesk so irrationally as to support an inference of conspiracy. To the contrary, Plaintiffs acknowledge that, under Tradeweb's management, the BondDesk platform (now known as Tradeweb Direct) has been highly successful and "facilitates one in seven corporate bond trades." (*Id.* ¶ 201.)

**Pressure tactics**. Plaintiffs suggest that two Defendants acted against their individual

interests by threatening to limit their business with First Tennessee if it competed against them for BlackRock's business. (*Id.* ¶¶ 149-150.) But *Twombly* confirms that, far from raising an inference of conspiracy, acts of "resisting competition" only amount to "routine market conduct" and are "only natural anyway." 550 U.S. at 566. Plaintiffs also allege that Salomon Smith Barney "refused" to trade with certain InterVest traders in the 1990s (SAC ¶ 148) and that many years later, Bank of America allegedly expressed concern about participating on Bonds.com due to potential "blowback" from "other Defendants" (*id.* ¶ 180). But again, resisting competition is "only natural anyway," *Twombly*, 550 U.S. at 566, and *Treasuries* rejected similar conclusory allegations of "'threat[s]' and 'intimidation,'" 92 F.4th at 415. Finally, Plaintiffs' allegation that two Defendants had spats with First Tennessee over BlackRock's business (SAC ¶¶ 149-150) has nothing to do with Plaintiffs' platform-boycott theory.

**Pricing disparities**. Plaintiffs' allegations of pricing disparities between odd lots and round lots (*id.* ¶¶ 79-141) are also unavailing because Plaintiffs cannot fit the square peg of their *pricing* allegations into the round hole of their *boycott* claim. Although Plaintiffs assert that these allegations show conduct contrary to each Defendant's self-interest (*id.* ¶¶ 208-216), their only specific allegation of purportedly irrational conduct is that Defendants "fail[ed] to compete on pricing for odd-lot trades" (*id.* ¶ 213). Apart from being unfounded, this allegation of irrational *pricing* conduct has nothing to do with Plaintiffs' *boycott* theory. *See Treasuries*, 92 F.4th at 412 (rejecting allegations where plaintiffs could not "really explain how [alleged conduct] coheres with their conspiratorial theory").[9] And to the extent Defendants allegedly receive increased profits on odd-lot trades because of the failure of all-to-all trading platforms (SAC ¶¶ 13, 201, 220), that

---

[9] Plaintiffs' naked allegation that Defendants could "easily" narrow odd-lot spreads and thereby gain greater market share given FINRA Rule 5310 execution requirements (SAC ¶¶ 213-214) is rank speculation and, in any event, is irrelevant to Plaintiffs' platform-boycott claim.

allegation only reinforces the conclusion that declining to support all-to-all trading was consistent with each Defendant's "individual, legitimate business interest[] to maintain a profitable and reliable market structure," *Treasuries*, 92 F.4th at 390.

In addition to being unconnected to their boycott theory, Plaintiffs' own allegations and citations provide "obvious alternative explanation[s]" for the alleged disparity between odd-lot and round-lot prices. *Twombly*, 550 U.S. at 567. According to the articles cited in the SAC, the "widely documented" fact that odd lots trade at greater spreads than round lots "is generally attributed to either dealer bargaining power or fixed costs in executing bond trades."[10] These explanations are echoed by the SAC, which alleges that Defendants' per-trade fixed costs are "the same whether the Defendants are dealing in [smaller] odd-lots or [larger] round lots of corporate bonds." (SAC ¶ 212.) These per-trade costs can thus be spread over a larger number of bonds when Defendants trade in round lots, resulting in lower per-bond costs and spreads for round lots than odd lots. The SAC further alleges that retail investors are "more likely" to trade in odd lots compared to institutional investors, which are more "sophisticated investors" that are "likely to receive better pricing than retail customers" because they are repeat players with better access to information. (*Id.* ¶¶ 106, 138.)

Ignoring these allegations, Plaintiffs insist that odd-lot pricing disparities are unexpected in light of alleged differences between the U.S. market compared to international markets or the historical U.S. market. (*Id.* ¶¶ 97-112.) But the studies of trading in Israel and Italy cited in the SAC did not find that odd-lot and round-lot spreads are identical in those countries, and they do not suggest that Defendants acted contrary to their self-interest or participated in a group boycott in the United States. Plaintiffs' allegation that "*during the pre-World War II period*, trade costs

---

[10] Ex. 7 (O'Hara (2021) at 54 (cited at SAC ¶¶ 85, 112 & n.28)); *see also supra* at 3-4 & nn.2-3.

were more uniform across all trade sizes" (*id.* ¶ 110 (emphasis added)) only underscores that the pricing disparity on which Plaintiffs rely has existed for over 75 years, negating any inference that it arises from or relates to a comparatively recent alleged conspiracy to boycott trading platforms.

### 2.    A Common Interest in Higher Profits Does Not Suggest Conspiracy.

In a single conclusory paragraph, Plaintiffs allege that Defendants share a "common motive to conspire to charge wider spreads to odd-lot bond investors" to secure "supracompetitive profits." (*Id.* ¶ 220.) But again, Plaintiffs' allegation of a motive to charge high prices for odd-lot trades fails at the outset because these *pricing* allegations are disconnected from Plaintiffs' allegations of a *platform-boycott* conspiracy.

Moreover, to plead a common motive to conspire, a plaintiff must do more than allege that defendants shared a motive to maximize profits, which is always the case. *See, e.g.*, *In re Musical Instruments*, 798 F.3d at 1194 n.8 ("[C]ommon motive for increased profits always exists."); *Tera*, 2024 WL 4501967, at *3 ("It is nearly always the case that, where, as here, a market is crowded with established participants, each incumbent business has an incentive to exclude a newcomer in order to protect its own market share."). Rather, a plaintiff must allege that the defendants shared a strong interest in conspiring to engage in conduct that they were unlikely to undertake absent a conspiracy, and the SAC fails to allege such a common motive. *See Twombly*, 550 U.S. at 566 ("no reason to infer that the companies had agreed among themselves to do what was only natural anyway"); *Tera*, 2024 WL 4501967, at *3 (rejecting common-motive allegations under closely analogous facts because those allegations led "'to an equally plausible inference of mere interdependent behavior'") (quoting *Apex Oil Co.* v. *DiMauro*, 822 F.2d 246, 254 (2d Cir. 1987))).

### 3.    Plaintiffs' Other Plus-Factor Allegations Are Meritless.

Plaintiffs contend that Defendants "have controlled 65% or more of the bond *underwriting* market every year since at least 2014." (SAC ¶¶ 62-63 (emphasis added).) But "merely possessing

the capability to carry out an effective boycott does not suggest that such a boycott resulted from any agreement," especially where "there is no allegation that any of the [defendants] needed the approval of another to utilize its tools of resistance" against the alleged boycott targets. *Tera*, 2024 WL 4501967, at *5. Plaintiffs' market-share allegation also fails to address the *trading* market at issue in the alleged boycott conspiracy, and in any event, the allegation that ten firms collectively have a 65% share falls well short of what other cases have found to be a concentrated market in conspiracy cases. *See, e.g.*, *Starr* v. *Sony BMG Music Entm't*, 592 F.3d 314, 323-24 (2d Cir. 2010) (four defendants controlled over 80% of market); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) ("four defendants sell 90 percent of U.S. text messaging services").[11]

Plaintiffs also allege that there are "high levels" of communications between Defendants (SAC ¶¶ 223-224),[12] but Plaintiffs fail to plead a single specific communication by or between any of the Defendants, much less any communication relating to the alleged boycott conspiracy. As a result, the SAC at best "merely alleges that the [Defendants] *could* have coordinated," and "the law is clear that the mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred." *Tera*, 2024 WL 4501967, at *4.

---

[11] The SAC alleges that the market share of NatWest (then known as RBS) in the underwriting market declined from 2.3% in 2014 to less than 1% in 2015 and to 0% after 2015. (SAC ¶ 63.) This allegation of minimal and declining market shares, followed by a 0% market share after 2015, belies the conclusory assertion that NatWest was "among the top firms by market share in the U.S. corporate bond underwriting market almost every year" or that its "share in the underwriting market" gave it "power" over the secondary-trading market. (*Id.* ¶¶ 63-64.) NatWest's alleged market share also underscores the implausibility of the SAC's claims against it. *See Fire & Police Pension Ass'n v. Bank of Montreal*, 368 F. Supp. 3d 681, 702-03 (S.D.N.Y. 2019) (dismissing claims against defendant bank after it ceased to be involved in setting price of allegedly manipulated financial instrument).

[12] Plaintiffs notably removed in the SAC their original allegation that there is "a constant communication loop among . . . bond trad[ers]," which is inevitable in any trading market. (ECF No. 128 ¶ 239.)

## II.    Plaintiffs' Group Pleading Does Not Connect Any Individual Defendant to the Alleged Conspiracy.

To state an antitrust conspiracy claim against an individual Defendant, Plaintiffs "must separately identify how [that] particular defendant contributed to the alleged conspiracy." *Treasuries*, 92 F.4th at 407 n.12.  A plaintiff in a Section 1 case thus must plead facts sufficient to show that each of the defendants, "in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective."  *AD/SAT, Div. of Skylight, Inc.* v. *Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999).  A complaint's "failure to identify the involvement of particular defendants in the alleged conspiracy" is "a basic pleading defect" that "dooms [its] allegations."  *Treasuries*, 92 F.4th at 396.  Allegations like those here that are laid out in "entirely general terms without any specification of any particular activities by any particular defendant" serve as "nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever."  *In re Elevator*, 502 F.3d at 50-51.  As the Second Circuit explained in *Treasuries*, "a complaint that provides no basis to infer the culpability of the specific defendants named in the complaint fails to state a claim."  92 F.4th at 397.

Applying this rule against group pleading, courts routinely dismiss such generalized claims of collusion asserted against a group of financial institutions en masse.  *See, e.g.*, *Okla. Firefighters Pension & Ret. Sys.* v. *Deutsche Bank Aktiengesellschaft (f/k/a Deutsche Bank AG)*, 2024 WL 4202680, at *7 (S.D.N.Y. 2024) ("Without any allegations relating to specific actions taken by each defendant, group pleading fails to tie each defendant to the conspiracy by showing that each defendant engaged in parallel conduct."); *Tera Grp., Inc.* v. *Citigroup, Inc.*, 2019 WL 3457242, at *11 (S.D.N.Y. 2019) ("[T]he Complaint's pervasive reliance on group allegations impacts the viability of [plaintiff's] claims because it results in a paucity of details linking certain of the Defendants to the alleged conspiracy."); *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp.

3d 380, 389 (S.D.N.Y. 2019) ("[E]ven if Plaintiffs have alleged the plausible existence of an antitrust conspiracy—a question the Court does not reach—they have not alleged anything that would 'plausibly suggest that the *particular* defendants named in this suit were part of that conspiracy.'"); *TheECheck.com, LLC* v. *NEMC Fin. Servs. Grp. Inc.*, 2017 WL 2627912, at *2 (S.D.N.Y. 2017) (dismissing allegations that attributed misconduct to defendants collectively without differentiating among defendants and alleging facts about any individual defendant's conduct); *Sonterra Capital Master Fund Ltd.* v. *Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 536, 556 (S.D.N.Y. 2017) (dismissing antitrust claims against all but one defendant and "reject[ing] plaintiffs' attempts to shoehorn [the other] defendants into a broad-based antitrust conspiracy"). Again, *Treasuries* is instructive:  the Second Circuit rejected similar boycott allegations because, among other reasons, they "mostly consist[ed] of unspecific activities of the 'primary dealers' or 'Boycott Defendants'" and thus "fail[ed] to sufficiently specify which (if any) Boycott Defendants furthered the alleged conspiracy or how they did so."  92 F.4th at 403.  The same is true here.

Despite multiple opportunities to amend their complaint, Plaintiffs still plead no facts suggesting that "each Defendant, in [its] individual capacit[y], consciously committed" itself to a boycott conspiracy.  *Tera*, 2019 WL 3457242, at *11.  The SAC instead continues to rely on vague and conclusory allegations that "Defendants" as a group participated in "boycotts" of six trading platforms.  (*E.g.*, SAC ¶¶ 142, 145-151, 153, 168-169, 174-175, 180-181, 185-187, 190, 198, 201, 203.)  With respect to the actual boycott activity, the SAC is almost entirely devoid of allegations about any specific Defendant.  General allegations that "Defendants" refused to deal with these platforms are insufficient to connect each of the Defendants to a group boycott.  *See Treasuries*, 92 F.4th at 408 (allegations that are "mostly generic and undifferentiated, and categorize the alleged wrongdoers as a group," are insufficient); *IRS II*, 2018 WL 2332069, at *17 (rejecting

allegations that were pled "generically and in undifferentiated fashion, [without] specifying a particular defendant or defendants" but rather referring only to "Dealer Defendants").[13]

The vast majority of the SAC's allegations that actually refer to specific Defendants relate to their lawful investments in trading platforms. The SAC identifies nine Defendants that invested in Tradeweb and certain individuals who served on Tradeweb's board; a (non-defendant) corporate affiliate of one Defendant that invested in MarketAxess; and four Defendants that had representatives on the BondDesk board. But the Tradeweb and MarketAxess allegations that mention particular Defendants simply identify them as investors in those platforms and as members of their boards, not as participants in a boycott. (SAC ¶¶ 154, 156, 158, 160-162, 205.) The BondDesk allegations likewise do not plead that any Defendant joined a boycott, but rather that four Defendants held ownership stakes in BondDesk between 2004 and 2006 and that their board representatives participated in the decision to replace the platform's management. (*Id.* ¶¶ 183, 186-192.) Such allegations do not plead participation in a boycott.

That leaves only a handful of substantive allegations that mention any Defendant by name. But these, too, are inadequate to plead participation in a boycott. The SAC's allegation that Bank of America expressed concern about participating on BondsPro because of potential "blowback" from "other Defendants" (*id.* ¶ 180) does not plead an agreement to participate in a boycott conspiracy. *See supra* at 12-13, 22-23, 26. Similarly, the SAC's allegations that Salomon Smith

---

[13] This case is unlike the collusion cases in which complaints have survived a group-pleading challenge. *Cf.*, *e.g.*, *Bais Yaakov of Spring Valley* v. *Educ. Testing Serv.*, 251 F. Supp. 3d 724, 745 (S.D.N.Y. 2017) (distinguishing plaintiffs' allegations from complaints that contain "generalized allegations about broad conduct with no explanation as to why any particular defendant was responsible for the conduct"); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 593 (S.D.N.Y. 2015) ("[I]n addition to describing the alleged conspiracy in great detail, the U.S. Complaint makes specific allegations regarding each Defendant."); *Vantone Grp. Ltd. Liab. Co.* v. *Yangpu NGT Indus. Co.*, 2015 WL 4040882, at *4 (S.D.N.Y. 2015) (complaint contained "factual allegations that distinguish between the conduct of the Moving Defendants, listing specific actions taken by each of them").

Barney "refused to do business" with InterVest traders in the 1990s (SAC ¶¶ 148) and that Morgan Stanley and Citibank separately fought a turf battle with First Tennessee for BlackRock's business between 2015 and 2019 (*id.* ¶¶ 149-150) fall well short of pleading a plausible group boycott.  *See supra* at 22-23, 25-26.  The SAC's *pricing* allegations also do nothing to suggest that any Defendant participated in a *boycott* conspiracy.  *See supra* at 26-28.

Ultimately, Plaintiffs appear to have selected the ten Defendant groups here because they were all among the "largest underwriter[s]" of corporate bonds.  (SAC ¶ 222.)  They then allege that Defendants (like every other dealer) charged wider spreads for odd lots than for round lots and that some Defendants invested in different trading platforms.  Beyond those general propositions, the SAC's allegations about particular Defendants "are sparse to the point of near non-existence."  *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016).  Because Plaintiffs "have not nudged" their boycott claim against each of the Defendants "across the line from conceivable to plausible, their complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

## III.    Plaintiffs' Claim Is Time-Barred in Its Entirety.

Plaintiffs' claim is subject to a four-year statute of limitations.  *See* 15 U.S.C. § 15b; *Johnson* v. *Nyack Hosp.*, 86 F.3d 8, 11 (2d Cir. 1996).  "The basic rule is that damages are recoverable under the federal antitrust acts only if suit therefor is commenced within four years after the cause of action accrued."  *Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).  Plaintiffs' claim is time-barred because the SAC does not allege a single act in furtherance of the alleged conspiracy after April 21, 2016—four years before Plaintiffs filed this action.[14]  Plaintiffs' invocation of the fraudulent-concealment doctrine cannot save their claim

---

[14] The SAC pleads that NatWest (then known as RBS) had a 0% share of the bond-underwriting market after 2015.  (SAC ¶ 63.)  It therefore contains no plausible basis to infer that NatWest participated in any purported conspiracy after 2015, providing an additional reason to conclude that Plaintiffs' claim is "fully time barred" as to NatWest.  *Bank of Montreal*, 368 F. Supp. 3d at 702-03.

because the SAC fails to plead any of the elements required for tolling with the requisite particularity.

### A.     Plaintiffs Do Not Allege Any Anticompetitive Act After April 2016.

The SAC does not allege a single act in furtherance of the alleged boycott conspiracy after April 2016.  To the contrary, every alleged anticompetitive act took place more than four years before Plaintiffs filed their initial complaint in April 2020.  In an effort to overcome this fatal flaw, Plaintiffs argue that they have alleged a "continuing violation" because they assert that odd-lot spreads continued to be artificially wide after April 2016.  That argument fails as a matter of law.

Under the continuing-violations doctrine, "each overt act that is part of the violation . . . starts the statutory period running again," but a plaintiff cannot "recover for the injury caused by old overt acts outside the limitations period." *Klehr* v. *A.O. Smith Corp.*, 521 U.S. 179, 189 (1997); *see also Rite Aid Corp.* v. *Am. Express Travel Related Servs. Co.*, 708 F. Supp. 2d 257, 268 (E.D.N.Y. 2010) ("The continuing violation exception only allows a plaintiff to recover damages caused by overt acts committed inside the limitations period.").  But that is exactly what Plaintiffs seek to do here:  recover for alleged injuries on corporate bond trades within the limitations period caused by "old overt acts" allegedly committed outside the limitations period.

As the Second Circuit explained, "when [an] anticipated economic benefit continues," the "payment[s] [are] the result of a completed conspiracy," and "not in furtherance of one that is ongoing." *United States* v. *Grimm*, 738 F.3d 498, 503-04 (2d Cir. 2013).  "[T]he result of [the] conspiracy may be continuing," but "the conspiracy does not thereby become a continuing one." *Id.*  A continuing conspiracy instead requires "[c]ontinuity of action to produce the unlawful result, or continuous co-operation of the conspirators to keep it up." *Id.*  Here, the allegedly inflated odd-lot spreads after April 2016 were the "anticipated economic benefit" of the alleged boycott, but they did not depend on "continuity of action" or "continuous co-operation" among Defendants.

Any post-April 2016 inflated prices thus were "merely the abatable but unabated inertial consequence of [Defendants'] pre-limitations" period conduct. *Poster Exch., Inc.* v. *Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir. 1975).

The Second Circuit's decision in *US Airways, Inc.* v. *Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019), is dispositive. The Court there held that each inflated payment under a 2006 contract that violated the Sherman Act "was not an overt act of its own, but a manifestation of the prior overt act of entering into the 2006 contract." *Id.* at 69. The same is true here. "[E]ach supracompetitive price" supposedly charged by Defendants after April 2016 "was not an overt act on its own, but a manifestation of the prior overt act[s]" of the alleged boycott—all of which occurred before April 2016. *Id.* at 68-69. Plaintiffs do not allege that Defendants agreed to charge certain prices or that charging "inflated prices" furthered the alleged boycott. Plaintiffs instead contend that higher prices were the "effect" of the alleged boycott. (SAC ¶ 251 ("effect" of boycott was to allow Defendants to earn "supracompetitive profits").)

Finally, Plaintiffs assert that one Defendant "punish[ed]" First Tennessee for trading with BlackRock at some unspecified time between 2015 and 2019 (SAC ¶ 149) and that two Defendants "threatened" First Tennessee for offering narrower spreads to BlackRock at some unspecified time between 2016 and 2018 (*id.* ¶ 150). Leaving aside that Plaintiffs' reliance on multi-year time periods fails to plead that these isolated instances occurred *after* April 2016, these allegations are unconnected to Plaintiffs' boycott theory and thus do not satisfy the requirement of an overt act in furtherance of the alleged boycott conspiracy during the limitations period. *See supra* at 22-23, 25-26.

## B.    Plaintiffs Fail to Plead Fraudulent Concealment.

Plaintiffs try to salvage their untimely boycott claim by contending that the statute of limitations should be equitably tolled on fraudulent-concealment grounds. To plead fraudulent

concealment, however, Plaintiffs must allege with particularity that (i) Defendants concealed the existence of their claim from them, (ii) Plaintiffs remained ignorant of their claim until some point within four years of filing suit, and (iii) this continuing ignorance was not attributable to a lack of diligence on Plaintiffs' part. *See Koch* v. *Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012). This pleading burden is a "heavy one." *Allen* v. *Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 347 (D. Vt. 2010). Plaintiffs' allegations fail to satisfy any of these elements, much less all three.

### 1. Plaintiffs Do Not Adequately Plead Concealment.

To plead concealment, Plaintiffs must allege with the specificity required by Rule 9(b) that Defendants wrongfully concealed material facts from them that prevented Plaintiffs from discovering their claim within the limitations period. *Corcoran* v. *N.Y. Power Auth.*, 202 F.3d 530, 543 (2d Cir. 1999). Plaintiffs' allegations do not come close to satisfying Rule 9(b).

To begin, the SAC's conclusory allegation that "the unlawful activity alleged herein was self-concealing" (SAC ¶ 257) is inadequate to plead concealment. It is well-settled that "merely stat[ing] in a conclusory fashion that the defendants' fraud was self-concealing" is not enough to plead concealment under Rule 9(b). *Butala* v. *Agashiwala*, 916 F. Supp. 314, 320 (S.D.N.Y. 1996). Likewise, the allegation that "Defendants' collusion [was] facilitated by the high levels of interfirm communication between Defendants," but that the details of those communications "were secret," is inadequate. (SAC ¶ 258.) It is also well-settled that simply alleging that Defendants had non-public communications and did not disclose them does not plead concealment. *Rx.com* v. *Medco Health Sols., Inc.*, 322 F. App'x 394, 397-98 (5th Cir. 2009) (allegedly "secret communications between the Defendants while they each claimed they were making unilateral decisions" did not constitute concealment); *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 773-74 (D. Minn. 2020) (allegations of "secret meetings, surreptitious communications between

Defendants by the use of the telephone or in-person meetings" without "any information regarding the 'who, what, when, where, and how'" failed to plead concealment).

In fact, Plaintiffs have pleaded themselves out of court.  By relying on price differences between odd-lot and round-lot trades discussed in academic articles dating back to 2007, developments related to electronic trading platforms that were reported in the press many years before 2016, and data made available as early as 2006, the SAC itself undermines any claim of concealment.  (SAC ¶¶ 81, 85.)  The "visible nature" of these articles, press reports, and data sources makes it impossible for Plaintiffs to plead that this conduct was concealed.  *See IRS I*, 261 F. Supp. 3d at 488 ("Given the visible nature of Tradeweb's trading platform and of the Dealers' majority ownership, the direction they gave to Tradeweb was not 'self-concealed.'").

Plaintiffs assert that Defendants' codes of conduct concealed the alleged boycott by "represent[ing] that their operations were above-board."  (SAC ¶ 260.)  This argument fails for multiple reasons.  First, the codes of conduct cited in the SAC were published in *2020*, not during the period Plaintiffs seek to have tolled.  (*Id.*)  Second, Plaintiffs do not allege that they relied on those codes in deciding not to assert their claim earlier.  And third, any claim of reliance on the generic statements in Defendants' codes of conduct would not be credible in view of the SAC's allegations—based on publicly filed cases dating back to 2013—that Defendants "engaged in multiple similar anticompetitive conspiracies in other markets for financial instruments."  (SAC ¶ 225.)  The Second Circuit has made clear that such codes of conduct "are a textbook example of 'puffery'" that "do not invite reasonable reliance."  *Singh* v. *Cigna Corp.*, 918 F.3d 57, 60-63 (2d Cir. 2019).  That is particularly true here given the SAC's other allegations.  (SAC ¶¶ 225-234.)[15]

---

[15] Two courts in this District have found that statements in codes of conduct were sufficient at the pleading stage to allege concealment.  *See Ohio Carpenters' Pension Fund* v. *Deutsche Bank AG*, 2024 WL 3938456 (S.D.N.Y. 2024); *In re European Gov't Bonds Antitrust Litig.*, 2020 WL 4273811 (S.D.N.Y. 2020). Defendants respectfully submit that those cases were wrongly decided because they conflict with the

### 2.    Plaintiffs Were on Inquiry Notice Well Before April 2016.

Plaintiffs' fraudulent-concealment allegations fail for another independent reason:   the SAC establishes that Plaintiffs were on inquiry notice years before April 2016.  *See Corcoran*, 202 F.3d at 543 (tolling unavailable when plaintiff "knew, or should have known, the nature of his claim within the statutory period").  The "boycott" conduct alleged in the SAC occurred in plain view and was publicly reported before April 2016, including in various articles cited in the SAC.  (*See, e.g.*, SAC ¶¶ 14 n.3, 156-157, 199.)  "[T]he public nature of the information upon which [Plaintiffs] base their claims" precludes them from pleading fraudulent concealment.  *Allen*, 748 F. Supp. 2d at 347-48; *see also IRS I*, 261 F. Supp. 3d at 489 n.38 (claims time-barred where "plaintiffs based their [claims] . . . on voluminous news articles and other public sources, many published well before" the statutory period).

Accepting them as true, the SAC's allegations that only a conspiracy can explain the widely reported market developments underscore that Plaintiffs were on inquiry notice well before April 2016.  Plaintiffs allege that there is "no reasonable economic justification to explain the magnitude of the pricing disparity between odd-lot and round lot trades."  (SAC ¶ 9; *see also id.* ¶ 87.)  According to Plaintiffs, "[t]he existence and persistence of significantly wider spreads for odd-lot corporate bond trades than for round lot trades . . . is itself evidence that Defendants are . . . failing to compete on pricing for odd-lot trades [and] . . . cannot be the result of legitimate, individual economic decisions."  (*Id.* ¶ 213.)  This "price disparity" between odd lots and round lots was publicly observable and the subject of extensive academic study long before April 2016.  Plaintiffs themselves base their claim on data that have been publicly available since 2006 (*id.* ¶ 80) and on

---

Second Circuit's decision in *Singh*.  Those cases also do not support Plaintiffs' concealment allegations here because the plaintiffs in both of those cases, unlike Plaintiffs here, alleged that they had actually relied on the codes of conduct.  *Deutsche Bank*, 2024 WL 3938456, at *7; *In re European Gov't Bonds*, 2020 WL 4273811, at *12.

numerous academic articles published between 2007 and 2015 that documented this price disparity (*id.* ¶ 81). In addition, InterVest publicly litigated and lost its claim that it was the victim of a boycott conspiracy more than 20 years before Plaintiffs filed suit, which surely provided Plaintiffs notice of their claim. *See supra* at 10-11. Plaintiffs' own allegations thus establish that they were on inquiry notice of their claim long before April 2016. *See IRS I*, 261 F. Supp. 3d at 489 ("[A]ccepting class plaintiffs' premise that only a plot can explain the missing platforms, class plaintiffs had every basis, in real time, to smell a rat. At a minimum they were on inquiry notice.").

Even more fundamentally, Plaintiffs cannot "simultaneously claim[] that the generalized evidence cited as the basis of [their] complaint—the vast majority of which involves factual allegations published prior to [the limitations period]—is sufficiently detailed to state a cognizable claim for relief, and that, nevertheless, these facts were somehow insufficiently particular to cause the statute of limitations to run." *Woori Bank* v. *Merrill Lynch*, 923 F. Supp. 2d 491, 495-96 (S.D.N.Y.), *aff'd*, 542 F. App'x 81 (2d Cir. 2013). In other words, Plaintiffs cannot have it both ways: either their allegations based on information that was publicly available years ago are insufficient to state a claim or Plaintiffs were on inquiry notice well before April 2016. *See Bank of Montreal*, 368 F. Supp. 3d at 708-09 (where plaintiffs "rel[y] solely on [their] economic analysis" of public data and other public information, such evidence cannot be "insufficient to put [them] on inquiry notice in 2013, but sufficient to file a lawsuit in 2018"); *IRS I*, 261 F. Supp. 3d at 489 n.38 ("Class plaintiffs based their [claims] . . . on voluminous news articles and other public sources, many published well before November 25, 2011. This too supports a finding that plaintiffs were on inquiry notice.").

### 3.    Plaintiffs Do Not Adequately Plead That They Exercised Diligence.

A plaintiff also must have "exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Koch*, 699 F.3d at 157. Plaintiffs do not allege a

single step they took to investigate their potential claim before April 2016.  While Plaintiffs insist that they "exercise[d] . . . reasonable due diligence" (SAC ¶ 256), they say nothing about what that diligence entailed.  Instead, they simply assert that "[n]one of the facts or information available to Plaintiffs and the Class could have led to the discovery of the conspiracies alleged in this complaint."  (*Id.* ¶ 259.)  A conclusory assertion that any diligence would have been futile does not satisfy Plaintiffs' pleading burden.  *See Bank of Montreal*, 368 F. Supp. 3d at 703-04 (rejecting as insufficient allegations that "Plaintiff and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by exercise of due diligence"); *Behrens* v. *JPMorgan Chase Bank, N.A.*, 2019 WL 1437019, at *8 (S.D.N.Y. 2019) (equitable tolling unavailable where "Plaintiffs do not identify any steps they took to determine whether they had a claim against the MTD Defendants during the limitations period").

Plaintiffs also never explain what previously unavailable information supposedly came to light within the last four years that enabled them to file this lawsuit in April 2020.  Without this explanation, "it is impossible to discern whether Plaintiffs could or should have discovered [their claim] within the limitations period."  *In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, at *25 (D.N.J. 2011); *see also Hinds Cnty., Miss.* v. *Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 520 (S.D.N.Y. 2009) ("The [complaint] does not specify when any Named Plaintiffs or Class members became aware of the antitrust violations, and therefore does not state 'with particularity the circumstances constituting fraud or mistake.'") (quoting Fed. R. Civ. P. 9(b)).  Plaintiffs thus fail to plead the exercise of diligence throughout the pre-April 2016 tolling period.

## CONCLUSION

For the foregoing reasons, the SAC should be dismissed in its entirety with prejudice.

Dated: October 18, 2024
      New York, New York

/s/ Adam S. Hakki
Adam S. Hakki
Richard F. Schwed
ALLEN OVERY SHEARMAN STERLING
US LLP
599 Lexington Avenue
New York, New York  10022
Telephone:  (212) 848-4000
adam.hakki@aoshearman.com
rschwed@aoshearman.com

*Attorneys for Defendants Bank of America
Corporation; BofA Securities, Inc.; and
Merrill Lynch, Pierce, Fenner & Smith
Incorporated*

/s/ Kevin P. Broughel
Kevin P. Broughel
Zoe Lo
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, New York  10020
Telephone:  (212) 940-6343
kevin.broughel@katten.com
zoe.lo@katten.com

*Attorneys for Defendant Barclays Capital Inc.*

/s/ Jay Kasner
Jay Kasner
Karen M. Lent
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Manhattan West
New York, New York  10001
Telephone:  (212) 735-3276
jay.kasner@skadden.com
karen.lent@skadden.com

*Attorneys for Defendants Citigroup Inc. and
Citigroup Global Markets Inc.*

/s/ Herbert S. Washer
Herbert S. Washer
Sheila C. Ramesh
Adam S. Mintz
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York  10005
Telephone:  (212) 701-3000
hwasher@cahill.com
sramesh@cahill.com
amintz@cahill.com

*Attorneys for Defendant Credit Suisse
Securities (USA) LLC*

/s/ John Terzaken
John Terzaken
Adrienne V. Baxley
Lani Lear
SIMPSON THACHER & BARTLETT LLP
900 G Street, NW
Washington, DC  20001
Telephone:  (202) 636-5000
john.terzaken@stblaw.com
adrienne.baxley@stblaw.com
lani.lear@stblaw.com

*Attorneys for Defendant Deutsche Bank Securities Inc.*

/s/ Robert D. Wick
Robert D. Wick
John S. Playforth
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, N.W.
Washington, D.C.  20001
Telephone:  (202) 662-6000
rwick@cov.com
jplayforth@cov.com

*Attorneys for Defendants JPMorgan Chase & Co. and J.P. Morgan Securities LLC*

/s/ Richard C. Pepperman II
Richard C. Pepperman II
Matthew J. Porpora
Jonathan S. Carter
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
peppermanr@sullcrom.com
porporam@sullcrom.com
carterjo@sullcrom.com

*Attorneys for Defendants The Goldman Sachs Group, Inc. and Goldman Sachs & Co. LLC*

/s/ Brad S. Karp
Brad S. Karp
Susanna Michele Buergel
PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3305
bkarp@paulweiss.com
sbuergel@paulweiss.com

Jane Baek O'Brien
PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
2001 K Street, N.W.
Washington, D.C.  20006
Telephone:  (202) 223-7300
jobrien@paulweiss.com

*Attorneys for Defendants Morgan Stanley; Morgan Stanley & Co., LLC; and Morgan Stanley Smith Barney LLC*

/s/ Paul S. Mishkin
Paul S. Mishkin
Sheila R. Adams James
Christopher Lynch
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4000
paul.mishkin@davispolk.com
sheila.adams@davispolk.com
christopher.lynch@davispolk.com

*Attorneys for Defendant NatWest Markets
Securities Inc.*

/s/ Jayant W. Tambe
Jayant W. Tambe
Laura Washington Sawyer
JONES DAY
250 Vesey Street
New York, New York  10281
Telephone:  (212) 326-3604
jtambe@jonesday.com
lwsawyer@jonesday.com

*Attorneys for Defendants Wells Fargo & Co.;
Wells Fargo Securities LLC; and Wells Fargo
Clearing Services LLC*