## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ISABEL LITOVICH, MICHAEL V. COTTRELL, FRANK HIRSCH, HOLDCRAFT MARITAL TRUST, and UNITED FOOD AND COMMERCIAL WORKERS UNION AND PARTICIPATING FOOD INDUSTRY EMPLOYERS TRI-STATE PENSION FUND, on Behalf of Themselves and All Others Similarly Situated, | Case No. 1:20-cv-03154 (VEC) Hon. Valerie E. Caproni |
| Plaintiffs, | |
| v. | |
| BANK OF AMERICA CORPORATION; MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; BofA SECURITIES, INC.; BARCLAYS CAPITAL INC.; CITIGROUP INC.; CITIGROUP GLOBAL MARKETS INC.; CREDIT SUISSE SECURITIES (USA) LLC; DEUTSCHE BANK SECURITIES INC.; THE GOLDMAN SACHS GROUP, INC.; GOLDMAN, SACHS & CO., LLC; JPMORGAN CHASE & CO.; J.P. MORGAN SECURITIES LLC; MORGAN STANLEY; MORGAN STANLEY & CO., LLC; MORGAN STANLEY SMITH BARNEY LLC; NATWEST MARKETS SECURITIES INC.; WELLS FARGO & CO.; WELLS FARGO SECURITIES LLC; and WELLS FARGO CLEARING SERVICES, LLC, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ....................................................................................................... 2

    I.        THE CORPORATE BOND MARKET ..................................................................... 2

    II.      DEFENDANTS' PARALLEL ANTICOMPETITIVE CONDUCT ...................... 3

           A.    Defendants Jointly Stifled Platforms that Promoted Transparent
                Pricing or the Potential of All-to-All Trading .............................................. 4

           B.    Defendants Boycotted Electronic Platforms that Threatened to
                Improve Pricing Transparency or Offer All-to-All Trading ...................... 6

           C.    Defendants Punish Dealers and Traders Who Threaten Their
                Supracompetitive Profits ................................................................................. 7

           D.    Defendants Charge Supracompetitive Prices .............................................. 8

LEGAL STANDARD .............................................................................................................. 9

ARGUMENT ......................................................................................................................... 10

    I.        PLAINTIFFS PLAUSIBLY ALLEGE A GROUP BOYCOTT
            CONSPIRACY ........................................................................................................ 10

           A.    *Treasuries* Does Not Foreclose Plaintiffs' Boycott Claim ...................... 11

           B.    Defendants Made Parallel Investments and Engaged in Catch-and-Kill
                Tactics to Forestall Competitive Electronic Trading for Odd Lots ......... 12

           C.    Defendants Boycotted Platforms that Threatened the Status Quo ........... 16

           D.    Defendants Punish Dealers and Traders Who Threaten Their
                Supracompetitive Profits ................................................................................. 21

           E.    Defendants Charge Supracompetitive Prices for Odd-Lot Trades ........... 21

           F.    Plus Factors Bolster the Plausibility of the Group Boycott Conspiracy ... 26

                1.    Defendants' Parallel Conduct Is Against Their Individual
                        Economic Self-Interest ................................................................... 26

                2.    The Failure to Engage in Price Competition Is Against Each
                        Defendant's Unilateral Self-Interest ............................................. 29

                3.    Defendants Have a Common Motive to Conspire ...................... 30

i

          4.      Other Plus Factors ................................................................... 31

II.     PLAINTIFFS' CLAIMS ARE TIMELY .............................................. 32

     A.    Plaintiffs May Pursue Damages Incurred within the Four-Year Statutory Period as a Result of Defendants' Continuing Antitrust Conspiracy ............................................................................. 32

     B.    Defendants' Fraudulently Concealed Their Actions.................................. 36

          1.      Defendants Concealed Their Conduct ........................................... 37

          2.      Plaintiffs Plead Reasonable Diligence ........................................... 38

CONCLUSION.......................................................................................................... 40

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012)........................................................................9, 10, 20

*Apex Oil Co. v. DiMauro*,
    822 F.2d 246 (2d Cir. 1987).....................................................................................26

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................................9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).....................................................................................9, 10, 18

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979)...........................................................................14, 19

*Butala v. Agashiwala*,
    916 F. Supp. 314 (S.D.N.Y. 1996) .........................................................................38

*Caruso Mgmt. Co. Ltd. v. Int'l Council of Shopping Ctrs.*,
    403 F. Supp. 3d 191 (S.D.N.Y. 2019).....................................................................13

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,
    92 F.4th 381 (2d Cir. 2024) .................................................................................1, 27

*Cnty. of Orange v. Sullivan Highway Prods., Inc.*,
    752 F. Supp. 643 (S.D.N.Y. 1990) .........................................................................35

*Colliton v. Cravath, Swaine & Moore LLP*,
    2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008).......................................................29

*Concord Assocs., L.P. v. Ent. Props. Tr.*,
    817 F.3d 46 (2d Cir. 2016)........................................................................................9

*Fiswick v. United States*,
    329 U.S. 211 (1946)...............................................................................................34

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
    700 F. Supp. 2d 378 (S.D.N.Y. 2010).....................................................................36

*In re Commodity Exch. Inc.*,
    213 F. Supp. 3d 631 (S.D.N.Y. 2016).............................................................29, 38

*In re Credit Default Swaps Antitrust Litig.*,
    2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014)............................................................30, 33, 37

*In re Domestic Drywall Antitrust Litig.*,
    163 F. Supp. 3d 175 (E.D. Pa. 2016) ................................................................................31

*In re. Elec. Books Antitrust Litig.*,
    859 F. Supp. 2d 671 (S.D.N.Y. 2012)........................................................... *passim*

*In re Eur. Gov't Bonds Antitrust Litig.*,
    2020 WL 4273811 (S.D.N.Y. July 23, 2020) ...........................................11, 23, 40

*In re Eur. Gov't Bonds Antitrust Litig.*,
    2020 WL 7321056 (S.D.N.Y. Dec. 11, 2020) .............................................................40

*In re Eur. Gov't Bonds Antitrust Litig.*,
    2022 WL 768680 (S.D.N.Y. Mar. 14, 2022) ....................................................31, 40

*In re Eur. Gov't Bonds Antitrust Litig.*,
    2023 WL 11646009 (S.D.N.Y. Sept. 25, 2023).........................................................35

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    74 F. Supp. 3d 581 (S.D.N.Y. 2015)................................................................................10

*In re GSE Bonds Antitrust Litig.*,
    396 F. Supp. 3d 354 (S.D.N.Y. 2019).....................................................25, 39, 40

*In re Int. Rate Swaps Antitrust Litig.*,
    261 F. Supp. 3d 430 (S.D.N.Y. 2017).......................................................... *passim*

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
    213 F. Supp. 3d 530 (S.D.N.Y. 2016)..............................................22, 24, 37, 39

*In re Pork Antitrust Litig.*,
    495 F. Supp. 3d 753 (D. Minn. 2020) .............................................................................38

*In re SKAT Tax Refund Scheme Litig.*,
    2020 WL 7059843 (S.D.N.Y. Dec. 2, 2020) ..............................................................32

*In re Sumitomo Copper Litig.*,
    120 F. Supp. 2d 328 (S.D.N.Y. 2000).............................................................................39

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
    865 F. Supp. 2d 1002 (C.D. Cal. 2011) ........................................................................31

*InterVest, Inc. v. Bloomberg, L.P.*,
    340 F.3d 144 (3d Cir. 2003).................................................................................................19

*Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, et. al.*,
   340 F. Supp. 3d 285 (S.D.N.Y. 2018)................................................................*passim*

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997)....................................................................................33, 34

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ...........................................................................................13

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
   709 F.3d 129 (2d. 2013).......................................................................................10

*Michael Grecco Prods., Inc. v. RADesign, Inc.*,
   112 F.4th 144 (2d Cir. 2024) ..............................................................................32

*Ohio Carpenters' Pension Fund v. Deutsche Bank AG*,
   2024 WL 3938456 (S.D.N.Y. Aug. 26, 2024)....................................................40

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*,
   530 F. Supp. 3d 301 (S.D.N.Y. 2021).........................................14, 19, 33, 36

*Rafferty v. Hempstead Union Free Sch. Dist.*,
   2020 WL 7024311 (E.D.N.Y. Nov. 30, 2020)....................................................29

*Rx.com v. Medco Health Sols., Inc.*,
   322 F. App'x 394 (5th Cir. 2009) .......................................................................38

*Singh v. Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019)..................................................................................40

*Starr v. Sony BMG Music Ent.*,
   592 F.3d 314 (2d Cir. 2010)...........................................................................*passim*

*State of New York v. Hendrickson Bros., Inc.*,
   840 F.2d 1065 (2d Cir. 1988)...................................................................36, 37, 38

*Tera Grp., Inc. v. Citigroup, Inc.*,
   2019 WL 3457242 (S.D.N.Y. July 30, 2019) .....................................................30

*United States v. Grimm*,
   738 F.3d 498 (2d Cir. 2013).........................................................................34, 35

*US Airways, Inc. v. Sabre Holdings Corp.*,
   938 F.3d 43 (2d Cir. 2019)..................................................................................34

*Walker v. Accenture PLC*,
   511 F. Supp. 3d 169 (D. Conn. 2020).................................................................36

*Zenith Radio Corp. v. Hazeltine Resch., Inc.*,
    401 U.S. 321 (1971)................................................................33, 34, 35

**Statutes, Rules, and Regulations**

18 U.S.C.
    § 371.........................................................................................34

Federal Rules of Civil Procedure
    Rule 9(b)....................................................................................37
    Rule 12(b)(6)........................................................................ *passim*

**Other Authorities**

7 Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law* (2d ed. 2003)
    § 1431a.......................................................................................31

Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law* (5th ed. 2025)
    ¶ 320c.......................................................................................34
    ¶ 320d.......................................................................................33

## PRELIMINARY STATEMENT

Defendants are a group of dealers that dominate the secondary market for corporate bonds in the United States. Plaintiffs' Second Amended Complaint details Defendants' conspiracy to maintain their ability to charge anticompetitive prices (*i.e.*, spreads) for odd lots of corporate bonds. Defendants have conspired to thwart electronic trading platforms that would increase competition on spreads—including by offering greater pre-trade price transparency, central limit order book ("CLOB") trading protocols, and/or all-to-all trading—by collectively commandeering some platforms and by collectively boycotting others that threaten the status quo. As a result, the over-the-counter ("OTC") market, in which Defendants act as intermediaries for every trade, remains dominant, with competition via CLOB order routing, real-time pricing transparency, or all-to-all trading foreclosed. Defendants police this conspiracy to such an extent that even Bank of America was cowed from doing business with an all-to-all platform. Defendants' actions are, individually, economically irrational in the absence of an anticompetitive agreement.

In seeking dismissal, Defendants lean on *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.* ("*Treasuries*"), 92 F.4th 381 (2d Cir. 2024), claiming that Plaintiffs' allegations are "largely indistinguishable" from those found wanting in *Treasuries*, where the Second Circuit held the allegations showed nothing more than the "natural, unilateral" action of each defendant acting in its "rational economic self-interest." ECF No. 204 (hereinafter "Mem.") at 2. But unlike in *Treasuries*, Plaintiffs have tied each Defendant ***individually*** to a conspiracy to constrain the emergence of more competitive electronic trading platforms that might endanger Defendants' supracompetitive odd-lot spreads. Plaintiffs also provide ***individualized*** economic and statistical evidence of Defendants' parallel and supracompetitive pricing of odd lots, and explain why there is nothing economically rational about Defendants' conduct.

Alternatively, Defendants seek dismissal based on a statute of limitations affirmative defense. Defendants stretch the continuing violations doctrine beyond recognition, and ignore the Sherman Act's longstanding injury accrual rule rooted in binding Supreme Court precedent. For damages accruing before April 21, 2016, Plaintiffs have alleged fraudulent concealment. Defendants have failed to carry their extraordinary burden to prove constructive inquiry notice at this stage. Ultimately, this fact-laden case should not be resolved on a motion to dismiss.

## STATEMENT OF FACTS

### I.    THE CORPORATE BOND MARKET

Corporate bonds are debt securities that investors sell, purchase, and trade. ¶ 56. [1] Companies sell new corporate bonds to registered securities dealers, like Defendants, in the primary, or underwriting, market. ¶¶ 2-3, 63-64. Dealers then trade the bonds in the secondary market. ¶¶ 66, 71. Defendants' collective market share in the primary underwriting market for U.S. corporate bonds is greater than 65%, which gives them correspondingly large power in the secondary market for trading in these bonds. ¶¶ 64-65. Defendants, the top 10 dealers in the U.S. corporate bond market, account for nearly 90% of trading volume in corporate bonds. ¶¶ 63-65.

Secondary market bond trades are delineated by their size. ¶ 5. "Round lots" are trades in increments of $1 million or more, almost exclusively by institutional investors. *Id.* "Odd lots" are trades under $1 million, frequently by retail investors. *Id.* "[I]n 2017, 2018, and 2019, approximately 90% of [all] corporate bond trades were less than $1 million in size." ¶ 8.

The secondary bond market is an OTC market, that differs significantly from the efficient exchange-based markets with CLOBs where stocks are traded. ¶¶ 14, 66, 71. In exchange-based

---

[1]    Paragraph citations are to the Second Amended Consolidated Class Action Complaint ("SAC"), ECF No. 194.

stock trading, investors receive contemporaneous pre-trade pricing information regarding best bid/offer prices, recent trade prices, and brokerage fees, and a CLOB routes trades to the best available price. ¶¶ 4, 66-71. Pre-trade pricing transparency, combined with all-to-all-trading between all investors at the best-available price through a CLOB, drives competition, increases liquidity and trading volumes, and leads to substantially lower trading costs. ¶¶ 66-67.

In contrast, the secondary OTC bond market has no pre-trade price transparency. Odd-lot investors instead execute trades through intermediary dealers, such as Defendants, who disclose only their own bid or offer—no competing bids or offers from other dealers are disclosed. ¶¶ 4, 71. Defendants keep the difference between the bid and offer, which is called the "spread," as profit, with investors paying the spread as the price, or cost, to trade. ¶¶ 4-6. Because there is no CLOB to route orders efficiently, and investors see no competing bids or offers, investors are never sure they are getting the best possible price. ¶¶ 4, 71-76. This allows Defendants to force odd-lot investors to pay spreads that are 25% to 300% higher than spreads on round-lot trades. ¶ 9.

There is no rational economic reason for this disparity in spreads. ¶¶ 99-112, 114-22, 125-31, 133-34. In a competitive market, each Defendant would have an incentive to reduce their odd-lot spreads towards the already profitable round-lot spreads in order to secure more market share, more trading volume, and thus higher profits (or would be forced to do so by the CLOB). The spreads imposed on odd-lot investors are irrationally supracompetitive. ¶¶ 4, 75-76, 209-11.

## II.    DEFENDANTS' PARALLEL ANTICOMPETITIVE CONDUCT

The SAC alleges parallel conduct by Defendants to thwart the emergence of more competitive trading platforms modeled after stock exchanges that would promote pre-trade pricing transparency, utilize a CLOB, and/or allow all-to-all trading. ¶¶ 9, 13, 64-65, 75, 78, 209-11. This collusive conduct has shielded Defendants' supracompetitive prices from competition.

A.    **Defendants Jointly Stifled Platforms that Promoted Transparent Pricing or the Potential of All-to-All Trading**

Numerous startups have unsuccessfully tried to use technological advances to make the bond market more efficient by creating transparent electronic trading platforms for odd-lot investors.  ¶¶ 142-46.  But because such electronic platforms threaten their business—as Defendants have admitted (¶ 142)—Defendants coordinated to shutter any such platforms or block them from making the odd-lot bond market more efficient.  Using a  "catch-and-kill" strategy, Defendants invested in platforms not for their business value but rather to remove them as competitors, leaving only platforms that are controlled by Defendants, eschew CLOB order routing, and provide little, if any, pre-trade price transparency. ¶¶ 145, 157, 163.

**InterVest**. In the mid-1990s, InterVest Financials Services planned to launch an electronic trading system for corporate bonds on Bloomberg terminals with anonymous, push-button trading, which could cut dealer commissions by over 75% and decrease the cost of odd-lot bonds to retail investors. ¶¶ 152-53. Defendants successfully pressured Bloomberg to shut InterVest down, barely a year after its launch. *Id.*

**TradeWeb**. In 1996, a former Credit Suisse employee founded TradeWeb, an electronic trading platform. By 2004, Defendants Credit Suisse, Barclays, Citigroup, Goldman Sachs, Citigroup, Merrill Lynch, Morgan Stanley, JPMorgan, and Deutsche Bank (or their predecessors) had ownership interests in TradeWeb. ¶ 154. Instead of deploying TradeWeb's technology to transform corporate bond trading, Defendants used their investment in the company to '"maintain[] the status quo."' ¶¶ 155-57. Defendants were forced to sell TradeWeb in 2004 due to regulatory concerns over competition issues in dealer-owned networks. However, when TradeWeb appeared it might offer direct access to retail investors, Defendants returned to invest again. By 2011, Credit Suisse, Goldman Sachs, JP Morgan, Barclays, Citigroup, Bank of America, Deutsche Bank,

Morgan Stanley, and RBS collectively controlled 15 of the 26 board seats of TradeWeb, and had appointed a Goldman Sachs employee as chairman of the board and a former Credit Suisse employee as CEO. ¶¶ 158, 161-62. Defendants used their regained control of TradeWeb to stifle efforts to bring all-to-all trading of odd lots to the platform. ¶¶ 154, 159-63.

**BondDesk**.  In 1999, BondDesk was founded as an electronic bond trading platform focusing on retail-sized trades and retail investors.  ¶ 182.  BondDesk's management supported improved transparency and price competition  for odd-lot trades. *Id*. Defendants Goldman Sachs, Bank of America, JPMorgan, and Wells Fargo (or their predecessors), invested in BondDesk and by 2004 had 6 of 11 seats on the BondDesk board. ¶¶ 183-84. Concerned that BondDesk's innovations were a threat to their ability to overcharge for odd-lot trades, they conspired to use their control of the BondDesk board and BondDesk's outside accountant (Grant Thornton) to neutralize that threat by raising false concerns about BondDesk's accounting for stock options. ¶¶ 185-91. The concerns were a ruse—the accounting never changed—but that pretext allowed Defendants to sideline BondDesk management that threatened to bring transparency and competition to the odd-lot bond market.  *Id*. Once that threat was neutralized, Defendants sold a majority share in BondDesk to a private equity firm. ¶ 192.

In 2011, BondDesk hired a CEO who announced plans for a new system that would have permitted retail investors to trade directly with one another, provided additional liquidity to create a retail market, and provided pre-trade benchmark pricing. ¶¶ 194-96. But in late 2013, TradeWeb (which was controlled by Defendants Bank of America, Merrill Lynch, Barclays, Citigroup, Goldman Sachs, JPMorgan, Morgan Stanley, and RBS) purchased BondDesk. ¶ 198. Rather than use BondDesk's expansion into retail investor trading for the benefit of TradeWeb and odd-lot investors, Defendants rebranded BondDesk as "TradeWeb Direct" and limited access to

institutional investors. ¶¶ 199-201. Since TradeWeb Direct provides no pre-trade price transparency nor true all-to-all trading, it does nothing to reduce odd-lot bid-offer spreads. ¶ 201.

**MarketAxess and TradingEdge**. In or around 2000, Defendant JPMorgan co-founded the trading platform MarketAxess. ¶ 205. Defendants Credit Suisse and Barclays (or their predecessors) also invested in MarketAxess. ¶ 156. In March 2001, those Defendants used MarketAxess to purchase TradingEdge, another electronic platform pursuing a direct-trading strategy that would have decreased bid-offer spreads on odd-lot bond trades. ¶¶ 205-06. Within seven months, MarketAxess terminated TradingEdge's anonymous bond trading platforms. ¶ 206.

### B. Defendants Boycotted Electronic Platforms that Threatened to Improve Pricing Transparency or Offer All-to-All Trading

The SAC also alleges that Defendants boycotted platforms that threatened to provide odd-lot investors with price transparency. ¶¶ 142-45, 168-69, 178, 180-81. Defendants either cut off or severely limited order flow, starving these platforms of necessary liquidity. ¶¶ 147-49. Less liquidity results in decreased volume, making it difficult to deliver narrower spreads.

**ABS / NYSE Bonds**. As early as 1976, the NYSE sought to return bond trading to efficient exchanges with its Automated Bond System ("ABS"), an electronic bond order book. ¶ 164. In 2007, the NYSE replaced ABS with NYSE Bonds. During the period from 2008 to 2011, NYSE Bonds had success in reducing bid-offer spreads for corporate bonds listed on it, especially for trades of less than $100,000. ¶ 166. But Defendants restricted their order flow on NYSE Bonds to a small number of bond issues, preventing NYSE Bonds from growing. ¶¶ 168-69. Defendants also collectively threatened to terminate or reduce their lucrative Bloomberg Terminal leases if Bloomberg did not delay NYSE Bonds' required connection to Bloomberg's Trade Order Management System ("TOMS"). ¶¶ 170-74. As a result, Bloomberg delayed access by more than a year, further hindering NYSE Bonds from competing. *Id*.

**Bonds.com**. In January 2005, a former bond underwriter and trader founded Bonds.com. ¶ 176. In January 2008, Bonds.com launched a trading platform called BondStation, opening it to both retail and institutional investors. ¶¶ 176-77. BondStation's business plan was to offer all-to-all, exchange-like trading, including to retail investors. *Id*. Dealers, including Defendants, refused to provide liquidity to BondStation. ¶¶ 178-79. After three months, Bonds.com refocused BondStation on institutional investors and was only then able to obtain liquidity from Defendants. ¶ 178. In 2010, Bonds.com attempted to launch a new platform called BondsPro, focused on institutional investors, but because it offered all-to-all electronic trading of odd-lot corporate bonds, it threatened Defendants' supracompetitive margins. ¶ 179. Defendants uniformly refused to participate in BondsPro. ¶¶ 180-81. In 2013, Bonds.com ran out of money and was sold. ¶ 181.

### C.    Defendants Punish Dealers and Traders Who Threaten Their Supracompetitive Profits

Defendants also collectively monitored and enforced their agreement, punishing dealers or traders who took actions that threatened Defendants' ability to impose supracompetitive spreads. In general, this action consisted of refusing to trade with a target for weeks to months. ¶ 148. Specific examples of punishment were initiated by Defendant Citigroup (via its predecessor Salomon Smith Barney) against odd-lot traders employed by InterVest in the 1990s (¶¶ 148, 152-53), and by Defendants Morgan Stanley and Citibank against the regional bank First Tennessee in the late 2010s (¶¶ 149-50). Even Defendants themselves expected to be punished by other Defendants if they threatened the status quo. When Bonds.com sought dealer participation on its BondsPro platform, Bank of America indicated that it was interested but feared blowback from other Defendants, and would only participate if other dealers such as Morgan Stanley or JPMorgan provided it with cover from retribution by participating as well. ¶ 180. None did.

### D.    Defendants Charge Supracompetitive Prices

Statistical evidence from peer-reviewed journals and a proprietary study by Plaintiffs' experts reveal that Defendants' collusive actions in thwarting the emergence of more competitive platforms for trading odd lots have allowed each Defendant to charge supracompetitive prices.

**Peer-Reviewed Econometric Research**. Beginning in July 2006, dealers in corporate bonds were required by FINRA to report certain limited trade data, including par value size and price, as part of the TRACE system. ¶ 80. This data is reported on a delayed and anonymous basis, preventing anyone from knowing the counterparties and intermediary dealers (such as Defendants) involved in any series of trades. *Id*. Peer-reviewed, replicable research based on this data shows that odd-lot investors pay average spreads that are between 10% and 1,775% greater than round-lot investors—even though the underlying bond issue is the same. ¶¶ 81-82. The impact of this adverse pricing is enormous, costing odd-lot investors billions of dollars annually. ¶ 84. This research also shows that dealers maintained a near-constant relative difference in prices between various sizes of odd-lot trades and round-lot trades from January 2006-July 2016. ¶ 91.

**Plaintiffs' Expert Analysis**. Plaintiffs also hired experts to analyze corporate bond trading data. ¶¶ 113-41. Plaintiffs' experts first focused on riskless principal trades ("RPTs")—where a dealer simultaneously purchases and sells a bond to customers, and thereby bears no inventory risk—as such trades in a competitive market would theoretically have little to no disparity between odd-lot and round-lot spreads. ¶¶ 114-15. Plaintiffs' experts' analyses found that Defendants, both collectively (¶¶ 118-26, 130-31, 133-34) and individually (¶¶ 127-29, 132)**,** charge retail investors statistically significantly larger spreads for odd-lot RPTs compared to round-lot RPT trades for the same bond issue, and that these disparities exist for both customer-initiated odd-lot RPT sales (¶ 130), and for customer-initiated odd-lot RPT purchases (*id.*). Plaintiffs' experts also found that

Defendants, as a group (¶ 137) and individually (¶ 138), paid prices for customer-initiated odd-lot sales that were statistically significantly lower than the benchmark prices for round-lot sales of the same bonds on the same date. Plaintiffs' experts further used Plaintiffs' own trading data, and found that individual Defendants charged the named Plaintiffs statistically significantly higher prices for their own customer-initiated odd-lot purchases than the benchmark prices for round-lot purchases of the same bonds on the same date. ¶¶ 139-41.

## LEGAL STANDARD

There is no "heightened pleading standard" for antitrust cases. *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016). Plaintiffs are "not required to mention a specific time, place or person involved in each conspiracy allegation." *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 325 (2d Cir. 2010). Under Federal Rule of Civil Procedure 12(b)(6), a court "must 'accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party.'" *In re. Elec. Books Antitrust Litig.* ("*eBooks*"), 859 F. Supp. 2d 671, 680 (S.D.N.Y. 2012) (citation omitted). To avoid dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Rule 12(b)(6) imposes a "plausibility" standard, not a "probability" standard, and "[e]ven if their truth seems doubtful, 'Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 556). "'[A] well-pleaded complaint may proceed even if . . . actual proof of those facts is improbable, and . . . a recovery is very remote

and unlikely' as long as the complaint presents *a* plausible interpretation of wrongdoing." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 591 (S.D.N.Y. 2015) (quoting *Twombly*, 550 U.S. at 556).

In considering a complaint's allegations, "'[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'" *eBooks*, 859 F. Supp. 2d at 689 (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). A plaintiff need not allege facts tending to exclude independent self-interested conduct as an explanation for parallel behavior—allegations that place parallel conduct in a context that raises a suggestion of a preceding agreement will survive a motion to dismiss. *Starr*, 592 F.3d at 325. Such context can be inferred from "plus factors" such as "'a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications.'" *Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d. 2013) (citation omitted).

## ARGUMENT

## I.    PLAINTIFFS PLAUSIBLY ALLEGE A GROUP BOYCOTT CONSPIRACY

The SAC plausibly alleges that Defendants conspired to boycott electronic trading platforms that threatened to increase pricing competition in odd lots of corporate bonds. It sets forth "enough factual matter (taken as true) to suggest that an agreement was made" and to "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556-57. The SAC alleges "parallel conduct" in a "'*setting suggesting the agreement necessary* to make out a § 1 claim,'" and "'further *circumstance pointing toward a meeting of the minds*.'" *Anderson News*, 680 F.3d at 184 (quoting *Twombly*, 550 U.S. at 557).

10

### A.    *Treasuries* Does Not Foreclose Plaintiffs' Boycott Claim

Allegations that are not specific to a particular Defendant can be used to establish the existence of a conspiracy. *See In re Eur. Gov't Bonds Antitrust Litig.* ("*Eurobonds I*"), 2020 WL 4273811, at *15-17 (S.D.N.Y. July 23, 2020) (market-wide or collective analyses allegations were enough to plead a price-fixing conspiracy). Nonetheless, Defendants argue that like the unsuccessful plaintiffs in *Treasuries*, Plaintiffs' allegations fail because Plaintiffs: (1) did not identify specific Defendants who were involved in the boycotts (Mem. at 10, 18); and (2) did not plausibly allege that Defendants acted against their individual interests (*id.* at 9). Defendants are incorrect.

First, unlike the complaint in *Treasuries*, Plaintiffs tie each Defendant to the conspiracy through extensive individualized allegations of parallel conduct during the class period. Plaintiffs identify the following individual Defendants who participated in the catch-and-kill operations: Citigroup, Bank of America (and its predecessor Merrill Lynch), Morgan Stanley, JP Morgan, Deutsche Bank, Credit Suisse, Barclays (and its predecessor Lehman Brothers), RBS, and Wells Fargo. ¶¶ 154, 156, 184, 205. Plaintiffs also describe how Bank of America feared retribution from Defendants if it broke rank with the Defendants' conspiracy (¶ 180), and identified Citibank and Morgan Stanley as enforcers of Defendants' conspiracy (¶¶ 149-50). And Plaintiffs' statistical allegations describe how ***each*** Defendant charges odd-lot investors statistically significantly higher prices than round-lot investors. ¶¶ 63-65, 74-75, 91, 113-14, 129-32, 136-41.

Second, Defendants argue that Plaintiffs' allegations raise no inference of conspiracy because Defendants have an independent interest to thwart startups that might reduce profits in their well-established corporate bond trading operations. Mem. at 8-9. But unlike the simple assertions of actions against self-interest in *Treasuries*, the SAC shows Defendants would have no expectation in a competitive market of recouping the losses they incurred through their catch-and-

kill tactics. *See infra*, § I.F.2. Defendants would have strong incentives to support these platforms because they would gain market share in a ***growing*** market and a platform would only need the participation of one or two Defendants to succeed. *Id.*

Furthermore, Plaintiffs' statistical evidence is far more robust and probative than that found lacking in *Treasuries*. Plaintiffs' statistical evidence shows that each Defendant charges odd-lot investors statistically significantly higher prices for trades than those charged to round-lot investors, and it also explains how these pricing discrepancies are only possible from Defendants' anticompetitive conduct. ¶¶ 63-65, 74-75, 91, 113-14, 129-32, 136-41. Moreover, Plaintiffs present statistical evidence that the pricing differences between odd lots and round lots have been unusually stable for at least 10 years and that due to the structure of the market, this pattern can only exist if Defendants are colluding. *See infra*, § I.E.

### B. Defendants Made Parallel Investments and Engaged in Catch-and-Kill Tactics to Forestall Competitive Electronic Trading for Odd Lots

As detailed in Statement of Facts § II.A, Defendants made parallel investments and engaged in catch-and-kill tactics to forestall competitive electronic trading for odd lots. The SAC alleges three instances of parallel investment and two instances of catch-and-kill, which when viewed together and with Plaintiffs' other boycott allegations and plus factors, make an inference of a Section 1 conspiracy among Defendants even stronger. *Id.* Indeed, in *In re Int. Rate Swaps Antitrust Litig.* ("*IRS*"), 261 F. Supp. 3d 430, 472-74 (S.D.N.Y. 2017), even ***a single instance of catch-and-kill*** was held to be sufficient to raise a plausible inference of a Section 1 boycott conspiracy among defendant dealers when viewed collectively in conjunction with other allegations. Defendants' approach, which analyzes each allegation in isolation, is simply incorrect. *See eBooks*, 859 F. Supp. 2d at 689 (a conspiracy is "not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.") (citation omitted).

Defendants also argue that parallel investment raises no inference of a boycott conspiracy and must be analyzed under the rule of reason. Mem. at 20-21. But "[a] rule of reason analysis is holistic" and a court "must weigh all of the circumstances of a case in deciding" whether "an unreasonable restraint on competition" exists. *Caruso Mgmt. Co. Ltd. v. Int'l Council of Shopping Ctrs.*, 403 F. Supp. 3d 191, 201 (S.D.N.Y. 2019) (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007)). Here, the question is whether the parallel investments in combination with all of the other allegations in the SAC leads to the inference of a prior agreement to restrain competition. And it clearly does: Defendants' investments resulted in their control over the platforms, which they then used to implement their catch-and-kill strategy rather than to expand the platforms by offering more pre-trade pricing transparency or all-to-all trading.

Below, Plaintiffs respond to Defendants' arguments concerning each of Plaintiffs' parallel investment and catch-and-kill allegations.[2] Defendants' arguments uniformly ignore that a court addressing a motion to dismiss "must accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *eBooks*, 859 F. Supp. 2d at 680 (cleaned up).

**MarketAxess/Trading Edge**. Defendants argue that there are no allegations that Defendants colluded against Trading Edge, caused MarketAxess to acquire TradingEdge, or forced MarketAxess to change TradingEdge protocols. Mem. at 13. But Defendants ignore Plaintiffs' allegations that Defendants JPMorgan, Credit Suisse, and Lehman Brothers (now Barclays) invested in and used their control over MarketAxess to ensure that it never offered pre-trade price transparency and all-to-all trading to odd-lot investors (¶¶ 156, 163, 205); caused MarketAxess to

---

[2]    Defendants pointedly fail to address Plaintiffs' allegations that Defendants dishonestly used the corporate audit process to remove BondDesk management favorable to innovations that could narrow odd-lot spreads (Statement of Facts, § II.A).

acquire TradingEdge and terminate TradingEdge's anonymous bond trading platforms that aimed to reduce bid-offer spreads (¶¶ 204-06); and that while MarketAxess recognized the value of TradingEdge's advanced trading model and planned to integrate its anonymous trading into their platform, that plan was terminated because it threatened Defendants' supracompetitive bid-offer spreads. ¶¶ 205-06. The most favorable (and reasonable) inference to Plaintiffs is that the management of MarketAxess wanted to expand the platform by acquiring Trading Edge, but that Defendants saw this as a threat and forced a change in this plan.

Defendants also assert that because Defendants' use of MarketAxess for catch-and-kill predates the class period, it is "stale" and should not be considered by the Court. Mem. at 13. Setting aside the fact that Defendants fraudulently concealed their conspiracy, this event is the same type of behavior as Defendants' other catch-and-kill actions and it lends plausibility that the entirety of Defendants' conduct was designed to ensure that there was no increased price competition in the market for odd-lot bonds. *See PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 350 (S.D.N.Y. 2021) ("Alleged acts prior to" the limitations period "may be introduced as evidence of a continuing conspiracy."); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 296 (2d Cir. 1979) (same).

**TradeWeb/Bond Desk**. Defendants argue that Plaintiffs have failed to allege any change to BondDesk's trading protocols after TradeWeb acquired it, and that there are no non-conclusory allegations that any of the Defendants were responsible for TradeWeb's decisions regarding BondDesk. Mem. at 15. Defendants are incorrect.

Plaintiffs allege that Credit Suisse, Lehman Brothers (later acquired by Barclays), Salomon Smith Barney (later acquired by Citigroup), Goldman Sachs, Citigroup, Merrill Lynch, Morgan Stanley, JPMorgan, and Deutsche Bank invested in TradeWeb and used their control over

TradeWeb to ensure that TradeWeb did not deploy its technology to improve corporate bond trading. ¶¶ 154-57. These same Defendants were later joined by RBS and appointed their employees to fill 16 of the 26 seats on the TradeWeb board, installed a Goldman Sachs employee as chairman of the board, and hired a former Credit Suisse employee as CEO. ¶¶ 161-63. Defendants used their control over TradeWeb's board and management to prevent the platform from offering pre-trade transparency and all-to-all trading to odd-lot investors, and then caused TradeWeb to purchase BondDesk and eliminate BondDesk features that would have introduced pre-trade price transparency to odd-lot investors. ¶¶ 163, 182-85, 192-97, 200-01.

Defendants also argue the allegations concerning TradeWeb should be disregarded because they mirror those that were dismissed in *IRS*. Mem. at 14. They are wrong. In *IRS*, plaintiffs alleged a nine-year conspiracy among 11 defendants to impede the development and survival of electronic exchange-based platforms for interest rate swaps ("IRS") trades through a group boycott. *IRS*, 261 F. Supp. 3d at 441, 463. The Court dismissed the claim for the period of 2007-2012 because there were no platforms to boycott and plaintiffs did not explicitly allege that TradeWeb had any plan to open an all-to-all electronic platform for IRS trading. *Id*. at 465-66. For the 2013-2016 time frame, however, the Court held that plaintiffs adequately alleged that defendants owned and controlled TradeWeb and caused TradeWeb not to launch anonymous all-to-all trading in interest rate swaps. *Id.* at 472. The court found the TradeWeb allegation, along with plaintiffs' other allegations, made "plausible the inference of a § 1 conspiracy among Dealers to boycott" three new platforms. *Id.* at 473-74.

The SAC's allegations regarding TradeWeb are similar to those deemed sufficient to plead a group boycott claim from the 2013-2016 period in *IRS*. The SAC cites contemporaneous reports that Defendants invested in TradeWeb primarily out of concern that it would diminish their market

power in corporate bonds, and that TradeWeb was planning to enter the corporate bond market with the potential to implement electronic ordering systems (in other words, a CLOB) for corporate bonds. ¶¶ 155-57. The SAC also alleges that Defendants used their ownership and control of TradeWeb to ensure that TradeWeb did not offer all-to-all odd lots trading. ¶ 163. And the SAC alleges that Defendants used their control over TradeWeb to catch and kill BondDesk when it threatened enhanced price transparency and reduced trading costs for odd-lot investors. ¶¶ 182-85, 192-97, 200-01. Like the 2013-2016 allegations in *IRS*, these allegations are sufficient to create a plausible inference of a Section 1 conspiracy among Defendants.

Finally, Defendants argue that Plaintiffs concede that it was rational for Defendants to invest in parallel in TradeWeb because having an equity stake in TradeWeb was a way of replacing money that dealers made on market making that might be lost when the market went electronic. Mem. at 14 (citing ¶ 157). This is drawing an improper inference. The allegation, which quotes a contemporaneous report, does not say that Defendants intended to use TradeWeb to eliminate pricing opaqueness. ¶ 157. Rather, it suggests that if some other platform emerged that broke Defendants' stranglehold on the market, Defendants would then use TradeWeb to compete. Consistent with that, and as explained extensively, Defendants acted against the interests of TradeWeb and their own independent self-interest by ensuring that TradeWeb did nothing to reduce the pricing opaqueness of the market.

### C. Defendants Boycotted Platforms that Threatened the Status Quo

As explained in Statement of Facts § II.B, in addition to catch-and-kill, Defendants also used their market power to obstruct emerging electronic trading platforms, such as InterVest, ABS/NYSE Bonds, and Bonds.com, that planned to improve pre-trade transparency and all-to-all trading of odd-lot bonds. Defendants primarily argue that these allegations should be disregarded because they constitute impermissible group pleading. Mem. at 10, 12. But Defendants once again

fail to read the SAC as a whole, as they must. *See eBooks*, 859 F. Supp. 2d at 689. The SAC clearly

ties each Defendant to this conspiracy, including by identifying individual Defendants who policed

the conspiracy or who were afraid to support emerging platforms due to such policing (¶¶ 148-50),

and providing statistical evidence of Defendants' parallel supracompetitive pricing (¶¶ 129-30,

132, 136-38). *See also* ¶¶ 19, 23, 27, 29, 32, 34, 36, 42, 46, 48, 52, 65, 141, 143, 154, 156, 160-62,

180, 183-84, 186-89, 198, 205. It is therefore not impermissible group pleading to refer to

Defendants' collective action in furtherance of the conspiracy using the more general phrase

"Defendant." *Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, et. al.* ("*IPERS*"), 340 F. Supp. 3d 285,

317 (S.D.N.Y. 2018); *see also Starr*, 592 F.3d at 325 ("plaintiffs [a]re not required to mention a

specific time, place or person involved in each conspiracy allegation"). Taken together with the

other evidence, Defendants' conduct against specifically-identified electronic platforms

adequately pleads a group boycott conspiracy and puts Defendants on notice of the claims against

them.

Defendants also argue that the boycott allegations are mere allegations of inaction, which

raise no inference of a conspiracy under *Treasuries*. Mem. at 18-19. But Defendants' conduct went

beyond mere inactive refusal to deal. In addition to withholding order flow from these platforms,

Defendants pressured Bloomberg to renege on its deal with InterVest to provide its system on

Bloomberg terminals (¶¶ 152-53), and scuttled ABS/NYSE by threatening to terminate their

Bloomberg terminal licenses, thereby causing Bloomberg to fatally delay ABS/NYSE access to

Bloomberg's vital order management system (¶¶ 169-74). While Defendants argue that Plaintiffs

do not provide enough detail regarding the threats and pressure employed by Defendants (Mem.

at 10, 11), Plaintiffs state that Defendants' leases of Bloomberg terminals gave them significant

leverage over Bloomberg. ¶¶ 169-74. At the pleading stage, all reasonable inferences must be

drawn in Plaintiffs' favor, including those arising out of allegations of inaction. *IPERS*, 340 F. Supp. 3d at 320.

Defendants also argue this case is like *Twombly*, 550 U.S. at 566, where the Supreme Court held that allegations failed to raise an inference that the alleged behavior was anything more than the unilateral reaction of each Defendant to a competitive threat. Mem. at 19. Defendants' reliance on *Twombly* is misplaced. *Twombly* concerned a group of telephone companies (the "Baby Bells") that had been created by breaking up a national monopoly ("Ma Bell"). 550 U.S. at 549. Each company had its own geographic monopoly due to the mechanics of the breakup. *Id.* The Court reasoned that it made little sense that those companies would aid any new entrants into their respective territories so the claimed collusion was really only the unilateral conduct of each defendant within its own geographic monopoly. *Id.* at 568. In contrast, the geographic market in this case is the entire United States, and no one dealer has a current or historic monopoly in the market. While the Baby Bells had no history of competing against one another and shared a common ancestry from Ma Bell, the Defendants here are long-time horizontal competitors, including competitors on odd-lot spreads. In this context, the only way that Defendants can maintain their ability to charge supracompetitive prices for odd-lot trades is to collude, and there is no plausible inference of any natural, unilateral action.

**InterVest**. Here, too, Defendants argue that because the boycott against InterVest occurred in the mid-1990s, the allegations are "stale." Mem. at 10. The SAC alleges Defendants have repeatedly boycotted emerging electronic platforms since the 1980s and continuing through the present. ¶ 147. Defendants' actions against InterVest, regardless of timing, are strong circumstantial evidence of the plausibility and existence of Defendants' group boycott conspiracy.

*See PharmacyChecker.com*, 530 F. Supp. 3d at 350 ("[A]cts prior to" the limitations period "may be introduced as evidence of a continuing conspiracy"); *Berkey Photo*, 603 F.2d at 296 (same).

Furthermore, the Defendants are incorrect when they claim that InterVest's claims were litigated and lost. Mem. at 10-11. While it is true that InterVest lost a motion for summary judgment against a single defendant, SG Cowen, all of the other defendant banks, including some Defendants in this case, settled on confidential terms with InterVest. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 149 (3d Cir. 2003). Under Rule 12(b)(6) standards, Defendants cannot draw any favorable inference from their settlement with InterVest. *eBooks*, 859 F. Supp. 2d at 680. Indeed, the only permissible inference to be made is Defendants settled because InterVest's claims had merit.

**ABS/NYSE Bonds**. Defendants argue that the SAC fails to allege that NYSE Bonds offered all-to-all trading. Mem. at 11. This is incorrect. The SAC alleges that NYSE Bonds offered pre-trade pricing transparency for investors with firm executable prices, which are the hallmarks of all-to-all trading. ¶ 166. In any event, a platform did not need to offer all-to-all trading to threaten Defendants' conspiracy and draw Defendants' boycott. Defendants also argue that they could be among the 25 bond dealers who participated on NYSE Bonds. Mem. at 11. Accepting this argument requires the court to assume unpleaded facts and make impermissible inferences in Defendants' favor. *eBooks*, 859 F. Supp. 2d at 680. NYSE Bonds did not identify participating dealers or the types of bonds (*e.g.*, corporate, treasury, municipal) that they traded. ¶ 167. The reasonable inference to be drawn in Plaintiffs' favor is that no Defendants provided NYSE Bonds with meaningful trade inventory, as evidenced by NYSE's failure to achieve the scale necessary to lower transaction costs to odd-lot investors.

Defendants argue that Bloomberg had market power over Defendants, not the other way around. Mem. at 11-12. This contradicts the well-pleaded facts in the Complaint. *See* ¶¶ 172-74.

Defendants just propose a different narrative that cannot be credited under applicable Rule 12(b)(6) standards. *Anderson News*, 680 F.3d at 185, 190 ("it is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives").

Defendants also argue that Plaintiffs do not explain how Bloomberg's 14-month delay in providing TOMS access to NYSE Bonds (which result from Defendants' pressure on Bloomberg) is to blame for the platform's failure. Mem. at 11. But Plaintiffs explain that the delay crippled NYSE Bonds' ability to gain traction in the electronic trading market (¶ 173) and discouraged the marketplace from participating in a threat to Defendants' dominance (¶ 174).

**Bonds.com**. Plaintiffs allege that Bank of America wanted to participate on Bond.com's BondsPro platform but was afraid to do so due to its fear of "blowback" from Defendants and would only do so if one or two other big dealers, like Defendants Morgan Stanley or JPMorgan, also participated to give it "cover" from "retribution." ¶ 180. Consistent with the rest of their analyses of the SAC, Defendants provide a tortured interpretation of these allegations, arguing that they do not suggest a conspiracy because it was only natural that Bank of America was reluctant to join Bonds.com unless other major market participants did, too. Mem. at 12. This is nonsensical. Plaintiffs' allegations give rise to a strong inference that there was a conspiracy, the conspirators policed one another, and that Bank of America refused to defect for fear of reprisal.

Defendants also argue that the Bank of America allegations fail because there are no allegations that any other Defendants made similar statements. Mem. at 13. But Defendants miss the point: the Bank of America allegations show more than unilateral action. They are evidence of an actual multi-party conspiracy that is monitored and enforced to such a degree that it constrained one of the world's largest corporate bond dealers. ¶ 173.

### D.      Defendants Punish Dealers and Traders Who Threaten Their Supracompetitive Profits

Defendants assert that their disputes with First Tennessee Bank over Blackrock (¶¶ 149-50) are too "narrow" and have no connection to the boycott theory. Mem. at 22. This is incorrect. It shows that when market participants tried to break Defendants' hold on odd-lot pricing information, Defendants punished them by threatening to stop trading with them and to "blackball" them. ¶ 149. Policing a conspiracy is classic group boycott behavior. It also makes no sense without a prior agreement—unless each Defendant knew that no other Defendant would step in and trade with the victims, the punishments would have no effect.

Defendants argue that the SAC's allegations of threats and pressure are isolated, separated by over 20 years, and too narrow. Mem. at 22. Once again, Defendants are improperly reading the allegations in isolation. It only makes sense that Defendants looking to maintain their dominance would deploy a variety of anticompetitive tactics over the course of the conspiracy. Allegations of threats and pressure are not isolated when considered with Plaintiffs' other allegations.

### E.      Defendants Charge Supracompetitive Prices for Odd-Lot Trades

Numerous peer-reviewed studies show that dealers have consistently charged investors significantly wider spreads for odd-lot transactions compared to round-lot transactions, even when the underlying bond issue is the same. ¶¶ 81-86. Plaintiffs' expert analyses confirm that in the United States, Defendants as a group and individually charge odd-lot prices that substantially exceed round-lot costs. ¶¶ 113, 114-22, 129-30, 133-34, 136-41.

In addition, this SAC graph (from a peer reviewed article):



shows that dealers maintained near constant relative differences in prices between various sizes of odd-lot trades and round-lot trades from January 2006 all the way through July 2016 (¶ 91). While the data is not specific to Defendants and relies upon averages, Defendants' domination of the bond market (¶¶ 63-65) means that this remarkably consistent relative pricing can only exist due to Defendants' collusion. In sum, the graph is further economic evidence that Defendants engaged in a conspiracy that persisted for at least from January 2006 to July 2016. *See In re London Silver Fixing, Ltd., Antitrust Litig.* ("*London*"), 213 F. Supp. 3d 530, 561 (S.D.N.Y. 2016) (aggregate statistical trends circumstantial evidence of trading by defendants because only they could have produced the observed phenomenon).

Nor can the disparity in pricing between odd lots and round lots be attributed to the inventory risk that Defendants take in trading odd lots. Plaintiffs' expert analyses confirm that in the United States, odd-lot spreads substantially exceed round-lot spreads in RPTs, where dealer have buyers and sellers lined up simultaneously for a transaction, such that there is no inventory risk to the dealers. ¶¶ 114-22, 133-34. Their analyses show that Defendants as a group and

individually charged statistically and economically significant wider spreads in odd-lot RPTs than in round-lot RPTs. ¶¶ 125-31. This shows that Defendants charge odd-lot prices that far exceed those that would prevail in a competitive market, and that the disparity cannot be explained by inventory risk, as RPTs by definition do not have any such risk.

Data from exchange-based trading in foreign markets such as Israel and Italy also show that Defendants charge supracompetitive prices for odd-lot trades. Despite having less liquidity and less trading volume than in the U.S., investors in those foreign markets pay substantially lower trading costs than U.S. investors. ¶¶ 99-107. Liquidity, trading activity, and legitimate economic forces cannot explain the adverse differential between odd-lot and round-lot pricing in the U.S.

Historic trading costs for odd lots in the U.S. market likewise show that Defendants charge supracompetitive prices. When bonds were exchange-traded in the U.S., the costs for odd lots were much lower than during the class period. ¶¶ 108-12. The relationship between trading costs and trade size was much flatter in the historical data than in modern samples, showing that adverse pricing for odd lots is neither economically justified nor consistent with a competitive market.

Plaintiffs' statistical evidence is significantly stronger than what courts have accepted in other cases. For instance, in *Eurobonds I*, 2020 WL 4273811, at *3, the court held that plaintiffs' statistical evidence was suggestive of a conspiracy in the Eurobond market even though much of the data was aggregated across all defendants, involved bonds in just two European countries, and employed averages that did not cover all bond types subject to the lawsuit. In contrast, Plaintiffs have shown that Defendants, both collectively and individually, charged supracompetitive prices for odd-lot trades, even when the trades were RPTs with no inventory risk. ¶¶ 125-31.

Defendants' nonsensical response to Plaintiffs' economic and statistical evidence is to assert that it has "little or nothing to do with the alleged conspiracy to boycott trading platforms."

Mem. at 1. The results of Plaintiffs' experts' analyses of RPTs, peer reviewed research, data from foreign markets, and historic U.S. data all lead to the plausible conclusion that anticompetitive conduct, not ordinary market forces or risk, explains the difference in odd-lot and round-lot pricing charged by Defendants. *See, e.g.*, *London*, 213 F. Supp. 3d at 561 (disproportionately wide bid-ask spreads constituted circumstantial evidence at pleading stage that defendants may have conspired to manipulate prices).

Defendants' other criticisms of Plaintiffs' statistical evidence lack merit. Defendants assert that the spread disparity between odd lots and round lots can be explained by per-trade fixed cost. Mem. at 27. This disregards allegations that there are two components in corporate bond transaction costs: (1) commission rates, which are approximately $1 dollar per bond traded; and (2) bid-offer spreads. ¶ 92. Commission rates already cover the fixed costs of trading that dealers incur. *Id*. Spreads do not cover fixed costs, *id*., and instead should be determined by the marginal costs and risk associated with the trade. Since the marginal cost and risk associated with round-lot trades exceed that of odd-lot trades (because round lots are larger and riskier), in a competitive and efficient market, dealers would price low marginal cost odd-lot trades at tighter spreads compared to round-lot trades. ¶ 95. Consistent with this basic economic theory, the U.S. stock market demonstrates increased spreads for larger sized transactions. ¶ 91. In addition, Plaintiffs' experts' analyses on Defendants' RPTs shows that even where Defendants bear no inventory risk, Defendants irrationally charge odd-lot investors higher prices than round-lot investors. ¶ 114.

Second, Defendants try to blame their supracompetitive spreads on retail customers' lack of sophistication. Mem. at 27. But Plaintiffs used **insurance companies'** data to conduct their Defendant-specific analyses, and showed that even these highly sophisticated institutional

investors paid economically and statistically significantly higher prices to trade odd lots of bonds than they do to trade round lots. ¶¶ 125, 139.

Defendants further mischaracterize Plaintiffs' allegations regarding the historical evidence by stating that the "pricing disparity . . . has existed for over 75 years." Mem. at 28. But the actual allegation, based on a published study, is that adverse pricing for odd-lot trades compared to round-lot trades did not exist pre-1940s when bonds were primarily traded on exchanges. ¶¶ 109-10. There is thus nothing intrinsic to the corporate bond market that would create the current supracompetitive odd-lot spreads in the United States today, other than the Defendants' collusion.

Finally, Defendants downplay the significance of the differences between the U.S. market and international markets. Mem. at 27-28. They argue that the studies of international markets "did not find that odd-lot and round-lot spreads are identical in those countries."  Mem. at 27. This mischaracterizes the findings of the papers and ignores Plaintiffs' allegations: foreign corporate bond markets have successfully reduced or eliminated any adverse pricing for odd-lot trades compared to round-lot trades, so much so that odd lots on foreign bond exchanges generally trade at narrower spreads than round lots in the United States. ¶¶ 99-107. Defendants' collusion is revealed by the fact that the narrow odd-lot spreads happen on foreign exchange-based platforms that have less liquidity and fewer participants than the U.S. corporate bond market. ¶¶ 99, 107.

In short, Defendants ignore Plaintiffs' allegations and try to draw impermissible inferences in their favor. *eBooks*, 859 F. Supp. 2d at 680. Defendants merely raise fact issues that are ill-suited for resolution at the initial pleading stage, which are insufficient to warrant dismissal under Rule 12(b)(6). *See In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 362-363 (S.D.N.Y. 2019) (rejecting defendants' factual arguments at pleading stage that trading data undermined price

fixing allegations, that numerical minority of defendants among dealers meant conspiracy was implausible, and that investors could have traded at lower prices with other non-defendant dealers).

### F.    Plus Factors Bolster the Plausibility of the Group Boycott Conspiracy

The SAC further alleges multiple "'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987). Because "[s]eemingly innocent or ambiguous behavior can give rise to a reasonable inference of conspiracy in light of the background against which the behavior takes place," each of the following plus factors should not be viewed "in a vacuum" but "in context with all the circumstances surrounding [the] dispute." *Id.* at 255.

#### 1.    Defendants' Parallel Conduct Is Against Their Individual Economic Self-Interest

One plus factor supporting a Section 1 claim is if the complaint alleges behavior "'that would plausibly contravene each defendant's self-interest in the absence of similar behavior by rivals.'" *eBooks*, 859 F. Supp. 2d at 682 (citation omitted).

Here, but for a conspiracy, Defendants' "catch-and-kill" tactics make no economic sense. The owners of companies like TradeWeb and MarketAxess would ordinarily want more trades on their platforms to grow volume and thus increase company profits. ¶ 163. Yet Defendants have used their control over TradeWeb and MarketAxess to prevent them from providing increased pre-trade pricing transparency and access to retail investors. ¶¶ 154, 156, 158-63. Moreover, Defendants have used their control over TradeWeb and MarketAxess to acquire and shut down other platforms that threatened to offer pre-trade pricing transparent to odd-lot investors. ¶¶ 154, 156, 159-63, 194-201, 204-06. This closed off the vast majority of corporate bond trading from TradeWeb and MarketAxess, harming TradeWeb and MarketAxess financially, as well as all of their investors, including Defendants. The only plausible explanation for Defendants' behavior is

that they expected to recoup any losses on their investments in TradeWeb and MarketAxess through their supracompetitive odd-lot pricing. Defendants' actions would have been against their individual economic interests absent the conspiracy. ¶¶ 154, 159-63.

Likewise, Defendants' refusals to do business with platforms seeking to attract liquidity make no economic sense but for a conspiracy. In a competitive market, dealers would compete for market share and trading volume by offering more attractive spreads—buying higher and selling lower than the competition so long as each trade would be profitable. ¶¶ 77, 213, 218. Indeed, those who moved first would have the opportunity to not only capture market share and trading volume, but do so in a market that was more rapidly expanding. ¶ 218. *IPERS*, 340 F. Supp. 3d at 322-23 (accepting reasonable inference that absent a conspiracy, it would have been in the self-interest of many of the defendants to support emerging trading platforms to avoid being left behind and to prevent customers from jumping to competitors). Defendants' collective refusal to deal "plausibly contravene[s] each defendant's self-interest in the absence of similar behavior by rivals." *Starr*, 592 F.3d at 327 (internal quotation marks omitted). These inferences are bolstered by the SAC's allegations that a platform need only one or two Defendants to succeed. ¶ 218.

Defendants argue that Plaintiffs' case is "nearly identical" to *Treasuries*, 92 F.4th at 403, where "[r]ational economic self-interest provides a ready explanation for the Boycott Defendants' supposed failure to patronize or invest in enterprises that could disrupt their business model." Mem. at 9. However, unlike *Treasuries*, Defendants' boycott in this action went far beyond merely declining to support or participate on platforms. As explained in Statement of Facts § II.A and Argument § I.B., instead of "sitting tight and waiting to see if the new platforms attracted sufficient support to survive" (Mem. at 25, citing *IRS*, 261 F. Supp. 3d at 475 n.23), Defendants pursued a "catch and kill" strategy and interfered with the business prospects of platforms they boycotted.

Moreover, as described in Statement of Facts § II.C, Defendants actively monitored and imposed or threatened punishment against market participants who broke their conspiracy. For example, Morgan Stanley and Citibank punished First Tennessee (a competitive regional bank) when it offered Blackrock odd-lot trades at narrower spreads than those offered by the Defendants. ¶¶ 147-51. Absent conspiracy, it would be against the self-interests of Morgan Stanley and Citibank to refuse to trade with First Tennessee because they could expect to lose its business to other Defendants. Withholding business would only be rational and effective if they knew that others would follow suit. Moreover, when Bank of America wanted to do business with Bonds.com—something in its individual economic self-interest—it declined to do so because it feared blowback and retribution from Defendants, suggesting Bank of America knew the other Defendants policed their common conspiracy. ¶ 180.

Defendants once again misrepresent the factual allegations in the Complaint and impermissibly draw inferences in their favor, *eBooks*, 859 F. Supp. 2d at 680, in arguing that the SAC identifies two reasons for their boycott conduct. Mem. at 25. First, Defendants claim it was natural for them to adopt a "wait and see" approach because "almost all startup platforms fail within a few years." Mem. at 25 (citing ¶ 203). But that the same paragraph states, "***the largest impediment to the success of these platforms was (and remains) the resistance of Defendants***." ¶ 203 (emphasis added). The failure of the new platforms resulted from Defendants' group boycott conspiracy, not the other way around. This inference is bolstered by the fact that there was little risk from a technology perspective as evidenced by the success of electronic trading platforms for equities and for corporate bonds overseas. ¶¶ 4, 66-67, 97-107. Moreover, courts have rejected this argument. *See IPERS*, 340 F. Supp. 3d at 322 (rejecting argument that each defendant had a unilateral interest in waiting to see how ventures evolved).

Second, Defendants assert they were already supporting three platforms that offered all-to-all odd-lot trading. However, the SAC does not allege this and Defendants are not entitled to import unpleaded facts for purposes of their motion to dismiss. *eBooks*, 859 F. Supp. 2d at 680. Instead, the SAC alleges that trading in odd lots of corporate bonds remains much as it was decades ago—predominantly OTC and lacking real transparency, efficiency, or competition—to the detriment of investors and to the benefit of Defendants, who profit as trading intermediaries from the inflated bid-offer spreads.[3]

### 2.    The Failure to Engage in Price Competition Is Against Each Defendant's Unilateral Self-Interest

As detailed above in Statement of Facts, § II.D, the Complaint provides abundant statistical evidence of Defendants' supracompetitive odd-lot pricing, which cannot be explained by any legitimate economic force. Market evidence that makes no rational, economic sense lends plausibility to the existence of a conspiracy. *In re Commodity Exch. Inc.*, 213 F. Supp. 3d 631, 664-67 (S.D.N.Y. 2016) (finding that allegations Defendants' price quotes were contrary to their self-interest supported a plausible inference of conspiracy). And antitrust scholars have concluded that statistically significant differences between actual and competitive prices constitute a plus

---

[3]    Defendants' assertion (Mem. at 15-16) that the SAC contradicts Plaintiffs' first amended complaint ("FAC", ECF No. 128) is without merit. Both the FAC and the SAC allege that MarketAxess and TradeWeb are OTC platforms where investors must submit Requests for Quotes, and that Defendants charge supracompetitive prices for odd-lot trades. *Compare* FAC ¶¶ 69, 72, 100-15 *with* SAC ¶ 74, 123-41. Even if allegations in the FAC and SAC could be said to be inconsistent—and they are not—the inconsistencies are not egregious enough to support Rule 12(b)(6) dismissal. *Compare Rafferty v. Hempstead Union Free Sch. Dist.*, 2020 WL 7024311, at *8 (E.D.N.Y. Nov. 30, 2020) (minor contradictions in amended complaint not egregious enough to require dismissal); *with Colliton* v. *Cravath, Swaine & Moore LLP*, 2008 WL 4386764, at *7, *12 (S.D.N.Y. Sept. 24, 2008) (egregious contradictions warranted dismissal where plaintiff attempted to evade his violation of attorney ethics by not disclosing arrests at the time he was hired by his former firm by amending complaint to allege he had worked there as a non-lawyer).

factor of "actions or conduct that could occur in the presence of a collusive agreement but that are highly unlikely to occur in its absence." ¶¶ 209, 211.

Defendants argue that maintaining supracompetitive pricing in odd lots was in their individual self-interests. Mem. at 26-27. However, in a competitive market, each Defendant would compete on price, reducing odd-lot spreads to match the already profitable round-lot spreads in order to capture a larger market share, more trading volume, and, thus, more profit. ¶ 218. This has not happened, despite FINRA's requirement for its members, including Defendants, to seek best execution for customers. ¶¶ 214-15. Defendants have ignored the logical competitive response of meeting customer demand and increasing market share (and trading volume and profits) with better prices and greater liquidity, enabled by technological innovations.

### 3.    Defendants Have a Common Motive to Conspire

Defendants contend that the SAC's assertion of a common motive to conspire is actually just a common motive to maximize profits, which is not indicative of a shared interest to conspire. Mem. at 28. Defendants again misconstrue and draw improper inferences from the allegations. Defendants each benefited from supracompetitive profits due to the lack of pre-trade transparency, CLOB order books, and all-to-all trading for odd-lot bond transactions. Defendants' common motive was to protect the pricing opacity in odd-lot trades, which was jeopardized by electronic platforms and could only be defeated through cooperation among the Defendants. ¶ 220. This type of common motive to conspire is recognized as a plus factor. *See IPERS*, 340 F. Supp. 3d at 322 (accepting allegations of defendants' common motive to preserve anticompetitive profits by charging excess fees under cover of price opacity); *In re Credit Default Swaps Antitrust Litig.*, 2014 WL 4379112, at *10 (S.D.N.Y. Sept. 4, 2014) ("no single [defendant] could prevent exchanges from emerging, but all [defendants] would profit from such prevention"); *Tera Grp., Inc. v. Citigroup, Inc.*, 2019 WL 3457242, at *20 (S.D.N.Y. July 30, 2019) (common motive to

protect lucrative existing business jeopardized by potential viability of new trading platform, which could be defeated only by cooperation among multiple Defendants).

### 4.    Other Plus Factors

Market concentration has also been recognized as an antitrust plus factor. *See In re Eur. Gov't Bonds Antitrust Litig.* ("*Eurobonds III*"), 2022 WL 768680, at *20 (S.D.N.Y. Mar. 14, 2022) (finding plus factor where the relevant market "concentrated in a small number of dealers"); *Starr*, 592 F.3d at 323-24 (finding plus factor where defendants control over 80% of the market) (citing 7 Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law* § 1431a (2d ed. 2003)). Here, the secondary corporate bond market alleged by Plaintiffs meets this plus factor and was conducive to collusion because it was highly concentrated and dominated by Defendants, who controlled the supply of corporate bonds in the secondary market by dominating the underwriting market and were the top dealers of U.S. corporate bonds for well over a decade. ¶ 62. According to a 2015 survey, the top 10 dealers in the U.S. corporate bond market accounted for approximately 90% of all U.S. trading volume in corporate bonds. ¶ 65. The SAC identifies Defendants as the top 10 dealers. ¶¶ 63, 65. Defendants' collective market power enabled them to achieve outcomes as a group that they could not accomplish individually, such as preventing the emergence of all-to-all trading with pre-trade transparency in the corporate bond market.

Opportunities for collusion through frequent high-level interfirm communications are likewise recognized as an antitrust plus factor, as they enhance the plausibility of the alleged conspiracy. *See In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1026 (C.D. Cal. 2011) (allegations of opportunities to communicate, combined with allegations that defendant insurers did not compete on reimbursements even though they competed on many other insurance plan provisions, amounted to more than simple "opportunities to conspire"); *In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175, 197 (E.D. Pa. 2016) ("[O]pportunities to

conspire may be probative of a conspiracy when [defendant meetings] closely followed in time by suspicious actions or records."). Here, Plaintiffs' have alleged that Defendants' conspiracy is facilitated by the frequent communications among their senior executives under the guise of TradeWeb board conference calls and in-person meetings. ¶ 224. Those available channels of private communication enabled Defendants to conspire with low risk of detection, supporting an inference that they did so. *See IRS*, 261 F. Supp. 3d at 466 (finding similar allegations to "establish interfirm communications"). Defendants argue that the allegations about interfirm communications constitute a "'mere opportunity to conspire'" which "'does not by itself support the inference'" of the group boycott conspiracy among Defendants. Mem. at 29 (citation omitted). But when considered alongside all other allegations—coordinated catch-and-kill and boycott actions, policing of the conspiracy, and reaping of supracompetitive profits—the SAC's allegations extend far beyond the mere opportunity to collude, and support the plausibility of a conspiracy.

## II.    PLAINTIFFS' CLAIMS ARE TIMELY

### A.    Plaintiffs May Pursue Damages Incurred within the Four-Year Statutory Period as a Result of Defendants' Continuing Antitrust Conspiracy

Plaintiffs allege an ongoing conspiracy by Defendants to restrain trading of odd lots of corporate bonds lasting from as early as August 1, 2006 to the present. ¶ 1. Because the conspiracy caused (and continues to cause) Plaintiffs and the proposed class to trade at artificially inflated spreads, their claims for damages incurred within four years of the filing of the initial complaint (*i.e.*, on or after April 21, 2016) are timely as a matter of law.

By contrast, Defendants fail to carry their burden on a Rule 12(b)(6) motion. *See Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144, 149 (2d Cir. 2024) ("'The lapse of a limitations period is an affirmative defense that a defendant must plead and prove.'"); *see also In*

32

*re SKAT Tax Refund Scheme Litig.*, 2020 WL 7059843, at *6 (S.D.N.Y. Dec. 2, 2020) ("a motion to dismiss based on untimeliness should not be granted unless it appears *beyond doubt* that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief[]") (internal citations and quotation marks omitted). They argue the complaint must be dismissed because Plaintiffs do not plead any overt act of boycotting after April 2016. Mem. at 33-34. Defendants' argument fails for multiple reasons.

First, Defendants apply the wrong accrual rule. The Sherman Act utilizes "a pure injury accrual rule." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188 (1997); *see Zenith Radio Corp. v. Hazeltine Resch., Inc.*, 401 U.S. 321, 338 (1971) ("In the context of a continuing conspiracy to violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendant[,] a cause of action accrues to him to recover the damages caused by that act."). That is, "it is the date of plaintiffs' injury, not the date of Defendants' conduct, that matters here." *Credit Default Swaps*, 2014 WL 4379112, at *15 (applying injury rule to a boycott conspiracy); *PharmacyChecker.com*, 530 F. Supp. 3d at 350 (same); *see also* Areeda & Hovenkamp, *Antitrust Law*, ¶ 320d (5th ed. 2025) ("An important corollary of the *Zenith* rule is that when the defendant commits an antitrust violation at time T1 but the plaintiff suffers no injury at all until time T2, the statute runs only from the latter time.")

Applying the correct accrual rule, Plaintiffs and the proposed class were injured each time they transacted in odd lots of bonds at artificial spreads, starting the running of the limitations period from that time for damages relating to those trades. The SAC shows that Defendants each charged supracompetitive spreads on odd lots from 2016 through 2019, and spreads continue to be artificially wide today. ¶¶ 79, 81-86, 113-32, 135-41. And Plaintiffs allege multiple specific sales in the four years before April 21, 2020. ¶¶ 20-23, 139, Exhibit A, ECF No. 194-1.

The continuing violation doctrine does not displace binding Supreme Court precedent pegging the accrual of Plaintiffs' claim to their injury. *See Zenith*, 401 U.S. at 338; *Klehr*, 521 U.S. at 188. "The continuing violation issue arises only when (a) the initial act violating the antitrust laws has not been improperly concealed *and* (b) causes sufficient injury early on." *See* Areeda & Hovenkamp, *Antitrust Law*, ¶ 320c (5th ed. 2025). This is made clear in the two Second Circuit cases upon which Defendants heavily rely—*Grimm* and *US Airways*. *See* Mem. at 34-35. In both those cases, the unlawful conduct had ended, and the injury had accrued, before the limitations period.

*Grimm* reversed criminal convictions under the general conspiracy statute, 18 U.S.C. § 371 (which uses a different accrual rule[4]), after the government failed to prove at trial that the defendants committed any overt acts in furtherance of defendants' bid-rigging scheme within the limitations period. *United States v. Grimm*, 738 F.3d 498, 500-04 (2d Cir. 2013). Favorable interest payments paid by unindicted co-conspirators did not constitute overt acts because they resulted mechanically from the instruments the defendants manipulated outside of the limitations period. *Id.* at 504. *US Airways* affirmed summary judgment on timeliness because the plaintiff's injury accrued when the single injurious act—an anticompetitive contract setting prices—occurred outside of the limitations period. *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019). The plaintiff could have sued immediately in 2006 and proved damages from 2006 to 2011 based on the contract's terms. These cases do not resemble private investors like Plaintiffs who are independently injured each time they trade in odd lots of bonds. An investor who traded in odd lots in 2018 could not have brought an antitrust claim earlier; there would be no Article III

---

[4]       The limitations period in *Grimm* "runs from the last overt act during the existence of the conspiracy," not the injury rule. *Fiswick v. United States*, 329 U.S. 211, 216 (1946).

standing. Likewise, even if an investor traded prior to April 2016 and sued at that time, it could not recover damages for future trades in 2019; they would be too speculative. *Zenith*, 401 U.S. at 339. According to Defendants, all trades after April 2016 are "forever incapable of recovery" as they "could not be proved within four years of the conduct from which they flowed," a notion the Supreme Court has expressly rejected. *Id.* at 339-40.

Second, to the extent Plaintiffs must identify an overt act in furtherance of the conspiracy, the SAC plainly suffices because each new trade Defendants enter within the limitations period at inflated spreads constitutes Plaintiffs' injury **and** an overt act. The inflated spreads "raise the underlying concern of concerted action." *Grimm*, 738 F.3d at 504. Had the conspiracy terminated prior to April 2016, market incentives, such as industry best execution requirements, or Defendants' individual competitive self-interest would erode artificially wide spreads and the OTC market through the natural evolution of all-to-all trading. ¶¶ 212-19. Instead, the OTC market and its inflated spreads have persisted past April 2016, along with continued boycott efforts directed at TradeWeb, ABS/NYSE, and BondDesk. ¶¶ 146, 149-50, 163, 167, 169. Defendants' contention that the inflated spreads must be the "result" or "manifestation" of the last pleaded boycotting act (Mem. at 34-35) is an impermissible inference drawn against Plaintiffs; there is no basis to conclude the conspiracy terminated with the supposedly last pleaded boycotting act. *See Cnty. of Orange v. Sullivan Highway Prods., Inc.*, 752 F. Supp. 643, 646 (S.D.N.Y. 1990) ("Once it is shown that a conspiracy of indefinite duration existed, it is logical to infer (or presume) that the conspiracy continued beyond the last conspiratorial act established by the evidence.").[5]

_____

[5]    There is also no basis to conclude NatWest withdrew from the conspiracy on or around 2015. *See* Mem. at 33 n.14. *See, e.g.*, *In re Eur. Gov't Bonds Antitrust Litig.* ("*Eurobonds IV*"), 2023 WL 11646009, at *12 (S.D.N.Y. Sept. 25, 2023) ("'[O]nce having joined a conspiracy, each conspirator is presumed to continue as a member until the conspiracy ends with its abandonment

Third, the SAC supplies the overt boycotting acts during the limitations period Defendants claim are missing. Morgan Stanley and Citibank took steps to punish First Tennessee, which was offering Blackrock odd-lot trades at narrower spreads, between 2015-2019. ¶¶ 149-50. [6] Defendants dispute whether these acts were indeed in furtherance of the continuing boycott conspiracy, but these arguments fail for the reasons stated above. *See supra* Argument § I.D. Nor must Plaintiffs allege, as Defendants contend (Mem. at 34), the precise date these acts occurred. *PharmacyChecker.com, LLC*, 530 F. Supp. 3d at 350 ("Where Defendants allegedly played a role in the conspiracy and the [SAC] does not allege a date, there is no basis for the Court to grant the Joint Motion on statute of limitations grounds."). In any event, the Court cannot resolve this fact issue on a motion to dismiss. *See, e.g.*, *Walker v. Accenture PLC*, 511 F. Supp. 3d 169, 192 (D. Conn. 2020) (holding that whether certain events "trigger[] the continuing violation doctrine or, instead, are discrete events is a question better addressed on a summary judgment motion after discovery.") (collecting authorities).

## B.    Defendants' Fraudulently Concealed Their Actions

Plaintiffs may also recover for injuries incurred prior to April 21, 2016 because Defendants fraudulently concealed their actions. Under *State of New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988), fraudulent concealment requires "an antitrust plaintiff" to "establish[] (1) that the defendant concealed from [the plaintiff] the existence of his cause of action, (2) that

---

or the accomplishment of its unlawful purpose or until the conspirator withdraws by some affirmative act.'").

[6]    Plaintiffs are not required to allege with particularity that each Defendant engaged in a so-called qualifying overt act within the limitations period. This would import a pleading standard even beyond the *Twombly* plausibility standard to state a claim. *Cf. Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) ("A §1 complaint must adequately allege the plausible involvement of each defendant and put defendants on notice of the claims against them, but it need not be detailed with overt acts by each defendant.").

he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." While fraudulent concealment "often cannot be decided at the motion to dismiss stage," all the requisite elements are nonetheless adequately alleged here under Fed. R. Civ. P. 9(b). *London*, 213 F. Supp. 3d at 572 (citation omitted).

### 1.    Defendants Concealed Their Conduct

Plaintiffs plead the first element through both Defendants' affirmative concealment and the "inherently self-concealing" nature of their conduct. *Hendrickson Bros.*, 840 F.2d at 1083-84. A conspiracy is inherently self-concealing when it "'must remain concealed from the victim of the' collusion in order 'to endure.'" *IPERS*, 340 F. Supp. 3d at 333 (quoting *Hendrickson Bros.*, 840 F.2d at 1084). Thus, courts have repeatedly held that "[a] group boycott of exchange trading has the characteristics of other types of conspiracies that have been held to be self-concealing-it is the kind of enterprise that requires a number of participants, is designed to endure over a period of time, and must remain concealed to be successful." *Credit Default Swaps*, 2014 WL 4379112, at *15; *accord IPERS*, 340 F. Supp. 3d at 333-34.

The boycott conspiracy here similarly is inherently self-concealing. Defendants imposed odd-lot pricing opacity upon the market and took actions to keep it that way. ¶¶ 66-78. Only Defendants have their complete trading data, subject to requirements for limited disclosure by FINRA. ¶ 80. The limited available TRACE data does not identify the parties to each trade and requires technical analysis beyond the capabilities of the ordinary investor to reveal Defendants' misconduct. ¶¶ 80, 124. Defendants' conduct required cooperation from numerous participants, as no individual Defendant was capable of thwarting all-to-all trading alone. ¶¶ 218-19. And to ensure success and long-term stability, Defendants engaged in conspiratorial conduct in secret via

telephone calls and in-person meetings. ¶¶ 224, 257-58.[7] Finally, this case is not analogous to *IRS*, where the visible nature of TradeWeb and Defendants' majority ownership belied any notion that the conspiracy was self-concealing. 261 F. Supp. 3d at 448. The public would not know that Defendants were using TradeWeb and MarketAxess to catch and kill potential market entrants—an "inherently self-concealing fraud[.]" *Hendrickson Bros.*, 840 F.2d at 1083-84.

Plaintiffs also plead active concealment. *See IPERS*, 340 F. Supp. 3d at 336 (concluding plaintiff need only plead "one affirmative act of concealment"). Defendants communicated about their conspiracy in secret (¶¶ 224, 257-58) and promulgated corporate codes of conduct in effect beyond April 2016 that disclaimed unlawful and anticompetitive conduct. ¶ 260. They also gave false explanations for their conduct that concealed its true nature, such as when Defendants forced out the management of BondDesk under the false pretense of accounting "improprieties" rather than the true explanation that they wanted to shield themselves from competition. ¶¶ 186-91.

### 2.    Plaintiffs Plead Reasonable Diligence

The SAC alleges Plaintiffs did not know of Defendants' conspiracy and could not have learned of it earlier through reasonable diligence. ¶¶ 256, 261. Defendants argue Plaintiffs were on inquiry notice at some indistinct point before April 2016 and, consequently, failed to act diligently because they should have sued earlier. Mem. at 38-39. As this Court has observed, "dismissal at the pleading stage, and even summary judgment, is often inappropriate on issues of constructive knowledge that typically depend on inferences drawn from the facts of each particular case." *Commodity Exch.*, 213 F. Supp. 3d at 676 (internal citations and quotations omitted).

---

[7]    Defendants' citations to cases involving RICO claims on a failed real estate venture (*Butala v. Agashiwala*, 916 F. Supp. 314 (S.D.N.Y. 1996)), summary judgment on a group refusal to deal with the plaintiff (*Rx.com v. Medco Health Sols., Inc.*, 322 F. App'x 394 (5th Cir. 2009)), and out-of-circuit authority rejecting the availability of the self-concealing doctrine (*In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753 (D. Minn. 2020)) are factually, procedurally, and legally irrelevant.

Defendants' burden at this juncture is "'extraordinary' and appropriate only in 'extreme circumstances.'" *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 347 (S.D.N.Y. 2000).

Defendants do not meet this demanding standard. Rather, they mischaracterize the allegations as deriving from public sources that a reasonable investor should have instantly interpreted to intuit Defendants' scheme. Mem. at 39. While some of the SAC's allegations rely on public sources, many do not, and Plaintiffs' analysis of Defendants' trades goes beyond publicly available information. ¶¶ 116-41. That analysis was created from corporate bond trading data purchased through a private entity and then analyzed by experts. Other allegations, such as the BondDesk episode and Bank of America's statements concerning its fear of retaliation, do not rely on publicly available information but the investigation of counsel. ¶¶ 180-92. And the SAC cites numerous sources published after April 2016. ¶¶ 14, 59, 63, 65, 75-76, 78, 81-85, 91, 98, 101, 106, 112, 116, 119-22, 125, 131, 133, 137, 143, 201, 254. The Court need not parse each source of information to determine what quantum was both contemporaneously available and sufficient to put Plaintiffs on inquiry notice, especially where Defendants dispute whether any of it is indicative at all of the conspiracy Plaintiffs allege. *See GSE Bonds*, 396 F. Supp. 3d at 368 n.6 (noting defendants "cannot simultaneously claim the pricing data is innocent and reveals nothing, yet should have galvanized plaintiffs to action immediately").

Similarly, Plaintiffs have expended more than reasonable diligence. *See London*, 213 F. Supp. 3d at 573 (noting even "threadbare" allegations of diligence can be "sufficient to withstand the . . . motion to dismiss under circumstances where Plaintiffs appear to have been diligent in researching, investigating, and litigating their claims.") (citation omitted). Plaintiffs' efforts began in July 2015 with a comprehensive investigation into the secondary market for odd lots of corporate bonds. *See* ECF No. 95 at 8. Plaintiffs' counsel spent hundreds of lawyer hours and

hundreds of thousands of dollars in out-of-pocket costs to uncover the information alleged in the SAC, engage academics to understand the corporate bond market, purchase trading data, and hire experts to analyze the data. *Id.* at 4, 8. That some anonymous TRACE data has been available in some form since 2006 does not undermine that diligence. "[R]equiring potential plaintiffs to conduct exhaustive statistical analysis of millions of transactions, just on the off chance that it would reveal some suspicious behavior, would be absurd." *GSE Bonds*, 396 F. Supp. 3d at 367-68.

Plaintiffs' diligence is rendered all the more reasonable by Defendants' public representations of lawful behavior in their codes of conduct. *See Eurobonds III*, 2022 WL 768680, at *13 ("where a plaintiff relies on misrepresentations of above-board behavior, allegations about their reliance on those false reassurances can prove sufficient due diligence to withstand a motion to dismiss.").[8] Defendants argue this line of cases is foreclosed by *Singh v. Cigna Corp.*, 918 F.3d 57, 60-63 (2d Cir. 2019). Mem. at 37. But "*Singh* does not address fraudulent concealment," *In re Eur. Gov't Bonds Antitrust Litig.* ("*Eurobonds II*"), 2020 WL 7321056, at *3 (S.D.N.Y. Dec. 11, 2020), and instead is a case about whether public statements were materially misleading under the securities fraud statute.[9] *Singh*, 918 F.3d at 60-63.

## CONCLUSION

Defendants' motion should be denied.

Dated: December 2, 2024                                  Respectfully submitted,

                                                        */s/ Christopher M. Burke*
                                                        Christopher M. Burke

---

[8]    *See also Eurobonds I*, 2020 WL 4273811, at *11; *Ohio Carpenters' Pension Fund v. Deutsche Bank AG*, 2024 WL 3938456, at *7-8 (S.D.N.Y. Aug. 26, 2024).

[9]    Defendants note that the quoted materials from their codes of conduct were published in 2020 (Mem. at 37), but do not dispute these versions substantially reflect codes prior to April 2016. Plaintiffs have also pleaded the same reliance (¶ 260) that the *Eurobonds III* court accepted. *See Eurobonds III*, 2022 WL 768680, at *13; *Ohio Carpenters' Pension Fund*, 2024 WL 3938456, at *6. The Court should reach the same result here.

Glen E. Summers
Karma M. Giulianelli
**BARTLIT BECK LLP**
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100
glen.summers@bartlit-beck.com
karma.giulianelli@bartlit-beck.com

Michael E. Criden
Kevin B. Love (pro hac vice)
Lindsey C. Grossman
**CRIDEN & LOVE, P.A.**
7301 SW 57th Court, Suite 515
South Miami, FL 33143
Telephone: (305) 357-9000
mcriden@cridenlove.com
klove@cridenlove.com
lgrossman@cridenlove.com

Jeffrey Erez
**EREZ LAW, PLLC**
SunTrust International Center
1 SE 3rd Avenue, Suite 1670
Miami, FL 33131
Telephone: (305) 728-3320
jerez@erezlaw.com

Eliezer Aldarondo
**ALDARONDO & LOPEZ-BRAS**
ALB Plaza, Suite 400
16 Las Cumbres Ave. (Road 199)
Guaynabo, PR 00969
Telephone: (787) 474-5447
eliezer.aldarondo@gmail.com

Marc H. Edelson
**EDELSON LECHTZIN LLP**
3 Terry Drive, Suite 205
Newtown, PA 18940
Telephone: (215) 867-2399
medelson@edelson-law.com

Michael J. Freed
Douglas A. Millen
Robert J. Wozniak

Yifan (Kate) Lv
Walter W. Noss
**KOREIN TILLERY P.C.**
401 West A Street, Suite 1430
San Diego, CA 92101
Telephone: (619) 625-5620
Facsimile:  (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

George A. Zelcs
Chad E. Bell
**KOREIN TILLERY LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
gzelcs@koreintillery.com
cbell@koreintillery.com

Patrick Coughlin
Patrick J. Rodriguez
600 W. Broadway, Suite 3300
San Diego, California 92101
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
Phone: 619-798-5325
pcoughlin@scott-scott.com
prodriguez@scott-scott.com

Patrick J. McGahan
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
pmcgahan@scott-scott.com

Robin A. van der Meulen
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 233-6444
rvandermeulen@scott-scott.com

**FREED KANNER LONDON &
MILLEN LLC**
2201 Waukegan Rd, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
mfreed@fklmlaw.com
dmillen@fklmlaw.com
rwozniak@fklmlaw.com

James C. Shah
Eric L. Young
**SHEPHERD, FINKELMAN, MILLER
& SHAH, LLP**
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
jshah@sfmslaw.com
eyoung@sfmslaw.com

James E. Miller
Laurie Rubinow
**SHEPHERD, FINKELMAN, MILLER
& SHAH, LLP**
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
jmiller@sfmslaw.com
lrubinow@sfmslaw.com

Joshua H. Grabar (pro hac vice)
**GRABAR LAW OFFICE**
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
jgrabar@grabarlaw.com

Seth D. Rigrodsky
Timothy J. MacFall
**RIGRODSKY & LONG, PA**
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
sdr@rl-legal.com
tjm@rl-legal.com

R. Alexander Saveri
Cadio Zirpoli
**SAVERI & SAVERI, INC.**
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
rick@saveri.com
cadio@saveri.com

John Radice
Kenneth Pickle
Daniel Rubenstein
**RADICE LAW FIRM, PC**
475 Wall Street
Princeton, NJ 08540
Telephone: (646) 245-8502
jradice@radicelawfirm.com
kpickle@radicelawfirm.com
drubenstein@radicelawfirm.com

*Counsel for Plaintiffs and the Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 2, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

<u>*s/ Christopher M. Burke*</u>
Christopher M. Burke