# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ISABEL LITOVICH, MICHAEL V.              :
COTTRELL, FRANK HIRSCH,                  :
HOLDCRAFT MARITAL TRUST, and             :
UNITED FOOD AND COMMERCIAL               :
WORKERS UNION AND PARTICIPATING          :
FOOD INDUSTRY EMPLOYERS TRI-             :
STATE PENSION FUND, on Behalf of         :
Themselves and All Others Similarly Situated, :
                                         :
                Plaintiffs,  :
                                         :
    v.                                     :
                                         :
BANK OF AMERICA CORPORATION;             :
MERRILL LYNCH, PIERCE, FENNER &          :
SMITH, INC.; BOFA SECURITIES, INC.;      :     Civil Case No. 1:20-cv-03154 (VEC)
BARCLAYS CAPITAL INC.; CITIGROUP         :
INC.; CITIGROUP GLOBAL MARKETS           :
INC.; CREDIT SUISSE SECURITIES (USA)     :     ORAL ARGUMENT REQUESTED
LLC; DEUTSCHE BANK SECURITIES            :
INC.; THE GOLDMAN SACHS GROUP,           :
INC.; GOLDMAN, SACHS & CO., LLC;         :
JPMORGAN CHASE & CO.; J.P. MORGAN        :
SECURITIES LLC; MORGAN STANLEY;          :
MORGAN STANLEY & CO., LLC;               :
MORGAN STANLEY SMITH BARNEY              :
LLC; NATWEST MARKETS SECURITIES          :
INC.; WELLS FARGO & CO.; WELLS           :
FARGO SECURITIES LLC; and WELLS          :
FARGO CLEARING SERVICES, LLC,            :
                                         :
                Defendants.  :
                                         :
                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR JOINT MOTION TO DISMISS THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR FAILURE TO STATE A CLAIM

January 16, 2025

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ...............................................................................................................................2

I.     Plaintiffs Fail to Plead a Plausible Group Boycott Conspiracy ..........................................2

       A.     Plaintiffs Fail to Allege Conduct Suggestive of a Boycott Agreement ..................2

              1.     Alleged Refusals to Deal ...........................................................................3

              2.     Alleged Investment Activity ......................................................................6

              3.     Alleged "Punishment" of First Tennessee ..................................................9

              4.     Alleged Pricing Disparities ........................................................................9

              5.     Plaintiffs' Allegations as a Whole ...........................................................10

       B.     Plaintiffs Fail to Allege "Plus Factors" That Raise an Inference of
              Conspiracy ...........................................................................................................12

              1.     Conduct Inconsistent With Individual Self-Interest .................................12

              2.     Common Motive to Conspire....................................................................14

              3.     Market Concentration ..............................................................................14

              4.     Interfirm Communications........................................................................15

II.    Plaintiffs' Group-Pleading Allegations Fail to Implicate a Single Defendant in a
       Group Boycott Conspiracy ..............................................................................................15

III.   Plaintiffs' Claim Stretching Back to the 1980s Is Time-Barred .......................................16

       A.     Plaintiffs Fail to Allege a Single Overt Act After April 21, 2016 ......................16

       B.     Plaintiffs Fail to Plead Fraudulent Concealment .................................................18

CONCLUSION...........................................................................................................................20

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009).............................................................................................4

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544 (2007)..................................................................................... *passim*

*City of Pontiac Police & Fire Ret. Sys.* v. *BNP Paribas Sec. Corp.*,
92 F.4th 381 (2d Cir. 2024) ......................................................................... *passim*

*In re Credit Default Swaps Antitrust Litig.*,
2014 WL 4379112 (S.D.N.Y. 2014)...................................................................17, 20

*Delaney* v. *Farley*,
2014 WL 5795562 (S.D.N.Y. 2014), *aff'd*, 623 F. App'x 14 (2d Cir. 2015).........................11

*In re European Gov't Bonds Antitrust Litig.*,
2020 WL 4273811 (S.D.N.Y. 2020).....................................................................3

*In re Interest Rate Swaps Antitrust Litig.*,
261 F. Supp. 3d 430 (S.D.N.Y. 2017).............................................................. *passim*

*InterVest, Inc.* v. *Bloomberg, L.P.*,
340 F.3d 144 (3d Cir. 2003)...............................................................................4

*Iowa Pub. Empls.' Ret. Sys.* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*,
340 F. Supp. 3d 285 (S.D.N.Y. 2018)..................................................................16, 20

*Klehr* v. *A.O. Smith Corp.*,
521 U.S. 179 (1997)......................................................................................17

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
213 F. Supp. 3d 530 (S.D.N.Y. 2016)..................................................................10

*Mayor & City Council of Balt.* v. *Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)..............................................................................6

*In re Merrill Lynch Ltd. P'ships Litig.*,
154 F.3d 56 (2d Cir. 1998)...............................................................................19

*In re Merrill, BofA & Morgan Stanley Spoofing Litig.*,
2021 WL 827190 (S.D.N.Y. 2021)......................................................................19

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ......................................................................13, 14

*PharmacyChecker.com, LLC* v. *Nat'l Ass'n of Bds. of Pharmacy*,
  530 F. Supp. 3d 301 (S.D.N.Y. 2021) ...........................................................17, 18

*SL-x IP S.a.r.l.* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  2023 WL 2620041 (2d Cir. 2023)........................................................................17

*Starr* v. *Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010)...............................................................................16

*Tera Group, Inc.* v. *Citigroup, Inc.*,
  2024 WL 4501967 (2d Cir. 2024)............................................12, 13, 14, 15

*U.S. Airways, Inc.* v. *Sabre Holdings Corp.*,
  938 F.3d 43 (2d Cir. 2019).................................................................................18

*United States* v. *Grimm*,
  738 F.3d 498 (2d Cir. 2013)...............................................................................18

*Walker* v. *Accenture PLC*,
  511 F. Supp. 3d 169 (D. Conn. 2020).................................................................18

*Wright* v. *Ernst & Young LLP*,
  152 F.3d 169 (2d Cir. 1998).................................................................................7

*Zenith Radio Corp.* v. *Hazeltine Research, Inc.*,
  401 U.S. 321 (1971)...........................................................................................17

**Rules**

Fed. R. Civ. P. 9(b) ..............................................................................................18, 20

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW (5th ed. 2024)...........................18, 20

## PRELIMINARY STATEMENT

Plaintiffs' opposition (ECF No. 206) fails to overcome three fatal flaws that continue to doom their claim notwithstanding their numerous opportunities to amend.

*First*, the opposition fails to identify allegations of parallel conduct and plus factors sufficient to raise a plausible inference of a conspiracy to boycott certain trading platforms. As in *Treasuries*, "[t]he most Plaintiffs plausibly allege is that the Boycott Defendants … pursued their own respective business interests, preferred to maintain a reliable and profitable market structure, and were averse to major market changes or reforms that might disadvantage them." *City of Pontiac Police & Fire Ret. Sys.* v. *BNP Paribas Sec. Corp.*, 92 F.4th 381, 403 (2d Cir. 2024).[1] *Treasuries* is directly on point and fatal to Plaintiffs' boycott claim. Plaintiffs' contrary arguments misstate the SAC's allegations and, as in *Treasuries*, fail to "connect dots far flung among isolated episodes involving different subsets of defendants over [multiple] decades." *Id.* The opposition also reinforces Plaintiffs' inability to distinguish the trading platforms Defendants supported from those they supposedly boycotted. Plaintiffs admit that Defendants supported three market-leading platforms that offered "pre-trade pricing transparency," "competition on pricing," and "investor-to-investor direct trading" of corporate bonds. (FAC (ECF No. 128) ¶ 198.) Plaintiffs nevertheless accuse Defendants of conspiring to "boycott" or "catch and kill" any platform that offered "pre-trade pricing transparency," "pricing competition," or all-to-all trading. (Opp'n 1, 3, 4, 6, 10, 16.) Plaintiffs never explain why Defendants purportedly opposed some platforms while supporting others. Their failure to "explain how this selective opposition coheres with their conspiratorial theory" further supports dismissal. *Treasuries*, 92 F.4th at 412.

*Second*, even if Plaintiffs could plead a plausible boycott conspiracy, the opposition fails

---

[1] Unless otherwise noted, internal citations, alterations, and quotation marks are omitted, and capitalized terms have the same meaning ascribed to them in Defendants' opening brief ("Mot.").

to connect any Defendant to the alleged multi-decade conspiracy Plaintiffs imagine. The SAC instead consists almost entirely of group pleading directed at "Defendants" as an undifferentiated bloc without "identify[ing] how each particular defendant contributed to [an] alleged conspiracy." *Id.* at 407 n.12. The opposition largely ignores this fatal defect, devoting only two paragraphs to defending the SAC's pervasive group pleading. (Opp'n 11, 16-17.)

*Third*, the opposition makes plain the SAC's failure to plead either (i) a single overt act within the four-year limitations period, or (ii) fraudulent concealment with the requisite particularity. Plaintiffs' claim based on allegations dating back decades is thus time-barred.

## ARGUMENT

### I. Plaintiffs Fail to Plead a Plausible Group Boycott Conspiracy.

#### A. Plaintiffs Fail to Allege Conduct Suggestive of a Boycott Agreement.

Plaintiffs try to piece together a plausible boycott conspiracy from a series of disparate and disconnected allegations that supposedly establish that, "since the 1980s," Defendants have boycotted "electronic platforms [that] threaten[ed] their business." (Opp'n 4, 18.) But Plaintiffs' grab-bag of allegations fails under the central holding of *Treasuries*. As the Second Circuit held, "[i]t is decidedly not indicative of a conspiracy that a group of similarly situated market participants would object, individually and separately, to a significant market development that could cut into their profits." 92 F.4th at 409. To the contrary, "[r]ational economic self-interest provides a ready explanation for [Defendants'] supposed failure to patronize or invest in enterprises that could disrupt their business model." *Id.* at 403. The Second Circuit's holding in *Treasuries* controls this case.

Plaintiffs try to distinguish *Treasuries* by asserting that the SAC "tie[s] each Defendant to the [alleged] conspiracy through extensive individualized allegations of parallel conduct during the class period." (Opp'n 11.) That is incorrect. Far from identifying any meaningful parallel

conduct, the "individualized allegations" Plaintiffs cite merely identify individual Defendants that either (i) invested in the MarketAxess, Tradeweb, and BondDesk platforms, or (ii) allegedly were involved in one-off instances of purported threats or pressure.  (*Id.* (citing SAC ¶¶ 149-150, 154, 156, 180, 184, 205).)  In *Treasuries*, the Second Circuit held that similar allegations were insufficient to plead a boycott conspiracy.  *See* 92 F. 4th at 405 (threats and pressure), 406-07 (investments in and pressure on MarketAxess), 408-09 (threats and retribution), 409-11 & n.14 (similar Tradeweb allegations), 413-14 (hostility to new platform).  Those allegations failed to sustain a plausible boycott claim because the defendants' alleged investments were consistent with each defendant's "independent self-interest in maintaining a market structure that was beneficial to each of them," *id.* at 411 n.14, and the alleged "threats … or pressure from one or more Defendants" were also consistent with "economically rational self-interest," *id.* at 403.  The same is true here, and Plaintiffs do not argue that their most recent amendments change the result.[2]

### 1.    Alleged Refusals to Deal

Although Plaintiffs repeatedly assert that Defendants "boycotted" InterVest, ABS/NYSE Bonds, and Bonds.com (Opp'n 16-20), their opposition fails to overcome two overarching flaws in those allegations.

*First*, when it comes to actual *boycott* conduct, the SAC's allegations "mostly consist of unspecific activities" attributed to "Defendants" as a group or "are otherwise vague or ill-defined" and thus "fail to sufficiently specify which (if any) … Defendants furthered the alleged conspiracy or how they did so."  *Treasuries*, 92 F.4th at 403.  The SAC's persistent failure to plead that specific Defendants engaged in specific acts of parallel boycott conduct is "a defect fatal to

---

[2] Plaintiffs' reliance (Opp'n 11) on *In re European Government Bonds Antitrust Litigation*, 2020 WL 4273811 (S.D.N.Y. 2020), is misplaced.  The court there held only that "allegations based on market-wide or collective analyses need not be entirely disregarded, *as long as* a plaintiff can adduce further facts to tie specific defendants to the conspiracy."  *Id.* at *15 (emphasis added).  Plaintiffs fail to plead such facts here.

Plaintiffs' boycott claims." *Id.* at 414.

*Second*, to the limited extent the SAC attributes specific conduct to specific Defendants, the alleged conduct is "only natural anyway," *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 566 (2007), and it is "not only compatible with, but indeed … more likely explained by, lawful, unchoreographed free-market behavior," *Ashcroft* v. *Iqbal*, 556 U.S. 662, 680 (2009). None of Plaintiffs' InterVest, ABS/NYSE Bonds, and Bonds.com allegations "suggest[s] an antecedent agreement, rather than parallel conduct that could just as well be independent action." *Treasuries*, 92 F.4th at 391.

**InterVest**. Plaintiffs argue that their InterVest allegations go beyond "mere allegations of inaction" by pleading that Defendants "pressured" Bloomberg to terminate a contract with InterVest because InterVest threatened to "cut dealer commissions." (Opp'n 4, 17, 19.) But the allegation cited by Plaintiffs states only that Bloomberg terminated a contract with InterVest in the mid-1990s "due to pressure from Defendants" (SAC ¶ 153), without identifying a single act of purported "pressure" by a single Defendant. *Treasuries* rejected similar allegations that "unnamed Boycott Defendants" successfully "pressured" a trading platform to end an "alliance" that offered all-to-all trading. 92 F.4th at 406-08. Such ill-defined allegations of unspecified "pressure" by unnamed Defendants raise no inference of conspiracy. *See id.* at 412 (rejecting allegations that Treasuries platforms "caved" to defendants' "pressure"); *see also InterVest, Inc.* v. *Bloomberg, L.P.*, 340 F.3d 144, 164-66 (3d Cir. 2003) (rejecting identical claim that dealers conspired to sever InterVest's relationship with Bloomberg). Plaintiffs' allegations also fail to distinguish InterVest from the three market-leading trading platforms Defendants admittedly supported. (Mot. 15-17.)

**ABS/NYSE Bonds**. Plaintiffs offer no meaningful defense of their ABS/NYSE Bonds allegations, which fail to (i) identify a single specific act by any specific Defendant, (ii) plead any

conduct inconsistent with each Defendant's individual self-interest, or (iii) distinguish ABS/NYSE Bonds from the trading platforms Defendants supported.  Instead, Plaintiffs highlight their allegation that unnamed Defendants in 2007 supposedly used "threats and pressure" to coerce Bloomberg to take an extra 14 months to provide ABS/NYSE Bonds with access to Bloomberg's Trade Order Management System ("TOMS").  (Opp'n 17, 20.)  But they never explain how a purported 14-month delay *in 2007* is somehow responsible for ABS/NYSE Bonds' failure to attain a significant market share at any time during its nearly 50-year existence from 1976 through 2024. (Mot. 11.)  Nor do they explain how Defendants could have credibly "threatened" Bloomberg given the SAC's allegation that access to TOMS is "essential" for "[e]veryone trading corporate bonds electronically, *including Defendants*."  (SAC ¶ 172 (emphasis added).)  As in *Treasuries*, Plaintiffs' vague allegations of "threats" and "pressure" raise no inference of conspiracy because they lack any allegations of specific conduct by specific Defendants.  *See* 92 F.4th at 411-12.

**Bonds.com**.  Plaintiffs have no response to Defendants' argument (Mot. 12-13) that it was unilaterally rational for each Defendant to decline to provide liquidity on the Bonds.com platform. Rather than address that fatal defect, Plaintiffs tout their allegation that a single Defendant supposedly feared unspecified "blowback" if it traded on Bonds.com.  (Opp'n 20.)  That allegation, however, is no different from the allegation in *Treasuries* that numerous market participants feared "backlash" from defendants if they supported an all-to-all Treasuries platform.  *See* 92 F.4th at 414.  Such allegations raise no inference of a boycott conspiracy because resisting competition from new market entrants is "routine market conduct," *id.* at 409, and "[a]llegations of threats, warnings, intimidation, or pressure" directed at new entrants posing a competitive threat are consistent with "economically rational self-interest," *id.* at 403.  Indeed, "if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1

violation of the Sherman Act against almost any group of competing businesses would be a sure thing." *Id.* at 409.  Plaintiffs' vague allegation that *one* Defendant supposedly feared unspecified "blowback" from unidentified parties is even less suggestive of a boycott conspiracy because it fails to allege any *parallel* resistance to a competitive threat.

### 2.    Alleged Investment Activity

Plaintiffs fare no better with their assertion that Defendants "made parallel investments" in electronic trading platforms in an effort to "forestall competitive electronic trading for odd lots." (Opp'n 12.)  That assertion is belied at the outset by Plaintiffs' admission that two platforms in which Defendants invested—MarketAxess and Tradeweb—"allow investor-to-investor direct trading (without intermediary dealers), and [provide for] pre-trade pricing transparency, which results in better competition on pricing."  (FAC ¶ 198; *see also* SAC ¶ 150; Mot. 16.)

Even putting that defect aside, Plaintiffs' allegations of parallel *investment* activity raise no inference of a *boycott* conspiracy because parallel conduct is suggestive of a preceding agreement only if the parallel behavior "is precisely the concerted action that is the conspiracy's object." *Mayor & City Council of Balt.* v. *Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013).  Here, Plaintiffs' conspiracy claim is predicated on a preceding agreement to *boycott* electronic trading platforms, not an agreement to *invest* in such platforms.  Plaintiffs' allegations of parallel investment behavior therefore "do not fit [their] conspiracy theory." *Treasuries*, 92 F.4th at 403.

Plaintiffs try to salvage these allegations by arguing that Defendants "would have no expectation in a competitive market of recouping the losses they incurred" on these investments (Opp'n 11), but again, their own allegations belie their assertion.  Far from alleging that Defendants incurred "losses" on their investments, Plaintiffs allege that MarketAxess and Tradeweb are highly successful (SAC ¶¶ 150, 201), that Defendants' investments made good business sense (*id.* ¶ 157), that Tradeweb acquired BondDesk's platform at a bargain-basement price (FAC ¶ 186), and that

Tradeweb has since grown that platform into a thriving venue that accounts for one in seven corporate bond trades (SAC ¶ 201). Defendants' investments in successful trading platforms provide no basis for inferring a boycott conspiracy. *See Twombly*, 550 U.S. at 556 ("lawful parallel conduct fails to bespeak unlawful agreement"); *Treasuries*, 92 F.4th at 409-11 (rejecting similar allegations that defendants jointly invested in Tradeweb); *In re Interest Rate Swaps Antitrust Litig.* ("*IRS I*"), 261 F. Supp. 3d 430, 465-69 (S.D.N.Y. 2017) (same).

**MarketAxess/Trading Edge**. Plaintiffs' allegations regarding MarketAxess's acquisition of Trading Edge (SAC ¶¶ 205-206) fail to plead *any* conduct by *any* Defendant. (Mot. 13.) Plaintiffs respond that the SAC alleges that "JPMorgan, Credit Suisse, and Lehman Brothers … caused MarketAxess to acquire Trading Edge and terminate Trading Edge's anonymous bond trading platforms" (Opp'n 13-14), but the SAC says no such thing. All it alleges is that JPMorgan, Credit Suisse, and Lehman Brothers at one time were investors in MarketAxess. (SAC ¶¶ 154, 205-206.) Having already amended their complaint three times, Plaintiffs are not entitled to amend it once again "through statements made in motion papers." *Wright* v. *Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998).

**Tradeweb**. Plaintiffs again rely on non-existent allegations when they suggest that, until Defendants stopped it from doing so, "Tradeweb was planning to enter the corporate bond market with the potential to implement electronic ordering systems." (Opp'n 16 (citing SAC ¶¶ 155-157).) All the SAC alleges is that Tradeweb offered an "electronic trading platform [that] was well-suited for trading corporate bonds." (SAC ¶ 155.) There are no allegations that Defendants stopped Tradeweb from "enter[ing] the corporate bonds market" or from "implementing electronic ordering systems" in that market; to the contrary, Plaintiffs acknowledge that Tradeweb did both those things with great success. (FAC ¶¶ 195, 197; SAC ¶ 201.) The allegations here are thus

even weaker than the similar Tradeweb-related allegations that were rejected in *Treasuries* and *IRS I*. *See Treasuries*, 92 F.4th at 409-11; *IRS I*, 261 F. Supp. 3d at 465-69.

Plaintiffs concede that *IRS I* rejected a similar Tradeweb allegation covering the 2007-to-2012 period, but insist that the court found a related Tradeweb allegation to be suggestive of conspiracy for the period after 2013. (Opp'n 15-16.) That is wrong. Plaintiffs rely on a single bullet point in *IRS I* that lists "[c]ommon direction of Tradeweb" as one of eleven sets of allegations relating to the post-2013 period. (*Id.* at 15 (citing *IRS I*, 261 F. Supp. 3d at 474).) But when the court actually analyzed that allegation, it concluded that, just like the similar pre-2013 allegation, it raised no plausible inference of conspiracy. *See IRS I*, 261 F. Supp. 3d at 486 ("Tradeweb's not having adopted anonymous all-to-all IRS trading would not, without more, give rise to an inference of participation in a conspiracy" after 2013); *id.* at 465-69 (analyzing pre-2013 period). Although *IRS I* ultimately sustained the plaintiffs' post-2013 claim (after dismissing the pre-2013 claim), it did so based on specific allegations of parallel conduct that have no analog in the SAC. *Id.* at 475-76 (holding that the allegation that four dealers each told platform on the first business day after its initial IRS trade that they would not clear trades on the platform until they had conducted a review of the platform's rulebook "suggests coordination").

**BondDesk**. Plaintiffs' BondDesk allegations are insufficient because they fail to allege either (i) that Tradeweb changed BondDesk's trading protocols after acquiring it, or (ii) that Defendants were responsible for Tradeweb's decisions regarding BondDesk. (Mot. 14-15.) Plaintiffs respond by asserting that "Defendants … caused TradeWeb to purchase BondDesk and eliminate BondDesk features that would have introduced pre-trade price transparency" (Opp'n 15), but again, the cited paragraphs of the SAC do not support that assertion. The only conduct attributed to *Defendants* in those paragraphs is that four Defendants had an ownership

stake in BondDesk from 2004 through 2006, at which point they were bought out by a private equity firm.  (SAC ¶¶ 184-185, 192; Mot. 14-15.)   In addition, Plaintiffs acknowledge that BondDesk was highly successful after Tradeweb acquired it in 2013 (SAC ¶ 201), that the platform had the same focus before and after the acquisition (Mot. 15), and that Tradeweb's platforms offer "pre-trade price transparency" and "competition on pricing" (FAC ¶¶ 195, 198).

### 3.    Alleged "Punishment" of First Tennessee

Plaintiffs cite a single instance in which two Defendants allegedly threatened to "punish" a rival bond dealer, First Tennessee, if it continued to compete for BlackRock's business.  (Opp'n 21 (citing SAC ¶ 150).)  That one-off allegation about First Tennessee, however, has nothing to do with all-to-all trading, pre-trade pricing transparency, or anything else allegedly targeted by the purported boycott conspiracy.  It therefore "do[es] not fit Plaintiffs' conspiracy theory—that the [Defendants] sought to prevent the widespread emergence of all-to-all trading." *Treasuries*, 92 F.4th at 403.  Nor does this allegation overcome *Twombly*'s holding that resisting competitive threats is "routine market conduct" that is "only natural anyway."  550 U.S. at 566.  *Treasuries* thus dismissed similar allegations of purported "threats," "intimidation," and "punish[ment]" as consistent with the defendants' "economically rational self-interest."  92 F.4th at 403, 405-12.

### 4.    Alleged Pricing Disparities

Plaintiffs' allegations of differences between odd-lot and round-lot prices also "do not fit [their] conspiracy theory."  *Id.* at 403.  To begin with, contrary to Plaintiffs' assertion, the SAC does not allege that there is anything particularly "parallel" about Defendants' pricing of corporate bonds that suggests a preceding agreement among them.  (Opp'n 1, 17.)  And even if Plaintiffs had adequately alleged parallel pricing, such conduct would be irrelevant because Plaintiffs' claim is predicated on an alleged agreement to *boycott electronic trading platforms*, not to *fix prices*. Although Plaintiffs try to dismiss this obvious point as "nonsensical" (*id.* at 23), they do not cite a

single case holding that purportedly parallel pricing behavior supported an inference of a non-pricing conspiracy. Instead, in the lone case on this issue cited by Plaintiffs (*id.* at 22), the court viewed the plaintiffs' pricing statistics as "circumstantial evidence suggesting that the [d]efendants may have conspired to manipulate" silver prices. *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 561 (S.D.N.Y. 2016).[3]

Despite this clear disconnect, Plaintiffs insist that "anticompetitive conduct, not ordinary market forces or risk, explains the difference in odd-lot and round-lot pricing." (Opp'n 24.) This argument conveniently ignores a series of "obvious alternative explanation[s]," *Twombly*, 550 U.S. at 567, for the alleged pricing difference (Mot. 27-28). Indeed, according to both the SAC and the opposition, persistent disparities between round-lot and odd-lot prices have existed *since the 1940s*, a period that pre-dates the alleged conspiracy by at least 40 years. (SAC ¶ 110; Opp'n 25.) Plaintiffs' own allegations thus discredit their assertion that a comparatively recent boycott conspiracy that supposedly has existed since the 1980s somehow explains a 75-year pricing disparity. And even if the alleged pricing disparity were attributable to "anticompetitive conduct" as Plaintiffs suggest, the SAC fails to connect that disparity to a *boycott* conspiracy among these Defendants directed at the electronic trading platforms identified in the SAC. In sum, there are "any number of reasons" that could explain Plaintiffs' pricing statistics, and those statistics raise no plausible inference of a *boycott* conspiracy. *Treasuries*, 92 F.4th at 401.

### 5.    Plaintiffs' Allegations as a Whole

Plaintiffs repeatedly argue that their allegations are stronger when viewed as a whole (Opp'n 10, 12, 17), but the allegations taken together actually "are even weaker than when taken

---

[3] Plaintiffs' pricing allegations are further undermined by their admission that most of their pricing statistics are "not specific to Defendants" but rather rely on "averages." (Opp'n 22.) As *Treasuries* recognized in rejecting the plaintiffs' separate *price-fixing* claim, statistics that "do not focus on the … Defendants in particular" are "fundamentally flawed." 92 F.4th at 399.

in series." *Treasuries*, 92 F.4th at 415. As in *Treasuries*, Plaintiffs' allegations require the Court to "connect dots far flung among isolated episodes involving different subsets of defendants over [multiple] decades," *id.* at 403; many of them fail to "separately identify how each particular defendant contributed to the alleged conspiracy," *id.* at 407 n.12; others are "stale" and pre-date the class period, *id.* at 405; and all of them "describe[] conduct as easily indicative of common interests held, individually and separately, by the … Defendants as any conspiracy," *id.* at 415.

Compounding those problems, when viewed as a whole, Plaintiffs' allegations fail to draw a coherent distinction between the trading platforms Defendants supported and those they allegedly boycotted. As the FAC admitted, Defendants actively supported the MarketAxess, Tradeweb, and Bloomberg platforms, all of which offered all-to-all trading, price competition, and pre-trade pricing transparency. (Mot. 15-17; FAC ¶¶ 195, 198.) Unable to deny those devastating admissions, Plaintiffs simply note that they deleted any reference to them in the SAC. (Opp'n 29.) That is irrelevant: the FAC's allegations are judicial admissions that the Court can consider on this motion.[4] *See Delaney* v. *Farley*, 2014 WL 5795562, at *5 (S.D.N.Y. 2014) ("Plaintiff is bound by his prior allegations"), *aff'd*, 623 F. App'x 14 (2d Cir. 2015); *see also* Mot. 17 & n.7. In any event, even the SAC implicitly admits that competitive odd-lot trading is available on the platforms Defendants supported (*e.g.*, SAC ¶ 150), and *Treasuries* likewise confirms that "[a]ll-to-all platforms exist for … corporate bonds," 92 F.4th at 402. Because Plaintiffs have offered no explanation of "how this selective opposition coheres with their conspiratorial theory," the SAC should be dismissed. *Id.* at 412.

---

[4] Plaintiffs assert in a footnote that there are no "inconsistencies" between the FAC and the SAC (Opp'n 29 n.3), but if true, that is all the more reason why the Court may take account of the FAC's uncontradicted judicial admissions. Plaintiffs also assert that MarketAxess and Tradeweb are RFQ platforms rather than CLOB platforms (*id.*), but the same is true of all but one of the platforms allegedly targeted by Defendants (*see* SAC ¶ 153 (only ABS allegedly offered an "order book")).

**B.** **Plaintiffs Fail to Allege "Plus Factors" That Raise an Inference of Conspiracy.**

Like the plaintiffs in *Treasuries*, Plaintiffs here "largely fail to allege parallel conduct with respect to the alleged boycott conspiracy," which "preclud[es] them from demonstrating an agreement … regardless of their plus factors." *Id.* at 415 n.17. But even if Plaintiffs had adequately alleged parallel boycott conduct, their anemic plus factor allegations are insufficient to convert that conduct into a plausible basis for inferring a conspiracy. Indeed, the Second Circuit recently rejected a nearly identical set of plus factor allegations in *Tera Group, Inc.* v. *Citigroup, Inc.*, 2024 WL 4501967, at *3-5 (2d Cir. 2024), a decision the opposition ignores.

**1.** **Conduct Inconsistent With Individual Self-Interest**

Second Circuit precedent recognizes that "[r]ational economic self-interest provides a ready explanation for the [defendants'] supposed failure to patronize or invest in enterprises that could disrupt their business model." *Treasuries*, 92 F.4th at 403; *see also Tera*, 2024 WL 4501967, at *3 ("each [defendant] had a clear economic incentive to steer buy-side customers away from [the new entrant] onto RFQ-friendly platforms"). Plaintiffs' three responses fail to overcome this on-point precedent.

*First*, Plaintiffs argue that Defendants should have tried to "compete for market share" by supporting startup platforms even if they threatened Defendants' business model. (Opp'n 27.) But the SAC concedes that "[a]lmost all" of the 89 new trading platforms that attempted to enter the corporate bonds market "failed within a few years."[5] (SAC ¶ 203.) Under those circumstances, it was "sound business strategy" for each Defendant "to take a wait-and-see approach" before supporting a potentially threatening new platform. *Tera*, 2024 WL 4501967, at *4. "If, once the

---

[5] Plaintiffs speculate that all 89 startup platforms might have failed due to "Defendants' group boycott conspiracy" (Opp'n 28), but the SAC does not allege that Defendants conspired against those platforms. Instead, it acknowledges that those platforms, like most startups, faced formidable challenges such as insufficient "capitalization," "sub-standard technology," and "flawed business models." (SAC ¶ 203.)

dust settled, it was clear that [a startup platform] would survive," Defendants "could simply elect to join the platform at that time." *Id.* A wait-and-see strategy also made sense because each Defendant had "individual, legitimate business interests to maintain a profitable and reliable market structure." *Id.* at *5 (quoting *Treasuries*, 92 F.4th at 390); *see also Twombly*, 550 U.S. at 568 (declining to infer boycott conspiracy where it was "natural" for each defendant to "sit[] tight, expecting [its] neighbors to do the same thing").

*Second*, Plaintiffs suggest that Tradeweb and MarketAxess acted irrationally by "clos[ing] off the vast majority of corporate bond trading" from their platforms. (Opp'n 26.) But nothing in the SAC remotely supports the suggestion that either Tradeweb or MarketAxess closed their platforms to a substantial share of corporate bonds trading. To the contrary, those platforms today are two of the three leading platforms for corporate bonds trading, collectively accounting for "approximately 97% of the market." (FAC ¶ 195.)[6] And, even if Plaintiffs had adequately alleged that those platforms failed to pursue a purported opportunity to expand, "firms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets." *Twombly*, 550 U.S. at 569. Plaintiffs thus lack any well-pled allegations that Tradeweb and MarketAxess engaged in conduct that would be "so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement," *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1195 (9th Cir. 2015), and there are no well-pled allegations that *Defendants* caused those platforms to engage in any such conduct. Plaintiffs' Tradeweb and MarketAxess allegations

---

[6] As to MarketAxess, the SAC alleges only that the platform declined to pursue a strategy that "could have threatened MarketAxess's business model." (SAC ¶ 206.) And as to Tradeweb, Plaintiffs acknowledge that Tradeweb permits retail investors to trade the same way they do on NASDAQ and the New York Stock Exchange—through brokers and asset managers—and that the retail-oriented Tradeweb Direct platform "facilitates one in seven corporate bond trades." (SAC ¶ 201; FAC ¶¶ 66, 188-189.)

thus fail for the same reasons that the similar allegations failed in *Treasuries* and *IRS I*. *See Treasuries*, 92 F.4th at 411 n.14; *IRS I*, 261 F. Supp. 3d at 466-72.

*Third*, Plaintiffs argue that Defendants' purportedly parallel pricing of corporate bonds conflicted with their individual self-interest because they should have "reduc[ed] odd-lot spreads" to capture more market share. (Opp'n 29-30.)  But these *pricing* allegations are again irrelevant to the *boycott* conspiracy alleged by Plaintiffs, whether asserted as a plus factor or as purportedly parallel conduct. *See supra* at 9-10.  Plaintiffs also do not allege that any Defendant would have earned more profits by cutting its prices *after* accounting for the corresponding reduction in per-trade profits and the likely competitive response of other bond dealers. *See Tera*, 2024 WL 4501967, at *3 (rejecting similar allegations where defendants "could have rationally and independently chosen" to prioritize one source of profits over another).

### 2.    Common Motive to Conspire

Plaintiffs argue that Defendants shared a common motive to earn "supracompetitive profits" by charging high prices for odd lots of bonds. (Opp'n 30.)  But mere allegations of a profit motive fail as a matter of law to provide a plus factor because *all* competitors in *all* industries share a common motive to earn more profits. *See Tera*, 2024 WL 4501967, at *3; *In re Musical Instruments*, 798 F.3d at 1194 n.8.  Citing the district court's decision in *Tera*, Plaintiffs assert that "cooperation among the Defendants" was necessary to "defeat" startup platforms that allegedly threatened Defendants' trading profits. (Opp'n 30.)  As the Second Circuit later held in that same case, however, that purported plus factor "does not lead to an inference of conspiracy" because "[i]t is nearly always the case" that "each incumbent business has an incentive to exclude a newcomer in order to protect its own market share." *Tera*, 2024 WL 4501967, at *3.

### 3.    Market Concentration

Plaintiffs do not deny that they fail to allege any Defendant's share of secondary-market

trading of U.S. corporate bonds, the alleged relevant product market here.  (Opp'n 31; SAC ¶¶ 245-247.)  Nor do they address the implications of their own allegations that corporate bonds are "fungible," that "a round lot of a given issue can be broken into odd-lots of that issue," and that bonds of comparable maturities are "interchangeable."  (*Id.* ¶¶ 5, 61.)  Accepting these allegations as true, nothing prevents non-defendant dealers from purchasing round lots of bonds at competitive prices, breaking them into odd lots, and selling them.  Plaintiffs are thus left without a plausible explanation of how Defendants' market shares in the "underwriting market" supposedly enable them to "control[] the supply" of corporate bonds in the secondary market.  (Opp'n 31.)

### 4.    Interfirm Communications

The opposition all but concedes that the SAC's allegations of interfirm communications "constitute a mere opportunity to conspire."  (*Id.* at 32.)  "[T]he law is clear that the mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred."  *Tera*, 2024 WL 4501967, at *4.

## II.    Plaintiffs' Group-Pleading Allegations Fail to Implicate a Single Defendant in a Group Boycott Conspiracy.

Plaintiffs do not dispute that a complaint's "failure to identify the involvement of particular defendants in the alleged conspiracy" is "a basic pleading defect" that "dooms [its] allegations."  *Treasuries*, 92 F.4th at 396.  Nevertheless, their opposition barely addresses this "basic pleading defect," relying instead on the bald assertion that the SAC's allegations "tie each Defendant to the conspiracy."  (Opp'n 11, 16-17.)  To the contrary, the SAC consists almost entirely of group pleading directed at "Defendants" as an undifferentiated bloc, and the handful of instances cited by Plaintiffs in which the SAC mentions individual Defendants by name are insufficient to "separately identify how each particular defendant contributed to the alleged [boycott] conspiracy."  *Treasuries*, 92 F.4th at 407 n.12.

The SAC's allegations that different Defendants held lawful ownership interests in certain trading platforms (SAC ¶¶ 154, 156, 184, 205) fall far short of pleading that any Defendant agreed to participate in a group boycott.  Likewise, the SAC's stray reference to alleged threats by two Defendants directed at First Tennessee for allegedly competing against them for BlackRock's business (*id.* ¶¶ 149-150) is unconnected to the alleged conspiracy to boycott electronic trading platforms.  And Bank of America's alleged concern about potential "blowback" if it participated on BondsPro (*id.* ¶ 180) does not describe any concerted conduct.  The same is true of the SAC's isolated allegation that a single firm later acquired by a Defendant "refused to do business" with InterVest traders in the 1990s.  (*Id.* ¶ 148.)  Last, Plaintiffs' *pricing* statistics—whether Defendant-specific or not—lend no support to an alleged *boycott* conspiracy.[7]

Ignoring the many group-pleading cases cited by Defendants (Mot. 30-33), Plaintiffs rely on two cases that are easily distinguishable (Opp'n 17).  *Starr* v. *Sony BMG Music Entertainment*, 592 F.3d 314 (2d Cir. 2010), did not address a boycott or group pleading at all.  And in *Iowa Public Employees' Retirement System* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.* ("*IPERS*"), 340 F. Supp. 3d 285, 317 (S.D.N.Y. 2018), the court concluded that the complaint "specifically allege[d] that each [d]efendant agreed to participate in the conspiracy" and "identifie[d] specific employees by name who held themselves out as representing the interests of their employers."  Not so here.

## III.    Plaintiffs' Claim Stretching Back to the 1980s Is Time-Barred.

### A.    Plaintiffs Fail to Allege a Single Overt Act After April 21, 2016.

Plaintiffs' opposition does not identify a single overt act in furtherance of the alleged

---

[7] Plaintiffs also cite with no explanation more than two dozen other paragraphs of the SAC (Opp'n 17) that fail to tie any individual Defendant to a boycott conspiracy.  Most contain only general references to Defendants that identify them as parties or state that they traded odd lots with "Plaintiffs and/or the Class." (*E.g.*, SAC ¶¶ 19, 23, 27, 29, 32, 34, 36, 42, 46, 48, 52, 141.)

boycott conspiracy that occurred during the four-year limitations period, *i.e.*, after April 21, 2016.[8] Instead, Plaintiffs contend that a new claim accrued, and the statute of limitations began to run anew, every time anyone purchased or sold odd lots of corporate bonds during the limitations period—even in the absence of any additional conduct in furtherance of the alleged boycott conspiracy. (Opp'n 33.) But that is not the law. Rather, a "cause of action under the antitrust laws accrues when a defendant commits an act that injures a plaintiff's business," and "the clock can restart in cases if the conspiracy continues through additional overt acts." *SL-x IP S.a.r.l.* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2023 WL 2620041, at *2 (2d Cir. 2023) (citing *Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)). The cases Plaintiffs cite (Opp'n 33) are fully consistent with this well-settled rule that the statute of limitations restarts only if the plaintiffs allege a "continuing conspiracy" in which the defendants committed "overt acts" in furtherance of the conspiracy during the limitations period.[9] *Zenith Radio*, 401 U.S. at 338-39 (cause of action accrues from date of injury "[i]n the context of a continuing conspiracy"); *Klehr* v. *A.O. Smith Corp.*, 521 U.S. 179, 189-90 (1997) ("in the case of a continuing violation, … each overt act that is part of the violation and that injures the plaintiff" restarts the limitations period).[10]

In an effort to satisfy the "overt act" requirement, Plaintiffs argue that "each new trade … within the limitations period" was "an overt act" in furtherance of the alleged boycott conspiracy.

---

[8] Because NatWest (f/k/a RBS) allegedly had a 0% share of the bond-underwriting market after 2015, there is no basis to infer that NatWest participated in any purported conspiracy after 2015, another reason why any claim against NatWest is time-barred. (Mot. 33 n.14.) Plaintiffs respond that there is "no basis to conclude NatWest withdrew from the conspiracy." (Opp'n 35 n.5.) But NatWest's 0% share of the underwriting market after 2015 means that it would have no reason to continue in any conspiracy.

[9] Similarly, the treatise cited by Plaintiffs (Opp'n 33) makes clear that a claim accrues when "injury *first* occurs," not every time a plaintiff suffers an injury. Areeda & Hovenkamp, *Antitrust Law* ¶ 320b (5th ed. 2024) (emphasis added).

[10] The other cases Plaintiffs cite involved allegations of anticompetitive conduct squarely within the limitations period. *See PharmacyChecker.com, LLC* v. *Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 350 (S.D.N.Y. 2021) (anticompetitive acts alleged within limitations period); *In re Credit Default Swaps Antitrust Litig.* ("*CDS*"), 2014 WL 4379112, at *5 (S.D.N.Y. 2014) (same).

(Opp'n 35.)  That is incorrect.  At most, these transactions constituted subsequent injuries arising from the prior alleged boycott conduct that occurred before April 21, 2016.  *See, e.g.*, *United States* v. *Grimm*, 738 F.3d 498, 503-04 (2d Cir. 2013) ("when [an] anticipated economic benefit continues" after conspiratorial conduct, the later payment of supracompetitive prices is "the result of a completed conspiracy," and "not in furtherance of one that is ongoing"); *U.S. Airways, Inc.* v. *Sabre Holdings Corp.*, 938 F.3d 43, 89 (2d Cir. 2019) ("[E]ach supracompetitive price charged [by defendant] was not an overt act of its own, but a manifestation of the prior overt act of entering into the … contract.").  And Plaintiffs' suggestion that the Court should just assume that overt acts continued for years after the last alleged act (Opp'n 35) would eviscerate the "overt act" requirement and extend the statute of limitations indefinitely.

Finally, Plaintiffs insist that their First Tennessee allegation pleads overt acts in furtherance of the alleged group boycott after April 21, 2016.  (*Id.* at 36.)  But the SAC fails to allege when that supposed conduct took place or how it purportedly furthered the alleged conspiracy to boycott electronic trading platforms.  Instead, Plaintiffs argue that they are not required to plead the "precise dates these acts occurred."  (*Id.*)  But the cases Plaintiffs cite make clear that, at a minimum, a plaintiff must allege that the conduct occurred within the limitations period, which the SAC does not do.  *See PharmacyChecker.com*, 530 F. Supp. 3d at 350 ("[a]ll of the conduct that allegedly gave rise to damages" occurred within limitations period); *Walker* v. *Accenture PLC*, 511 F. Supp. 3d 169, 192 (D. Conn. 2020) (seven discrete acts occurred within limitations period).

### B.    Plaintiffs Fail to Plead Fraudulent Concealment.

Plaintiffs fail to plead with the particularity required by Rule 9(b) any of the three elements of fraudulent concealment.

*First*, Plaintiffs' opposition offers no serious response to Defendants' showing (Mot. 38-39) that Plaintiffs' boycott claim is based on facts and news articles that were publicly available

well before April 21, 2016, thereby putting them on inquiry notice. *See IRS I*, 261 F. Supp. 3d at 489 n.38 ("plaintiffs based their [claims] … on voluminous news articles and other public sources, many published well before" the statutory period, and thus were on inquiry notice). Instead, Plaintiffs argue that they also cite some "sources published after April 2016" (Opp'n 39), but these additional citations cannot change the fundamental fact that the information available before April 2016 put them on inquiry notice (SAC ¶¶ 88 n.14, 110, 142 n.35).    Similarly, Plaintiffs' assertion that they based their claim on "corporate bond trading data purchased through a private entity and then analyzed by experts" (Opp'n 39) is irrelevant because the trading data also were available well before April 2016.    And Plaintiffs ignore (i) case law holding that they cannot simultaneously argue that allegations based on information available before April 2016 are sufficient to plead a boycott conspiracy yet insufficient to put them on inquiry notice (Mot. 39); (ii) the inconsistency between Plaintiffs' claim that they had no way of knowing about the alleged boycott and their assertion that only anticompetitive conduct can explain widely reported market developments (*id*. at 38); and (iii) the public nature of the alleged boycott activity, including the prior InterVest litigation (*id.* at 39).

*Second*, Plaintiffs do not identify a single step they took to investigate their claim before April 2016 or explain what previously unavailable information became available after April 2016 that led them to file their lawsuit.    Although the opposition argues that Plaintiffs' counsel spent significant time investigating the claim (Opp'n 39-40), it does not claim that *Plaintiffs* exercised any diligence.    *See In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) ("[i]nvestors did not allege" they "exercised due diligence").    Instead, Plaintiffs argue that their lack of diligence was "reasonable" because Defendants made "public representations of lawful behavior in their Codes of Conduct." (Opp'n 38.) But the "everyday statements" reflected in those

codes of conduct are "too general to cause a reasonable investor to rely upon them." *In re Merrill, BofA & Morgan Stanley Spoofing Litig.*, 2021 WL 827190, at *9, *11 (S.D.N.Y. 2021) (rejecting fraudulent concealment based on "public statements that [defendants] maintain established procedures that ensure compliance with all applicable laws and regulations").[11]

*Third*, Plaintiffs do not allege with particularity that Defendants concealed material facts that prevented them from discovering their boycott claim. Plaintiffs instead rely on the vague and conclusory contention that Defendants "communicated about their conspiracy in secret" (Opp'n 38), which cannot satisfy Rule 9(b). Plaintiffs also argue that the alleged conduct was self-concealing, relying on *IPERS* and *CDS*. (*Id*. at 37.) But those cases alleged supposedly hidden conduct that no amount of diligence could have uncovered. *See IPERS*, 340 F. Supp. 3d at 334-35 (defendants were "(i) conducting secret meetings, (ii) using code words, (iii) misrepresenting their support for [boycotted platforms], and (iv) using threats to silence victims and witnesses"); *CDS*, 2014 WL 4379112, at *6 (similar). Here, in contrast, virtually all the conduct that Plaintiffs claim creates an inference of a group boycott was publicly reported. *See supra* at 6-9 (discussing investments in MarketAxess, Trading Edge, Tradeweb, and BondDesk). For this same reason, *IRS I* rejected a similar argument that an alleged boycott was self-concealing. 261 F. Supp. 3d at 488 ("Given the visible nature of Tradeweb's trading platform and of the Dealers' majority ownership, the direction they gave to Tradeweb was not 'self-concealed.'").

## CONCLUSION

For the foregoing reasons, the SAC should be dismissed in its entirety with prejudice.

---

[11] In addition, unlike the plaintiffs in cases cited in the opposition, Plaintiffs here do not plead that they relied on these Codes of Conduct during the limitations period (or at any time). Although Plaintiffs insist that the SAC pleads reliance (Opp'n 40 n.9), the paragraph they cite simply states that the Codes "provid[ed] a false sense of security to corporate bond investors" (SAC ¶ 260). Nor could they plead reliance before April 2016 because the SAC does not allege any Codes of Conduct from that time period. (*See id.*)

Dated: January 16, 2025
       New York, New York


/s/ Adam S. Hakki

Adam S. Hakki
Richard F. Schwed
ALLEN OVERY SHEARMAN STERLING
US LLP
599 Lexington Avenue
New York, New York  10022
Telephone:  (212) 848-4000
adam.hakki@aoshearman.com
rschwed@aoshearman.com

*Attorneys for Defendants Bank of America
Corporation; BofA Securities, Inc.; and
Merrill Lynch, Pierce, Fenner & Smith
Incorporated*


/s/ Kevin P. Broughel

Kevin P. Broughel
Zoe Lo
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, New York  10020
Telephone:  (212) 940-6343
kevin.broughel@katten.com
zoe.lo@katten.com


*Attorneys for Defendant Barclays Capital Inc.*


/s/ Jay Kasner

Jay Kasner
Karen M. Lent
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Manhattan West
New York, New York  10001
Telephone:  (212) 735-3276
jay.kasner@skadden.com
karen.lent@skadden.com

*Attorneys for Defendants Citigroup Inc. and
Citigroup Global Markets Inc.*


/s/ Herbert S. Washer

Herbert S. Washer
Sheila C. Ramesh
Adam S. Mintz
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York  10005
Telephone:  (212) 701-3000
hwasher@cahill.com
sramesh@cahill.com
amintz@cahill.com

*Attorneys for Defendant Credit Suisse
Securities (USA) LLC*

/s/ John Terzaken
John Terzaken
Adrienne V. Baxley
SIMPSON THACHER & BARTLETT LLP
900 G Street, NW
Washington, DC  20001
Telephone:  (202) 636-5000
john.terzaken@stblaw.com
adrienne.baxley@stblaw.com

*Attorneys for Defendant Deutsche Bank
Securities Inc.*

/s/ Richard C. Pepperman II
Richard C. Pepperman II
Matthew J. Porpora
Jonathan S. Carter
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
peppermanr@sullcrom.com
porporam@sullcrom.com
carterjo@sullcrom.com

*Attorneys for Defendants The Goldman Sachs
Group, Inc. and Goldman Sachs & Co. LLC*

/s/ Robert D. Wick
Robert D. Wick
John S. Playforth
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, N.W.
Washington, D.C.  20001
Telephone:  (202) 662-6000
rwick@cov.com
jplayforth@cov.com

*Attorneys for Defendants JPMorgan Chase &
Co. and J.P. Morgan Securities LLC*

/s/ Brad S. Karp
Brad S. Karp
Susanna Michele Buergel
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3305
bkarp@paulweiss.com
sbuergel@paulweiss.com

Jane Baek O'Brien
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
2001 K Street, N.W.
Washington, D.C.  20006
Telephone:  (202) 223-7300
jobrien@paulweiss.com

*Attorneys for Defendants Morgan Stanley;
Morgan Stanley & Co., LLC; and Morgan
Stanley Smith Barney LLC*

/s/ Sheila R. Adams James
Sheila R. Adams James
Christopher Lynch
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4000
sheila.adams@davispolk.com
christopher.lynch@davispolk.com

*Attorneys for Defendant NatWest Markets Securities Inc.*

/s/ Jayant W. Tambe
Jayant W. Tambe
Laura Washington Sawyer
JONES DAY
250 Vesey Street
New York, New York  10281
Telephone:  (212) 326-3604
jtambe@jonesday.com
lwsawyer@jonesday.com

*Attorneys for Defendants Wells Fargo & Co.; Wells Fargo Securities LLC; and Wells Fargo Clearing Services LLC*

**CERTIFICATE OF COMPLIANCE WITH LOCAL CIVIL RULE 7.1(C)**

The undersigned hereby certifies that the foregoing brief contains 6,656 words, excluding the parts of the document that are exempted from Local Civil Rule 7.1(c), which is fewer than the 20 pages (or 7,000 words) the Court so-ordered on October 11, 2024. (ECF No. 202.) In preparing this certification, I have relied on the word count of the word-processing system used to prepare this document.

Dated: January 16, 2025

/s/ Richard C. Pepperman II
Richard C. Pepperman II
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone: (212) 558-4000
peppermanr@sullcrom.com