UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  9/2/25
```

------------------------------------------------------------------- X

ISABEL LITOVICH; MICHAEL V. COTTRELL;  :
FRANK HIRSCH; HOLDCRAFT MARITAL TRUST;  :
and UNITED FOOD AND COMMERCIAL WORKERS  :
UNION AND PARTICIPATING FOOD INDUSTRY  :
EMPLOYERS TRI-STATE PENSION FUND, on Behalf  :
of Themselves and All Others Similarly Situated,  :
                                        :
                             Plaintiffs,  :               20-CV-3154 (VEC)
                                        :
                                        :               OPINION AND ORDER
          -against-                      :
                                        :
BANK OF AMERICA CORPORATION; MERRILL  :
LYNCH, PIERCE, FENNER & SMITH, INC.; BANK OF  :
AMERICA SECURITIES, INC.; BARCLAYS CAPITAL  :
INC.; CITIGROUP INC.; CITIGROUP GLOBAL  :
MARKETS INC.; CREDIT SUISSE SECURITIES (USA)  :
LLC; DEUTSCHE BANK SECURITIES INC.; THE  :
GOLDMAN SACHS GROUP, INC.; GOLDMAN,  :
SACHS & CO., LLC; JPMORGAN CHASE & CO.; J.P.  :
MORGAN SECURITIES LLC; MORGAN STANLEY;  :
MORGAN STANLEY & CO., LLC; MORGAN  :
STANLEY SMITH BARNEY LLC; NATWEST  :
MARKETS SECURITIES INC.; WELLS FARGO & CO.;  :
WELLS FARGO SECURITIES LLC; and WELLS  :
FARGO CLEARING SERVICES, LLC,  :
                                        :
                             Defendants.  :

------------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

Plaintiffs, on behalf of themselves and all others similarly situated, bring a putative class

action against Defendants, financial institutions and major dealers in the corporate bond market,

alleging a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by unlawfully restraining the

secondary corporate bond market.  Second Amended Complaint ("SAC"), Dkt. 194.  Defendants

moved to dismiss the SAC in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

*See* Defs. Mot., Dkt. 203.  Plaintiffs opposed the motion.  Pls. Opp., Dkt. 206.  Defendants'
motion is GRANTED.

## I.    BACKGROUND[1]

### A.  The Corporate Bond Market

Plaintiffs are bond investors who bought and sold odd lots of corporate bonds in the
secondary market directly from and to Defendants.  SAC ¶ 2.  Corporations raise capital by
issuing bonds that are underwritten by one or more registered securities firms ("dealers") in the
primary market.  *Id.* ¶¶ 3, 56.  Once the bonds are issued, the dealers then trade them on the
secondary market.  *Id.* ¶ 3.  Because the secondary market for corporate bonds is an over-the-
counter ("OTC") market, investors do not receive the kind of transparency that is available in the
equities market.  *Id.* ¶ 4.  Because Defendants act as intermediaries for every trade and only
disclose their own bid or offer price, investors do not see competing bids or offers and do not
know whether they are getting the best price.  *Id.* ¶¶ 4, 71–76.

Corporate bonds are categorized based on the lot size of the trade: round lots consist of
any trade involving increments of 1,000 bonds or that is greater than and divisible by $1 million
in par value, whereas odd lots consist of trades involving less than 1,000 bonds or less than $1
million in par value.  *Id.* ¶ 5.  Because bonds from the same issue are fungible, odd lots of any
given issue can be combined into a round lot, and round lots of any given issue can be broken
into odd lots.  *Id.*  Odd lots make up the vast majority of trades by number of trades in the
secondary market.  *Id.* ¶ 8.  Institutional investors primarily trade in round lots, while individual

---

[1]    The well-pled facts alleged in the SAC are assumed true for purposes of evaluating Defendants' motion to
dismiss.  *See Nielsen v. Rabin*, 746 F.3d 58, 61 (2d Cir. 2014).  The facts are taken from the SAC and any
documents incorporated by reference.

investors generally trade smaller odd lots.  *Id.* ¶¶ 105, 109, 144.  Defendants are dealers for both round lots and odd lots of corporate bonds.  *Id.* ¶ 5.

Defendants typically provide a bid price at which they are willing to purchase bonds and an offer price at which they are willing to sell bonds.  *Id.* ¶ 6.  The difference between the bid and the offer is known as the "bid-offer spread" or the "spread," and that becomes the profit dealers make on their trades.  *Id.* ¶ 6.

Defendants control nearly 65 percent or more of the bond underwriting market; according to the SAC, that control gives Defendants power to control the supply of bonds to be sold in the secondary market.  *Id.* ¶¶ 63–64.  Defendants also account for roughly 90 percent of trading volume in corporate bonds.  *Id.* ¶ 65.  The SAC alleges that Defendants' spreads for odd lots were 25 to 300 percent higher than spreads on round lot trades.  *Id.* ¶ 9.

### B.  The Boycott Conspiracy

Plaintiffs allege that Defendants conspired to boycott trading platforms that would promote pre-trade pricing transparency and all-to-all trading and that their collusive conduct has restricted competition from electronic trading platforms that seek to improve odd lot pricing for retail investors.  *Id.* ¶¶ 9, 13, 64–65, 75, 78, 209–11.  The collusive conduct allegedly included: (1) punishing dealers who engaged in trading activity that had the potential to narrow the spreads; (2) acquiring control of electronic platforms to ensure they did not improve pricing for odd lots; and (3) engaging in a group boycott of retail-focused electronic trading platforms that sought to improve pricing transparency by denying them liquidity and access to essential facilities.  *Id.* ¶ 144.  The SAC alleges that Defendants punished dealers or traders who took actions that threatened the conspiracy by placing them in a "penalty box" and by refusing to deal

with the penalized dealer/trader. *Id.* ¶ 148.  The SAC includes two examples of such activity.  In the first, when odd lot traders employed by InterVest engaged in trading that Salomon Smith Barney (later acquired by Citigroup) deemed to be "disruptive" of the market, Salomon purportedly refused to do business with those traders and no other Defendants did business with those traders either.  *Id.*  The SAC does not allege when this occurred beyond the vague allegation that it took place in the mid-1990s.  *Id.* ¶¶ 152–53.  The second example occurred sometime between 2015 and 2019.  *Id.* ¶ 149.  BlackRock began to use competitive regional banks and brokers, including but not limited to First Tennessee, for its odd lots trading because of the narrower spreads they provided.  *Id.*  When Morgan Stanley and Citibank learned that BlackRock was executing trades with First Tennessee and other dealers, Morgan Stanley twice and Citibank once purportedly threatened to limit any business that they would transact with First Tennessee as punishment for its offering narrower spreads for such transactions.  There are no allegations that the other institutions with which BlackRock was trading at narrowed spreads were similarly threatened.  *Id.* ¶¶ 149–50.

Plaintiffs also allege that Defendants coordinated to execute a so-called "catch-and-kill" strategy to invest in certain platforms so they could be removed as competitors.  *Id.* ¶¶ 145, 157, 163.

### 1.  InterVest

In the mid-1990s, InterVest Financials Services planned to launch a new electronic trading system for corporate bonds that promised to cut commissions by more than 75 percent; the system would operate on Bloomberg terminals and would offer anonymous, push-button trading.  *Id.* ¶ 152.  Unidentified bond dealers began to complain to Bloomberg that InterVest

offered a service that competed with them.  *Id.* ¶ 153.  When Bloomberg attempted to stop InterVest from launching, InterVest threatened legal action.  *Id.*  Although the service launched in December 1996, "due to pressure from Defendants," Bloomberg terminated the service by February 1998.  *Id.*  The SAC does not allege any specific facts regarding which Defendant did what, what sort of "pressure" any particular Defendant exerted, or against whom the pressure was allegedly exerted.

## 2.  TradeWeb

TradeWeb was founded in 1996.  *Id.* ¶ 154.  Its initial funding came from Credit Suisse, Lehman Brothers (later acquired by Barclays), Salomon Smith Barney (later acquired by Citigroup), and Goldman Sachs.  *Id.*  By 2004, Citigroup, Merrill Lynch, Morgan Stanley, JPMorgan, and Deutsche Bank had ownership interests in TradeWeb.  *Id.*  News reports from that time suggested that those Defendants invested in TradeWeb due to concern that emerging electronic platforms would affect their market power in corporate bonds.  *Id.* ¶ 155.  Although, according to the SAC, TradeWeb was well-suited for trading corporate bonds, a 2001 *Forbes* article stated that "TradeWeb was created with the aim of maintaining the status quo."  *Id.*  An earlier article in *Euromoney* stated: "TradeWeb is only as independent as the seven banks [that own it] want it to be."[2]  *Id.* ¶ 156.

In 2004, Thomson Reuters purchased TradeWeb.  *Id.* ¶ 158.[3]  As part of that transaction, the "founding investment banks" agreed to steer liquidity to TradeWeb for four years.  *Id.* ¶ 159.

---

[2]    Of the seven banks that owned TradeWeb at the time, according to the article, five also had ownership positions in other electronic platforms, including BondBook (Deutche Bank, Goldman Sachs, Merrill Lynch, Morgan Stanley, and Salomon), and MarketAxess (Credit Suisse and Lehman).  SAC ¶ 156.

[3]    According to at least one source (about whom the SAC contains no information), Defendants sold TradeWeb because of "regulatory concerns over potential conflicts of interest and competition issues in dealer-owned networks"; four years prior, the Department of Justice had issued antitrust civil investigative demands to

In 2008, with its prior deal ending, Thomson Reuters agreed to a joint ownership structure called "Project Fusion." *Id.* ¶ 160. Project Fusion gave a minority ownership stake in TradeWeb to Credit Suisse, Goldman Sachs, Lehman Brothers, Merrill Lynch, Morgan Stanley, JPMorgan, Deutsche Bank, and RBS (now NatWest). *Id.* Citigroup joined later in 2008. *Id.* By 2010, "Defendants and other primary dealers" held 16 of the 26 seats on the TradeWeb Board of Director and governance committees. *Id.* ¶ 161.

Plaintiffs allege that Defendants' ownership of TradeWeb allowed them to use it as a "stalking horse" to catch-and-kill emerging electronic platforms that threatened to provide better pricing transparency to odd lot investors. *Id.* ¶ 163.

### 3. BondDesk

BondDesk was founded in 1999 as an electronic bond trading platform focused on retail sized trades and retail investors. *Id.* ¶ 182. By 2004, 14 major banks, including Defendants Goldman Sachs, Bank of America, JPMorgan, and Wells Fargo, had an ownership interest; those four Defendants eventually secured six of the 11 seats on BondDesk's Board of Directors, including seats held by Brad Levy, who was affiliated with Goldman Sachs, and Matthew Frymier, who was affiliated with Bank of America. *Id.* ¶¶ 183–84. The SAC alleges that Defendants viewed BondDesk and its management's attempt to improve pricing transparency as a threat to their profitability. *Id.* ¶ 185.[4] On some unspecified date, Defendants conspired to remove the management of BondDesk. *Id.* ¶ 186.

---

similar electronic trading platforms and to some of the banks that had an ownership interest in those platforms. *Id.* ¶ 158.

[4]    This paragraph is one of many where Plaintiffs elide from a specific allegation that implicates one or more specific Defendants to a generic allegation against "Defendants." Specifically, the SAC alleges that only four of the Defendant banks invested in BondDesk. But paragraph 185 implicates all Defendants: "Despite investing in BondDesk, Defendants saw [its] innovations . . . as a threat to the supracompetitive profitability they enjoyed from

The effort to oust the BondDesk management was led by Levy and Frymier, who allegedly pressured its management to leave by raising false concerns about its accounting treatment of stock options. *Id.* ¶ 187. Purportedly, they did so by reaching out to the partner in charge of BondDesk's account at Grant Thornton (BondDesk's auditor) and encouraging him to raise a red flag about the existing accounting treatment. *Id.* ¶ 188. Levy and Frymier offered to refer additional clients to Grant Thornton in exchange for it raising red flags. *Id.* ¶ 189. The firm purportedly agreed to do so, and the board, controlled by the board members affiliated with Defendants,[5] used the accounting issue as an excuse to remove or sideline BondDesk's management. *Id.* ¶ 190. The accounting issue was ultimately resolved without any changes to the accounting treatment. *Id.* ¶ 191.

Defendants sold a majority share in BondDesk to a private equity firm in 2006. *Id.* ¶ 192. BondDesk announced in 2007 that it was extending its "online odd-lot fixed-income marketplace to institutional traders and portfolio managers," but would not extend the marketplace directly to retail investors. *Id.*

In 2011, BondDesk announced a plan to introduce BondWorks, a system for direct retail trading on BondDesk. *Id.* ¶ 194. BondWorks initially created workstations for advisors and brokers to access BondDesk, but its announced plan was that it would "eventually" allow retail investors to also have access. *Id.* BondDesk partnered with another trading platform in 2011 and made this new combined service immediately available to its dealer clients but not to retail

---

wider bid-offer spreads on odd-lots of corporate bonds." *Id.* ¶ 185. That sort of sleight of hand is prevalent throughout the SAC.

[5]     The SAC does not allege which Defendants had employees who sat on the Board of BondDesk at that time.

investors.  *Id.* ¶ 195.  In July 2013, BondDesk announced Odd-Lot Valuations, a new pricing service for U.S. corporate and municipal bonds that responded to "the need for improved price transparency in the odd-lot fixed income markets."  *Id.* ¶ 196.  BondDesk announced that the service would launch in the fourth quarter of 2013.  *Id.*

Plaintiffs allege that Defendants were threatened by these moves and responded by using TradeWeb, in which, as previously noted, several Defendants held minority ownership interests, to acquire BondDesk.  *Id.* ¶ 198.  Following the acquisition in November 2013, BondDesk was folded into TradeWeb Direct, a platform that currently facilitates one in seven corporate bond trades without pre-trade pricing transparency.  *Id.* ¶¶ 200–01.

### 4.  MarketAxess and Trading Edge

In 2000, Defendant JPMorgan, among others, founded MarketAxess, an electronic trading platform.  *Id.* ¶ 205.  Defendants Credit Suisse and Barclays also invested in MarketAxess.  *Id.* ¶ 156.  In March 2001, MarketAxess acquired Trading Edge, another electronic trading platform that allowed anonymous matching for bond trades designed to increase available liquidity to investors.  *Id.* ¶ 204.  At or around the time of the acquisition, MarketAxess announced that it intended to integrate Trade Edge's anonymous trading capability into the MarketAxess platform.  *Id.* ¶ 205.  Within seven months, however, MarketAxess ended Trading Edge's anonymous bond trading platform.  *Id.* ¶ 206.  One unidentified analyst noted at some unspecified time that "an anonymous model [like Trading Edge's] could have threatened MarketAxess's business model."  *Id.*

### 5.  ABS and NYSE Bonds

In 1976, the New York Stock Exchange ("NYSE") introduced the Automated Bond

System ("ABS"), an electronic bond order book; it was not successful.  *Id.* ¶¶ 164-65.  In 2007, the NYSE replaced ABS with NYSE Bonds, which offered pre-trade pricing transparency for investors.  *Id.* ¶ 166.  A 2014 study found that during the period from 2008 to 2011, bid-offer spreads for corporate bonds listed on NYSE Bonds were 10 basis points lower than spreads on comparable bond issues not listed on it, and the positive effect was most notable for trades of less than $100,000.  *Id.*  NYSE Bonds did not gain traction in trading among dealers.  *Id.* ¶ 167.

Plaintiffs allege that ABS and NYSE Bonds were not successful due to concerted illegal activity by Defendants.  *Id.* ¶ 168.  According to Plaintiffs, Defendants engaged in a concerted boycott of the platforms substantially to limit order flow and colluded to deny or delay NYSE Bonds access to Bloomberg's Trade Order Management System ("TOMS").  *Id.*  According to Plaintiffs, TOMS is an essential venue for a newcomer seeking to compete in the corporate bond market.  *Id.* ¶¶ 168, 172–74.  NYSE Bonds was not given a connection to Bloomberg TOMS for 18-19 months, a delay that purportedly harmed NYSE Bond's ability to gain traction in the electronic bond trading market.  *Id.* ¶ 173.

### 6. Bonds.com

In 2005, Bonds.com was founded with the goal of empowering "the self-directed individual and institutional investors with a no cost trading platform, enabling execution, aggressive pricing and education in the fragmented fixed income marketplace."  *Id.* ¶ 176.  In January 2008, Bonds.com launched a trading platform called BondStation, open to both retail and institutional investors.  *Id.* ¶ 177.  After just three months, however, Bonds.com refocused BondStation on institutional investors "due to market conditions and other economic factors."  *Id.* ¶ 178.  According to the SAC, one of those "market conditions" was a group boycott of the

platform by dealers.[6]  *Id.*  In 2010, Bonds.com stopped using BondStation and offered a new

platform called BondsPro, which aimed to offer institutional investors and professional traders

an alternative trading system for odd lot fixed income securities.  *Id.* ¶ 179.  Although not open

to retail investors, the platform continued to allow all-to-all, anonymous, exchange-style trading.

*Id.*  Between 2012 and 2013, Bonds.com sought liquidity on its BondsPro platform from major

corporate bond dealers like Defendants.  *Id.* ¶ 180.  The SAC alleges that Defendants collectively

refused to participate with Bonds.com.  *Id.*  Defendant Bank of America allegedly indicated (the

SAC does not allege to whom or when) that it was interested in participating on BondsPro but

that it feared the "blowback" it would suffer from other Defendants.  *Id.*  The SAC alleges that

Bank of America said that it would only participate on the platform if at least one or two other

large dealers did as well.  *Id.*  Bonds.com ran out of funding in 2013 and was sold in 2014.  *Id.* ¶

181.

### C.  Procedural History

Plaintiffs brought this action against Defendants on April 21, 2020, *see* Compl., Dkt. 1,

and Defendants moved to dismiss Plaintiffs' Amended Complaint on December 15, 2020, *see*

Dkt. 130.  Judge Liman, to whom the case was assigned at the time, granted Defendants' motion

to dismiss, *see* Opinion & Order, Dkt. 147, and Plaintiffs appealed, *see* Not. of Appeal, Dkt. 150.

While the appeal was pending, the Clerk of Court (the "Clerk") informed the parties that,

while Judge Liman was presiding over the case, his wife, whose stock ownership is imputed to

Judge Liman, owned stock in one of the Defendants.  *See* Feb. 25, 2022 Letter, Dkt. 155.

Although the Clerk reported that Judge Liman's stock ownership had "neither affected nor

---

[6]        The SAC alleges the boycott was "by dealers," a group that is substantially larger than and different from
Defendants.

impacted his decisions in this case[,]" it "would have required recusal under the Code of Conduct for United States Judges . . . ." *Id.* at 2.   On March 2, 2022, this case was randomly reassigned to the Undersigned.

On March 1, 2022, Plaintiffs moved to hold their appeal in abeyance in light of the Clerk's disclosure, *Litovich v. Bank of Am. Corp.*, No. 21-2905 (2d Cir.), Dkt. 85, and filed their merits brief a week later, Pls. Brief, *id.* at Dkt. 100.   Plaintiffs identified the issues on appeal as whether the judgment should be vacated and remanded because it was incorrect on the merits and, in the alternative, whether the judgment should be vacated and remanded because Judge Liman was required to recuse in light of his wife's stock ownership. *See* Pls. Brief at 4.   On March 15, 2022, the Second Circuit denied Plaintiffs' motion to hold their appeal in abeyance. *See Litovich v. Bank of Am. Corp.*, No. 21-2905 (2d Cir.), Dkt. 112.   Plaintiffs then moved this Court, pursuant to Federal Rule of Civil Procedure 62.1, for an indicative ruling that it would vacate Judge Liman's decision and grant Plaintiffs leave to file a second Amended Complaint. *See* Pls. Not. of Mot. 160.   The Court denied Plaintiffs' motion. *See* Opinion & Order, Dkt. 172. On July 2, 2024, the Second Circuit held that "while there was no direct conflict of interest when [Judge Liman] ruled on the merits of this action," vacatur was warranted pursuant to 28 U.S.C. § 455, and the case was remanded for further proceedings before the Undersigned. *See* Opinion at 3, Dkt. 183.

The Court granted Plaintiffs' request to file the SAC, as opposed to proceeding with the Amended Complaint that had been filed in March 2022. *See* Dkt. 193.   Plaintiffs filed the SAC on September 3, 2024, *see* Dkt. 194, and Defendants moved to dismiss, *see* Defs. Mot., Dkt. 203.

## DISCUSSION

### I.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).  A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  "[A] complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted).  The Court is not required to credit "mere conclusory statements," which "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 678–79 (citing *Twombly*, 550 U.S. at 555).

 "There is no heightened pleading requirement in antitrust cases." *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 54 (S.D.N.Y. 2012).  A plaintiff must, however, "do more than cite relevant antitrust language to state a claim for relief." *Wolf Concept S.A.R.L. v. Eber Bros. Wine & Liquor Corp.*, 736 F. Supp. 2d 661, 667 (W.D.N.Y. 2010) (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)).  A complaint "must allege sufficient facts to support a cause of action under the antitrust laws.  Conclusory allegations that the defendant violated those laws are insufficient." *Id.* at 667–68 (quoting *Kasada, Inc. v. Access Capital, Inc.*, No. 01-CV-8893, 2004 WL 2903776, at *3 (S.D.N.Y. Dec. 14, 2004)).  "[A] bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits

dismissal." *Id.* at 668 (quoting *Heart Disease Res. Found. v. Gen. Motors Corp.*, 463 F.2d 98, 100 (2d Cir. 1972)).

Section 1 of the Sherman Act prohibits conspiracies to restrain trade. *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 54 (2d Cir. 2019). To prove a Section 1 violation, a plaintiff must show that there were "concerted action[s] between at least two legally distinct economic entities" that evince "a conscious commitment to a common scheme designed to achieve an unlawful objective." *United States v. Apple, Inc.*, 791 F.3d 290, 313, 315 (2d Cir. 2015) (citation omitted). The "crucial question" in a Section 1 case is whether "the challenged conduct stems from independent decision or from an agreement, tacit or express." *Id.* at 314-15 (citation omitted).

At the pleading stage, a plaintiff must allege enough facts to support the inference that a conspiracy existed. *Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). "While for purposes of a summary judgment motion, a Section 1 plaintiff must offer evidence that tends to rule out the possibility that the defendants were acting independently, to survive a motion to dismiss[,] . . . a plaintiff need only allege enough factual matter (taken as true) to suggest that an agreement was made." *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 321 (2d Cir. 2010) (citations omitted). "The ultimate existence of an 'agreement' under antitrust law, however, is a legal conclusion, not a factual allegation." *Mayor & City Council of Baltimore*, 709 F.3d at 135–36 (citing *Starr*, 592 F.3d at 319 n.2 ("The allegation that defendants agreed to [a] price floor is obviously conclusory, and is not accepted as true.")).

To allege the existence of a conspiracy, allegations of parallel action are not, by themselves, sufficient. *In re Inclusive Access Course Materials Antitrust Litig.*, 544 F. Supp. 3d

420, 434 (S.D.N.Y. 2021) (citing *Apple*, 791 F.3d at 315).  But the existence of "additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts" can serve to allow a fact-finder to infer the existence of a conspiracy.  *Id.* (citing *Apple*, 791 F.3d at 315).  These additional circumstances can consist of "direct evidence that the defendants entered into an agreement," or "circumstantial facts supporting the inference that a conspiracy existed."  *Apple*, 791 F.3d at 315 (citation omitted).  "Circumstances that may raise an inference of conspiracy include a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications."  *Id.* (citation omitted).  Once a plaintiff has adequately alleged concerted action, the plaintiff must allege that the concerted action "constituted an unreasonable restraint of trade."  *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 97 (2d Cir. 2018) (citation omitted).

## II.    Defendants' Motion to Dismiss is Granted

Defendants move to dismiss the SAC, arguing that Plaintiffs have not adequately pled a boycott conspiracy; Plaintiffs' group pleading did not connect any individual Defendant to the alleged conspiracy; and Plaintiffs' claim is time-barred.  The Court agrees with Defendants and will address each argument in turn.

### A.  Plaintiffs Fail Adequately to Plead a Boycott Conspiracy

The SAC alleges that, as early as 2006 and up through the present, Defendants, horizontal competitors, "conspired to restrain all-to-all electronic trading of odd-lots of corporate bonds via a group boycott."  SAC ¶ 2.  Plaintiffs point to three categories of evidence that they rely on as evidence of Defendants' conspiracy: (i) Defendants' boycott of existing or new electronic trading

14

platforms that sought to offer all-to-all trading; (ii) Defendants' acquisition of control of three trading platforms (Trading Edge, TradeWeb, and BondDesk) as a "catch-and-kill" operation to prevent them from offering all-to-all trading of odd lots; and (iii) Defendants' punishment of dealers and traders who threatened their supracompetitive profits.

While this case was on appeal, the Second Circuit decided *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Secs. Corp.*, 92 F.4th 381 (2d Cir. 2024) ("*Treasuries*"). In that case, the Court squarely rejected materially similar boycott claims. In *Treasuries*, the plaintiffs were pension and retirement funds that alleged that ten large banks conspired to boycott direct trading between buy-side investors, known as all-to-all trading, on the secondary market for Treasuries, including by threatening or intimidating trading platforms that sought to offer that kind of trading. *Id.* at 389. The Court affirmed the district court's dismissal of the claims, holding that the plaintiffs failed "to weave scattered, unrelated episodes involving different dealers over the course of roughly two decades into an actionable conspiratorial narrative." *Id.* at 390. The Court concluded that the most that plaintiffs plausibly alleged was that the boycott defendants "preferred to maintain a reliable and profitable market structure, and were averse to major market changes or reforms that might disadvantage them." *Id.* at 403. Further, the Court held that it is "decidedly not indicative of a conspiracy that a group of similarly situated market participants would object, individually and separately, to a significant market development that could cut into their profits." *Id.* at 409.

Plaintiffs attempt to distinguish their allegations from those found wanting in *Treasuries*. For the reasons that follow, their arguments are not persuasive.

### 1. Parallel Conduct

The SAC alleges that Defendants have engaged for twenty years in parallel conduct to thwart the emergence of competitive trading platforms that would allow all-to-all trading and would include pre-trade pricing transparency. Plaintiffs contend that each allegation in the SAC should not be analyzed in isolation, and that the conspiracy is "not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." Pls. Opp. at 12 (citing *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 689 (S.D.N.Y. 2012)).

Defendants argue that the SAC does not plausibly allege either direct evidence of a conspiracy or parallel conduct and plus factors that raise a plausible inference of a conspiracy. They argue that, once conclusory allegations are stripped away, the conduct pled consists of acts consistent with each dealer's independent self-interest, and that there is insufficient circumstantial evidence or "plus factors" to suggest an illegal agreement.

The Court discusses all of Plaintiffs' allegations separately but does so recognizing that the alleged conspiracy must be evaluated as a whole. *Treasuries*, 92 F.4th at 403.

### a. Alleged Joint Boycotts

The SAC alleges that Defendants jointly boycotted three trading platforms: InterVest, NYSE Bonds, and Bonds.com. None is adequately alleged.

### i. InterVest

According to Plaintiffs, in the mid-1990s, InterVest was set to launch an anonymous, transparent trading platform. SAC ¶ 152. It made a deal with Bloomberg to provide its system on Bloomberg terminals, but, after launching in 1996, Bloomberg terminated the service in 1998 due to pressure from Defendants and because unidentified bond dealers complained to

Bloomberg. *Id.* ¶¶ 152–53. This allegation is wholly deficient for several reasons. First, the SAC does not identify a single action taken or statement made by any Defendant. Instead, it alleges in an entirely conclusory fashion that Bloomberg terminated the service due to "pressure from Defendants." *Id.* ¶ 153. That is not a sufficient factual allegation from which the Court can infer anything about Defendants. *See Treasuries*, 92 F.4th at 414 (citation omitted) (rejecting allegations "characterized by generic references to the Boycott Defendants or dealers, and vague descriptions of the nature of the alleged misconduct"). Nor do Plaintiffs plead facts about the conduct of any single Defendant, relying instead on vague allegations about Defendants as a group. "This failure to identify the involvement of particular defendants in the alleged conspiracy" is "a basic pleading defect" that "dooms" Plaintiffs' complaint. *Treasuries*, 92 F.4th at 396.

In short, Plaintiffs did not plead any facts about Defendants' relationship to InterVest from which the Court can plausibly infer that Defendants agreed to boycott it.[7]

### ii.    NYSE Bonds

In 2007, NYSE decided to replace ABS, its largely unsuccessful electronic trading platform for corporate bonds, with NYSE Bonds. SAC ¶ 166. NYSE Bonds offered pre-trade pricing transparency for investors, but it failed to gain traction with dealers. *Id.* ¶¶ 164–67. Plaintiffs allege that it took NYSE Bonds 18-19 months, rather than the normal five months, to gain access to Bloomberg's TOMS facility, a platform necessary to compete in the corporate bond market. *Id.* ¶ 173. According to Plaintiffs, the Defendants colluded to cause the delay

---

[7]    It is also notable that this allegation relates to conduct in the "mid-1990s" while the class period alleged in the SAC begins a decade later in August 2006. *Id.* ¶ 2.

which, in turn, crippled NYSE Bonds's ability to gain traction in the electronic bond trading market. *Id.* ¶¶ 168, 173.

The factual allegations to support Plaintiffs' assertion that the delays NYSE Bonds experienced should be laid at Defendants' feet are entirely conclusory. The SAC alleges: "Defendants forced Bloomberg to delay NYSE Bonds' connectivity through Bloomberg TOMS by threatening to terminate or reduce their Bloomberg Terminal leases if Bloomberg failed to do so." *Id.* ¶ 174. Plaintiffs do not plead any specific facts about any individual Defendants. The SAC does not allege when the threats were made, by whom, or to whom they were made. Although the Court must accept as true factual allegations, it cannot accept as true conclusory allegations like these.[8] *See Rodriguez v. City of New York*, 649 F. Supp. 2d 301, 308 (S.D.N.Y. 2009).

### iii.    Bonds.com

Bonds.com launched its initial bond trading platform, BondStation, in 2008, which was initially open to both retail and institutional investors. SAC ¶ 177. Soon after launching, the platform "refocused" on institutional investors "due to market conditions and other economic factors." *Id.* ¶ 178. Years later, between 2012 and 2013, Bonds.com sought liquidity on its BondsPro platform "from major corporate bond dealers like Defendants, including Bank of America, JPMorgan, and Morgan Stanley, among others. None of the dealers would participate

---

[8]     Even if the allegation of threats to Bloomberg were more specific, it strains plausibility. Plaintiffs argue that Defendants' leases of Bloomberg terminals gave them leverage over Bloomberg, Pls. Opp. at 17, and yet Plaintiffs also allege that Bloomberg TOMS was an "essential venue," SAC ¶ 168, to the electronic trading market that "[e]veryone trading corporate bonds electronically, including Defendants, must use," *id.* ¶ 172. Under those circumstances, it is not plausible that Bloomberg would be cowed by a bank's threat to terminate its Bloomberg leases.

with Bonds.com . . ..".[9]  *Id.* ¶ 180.  Bank of America purportedly "indicated that it had interest in

participating on BondsPro, but that it could not do so due to blowback it would suffer from other

Defendants."  *Id.*  It also allegedly stated that it would only participate on Bonds.com if at least

one or two other big dealers also participated.  *Id.*  As a result of the alleged boycott, the SAC

claims that Bonds.com ran out of money in 2013 and was sold in 2014 to a subsidiary of the

London Stock Exchange Group.  *Id.* ¶ 181.

Once again, the SAC is long on vague and conclusory allegations and short on facts.  To

whom did Bank of America indicate an interest in the platform, when, and under what

circumstances?  Although it is true that threatening to punish cartel members who stray can be

evidence of a conspiracy, the Court does not need to credit vague allegations that a single

Defendant, at an unspecified time and under unspecified circumstances, expressed concern about

"blowback" from other unspecified Defendants.

Even if the allegations were more specific, conduct that is readily explained by

Defendants' rational economic self-interest in not wishing "to patronize or invest in enterprises

that could disrupt their business model," does not give rise to an inference of conspiracy.

*Treasuries*, 92 F.4th at 403.  *See also In re Interest Rates Swaps Antitrust Litig.*, 261 F. Supp. 3d

430, 475 (S.D.N.Y. 2017) ("Each Dealer's [alleged] decision to avoid [this] startup platform[],

like the decision by each phone company in *Twombly* not to compete in new markets, is, in and

of itself unremarkable.").  Similarly unhelpful is the allegation that Defendant Bank of America

was willing to participate on BondsPro only if other major banks did also.  It is entirely rational

---

[9]    The Court is not sure how to interpret those two sentences.  Do Plaintiffs intend to allege that Bonds.com sought liquidity from all eleven Defendants?  Or a subset that is "like" the eleven Defendants?  Or, of the Defendants, did it only seek liquidity from Bank of America, JP Morgan and Morgan Stanley?  And what is the antecedent of "none"?  Is it, again, all Defendants?  Or just the three specifically named banks?

that a major dealer would "sit[] tight and wait[] to see if the new platform[] attracted sufficient support to survive." *Id.* at 475 n.23.

These allegations of purported parallel conduct do not give rise to an inference that there was an agreement to boycott all-to-all trading. As in *Twombly*, the SAC pleads examples of "rational and competitive business strategy," 550 U.S. at 554, for any individual Defendant independently to have sought to maintain the status quo and to discourage, not facilitate, all-to-all trading platforms from taking root. There is nothing in the SAC that intimates that "resisting the upstarts was anything more than the natural, unilateral reaction of each [Defendant]." *Id.* at 546–47.

The SAC's theory is that such platforms presented an existential threat to Defendants' profit margins. While the Court may see that characterization as somewhat hyperbolic, accepting the kernel that electronic platforms offering all-to-all trading would dent Defendants' profits, each Defendant had good reason independently to discourage and not to encourage the development of such platforms. "Common economic experience, and the facts alleged in the complaint itself, thus show that independent self-interest is an obvious alternative explanation for defendants' common behavior." *In re Interest Rates Swaps Antitrust Litig.*, 261 F. Supp. 3d at 464 (cleaned up); *Twombly*, 550 U.S. at 547, 568 (no inference of conspiracy where each defendant "liked the world the way it was" and was "sitting tight, expecting [its] neighbors to do the same thing"). The plaintiffs in *Treasuries* alleged similar boycott claims regarding electronic trading platforms offering all-to-all trading. The Circuit was not moved: "it is unremarkable that a group of the world's largest banks, which have well-established, profitable operations in the secondary Treasury market, would independently forgo supporting -- and decide to not nurture --

a pair of fledgling startups." *Treasuries*, 92 F.4th at 412–13.  Even accepting as true the SAC's

claims that Defendants all refused to do business with new platforms that threatened their profits,

that does not give rise to the inference that they did so as the result of a conspiratorial agreement.

### b. Alleged Catch-and-Kill Operations

The SAC alleges that Defendants made parallel investments in three trading platforms,

Trading Edge, TradeWeb, and BondDesk, to prevent them from offering all-to-all trading of odd

lots.  Once again, the allegations are inadequate to give rise to an inference that the Defendants

acted based on a conspiratorial agreement.

### i. Trading Edge

Trading Edge was an electronic trading platform that allowed anonymous matching of

bond trades, intended to decrease bid-offer spreads.  SAC ¶ 204.  According to Plaintiffs, around

the turn of this century, when many bond trading platforms crashed and burned, Trading Edge

had some success.  *Id.* ¶¶ 203-04.  In 2001, MarketAxess, a platform that had been founded by

JPMorgan and others, acquired Trading Edge.  *Id.* ¶ 205.  At the time of the acquisition,

MarketAxess stated that it would integrate Trading Edge's anonymous trading capability into its

then-current platform; within seven months of acquiring Trading Edge, MarketAxess "decided to

terminate [Trading Edge's] anonymous convertible and municipal bond trading platforms."  *Id.*

¶¶ 205–206.

Catch-and-kill is a catchy phrase, but there are simply no factual allegations in the SAC

to support the inference that anything nefarious happened vis-à-vis Trading Edge.  The only

connection to any Defendant is that MarketAxess was founded by, among others, JPMorgan.  *Id.*

¶ 205.  There are no allegations that JPMorgan or any other Defendant had any influence on

MarketAxess's business decision to terminate anonymous trading of corporate bonds on its platform.  Moreover, the SAC itself, quoting an unidentified analyst, provides a ready explanation for MarketAxess's decision: Trading Edge's model could have "threatened MarketAxess's business model."  *Id.* ¶ 206.[10]

### ii.    TradeWeb

The second purported example of Defendants engaging in a concerted "catch and kill" operation revolves around TradeWeb.  TradeWeb was founded in 1996 with funding from a few Defendants or Defendants' predecessors.  *Id.* ¶ 154.[11]  Relying on news reports from the time, Plaintiffs speculate that those Defendants invested in TradeWeb "out of fear that emerging electronic platforms would decrease their market power in corporate bonds."  *Id.* ¶ 155.  The SAC cites various news articles, which described TradeWeb as "the textbook case on the politics of multi-bank consortia" and that "TradeWeb is only as independent as the seven banks[12] [that own it] want it to be."  *Id.* ¶ 156.

In 2004, Thomson Reuters purchased TradeWeb with a commitment from certain Defendants to a four-year contract pursuant to which the founding investment banks would steer liquidity to TradeWeb.  *Id.* ¶¶ 158–59.  When that contract ended in 2008, TradeWeb entered into a joint ownership structure that gave a minority ownership stake in the platform to a group

---

[10]    It is also worth noting that this allegation pre-dates the class period in 2006.  *See Treasuries*, 92 F.4th at 405 (rejecting "stale" allegations that pre-dated the class period).

[11]    Initial funding came from Credit Suisse, Lehman Brothers (later acquired by Barclays), Salomon Smith Barney (later acquired by Citigroup) and Goldman Sachs.

[12]    The banks were Deutsche, Goldman Sachs, Merrill Lynch (now owned by Bank of America), Morgan Stanley, Salomon Smith Barney (now owned by Citigroup), Credit Suisse, and Lehman Brothers (now owned by Barclays).  SAC ¶ 156.

of banks comprised of some, but not all, Defendants. *Id.* ¶ 160. The SAC alleges that Defendants placed senior executives on TradeWeb's Board of Directors[13] and had the ability to use TradeWeb as a "stalking horse" to catch and kill emerging platforms that threatened to offer better pricing transparency to odd lot investors. *Id.* ¶¶ 161, 163.

These allegations are inadequate to give rise to an inference of concerted activity. First, the SAC never alleges that TradeWeb ever planned to offer all-to-all trading of corporate bonds or that Defendants, individually or jointly, prevented the platform from doing so. *See In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d at 466 (rejecting the same allegation about TradeWeb because the plaintiffs never alleged that TradeWeb intended to introduce all-to-all trading); *Treasuries*, 92 F.4th at 411 n.14 (citation omitted) (Second Circuit rejected similar "nefarious" allegations about TradeWeb's acquisitions of other platforms, as the plaintiffs did not show that "defendants were not merely acting pursuant to their 'independent self-interest' in maintaining a market structure that was beneficial to each of them"). At most, the SAC alleges that TradeWeb offered an "electronic trading platform [that] was well-suited for trading corporate bonds." SAC ¶ 155. What it does not allege is facts from which the Court can plausibly infer that Defendants, acting collectively, prevented TradeWeb from entering the corporate bonds market or from implementing electronic ordering systems. Indeed, the Court cannot infer that because, as the SAC fully acknowledges, TradeWeb accomplished both;

---

[13] The SAC is not clear how much control Defendants had collectively. It alleges that "[i]n 2010, Defendants and other primary dealers collectively held 16 of the 26 seats on the TradeWeb Board of Directors." *Id.* ¶ 161. It then lists 14 individuals who were, at some undisclosed point, on the Board of Directors of TradeWeb and who were also employed, at some time, by one of the Defendants. *Id.* ¶ 162. It is unclear whether those 14 are part of the 16 directors referenced in paragraph 161, and it is unclear what percentage of the 16 board seats were held by an employee of a Defendant as opposed to an employee of an "other primary dealer."

TradeWeb Direct facilitates one in seven corporate bond trades (14 percent of the market) today. *Id.* ¶¶ 195, 201.

Central to Plaintiffs' boycott theory is the claim that Defendants thwarted the emergence of trading platforms that offer all-to-all electronic trading of odd lots of corporate bonds. *Id.* ¶ 2. Plaintiffs conceded, however, in their first Amended Complaint that three of the electronic trading platforms that Defendants support, MarketAxess, TradeWeb, and Bloomberg, represent 97 percent of the market in electronic trading of corporate bonds and that these three services "allow investor-to-investor direct trading (without intermediary dealers), and increase pre-trade pricing transparency" and allow institutional investors to trade in odd lot transactions.  Am. Compl. ¶¶ 195, 198–99, Dkt. 128.  When Plaintiffs filed the SAC, they removed any references to the fact that Defendants supported services that allow all-to-all trading.  *See Treasuries*, 92 F.4th at 403 (finding that some of the plaintiffs' allegations "do not fit [their] conspiracy theory – that the Boycott Defendants sought to prevent the widespread emergence of all-to-all trading"). Although Plaintiffs omitted these inconvenient facts, the Court can still consider them.  *Colliton* v. *Cravath, Swaine & Moore LLP*, No. 08-CV-400, 2008 WL 4386764, at *6 (S.D.N.Y. 2008), *aff'd*, 356 F. App'x 535 (2d Cir. 2009) (citation omitted) (Where a "plaintiff blatantly changes his statement of the facts in order to respond to the defendant['s] motion to dismiss . . . [and] directly contradicts the facts set forth in his original complaint," a court is authorized "to accept the facts described in the original complaint as true.").

The fact that Defendants made parallel investments in various electronic platforms does not support an inference of an unlawful conspiracy.  The SAC itself quoted an article in *Euromoney* that explained a non-conspiratorial, logical explanation for Defendants' investments:

24

"[h]aving a stake in BondBook or MarketAxess is a way of replacing money which [banks] made on market-making but which will be lost once [bond trading] goes electronic."  SAC ¶ 157.

### iii.    BondDesk

The third alleged "catch and kill" operation involves BondDesk.  The SAC alleges that Defendants used their ownership stake in TradeWeb[14] to acquire another electronic platform, BondDesk, in order to eliminate features of BondDesk that would have introduced pre-trade pricing transparency to odd lot investors.  *Id.* ¶¶ 182–85, 192–97, 200–01.

BondDesk was independently owned from 1999 to 2013 except for a brief period from 2004 to 2006 when a few Defendants held an ownership interest.[15]  *Id.* ¶¶ 182–84, 192, 196–98.  In 2004, certain Defendants secured six of the 11 seats on the BondDesk Board of Directors.[16]  *Id.* ¶ 184.  Plaintiffs allege that Defendants conspired to use their control of the Board to remove BondDesk's existing management, which was supportive of odd lot investors.  *Id.* ¶¶ 185–86, 191.  Management was deposed in 2004 purportedly based on invented concerns about management's accounting treatment of stock options.  *Id.* ¶¶ 187–191.  In 2006, a private equity firm, Advent International Corporation, purchased a majority stake in BondDesk.  *Id.* ¶ 192.  In 2013, TradeWeb acquired BondDesk and renamed it TradeWeb Direct.[17]  *Id.* ¶¶ 198, 200.

---

[14]    Despite the wording of the SAC, there is no allegation that all of the Defendants had an ownership position in TradeWeb.

[15]    Goldman Sachs, Bank of America, JPMorgan, and Wells Fargo had some ownership interest at that time. The other Defendants apparently did not.

[16]    That statistic may be misleading as three of the seats were occupied by individuals employed by companies that, while later acquired by a named Defendant (i.e., AG Edwards, Bear Stearns, and First Union), are themselves not alleged to have been part of the conspiracy.  *Id.* ¶ 184.

[17]    At the time of the acquisition, TradeWeb was owned in part by Bank of America Merrill Lynch, Barclays, Citibank, JPMorgan, and Morgan Stanley.  *Id.* ¶ 198.  Prior to the acquisition and at the time BondDesk was making favorable statements about price transparency for retail investors, it and TradeWest Systems, which was a division of MarketAxess, were partners.  *Id.* ¶ 195.  The exact ownership structure of MarketAxess is not alleged in the SAC.

Plaintiffs' allegations center around statements BondDesk made prior to being acquired by TradeWeb in which it "[r]ecogniz[ed] the need for improved price transparency" and that it sought to bring "quality prices" and make "fixed income markets more transparent and accessible to retail investors." *Id.* ¶¶ 196–97. After TradeWeb acquired BondDesk, none of BondDesk's former statements about improving pre-trade transparency came to fruition. *Id.* ¶ 200.

The BondDesk allegations fail for the same reasons that the Trading Edge and TradeWeb allegations fail. The SAC has no non-conclusory allegations that Defendants, collectively or individually, were involved with TradeWeb's decisions not to implement plans BondDesk had discussed prior to being acquired by TradeWeb. The SAC concedes that BondDesk has been successful since TradeWeb acquired it. As noted above, TradeWeb Direct currently facilitates 14 percent of all corporate bond trades. *Id.* ¶ 201. The fact that TradeWeb Direct does not function as Plaintiffs want it to and did not implement BondDesk's previously-stated goals of increasing transparency for retail investors is not evidence of a conspiracy. *See Treasuries*, 92 F.4th at 410 (holding that the operation of a particular trading platform that was "in line with a wide swatch of rational and competitive business strategy" does not suggest a conspiratorial agreement).

### c.    Alleged Punishment of Dealers and Traders

As further purported evidence of a conspiratorial agreement, Plaintiffs allege that Defendants threatened and pressured dealers and traders who threatened their supracompetitive

---

The SAC does allege, however, that MarketAxess was founded by JPMorgan, *id.* ¶ 146; that, as of 2000, Credit Suisse and Lehman Brothers (now Barclays) were investors, *id.* ¶ 156; and that, as of 2011, a subsidiary of JPMorgan owned a 17.5 percent stake, *id.* ¶ 205.

profits.  These threats include: Salomon Smith Barney purportedly refusing to trade with certain InterVest Traders in the 1990s who were deemed "disruptive" of the market, SAC ¶ 148; Bank of America purportedly stating in 2012 or 2013 that it would participate on Bonds.com only if other major dealers participated due to the "blowback" it would otherwise suffer, *id.* ¶ 180; and sometime between 2016 and 2018, Morgan Stanley and Citibank allegedly threatening to "blackball" First Tennessee, a regional bank that offered narrower spreads for corporate bond transactions, *id.* ¶ 149–50.

Putting aside the vagueness of each of those allegations,[18] they span almost thirty years, and the SAC has not pled sufficient intervening facts to tie the alleged threats together.  *See In re Treasury Secs. Auction Antitrust Litig.*, No. 15-MD-2673, 2021 WL 1226670, at *20 (S.D.N.Y. Mar. 31, 2021).  The Court cannot plausibly infer from three isolated incidents involving different subsets of Defendants that they occurred as part of a boycott conspiracy.  The Salomon Smith Barney incident occurred well before the class period.[19]  Second, the Court cannot plausibly infer that Bank of America's concern about "blowback" if it participated on Bonds.com reflected a collective agreement with other Defendants rather that reflecting an isolated concern of a single Defendant.  Moreover, it is completely rational for an institution the size of Bank of

---

[18]    The allegations cry out for basic underlying facts: Who at Salomon Smith Barney refused to trade with whom at InterVest?  For how long?  How did InterVest know that it was being snubbed by Salomon Smith Barney because of "disruptive" trading?  Who at Bank of America said it would trade on Bonds.com only if other large banks did also?  To whom was that said and under what circumstances (e.g., was it based on a proposed business model or an actually functioning platform)?  Who at Morgan Stanley and Citibank threatened First Tennessee?  To whom were the threats made?  What is the basis for alleging the threats were connected to First Tennessee's spreads on trades with BlackRock?

[19]    It is also notable that there is no allegation that Salomon Smith Barney was a member of the alleged conspiracy prior to being acquired by Citigroup, beyond the vague allegation that, as used in the SAC, Citigroup "includes all of Citigroup's predecessors, subsidiaries, or affiliates that played a material role in the unlawful acts alleged herein."  *Id.* ¶ 32.

America not to want to participate on a particular platform if no other major institutions was also participating. Third, the allegation that Morgan Stanley and Citibank threatened and punished First Tennessee purportedly for offering narrower spreads to BlackRock is not connected in any way to Plaintiffs' theory that Defendants conspired to boycott electronic trading platforms.[20]

In short, these allegations amount to isolated conduct by three of the eleven Defendants that does not give rise to a plausible inference of parallel conduct indicative of a wide-ranging conspiracy to boycott electronic trading platforms for corporate bonds.

## 2. Plus Factors

The Second Circuit has held that allegations of parallel conduct are a necessary but not sufficient basis for pleading a Section 1 claim based on circumstantial evidence. *See Treasuries*, 92 F.4th at 401 ("Because Plaintiffs fail to allege parallel conduct with respect to the alleged . . . conspiracy, they cannot demonstrate an agreement to conspire based on indirect evidence irrespective of their plus factors."); *In re Treasury Sec. Auction Antitrust Litig.*, 2021 WL 1226670, at *19 (citations omitted) ("Absent any actual parallel conduct, [allegations of plus factors] do not suffice to plead an antitrust conspiracy."). Because Plaintiffs' failure to plead unlawful parallel conduct is fatal to their claims under Section 1, the Court need not consider whether they have adequately alleged plus factors. But, even if the SAC had adequately alleged parallel conduct, the plus factors alleged would be inadequate to state a Section 1 claim.

---

[20]    Even if the allegation were directly tied to the use of electronic platforms, the Court could not plausibly infer from it that either bank was acting on behalf of a conspiracy. The SAC alleges that BlackRock turned to First Tennessee, Piper Jaffrey and McDonald & Co. for its odd lot trading needs because they offered lower spreads. *Id.* ¶ 149. But it alleges that Morgan Stanley and Citibank only took or threatened to take retaliatory actions against First Tennessee. *Id.* The SAC offers no reason, and the Court cannot intuit a rational reason, why, if this were part of a conspiracy to punish dealers and traders who strayed from the boycott, those Defendants would not also have threatened Piper Jaffrey and McDonald & Co.

Plaintiffs argue that they have adequately alleged multiple plus factors.  Pls. Opp. at 26.

According to Plaintiffs, the SAC alleges conduct '"that would plausibly contravene each

defendant's self-interest in the absence of similar behavior by rivals."'  *Id.* (citing *In re Elec.*

*Books Antitrust Litig.*, 859 F. Supp. 2d 671, 682 (S.D.N.Y. 2012)).  Plaintiffs assert that

Defendants' "catch-and-kill" behavior makes no economic sense but for a conspiracy.

Defendants have used their control over TradeWeb and MarketAxess to prevent the platforms

from providing pre-trade pricing transparency and access to retail investors, which would allow

the platforms to grow their volume and increase profits.  Plaintiffs also assert that Defendants'

refusal to do business with platforms seeking to attract liquidity contravenes each Defendant's

self-interest, as it would be more sensible for Defendants to compete for market share.  Absent a

conspiracy, Plaintiffs argue that it would go against each Defendant's self-interest to make

threats and refuse to trade with smaller regional banks, such as First Tennessee, unless

Defendants had a pre-existing agreement to withhold business.

*Treasuries* addressed squarely the argument that Defendants acted against their individual

self-interests by refusing to participate on platforms that offered all-to-all odd lot trading.  The

Circuit held that there was a ready explanation for the defendants' "supposed failure to patronize

or invest in enterprises that could disrupt their business model."  92 F.4th at 403.  Moreover, the

first Amended Complaint alleged that three of the platforms that Defendants support in fact offer

all-to-all-trading.  Am. Compl. ¶ 198.  Plaintiffs asserted that Defendants invested in platforms

and then stifled their potential growth, and yet the SAC also alleges that TradeWeb Direct has

been one of the most successful electronic trading platforms.  SAC ¶ 201.  Plaintiffs also point to

the threats that Morgan Stanley and Citibank made to limit their business with First Tennessee

29

and Bank of America's concern about "blowback."  But those sorts of allegations were also

addressed in *Treasuries*.  The Second Circuit opined that such "threats, warnings, intimidation or

pressure from one or more of the Boycott Defendants reflect economically rational self-interest."

92 F.4th at 403.

      Plaintiffs also maintain that Defendants' failure to engage in price competition goes

against each Defendant's unilateral self-interest.  Plaintiffs contend that the SAC provides ample

statistical evidence of Defendants' supracompetitive odd lot pricing; Plaintiffs argue that the

statistical evidence cannot be explained by legitimate economic forces.  They assert that

statistically significant differences between actual and competitive prices constitute a plus factor

of "actions or conduct that could occur in the presence of a collusive agreement but that are

highly unlikely to occur in its absence."  SAC ¶¶ 209, 211.  In a competitive market, each

Defendant would compete on price, reducing odd lot spreads to match the already profitable

round-lot spreads in order to capture a larger market share, more trading volume, and more

profit.  *Id.* ¶ 218.

      Plaintiffs' allegations regarding pricing disparities between odd and round lots do not

support the existence of a boycott conspiracy.  Plaintiffs' statistical allegations purport to show

that: Defendants charged on average wider spreads for odd lots than for round-lots; Defendants

obtained lower execution prices for customer-initiated sales of odd lots than for round lots; and

Defendants charged Plaintiffs higher transaction costs for odd lot trades.  SAC ¶¶ 114–41.  First,

Plaintiffs admitted that their pricing statistics are "not specific to Defendants" but, instead, rely

on "averages."  Pls. Opp. at 22.  Statistics that do not focus on Defendants specifically are

"fundamentally flawed."  *Treasuries*, 92 F.4th at 399.  Second, the SAC's allegations that

Defendants increased their profits on odd lot trades by thwarting the development of all-to-all

trading platforms, SAC ¶¶ 201, 220, is consistent with each individual Defendant's "legitimate

business interest[] to maintain a profitable and reliable market structure." *Treasuries*, 92 F.4th at

390.

Plaintiffs' argument that no other economic factors can account for the disparity in

pricing between odd lots and round lots is belied by other allegations in the SAC.   For example,

one economic factor that contributes to the disparity has to do with per-trade costs.  According to

Plaintiffs, Defendants' per-trade fixed costs are "the same whether the Defendants are dealing in

[smaller] odd-lots or [larger] round lots of corporate bonds."  SAC ¶ 212.  When Defendants

trade in larger round lots, they are able to spread per-trade fixed costs over a larger number of

bonds, which results in lower per-bond costs and spreads for round-lots than for smaller odd lots.

Additionally, retail investors are "more likely" to trade in smaller odd lots compared to

institutional investors; institutional investors are "sophisticated investors" that are "likely to

receive better pricing than retail customers" because they have better access to information.  *Id.*

¶¶ 106, 138.

Plaintiffs also argue that the concentration of the secondary corporate bond market[21] and

Defendants' collective market power, frequent high-level interfirm communications, and a

common motive to conspire constitute plus factors.  Pls. Opp. at 31.  These factors fare no better.

---

[21]    The SAC alleges only the Defendants' market shares in the underwriting market, not the secondary market. *See id.* ¶ 63.  Using shares of the underwriting market in 2018 as the test, the underwriting market does not appear to be particularly concentrated.  Using the market shares as alleged by Plaintiffs, the Herfindahl-Hirschman Index is 541.09, well below what the Department of Justice would consider to be a moderately concentrated market.  *See* DEP'T OF JUST., *Herfindahl-Hirschman Index* (2024), https://www.justice.gov/atr/herfindahl-hirschman-index.

The SAC alleges that, since 2014, Defendants have been among the top firms by market share in the U.S. corporate bond underwriting market, controlling 65 percent or more of that market; the SAC is silent relative to Defendants' market share in the secondary market. SAC ¶ 63. Plaintiffs assert, *ipse dixit*, that Defendants' collective market share in the underwriting market for U.S. corporate bonds gives them power to control the supply of bonds in the secondary market. *Id.* ¶ 64. Because bonds from the same issue are fungible, *id.* ¶ 5, dealers can purchase round lots of bonds and convert them into odd lots to sell. Thus, even accepting as true that Defendants' market share of the underwriting market means they also have the power to control the supply of bonds to the secondary market, it does not follow that Defendants have the power to control pricing of the bonds in the secondary market.

Plaintiffs argue that Defendants' conspiracy is facilitated by "frequent high-level interfirm communications," pointing out that some Defendants had senior executives on TradeWeb's Board of Directors, and noting that the Board had weekly conference calls, providing "cover" for interfirm communications. *Id.* ¶ 224. Putting aside the fact that the SAC allegations are ambiguous about how long there was simultaneous representation of Defendants on TradeWeb's board,[22] the allegation that the TradeWeb Board provided "cover" for Defendants to conspire is entirely conclusory. A "mere showing of close relations or frequent meetings between the alleged conspirators . . . will not sustain a plaintiff's burden absent

---

[22]    The SAC alleges that "Defendants and other primary dealers" held 16 of 26 board seats in 2010. SAC ¶ 161. It then has a list of various executives who served on the TradeWeb board, but it does not allege the dates of anyone's service, making it impossible to tell when, if ever, multiple Defendants overlapped on the Board. Finally, Defendant Wells Fargo never seems to have had an executive on the Board. *Id.* ¶ 162.

evidence which would permit the inference that these close ties led to an illegal agreement."

*H.L. Moore Drug Exch. v. Eli Lilly & Co.*, 662 F.2d 935, 941 (2d Cir. 1981) (citation omitted).

Finally, Plaintiffs allege that Defendants share a "common motive to conspire to charge

wider spreads to odd-lot bond investors" to secure "supracompetitive profits."  SAC ¶ 220.  This

one-paragraph allegation is speculative.  Moreover, allegations of a profit motive are not

sufficient to raise an inference of conspiracy as it is "nearly always the case" that "each

incumbent business has an incentive to exclude a newcomer in order to protect its own market

share."  *Tera Grp., Inc. v. Citgroup, Inc.*, No. 24-CV-135, 2024 WL 4501967, at *3 (2d Cir. Oct.

16, 2024).

In short, Plaintiffs have not adequately alleged plus factors that would support the

plausibility of the alleged boycott conspiracy.

### B.  Group Pleading

Defendants contend that the SAC impermissibly relies on group pleading that fails to

tie each individual Defendant to the boycott conspiracy.  Although a complaint that alleges an

antitrust conspiracy can reference the defendants as a group, the allegations "must separately

identify how each particular defendant contributed to the alleged conspiracy."  *Treasuries*, 92

F.4th at 407 n.12.  *See also In re Interest Rates Swaps Antitrust Litig.*, No. 16-MC-2704, 2017

WL 2332069, at *17 (S.D.N.Y. May 23, 2018) (dismissing claims that did not adequately plead a

Sherman Act conspiracy because "[the defendants'] parallel actions, motivations, perspectives,

and intentions are largely pled generically and in undifferentiated fashion . . . [without]

specifying a particular defendant or defendants"); *In re Mexican Gov't Bonds Antitrust Litig.*,

412 F. Supp. 3d 380, 389 (S.D.N.Y. 2019) (citation omitted) (concluding that Plaintiffs "have

not alleged anything that would plausibly suggest that the *particular* defendants named in this suit were part of [the] conspiracy").  Although Federal Rule of Civil Procedure 8 "does not demand that a complaint be a model of clarity or exhaustively present the facts alleged, it requires, at a minimum, that a complaint give each defendant 'fair notice of what the plaintiff's claim is and the ground upon which it rests.'"  *TheECheck.com, LLC v. NEMC Fin. Servs. Grp. Inc.*, No. 16-CV-8722, 2017 WL 2627912, at *2 (S.D.N.Y. June 16, 2017) (citing *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001)).  A complaint fails to give fair notice when it "lump[s] all the defendants together in each claim and provid[es] no factual basis to distinguish their conduct[.]"  *Id.*

As has been noted in Part II.A., *supra*, the SAC does not allege facts that are individualized to each Defendant.  Instead, the SAC relies on vague allegations that refer to Defendants collectively as a group; the SAC is largely devoid of allegations about the individual Defendants.  For example, the SAC alleges "Defendants have colluded to prevent the electronic platforms from offering all-to-all trading," SAC ¶ 142; "Defendants refused to transact business with any market participant that threatened the operation of their conspiracy," *id.* ¶ 148; and "Defendants' efforts to discipline and punish those who threaten to narrow odd-lot spreads continue to this day," *id.* ¶ 149.  Allegations like these that are "mostly generic and undifferentiated, and categorize the alleged wrongdoers as a group" do not state an antitrust claim.  *See Treasuries*, 92 F.4th at 408.

Plaintiffs point to paragraphs 148–150 for individualized allegations of Defendants allegedly policing the conspiracy and of a Defendant expressing fear of retaliation if it supported an emerging platform and point to many other paragraphs for allegations that all Defendants

engaged in supracompetitive pricing.  Pls. Opp. at 17.  As to the former, the cited paragraphs

include vague allegations that: (1) at some unspecified time in the mid-1990s, traders at Salomon

Smith Barney refused to do business with "disruptive" traders and no other Defendant stepped in

to do business with the shunned traders, SAC ¶ 148; and (2) Morgan Stanley twice and Citibank

once threatened to retaliate against First Tennessee for trading with BlackRock at "narrower

spreads" *id.* ¶¶ 149–50.  No other alleged conspirator is discussed in those paragraphs.  As to the

latter, allegations regarding average spreads by trade size do not constitute individualized factual

allegations that would allow the Court plausibly to infer that each Defendant engaged in the

alleged conspiracy.  In the few instances in which the SAC does refer to individual Defendants, it

does so by identifying Defendants that invested in particular trading platforms.  *See id.* ¶¶ 154,

183, 198.  More specifically, the SAC names: nine Defendants that invested in TradeWeb along

with other individuals who served on TradeWeb's board, *id.* ¶¶ 154, 156; four Defendants with

representatives on the BondDesk board, *id.* ¶ 184; and three Defendants that invested in

MarketAxess, *id.* ¶¶ 146, 156, 205.  These allegations allow the Court to infer that individual

Defendants made investments in trading platforms; they do not allow the Court to infer that the

individual Defendants conspired to boycott other platforms.  The only other allegation that

mentions an individual Defendant (Bank of America feared "blowback" if it participated on

Bonds.com and did not want to participate unless at least one other large bank also participated,

*id.* ¶ 180) does not allow the Court to infer that the mentioned Defendant agreed to participate in

a boycott.

        In sum, the SAC fails to "separately identify how each particular defendant contributed to

the alleged [boycott] conspiracy."  *Treasuries*, 92 F.4th at 407 n.12.

### C.  Plaintiffs' Claim is Time-Barred

Defendants argue that Plaintiffs' claim is time-barred by the Sherman Act's four-year statute of limitations.  15 U.S.C. § 15b.  Plaintiffs contend that their claims are timely, arguing that they were injured "each time they transacted in odd lots of bonds at artificial spreads."  Pls. Opp. at 33.  Further, they contend that this was a continuing violation and that Defendants concealed the conspiracy.

Claims under Section 1 of the Sherman Act are subject to a four-year statute of limitations that begins to run "when a defendant commits an act that injures a plaintiff's business."  *Zenith Radio Corp.* v. *Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971); *see* 15 U.S.C. § 15b.  "Thus, if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to [the plaintiff] to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date."  *Zenith Radio Corp.*, 401 U.S. at 339.  If the defendant engages in a continuing violation, each new overt act that is part of the violation restarts the period of limitations but does not permit the plaintiff to recover for injuries caused by acts that occurred before that limitations period.  *Klehr* v. *A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (internal citation omitted).

#### 1.  Continuing Violation Doctrine

Plaintiffs filed their complaint on April 21, 2020; Defendants argue that because the SAC does not allege any overt act committed in furtherance of the alleged conspiracy after April 21, 2016, Plaintiffs' claim is time-barred.  Defs. Mem. at 34.  Plaintiffs argue that the continuing violation doctrine applies, and that it is "the date of plaintiffs' injury, not the date of Defendants'

conduct, that matters here." Pls. Opp. at 33 (citing *In re Credit Default Swaps Antitrust Litig.*, No. 13-MD-2476, 2014 WL 4379112, at *15 (S.D.N.Y. Sep. 4, 2014)).

Antitrust law provides that, "in the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' *e.g.*, each sale to the plaintiff, 'starts the statutory period running again.'" *Klehr*, 521 U.S. at 189 (citations omitted). In *US Airways v. Sabre Holdings Corp.*, the Second Circuit held that each inflated payment under a 2006 contract "was not an overt act of its own, but a manifestation of the prior overt act of entering into the 2006 contract." 938 F.3d at 69.

Applying *US Airways* here, each new trade Plaintiffs made within the limitations period was not an "overt act" in furtherance of the alleged conspiracy. Such trades may constitute injury arising from the alleged boycott conspiracy that predated April 21, 2016, but they are not overt acts in furtherance of the conspiracy. *See, e.g.*, *United States v. Grimm*, 738 F.3d 498, 503–04 (2d Cir. 2013) ("when [an] anticipated economic benefit continues" after conspiratorial conduct, the later payment of supracompetitive prices is "the *result* of a completed conspiracy," and "not in furtherance of one that is ongoing").

Plaintiffs contend that the SAC alleges that Morgan Stanley and Citibank "threatened to punish" First Tennessee at some unspecified time between 2015 to 2019 for offering narrower spreads for odd lot bond trades. SAC ¶¶ 149–50. Because Plaintiffs rely on a multi-year time period, the Court has no way of knowing whether any of the alleged threats to punish First Tennessee occurred after April 2016. Nor did Plaintiffs plead with specificity what those particular Defendants actually did. This allegation, more importantly, is not connected to

Plaintiffs' theory that Defendants conspired to boycott electronic trading platforms.  Even if Plaintiffs had more specifically alleged what either Defendant did vis-à-vis First Tennessee and that its conduct occurred after April 2016, this isolated incident is not enough to extend the entire conspiracy into the limitations period.  *See Klehr*, 521 U.S. at 181, 189 (holding "each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again," and that "the plaintiff cannot use an independent, new act as a bootstrap to recover for injuries caused by other predicate acts that took place outside the limitations period").  Additionally, Plaintiffs do not plead that they ever purchased bonds from First Tennessee or any other regional bank or explain how Defendant's "threat[s] to punish" First Tennessee caused them harm.

In short, Plaintiffs' allegations regarding threats by Citibank and Morgan Stanley do not adequately allege overt acts of the conspiracy within the statute of limitations.

### 2.  Fraudulent Concealment

The Sherman Act's four-year statute of limitations can be equitably tolled in "rare and exceptional circumstances," such as when "the plaintiff can demonstrate fraudulent concealment."  *Phhhoto Inc. v. Meta Platforms, Inc.*, 123 F.4th 592, 603 (2d Cir. 2024) (cleaned up).  To allege fraudulent concealment, the plaintiff must allege: "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part."  *Id.* (citations omitted).  Further, "[t]he plaintiff must plead the fraudulent concealment with particularity, in accordance with Federal Rule of Civil Procedure 9(b)."  *Id.* (citation omitted).  A plaintiff may

prove the concealment element by showing "either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

Plaintiffs allege that Defendants' concealment was both affirmative and "inherently self-concealing." Pls. Opp. at 37. As to active concealment, Plaintiffs allege that Defendants used secret calls and meetings "to coordinate their strategy for controlling the corporate bonds market" and took active steps to conceal evidence of their misconduct. SAC ¶¶ 224, 258–60. The SAC also alleges that Defendants' codes of conduct misrepresented that their conduct was above board. *Id.* ¶ 260. Plaintiffs assert that the boycott conspiracy was self-concealing, and that Defendants imposed odd lot pricing opacity upon the market and took actions to thwart all-to-all trading. Pls. Opp. at 37. Plaintiffs finally argue that although Defendants' ownership stakes in platforms like TradeWeb were public, the fact that Defendants used TradeWeb and MarketAxess to "catch and kill" potential new platforms was "inherently self-concealing." *Id.* at 38.

The allegations in the SAC are far too conclusory to support a finding that Defendants concealed the alleged conspiracy, either actively or otherwise. Plaintiffs argue that Defendants communicated with each other about the conspiracy in secret. Alleging that Defendants had non-public communications that were not disclosed is not sufficient to plead concealment, nor is such an allegation pled with particularity in accordance with the heightened pleading standards of Rule 9(b). Plaintiffs' allegation that Defendants promulgated corporate codes of conduct that disclaimed anticompetitive conduct "are not sufficient to invoke fraudulent concealment,"

because "communications to the community at large will not generally support a finding of fraudulent concealment." *In re Merrill, BofA, & Morgan Stanley Spoofing Litig.*, No. 19-CV-6002, 2021 WL 827190, at *11 (S.D.N.Y. Mar. 4, 2021). "[G]eneral statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'" *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014). *See also Singh v. Cigna Corp.*, 918 F.3d 57, 60 (2d Cir. 2019) (holding that statements in defendant's Code of Ethics "are a textbook example of puffery"). Further, the codes of conduct cited in the SAC were published in 2020 and did not cover the limitations period that Plaintiffs seek to toll. SAC ¶ 260.

Plaintiffs' claim that "the unlawful activity alleged [in the SAC] was self-concealing," *Id.* ¶ 257, is not pled "with sufficient particularity." *See Butala v. Agashiwala*, 916 F. Supp. 314, 320 (S.D.N.Y. 1996). Plaintiffs fail adequately to plead the second prong of fraudulent concealment with particularity because the SAC does not specify when Plaintiffs became aware of the violations. S*ee Hinds Cty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 520 (S.D.N.Y. 2009) ("The [complaint] does not specify when any Named Plaintiffs or Class members became aware of the antitrust violations, and therefore does not state with particularity the circumstances constituting fraud or mistake." (internal quotation marks and citation omitted)). Defendants' ownership stakes in the various platforms referenced in the SAC were publicly known, and the visible nature of those trading platforms and Defendants' ownership interests were not "self-concealed." *In re Interest Rates Swaps Antitrust Litig.*, 261 F. Supp. 3d at 488. Plaintiffs derive many of their allegations from articles, press reports, and data that were

available as early as 2000. *See* SAC ¶¶ 14, 81, 85, 155–57, 199. Those articles demonstrate that Plaintiffs also cannot meet the first element of a fraudulent concealment claim, and, even if they could, that information put Plaintiffs on inquiry notice of the conspiracy.

Nor have Plaintiffs plausibly alleged a single action they took to investigate their claim or facts from which the Court could infer that they exercised due diligence. The SAC alleges that Defendants' concealing conduct "prevented Plaintiffs from discovering earlier that they were injured by Defendants' conspiracy, despite the exercise of reasonable due diligence." *Id.* ¶ 256. That is plainly inadequate. General assertions of due diligence without more specific allegations of what diligent actions the plaintiffs took do not satisfy the pleading standard. *Masters v. Wilhelmina Model Agency, Inc.*, No. 02-CV-4911, 2003 WL 1990262, at *2 (S.D.N.Y. Apr. 29, 2003). *See also Hinds Cty., Miss.*, 620 F. Supp. 2d at 521 (quoting *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998)).

Accordingly, even if Plaintiffs' Section 1 claim were adequately pled, it would be time-barred.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the SAC is GRANTED.

Although leave to amend should generally be "freely give[n]," Fed. R. Civ. P. 15(a)(2), "leave to amend a complaint may be denied when amendment would be futile." *Tocker v. Philip Morris Cos., Inc.*, 470 F.3d 481, 491 (2d Cir. 2006) (citation omitted). Plaintiffs have already amended the Complaint twice, and any further amendment would be futile. Despite several opportunities to amend, Plaintiffs are still asserting the same disparate allegations without

pleading facts sufficient from which the Court can infer a conspiracy.  For those reasons, leave to amend is denied.

The Clerk of Court is respectfully directed to terminate the open motion at docket entry 203 and close the case.

**SO ORDERED.**

Date:  **September 2, 2025**
       **New York, New York**

                               **VALERIE CAPRONI**
                          **United States District Judge**